```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3                            -   -   -

 4    EDWARDS LIFESCIENCES AG and    :      Civil Action
      EDWARDS LIFESCIENCES LLC,      :
 5                                   :
                 Plaintiffs,         :
 6                                   :
           v.                        :
 7                                   :
      COREVALVE, INC.,               :
 8                                   :
                 Defendant.          :      No. 08-91(GMS)
 9
                              -   -   -
10
                         Wilmington, Delaware
11                    Wednesday, March 31, 2010
                            9:00 a.m.
12                       Day 7 of Trial

13                            -   -   -

14    BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
                                        and a Jury
15
      APPEARANCES:
16
                JACK B. BLUMENFELD, ESQ.
17              Morris, Nichols, Arsht & Tunnell LLP
                          -and-
18              JOHN E. NATHAN, ESQ.,
                CATHERINE NYARADY, ESQ.,
19              BRIAN EGAN, ESQ., and
                KRIPA RAMAN, ESQ.
20              Paul, Weiss, Rifkind, Wharton & Garrison LLP
                (New York, N.Y.)
21
                                    Counsel for Plaintiffs
22

23

24

25
```

1   **APPEARANCES CONTINUED:**

2       **JOHN W. SHAW, ESQ.**
    **Young Conaway Stargatt & Taylor LLP**
3           **-and-**
    **ROBERT A. VAN NEST, ESQ.,**
4       **BRIAN FERRALL, ESQ., and**
    **KAREN VOGEL WEIL, ESQ.**
5           **-and-**
    **JOSEPH S. CIANFRANI, ESQ.**
6       **Knobbe Martens Olson & Bear LLP**
    **(Irvine, CA)**

7

                    **Counsel for Defendant**
8

9               **-   -   -**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  Good morning, counsel.

2        (Counsel respond "Good morning.")

3        THE COURT:  Are we ready for our next witness?

4        MR. VAN NEST:  Your Honor, if I could give the

5   Court a report on time very briefly.  The parties have

6   conferred.  And the defense has three hours and 27 minutes

7   of time remaining, the plaintiff has one hour and 31 minutes

8   of time remaining.

9        On the defense side, we have two live witnesses

10  to present this morning, Dr. Kinrich and Dr. Rothman, and

11  two short videos.  And then we will hear what if any

12  rebuttal there will be.

13        On the defense side, we are trying very hard

14  to -- we don't expect to use all of our time, although we

15  may.  We are trying to get to the point where possibly, if

16  the Court is ready to do it and we have got everything lined

17  up, we could instruct later today.

18        THE COURT:  I thought, my thinking was that at

19  the close of the evidence, we could talk about the points of

20  disagreement.  I have thoughts, leanings, with regard to the

21  instructions.  We can do that.

22        I am glad you interrupted me before calling the

23  jury out, because two of the jurors have reported to Ms.

24  Walker -- it was a question first, from the jury.  That was,

25  it had to do with the length of deliberations and how long

1  they would be permitted to deliberate.

2          Two of the jurors do have vacation plans, but

3  are willing to come back should it be required for them to

4  continue their deliberations Monday.

5          The Court will close Friday.

6          And so that's good news on two counts.  No. 1,

7  they won't feel the pressure, neither side wants them to

8  feel undue pressure, I am sure, to get through the evidence

9  they need to get through.  And that gives me less of a sense

10  of urgency than I had coming into work this morning.

11          MR. VAN NEST:  That is good to know.  Thank you,

12  Your Honor.

13          THE COURT:  Mr. Nathan, do you concur in the

14  calculations, the time report?

15          MR. NATHAN:  I do, Your Honor.  We will not have

16  any videos to play in rebuttal, if they play the ones they

17  are talking about.  We have two potential rebuttal

18  witnesses.  And we will have to see what they say in

19  response to Dr. Kinrich and Professor Rothman.

20          THE COURT:  Mr. Nathan, what you want to keep in

21  mind is -- and I won't say anything more than this at this

22  point -- in spite of what I just reported to the parties

23  regarding the jury's willingness to continue on, when we had

24  the pretrial conference I think I made a point that the

25  closings, openings and closings were part of the time

1    calculus.

2              MR. NATHAN:  I understand, Your Honor.

3              THE COURT:  If there was a miscommunication on

4    that, we need to talk about that right now.

5              MR. VAN NEST:  I don't think there is any

6    miscommunication.  What we understood was that the idea was

7    we would close our proofs today, and each have an hour of

8    argument tomorrow.

9              THE COURT:  Good.

10             MR. VAN NEST:  That is what we are assuming.

11             THE COURT:  That is what I said may please me

12   the other day.

13             What I am really talking about right now or

14   referencing is the rebuttal, and your report on the

15   plaintiffs' remaining time, which is an hour and 31 minutes.

16             MR. NATHAN:  I understand.  And I can go

17   further.  We don't anticipate calling any rebuttal

18   witnesses.  The word I tried to use was potential.

19             MR. BLUMENFELD:  Your Honor, when I stood up on

20   Monday morning and said Mr. Shaw and I had reached an

21   agreement on time subject to Your Honor's approval, it was

22   the time for these three days, I think that Mr. Shaw and I

23   both agreed, again, subject to Your Honor's approval, that

24   that was in addition to the hour of closings tomorrow.

25             We have a lot less time than originally

```
 1    scheduled.

 2             THE COURT:  I think Mr. Van Nest is a little

 3    surprised.  I am okay with that, given what I have just

 4    reported concerning the jury.  Okay.

 5             MR. VAN NEST:  I think we are on the same page,

 6    Your Honor.

 7             THE COURT:  Okay.  Ms. Walker.

 8             I am going to ask both parties, to the extent

 9    that you care to accept the invitation, to hang around for a

10    bit after the verdict.  Sometimes that's difficult for one

11    side or the other to do, for two reasons:  Number one, I do

12    speak with my juries afterwards.  Sometimes there is

13    valuable, nothing for appeal purposes, but valuable

14    information from those conversations, and, two, I do want to

15    talk about the time that it's taken to do this, to present

16    the evidence in this case.

17             I don't want to lecture.  I just want to talk

18    about it.

19             (Jury enters courtroom at 9:05 a.m.)

20             THE COURT:  It might be educational for me,

21    quite frankly.

22             Good morning.  How are you?  Please take your

23    seats.

24             There may be things that I can learn from you.

25             MS. WEIL:  Thank you, Your Honor.  Good morning.
```

```
 1              CoreValve calls as its next witness Mr. Jeffrey

 2    Kinrich.

 3              While he is taking the stand, may I approach and

 4    distribute books?

 5              THE COURT:  Ms. Walker will give you assistance.

 6              ... JEFFREY KINRICH, having been duly sworn as a

 7         witness, was examined and testified as follows ...

 8                      DIRECT EXAMINATION

 9    BY MS. WEIL:

10    Q.   Good morning, Mr. Kinrich.

11    A.   Good morning.

12    Q.   Would you please introduce yourself to the jury?

13    A.   My name is Jeff Kinrich.  I only -- as someone else

14    said, I only have one wife, and three children, ages 23 to

15    17.  The are mostly wonderful.

16              And I am a certified public accountant.

17              I live in Los Angeles.

18              I am happy to be here.

19    Q.   We are happy to have you.

20              Are you testifying here today as an expert

21    witness?

22    A.   I am.

23    Q.   On what subject?

24    A.   On the subject of damages, that is, should plaintiff

25    prevail in this case, should Edwards prevail, what the case
```

1   is worth.

2   Q.    Okay.  And before we get into your opinion on damages,

3   I would like to go over a little bit of your background.  If

4   you could tell us about your education?

5   A.    Yes.  I got a Bachelor's degree in mathematics from

6   Pomona College, which is in Southern California.

7             I then went on to graduate school and got a

8   Master's degree in statistics at Stanford University.

9             I was in a Ph.D. program in statistics, but I

10  dropped out.  Actually, I technically took a leave.  I am

11  still on leave 35 years later.  I may not be going back.  I

12  decided I did not want to pursue that direction.

13            Instead, I went to work for a living, and then

14  got a Master's in business administration degree, an M.B.A.,

15  in finance; then later became a certified public accountant,

16  a CPA.

17  Q.    Where did you get your M.B.A.?

18  A.    My M.B.A. was at the University of Maryland.

19  Q.    And would you tell us a little bit about your relevant

20  work experience?

21  A.    After my M.B.A., I started work at PriceWaterhouse,

22  which was at the time one of the Big 8 accounting firms,

23  probably best known for being the people that count the

24  Academy Award ballots.  By the way, the secret room where

25  they count them was the conference room by my office, but it

Kinrich - direct

1  wasn't very secret.  I had nothing to do with that count,

2  however.

3           I worked there for over 20 years.  It moved from

4  PriceWaterhouse to PricewaterhouseCoopers, after a merger.

5  And I stayed there from 1981 to 2001.

6           I left in 2001 to join the firm I am currently

7  with, a firm called Analysis Group.  We have a firm of

8  consulting economists, accountants, finance people, things

9  of that sort, who work on economic and financial issues for

10 our clients.

11          Typically, that includes things like I am doing

12 here today, valuation litigation, damage assessment, things

13 of that sort.

14          We have about 500 people across the country,

15 about 70 of them are in Los Angeles with me.

16          I am what is called a managing principal there,

17 which is sort of like being a partner, except we are legally

18 a corporation, not a partnership.  So no partners.

19 Q.   Have you had experience evaluating damages in patent

20 infringement cases?

21 A.   Yes.  I have done hundreds of patent infringement

22 matters.

23 Q.   And have you written articles about determining

24 damages in patent cases?

25 A.   I have.  I have published several articles on that

Kinrich - direct

1    subject.

2    Q.    And you testified that you are testifying here as an

3    expert today on the subject of damages.

4              Are you providing any opinion as to whether

5    CoreValve has infringed the Andersen patent or whether that

6    patent is valid?

7    A.    No.  I have no opinion whatsoever on the infringement

8    or technical issues.

9    Q.    For purposes of your opinion, are you just assuming

10   that there is liability?

11   A.    Well, the jury never reaches the issue of damages

12   unless they find liability.  So I do assume liability for

13   purposes of doing a damage calculation and for nothing else.

14   Q.    And if the jury finds that the Andersen patent is not

15   infringed or is invalid, what is the relevance of your

16   testimony here today?

17   A.    They can ignore everything I have to say, because I

18   have no relevance at that point.

19   Q.    And you are here to rebut the testimony of Dr. Leonard

20   that was provided last week?

21   A.    In part, to rebut Dr. Leonard's testimony.  In part,

22   to provide my own affirmative opinion as to what damages

23   would be if liability is found.

24   Q.    Would it be fair to say you did a lot of work prior to

25   today to prepare for your opinions?

Kinrich - direct

1    A.    Yes.   That is the technical term we use in the

2    profession, "a lot of work," yes.

3    Q.    Can you tell us the kinds of documents and things that

4    you did to prepare your opinions in this case?

5    A.    I looked at a lot of documents.  I looked at things

6    like depositions.  I looked at business plans.  I looked at

7    financial statements.  I interviewed people.

8              I looked at lots of the production of documents,

9    boxes and boxes and boxes of documents, having to do with

10   issues, business issues, manufacturing issues, things that

11   have to do with how these products were made, sold, and what

12   would happen if circumstances changed.

13   Q.    Including financial information of the parties?

14   A.    Absolutely.

15   Q.    Marketing information of the parties?

16   A.    Yes, marketing information, lots of it.

17   Q.    And you said you interviewed people.  Who did you

18   interview?

19   A.    I spoke to Mr. Michiels, Rob Michiels, who testified

20   yesterday.  I spoke to several other people who worked at

21   CoreValve and Medtronic.  And I think everybody I spoke to

22   was someone who was associated with CoreValve or Medtronic.

23   Q.    Can you give us an idea of the volume of documents

24   that you have reviewed in this case?

25   A.    I can use that same technical term and just say it's a

Kinrich - direct

1   lot.  But it was boxes and boxes, and then a lot more that

2   was in computer form so it doesn't pile up on a desk.  But

3   it certainly is a lot of volume of spreadsheets and

4   financial statements and depositions and marketing plans and

5   things of that sort.

6   Q.    Can you give us an idea of how many hours you and your

7   colleagues spent reviewing all of this in formulating your

8   opinions?

9   A.    Hundreds, hundreds of hours.  I can't be more precise,

10  but many hundreds.

11  Q.    Based on all the work that you have done, what

12  opinions have you formed as to what the damages would be in

13  this case if liability is found?

14  A.    Well, you may recall that damages in a patent case

15  fall in two categories.  There is what is called lost

16  profits, and then there is a category called reasonable

17  royalty.

18          My opinion is there are no lost profits.  The

19  lost profits are zero.

20          The reasonable royalty through December 31 of

21  2009 is about 1.2 million dollars.

22  Q.    Now, you said that your damages number goes through

23  December 2009.  You were here during the testimony of Dr.

24  Leonard.  Correct?

25  A.    I was.

Kinrich - direct

1  Q.    Do you recall that he gave a damages number through

2  trial?

3  A.    His number was actually through March 15th of this

4  year, not quite through trial, but through a couple weeks.

5  Q.    Why is your damages number through December 2009 and

6  Dr. Leonard's through March 15?

7  A.    Because the parties only produced documents, produced

8  information about sales and things like that through

9  December 2009.  You have to stop sometime.

10          The information produced in this case ran

11  through December 2009.

12          Dr. Leonard projected or estimated what it might

13  be during that intervening period.  But in my experience, no

14  matter what date you pick, there is always tomorrow and

15  there is always one more day.

16          What usually happens is the Court and the

17  parties, after the case is over, resolve the gap, if any.

18          So what I did was limit it to data that was

19  real, not projections and expectations, recognizing, you are

20  always going to have to deal with a couple more days of

21  sales anyway.

22  Q.    Okay.  So we are going to talk about both lost profits

23  and reasonable royalty and your opinion on both.

24          Let's start with lost profits.  You testified

25  that you don't think that there are lost profits in this

Kinrich - direct

1    case.

2              If we could put up Demonstrative 2.  Can you

3    tell us what this is and why you do not believe that Edwards

4    is entitled to any lost profits in this case?

5    A.    Yes.   There is a case called Panduit.  It is the name

6    of a litigation matter.  It is the name of one of the

7    parties.  This is guidance for people that do what I do.

8              There are what are called four Panduit factors.

9    Courts have said that this is a good way to figure out if

10   there are lost profits.

11             The four are, first, is there demand for the

12   patented technology?  And I didn't even address that issue.

13   I said, fine, I will assume there is.  And I didn't consider

14   it further.

15             Second, the question is, is there an absence of

16   acceptable noninfringing alternatives?  What does that mean?

17   That essentially says, can the defendant, if they don't

18   infringe, do something else that's acceptable to the

19   marketplace?  Here the answer is, yes, there is something

20   else.  Dr. Leonard agrees.  They could manufacture overseas.

21   There is nothing about this case that says they can't make

22   the product.  They merely can't make it in the United

23   States.  All of their sales are outside of the United

24   States, that is not even disputed, that is not an issue.  So

25   the acceptable noninfringing alternative is to manufacture

Kinrich - direct

1    overseas.

2              Third, even if they couldn't manufacture it

3    overseas, could the -- the question I had to ask myself is

4    could Edwards fulfill the demand for the product if

5    CoreValve isn't making it?  And I found the answer is no,

6    for reasons having to do with training, bottlenecks,

7    customer demand, things of that sort.  And I will talk about

8    that a little bit more.

9              Finally, the last one is really mechanical:  Can

10   the parties actually compute a number?  And I said, yeah,

11   they can, I am a good accountant, I can do it.  Dr. Leonard

12   can do the arithmetic.  That became a nonissue.

13             The two middle ones are the reasons separately

14   and independently why there are no lost profits.

15   Q.    Is it your understanding, Mr. Kinrich, that in order

16   to get lost profits under this test Edwards has to satisfy

17   all four of these prongs?

18   A.    Yes.  If any one of them fails, then there are no lost

19   profits.

20   Q.    And you believe that two of them fail?

21   A.    I do.

22   Q.    And just to clarify, those are independent reasons for

23   why you think there is no lost profits?

24   A.    Yes.  The first --

25             THE COURT:  Counsel, I would appreciate that you

Kinrich - direct

1    not lead the witness.

2              MS. WEIL:  Thank you, Your Honor.

3    BY MS. WEIL:

4    Q.    What is the significance of there being "no" on two

5    lines there?

6    A.    They are two separate reasons.  The first is if I'm

7    correct -- and I'll show you why I think I'm correct -- that

8    there is an acceptable noninfringing alternative and that

9    CoreValve would have succeeded in making all of the sales we

10   did, we're done.  There can be no questions that CoreValve

11   would have made those sales.  There is nothing left extra

12   for Edwards to pick up.  That seems pretty clear to me.

13             If there were some unfulfilled sales, some sales

14   that CoreValve lost, we turn to the second question.  And if

15   it is the case that Edwards couldn't have fulfilled them

16   anyway, there is still no lost profits so there are two

17   separate and independent bases.

18   Q.    So we'll talk about each of those two bases one at a

19   time.  And let's talk the first one, the absence of

20   acceptable noninfringing alternatives.

21             So you testified that both you and Dr. Leonard

22   agree that CoreValve would have gone overseas.  You conclude

23   no lost profits.  He concludes lost profits on virtually all

24   of CoreValve's sales.

25             Why do you come to completely different

1    conclusions starting from the same premise?

2    A.    It's all in the timing.

3    Q.    And what do you mean by that?

4    A.    The entire difference on this issue, between

5    Dr. Leonard and me, has to do with the sequence of events

6    when the parties would -- when CoreValve would take certain

7    actions and then how long it would take them to complete the

8    actions.  For example, when CoreValve would start to move

9    their facility overseas, if they had to, and then how long

10   it takes them to get up and running.

11              Dr. Leonard concluded certain things and

12   Mr. Michiels yesterday explained why those things were not

13   reasonable.  And I have taken those various steps and done

14   the calculations necessary to show there are no lost

15   profits.

16   Q.    Okay.  In Dr. Leonard's testimony, we heard the

17   expression but-for world.  Did you look at the but-for

18   world?

19   A.    Yes.  That's a common phrase in my profession.  You

20   talk about but for the actions of the defendant, what would

21   have happened.

22   Q.    Okay.  And did you look at what CoreValve would have

23   done in this but-for world?

24   A.    I did.

25   Q.    And did you prepare a time line to show what you think

Kinrich - direct

1    would have happened in the but-for world?

2    A.    I did.

3    Q.    And if we could put up Demonstrative 4.

4              All right.  Would you explain what is shown

5    here?

6    A.    Yes.

7    Q.    And do you have a laser pointer?

8    A.    Yes.  Is this one?  Yes, this looks like one.

9    Q.    That might help.

10   A.    Let's start with the bottom.  Ignore the top for a

11   minute, start with the bottom, what really happened.

12             What really happened was in the Fall of 2004,

13   CoreValve began setting up its U.S. facility.  And at that

14   point began to first manufacture its Generation 2 prototype.

15             In March of '05, it first manufactured its

16   clinical grade, that is, one suitable for implantation, of

17   that version.

18             Late summer 2005, it started manufacturing its

19   Generation 3 prototype.

20             In April of 2006, it first manufactured the

21   clinical grade version of that for clinical trials and

22   implantation.

23             Then in March, 2007, it received the CE mark

24   approval in Europe, and it began selling in April.

25             And then in July, it opened a larger

Kinrich - direct

1   state-of-the-art manufacturing facility.  Until then, it was

2   manufacturing at this smaller facility that really didn't

3   have high volume production capabilities.

4          And only by '08 was it able to scale up

5   production.  That's what really happened.

6          Now, in my hypothetical but-for world, CoreValve

7   discovers when it starts making its products, when it starts

8   developing its prototypes, whoops, we can't do that.  If we

9   make these in the United States, they would infringe.  And

10  the assumption made by the law, as I understand it, is that

11  the parties both understand in this hypothetical discussion,

12  that if you make your product, it will infringe a patent.

13         So you have to ask yourself what would the

14  parties do?  In this case, what would CoreValve do?

15         Well, CoreValve had just begun setting up a U.S.

16  facility at the time that, of the Gen 2, Generation 2

17  prototype.  The Generation 2 prototype is exactly the same

18  frame as the Generation 3.  And Dr. Buller said the

19  Generation 2 prototype infringes as well.  So at that point,

20  they know they've got an infringing product or potentially

21  infringing product.

22         They simply don't set up a U.S. facility.  They

23  set up an overseas facility.

24         Mr. Michiels testified, as I heard yesterday,

25  they could have done that.  There were other places in the

Kinrich - direct

1  world to go.  They didn't have to go to Irvine, though they

2  were happy and satisfied to go to Irvine.  It will cost them

3  some money and some hassle to not go to Irvine.  I've

4  accounted for that but they would have done it somewhere

5  else.

6          If they go somewhere else, the rest of the time

7  line looks exactly the same.  Instead of doing it in the

8  United States, they would do it overseas.  They still

9  develop things at the same time, and thus they still get

10 their CE mark approval at the same time.  They begin selling

11 at the same time.  They develop an overseas manufacturing

12 facility instead of a U.S. manufacturing facility at the

13 same time.

14          Some of these things cost them more money, and

15 that is part of what I will account for in a royalty

16 calculation, but it doesn't slow up the sales and,

17 therefore, it doesn't impact lost profits.

18 Q.   And so based upon this time line, what conclusion did

19 you reach as to the quantity of sales that CoreValve would

20 have made in this but-for world if it had started overseas

21 in the fall of 2004?

22 A.   CoreValve would have made the same quantity of sales

23 in the but-for world that it made in the actual world.

24 Q.   Okay.  And that is why there are no lost profits in

25 your view?

1    A.      That's right.  If they make the same quantity, there

2    are no extra sales up for grabs that Edwards could have

3    considered, could have possibly obtained.  The parties are

4    competing in the same way.  It's just they don't have U.S.

5    workers and U.S. producers, they have an overseas work

6    force.  That, again, may have cost them an amount of money,

7    but I will account for that in a royalty calculation.

8    Q.      So in this slide, you started your but-for world in

9    the fall of 2004.  And did you also do an alternative time

10   line starting in the Spring of '05?

11   A.      I did.

12   Q.      And if we could go to Demonstrative 5.

13           And if you could briefly just explain what is

14   shown here?

15   A.      Yes.  You will remember that what I just said on the

16   first one had to do with the date when the prototype is

17   first manufactured, the Generation 2.

18           Another way to think about it is let's not think

19   about the prototypes.  Let's think about the first

20   manufacturing of clinical grade product.  Well, that didn't

21   occur until the Spring of '05.  So if, in fact, you don't

22   make the decision to go overseas in the Fall of '04 because

23   the research and development process is not considered

24   infringing but only the manufacture, the clinical grade

25   product is, then the decision is delayed or at least

1    possibly delayed.

2              In that case, CoreValve would have to do

3    something a little different.  They would have to use what

4    is called a contract clean room facility.  That is, while

5    they're building their own facility overseas, they would

6    have to go somewhere else and essentially rent or

7    subcontract clean room facilities to get those first few

8    dozen clinical trials product manufactured, and that will

9    cost them some more money.  It won't delay them any more

10   time, Mr. Michiels talked about that, but it will cost them

11   more money.

12             The lack of delay means they actually still do

13   everything on the same time schedule, and they still get CE

14   mark at the same time, but as this blue section shows, they

15   will have to spend some money for contract clean room

16   facilities.  And that means that when I get to royalty, I

17   have to take that extra cost into account, but it doesn't

18   change the lost profits arithmetic.  They still manage to

19   produce things at the same time, so there is still no lost

20   profits.

21             MS. WEIL:  Your Honor, I would like to mark

22   these two time lines Exhibits 1478 and 1479 -- Exhibits

23   DTX-1478 and 1479.

24             MR. BLUMENFELD:  Your Honor, I don't object to

25   them marking them.  I do object to them going into evidence.

1      THE COURT:  Okay.  Mark them.

2      MS. WEIL:  Thank you.

3      You can take that down.

4   BY MS. WEIL:

5   Q.    All right.  Let's go back to Demonstrative 2.

6      And we've just finished our discussion of the

7   second factor, absence of acceptable noninfringing

8   alternative.

9      Let's go to the third one, manufacturing and

10  marketing ability to meet demand.

11     And would you explain why you believe that

12  Edwards hasn't satisfied that prong?

13  A.    Yes.  This has to do with the issues surrounding

14  training, surrounding the ramp-up time of Edwards,

15  surrounding doctors and resource use, bottlenecks in the

16  process that Edwards used to train physicians, and the fact

17  that they want to proceed at a measured pace, a reasonable

18  pace, that doesn't jeopardize successful clinical outcomes.

19  Q.    And so what did you conclude with regard to the

20  bottleneck in the waiting list?  How did that impact your

21  conclusion on this factor?

22  A.    Well, because there are bottlenecks, because there are

23  shortages, that is, Edwards can't train the population of

24  doctors as fast, it bottlenecks -- that was a terrible

25  sentence -- there is backlog.  There is waiting lists that

Kinrich - direct

1    shows Edwards is not training as fast as the demand exists.

2    If the demand is twice as big, you still have the

3    bottlenecks.  So even if there were additional doctors who

4    said train me, train me, they're not training the ones who

5    already want it.  They can't train more.  That's part of it.

6             Then you get things that Dr. -- oh, I can't

7    pronounce his name.  Manoharan.

8    Q.    Dr. Manoharan.

9    A.    Dr. Manoharan -- thank you -- talked about the use of

10   the Edwards device requires more medical resources:  more

11   operating rooms, more use of anesthesiologists and things of

12   that sort.  So those constraints in most hospitals also

13   would put a damper on Edwards' ability to proceed even if

14   they had the training capacity.

15   Q.    Now, you heard Dr. Leonard testify that he believed

16   that Edwards could have expanded its training capacity to

17   make CoreValve's sales in the but-for world.  Do you agree

18   with that conclusion?

19   A.    No.  I saw that and I do not agree with that.

20   Q.    Okay.  Did you rely on some Edwards documents to

21   support your conclusion on the capacity factor?

22   A.    Yes.

23   Q.    Okay.  If we could call up Exhibit DTX-595.

24             And that should be in your book, Mr. Kinrich.

25   A.    I'll look at it on the screen.  I see it.

Kinrich - direct

1    Q.    Is this one of the documents that you relied on?

2    A.    Yes.

3    Q.    And if we could go to the page that ends in 446,

4    Mr. Hugo.   There you go.

5              Okay.   What about this did you rely on to

6    support your opinion on the capacity issue?

7    A.    This document is one that Edwards used right just

8    before it was beginning its roll-out plan.   It was not yet

9    on the market but it was expecting to be on the market soon.

10             And it considered, in terms of strategy, several

11   cases.   It has a base case where it says, if they proceed

12   only at this level, they risk ceding the market leadership

13   to CoreValve and leaving some market potential on the table.

14             The one they end up choosing is the one they

15   call moderate roll-out, with funding as the main limiting

16   factor.   They're able to do a certain number of cases and

17   that centers, will have a certain amount of money -- I

18   didn't mention money but money is an issue here -- for the

19   first 18 months.

20             And then in time, they think they can roll-out

21   to 300 or 4 00 more centers.   So over time, they have the

22   capacity to go to 300 or 400 centers but not immediately.

23   They can't step to that level quickly.   The fact that they

24   moved to a moderate roll-out instead of a base case is based

25   in part on these words right here.

Kinrich - direct

1       If it weren't for CoreValve, it looks like they

2    were more likely to do the base case.  CoreValve actually

3    encouraged them to move faster, not slower, didn't stand in

4    their way.  It's like you are running a race.  If you are

5    jogging on the street, you are not necessarily going to run

6    as fast as you can.  If you run with somebody else, you are

7    going to put in a little extra burst of speed to beat them.

8       Edwards was trying to beat CoreValve here, move

9    their development even faster.  Without CoreValve, it's not

10   that they would have had more opportunity to do more, it's

11   that they probably actually might have gone slower --

12   certainly no faster.

13   Q.    Okay.  And were you here during the testimony of

14   Mr. Wood?

15   A.    I was.

16   Q.    Okay.  And if we could put up a portion of Mr. Wood's

17   trial testimony.  This is from Page 587, lines 12 through

18   17.

19       And he was asked -- and this is on Edwards

20   training and its ability to train.

21       "Question:  But from Day One, you could have

22   made more sales had you ramped up your training, ramped up

23   your qualifications and gotten the waiting list worked down.

24   Right?"

25       And he answered:

Kinrich - direct

1          "Answer:  Well, we always worked the waiting

2     list down.  Yes.  We could have gone faster from the very

3     beginning.  But, again, we try to be disciplined and do it

4     responsibly."

5     Q.    What does this say to you about the speed and capacity

6     or training that Edwards would have done in the but-for

7     world?

8     A.    This is -- this kind of statement applies to both

9     Edwards and incidentally to CoreValve.  Both of them knew

10    that they could train doctors faster and faster, but they

11    also knew if they did that, they would jeopardize clinical

12    outcomes and jeopardize the long term success of the

13    business.  They had to be, as this says, disciplined and do

14    it responsibly.

15          My discussions with CoreValve suggest that they

16    went as fast as they could while being disciplined and

17    acting responsibly as well.  That Edwards didn't interfere

18    with CoreValve's growth because the market potential was so

19    high.

20          And, similarly, there is nothing here that

21    suggests that Edwards was constrained.  It may be that at a

22    given hospital, they say, boy, we wish we could have had

23    that one but because of capacity they're going somewhere

24    else.  They're still going to get the same number, maybe not

25    the same identical hospitals but the same number of

Kinrich - direct

1    hospitals based on their ability to train people which can't

2    expand at an unlimited rate.

3    Q.    So does this say anything to you about whether Edwards

4    would have gone at a faster pace in the but-for world if

5    CoreValve weren't on the market or were manufacturing

6    overseas?

7    A.    Yes.   When you take this -- and there are many other

8    examples in the documents that suggest backlogs, lots of

9    documents that say we can't get to those people to train

10   them, lots of ones that say we can't make these sales

11   because we don't have enough doctors trained, we don't have

12   enough trainers to do the training.  All of those things

13   together say that for good reasons, for good business

14   reasons, having to do with responsible roll-out, they didn't

15   have more ability to roll-out faster than they did.

16          Now, today, that may not about true.  Today,

17   once you reach enough critical mass, perhaps you can move

18   faster but that is not what is important.  By today, both

19   parties, I think it's undisputed both parties would pretty

20   much be on the market.

21          It's this period through 2009 and through today,

22   that's what is important.  And during that period, there are

23   significant training constraints, not because Edwards is a

24   badly managed business.  These are intentional constraints

25   to manage and get high clinical outcomes.

Kinrich - direct

1   Q.    Let's look at one more document.  If we could call up

2   DTX-161.

3           Is this another document that you considered on

4   the capacity issue?

5   A.    Yes.

6   Q.    And what is your understanding as to what this

7   document is?

8   A.    This is a document that Edwards commissioned from a

9   research company called Medex to study what is going on in

10  the market for these heart valves in June of 2008.

11  Q.    Let's go to the page that ends 532.  And, Mr. Hugo, if

12  you could pull up the second to last bullet point there:

13  Big Problem Against Edwards.

14          Okay.  And so in this document, it says, big

15  problem against Edwards throughout Europe is lack of

16  availability of proctors -- long waiting lists -- CV getting

17  in first -- TRAIN MORE PROCTORS in all capital letters.

18  Q.    What does that say to you about Edwards' training

19  capacity in the but-for world and whether it could have

20  increased its training capacity?

21  A.    This is what I was referring to before.  Proctors are

22  trainers.  And Edwards knew if it had more proctors, more

23  trainers, it could have gone faster.  And it saw, in 2008

24  that it needed to do that or at least it was a thing that

25  kept it from proceeding in the market.  But it was a self --

1    I won't say self-imposed constraint, but it wasn't because

2    of CoreValve being in the marketplace.

3          If there were twice as much available sales,

4    there is still this constraint.  They had a long waiting

5    list of people.  If you had long waiting lists, you can't

6    say, if the baiting list were even longer, I get them.  You

7    already have a long list.  If the line is out the door, it

8    doesn't get any shorter if now you add more people to the

9    back and it goes around the block.

10    Q.    One last point on the capacity issue.  Did you look at

11    the size of the potential market for these prostheses

12    products?

13    A.    I did.

14    Q.    Did you prepare a demonstrative showing the effect of

15    the size of the potential market on your evaluation of the

16    capacity issue?

17    A.    I did.

18    Q.    If we could pull up Demonstrative 6.

19          Would you explain what is shown here?

20    A.    Yes.  The total size -- every one of these hearts

21    represents a thousand possible patients during the years

22    2007 to 2009, based on estimates of market size the parties

23    had in their planning documents.

24          This is for outside the United States, because

25    obviously this product is not approved for use in the United

Kinrich - direct

1    States.   There are about 290,000, according to somebody's

2    estimate, potential patients during this time period.

3    During that same time period, Edwards sold 6,900 -- those

4    are the blue hearts over here -- and CoreValve sold about

5    7,500 products.

6                This entire group of pale blue hearts were

7    unserviced by anybody.

8                So Dr. Leonard's comment that:  "If you can't

9    get service by CoreValve, you know, what's your choice?  You

10   are going to have to get nothing or get Edwards?  And you

11   will clearly get Edwards," that is not true.  All of these

12   people in the middle were not serviced by CoreValve and

13   didn't get Edwards, either.

14               This is a very small market -- excuse me.  This

15   is a very early market.  The parties are just beginning to

16   penetrate it through these years.  And there are huge

17   numbers of people, huge demand that isn't being serviced by

18   either company.

19               There will be a day when this is Coke versus

20   Pepsi and everybody gets the soda they want.  But right now

21   they are not there.  They are both very small, climbing,

22   tremendous potential.  But during this period, clearly,

23   there are lots of people who get neither.

24   Q.    If we could go back to Demonstrative 2.  We have

25   completed our discussion on the two middle factors, capacity

Kinrich - direct

1    and the overseas manufacturing.  And this is the basis for

2    your opinion that there is no lost profits?

3    A.    Correct.

4    Q.    Okay.  Now, aside from that, did you have additional

5    criticisms of Dr. Leonard's lost profits analysis?

6    A.    Yes.

7    Q.    If we could go to Demonstrative 8.

8          Would you briefly explain the criticisms that

9    are on this slide?

10   A.    Yes.  Once you get over the hurdle of whether there

11   are lost profits or not, there is some mechanical, much less

12   significant issues in Dr. Leonard's calculation.  He has

13   provided for far too long a timeline, even assuming his

14   starting date as to how long it takes to implement an

15   overseas facility.

16         Mr. Michiels explained yesterday what a

17   reasonable timeline is, and Dr. Leonard's is much, much

18   longer.

19         SAPIEN cannot be used to treat all of CoreValve

20   patients.  Dr. Leonard agrees to some of that.  He takes the

21   annulus size adjustment into account.  But he doesn't

22   properly take into account the fact that some people have a

23   very small femoral artery.  Dr. Manoharan talked about that.

24         He also doesn't take into account the

25   bottlenecks.

Kinrich - direct

1              And then at the last one, he ignores location

2      and overlap of customers.

3              Dr. Leonard assumes that once Edwards makes a

4      sale in Europe, every sale that CoreValve makes in Europe is

5      up for grabs, even if Edwards doesn't even sell in the right

6      country.

7              So if, for example, CoreValve sells in Italy in

8      a certain date and Edwards never sells in Italy until months

9      later, Dr. Leonard says that CoreValve sale would be

10     available for Edwards to make.

11             There are documents that say, we can't make

12     these sales, we are not in Italy.  But Dr. Leonard ignores

13     that.

14             Those are much smaller issues compared to the

15     two big issues I have already discussed.  But they are part

16     of the problem.

17     Q.     What is the effect of Dr. Leonard doing these

18     inaccuracies that are set forth on Demonstrative 8 on your

19     analysis?

20     A.     Well, I fixed them.  He has a very large lost profits

21     number, in the 70-million-dollar range.  When you fix them,

22     primarily the timing, that's the biggest single one.

23     Q.     What do you mean by the timing?  Would you explain

24     that a little bit more?

25     A.     Even if you accept Dr. Leonard's starting point --

1    remember, he started in January of 2006.  If you fix the

2    timing from that point forward -- let me back up.

3                Remember, I say the timing starts in 2004 to

4    2005.  That was the timeline I put up a few minutes ago.

5    Even if you accept his starting point of January 2006, when

6    you fix the sequence of events as to when CoreValve would be

7    able to go overseas and when it would be able to do its

8    manufacturing, you do get at that point a little bit of

9    potential lost profits.  But the number comes down from some

10   $70 million to about $900,000 under those circumstances.

11   Q.    Do you think that that is the right analysis?

12   A.    I do not, because I think the timing should start in

13   2004 or 2005, where there are no lost profits.

14               But if you move the timing to Dr. Leonard's 2006

15   date, there is the potential for a little lost profits.  If

16   you ignore the training issue, and say give it to Edwards

17   anyway, you get $900,000 of lost profits.

18   Q.    And that's instead of the 70-million-number that he

19   gave?

20   A.    Yes.

21   Q.    All right.

22               So let's put aside lost profits for the moment

23   and let's talk about reasonable royalty.  You concluded, I

24   believe you testified at the beginning, that you thought

25   that damages in this case were only in the form of

Kinrich - direct

1    reasonable royalty in the amount of 1.2 million.  Is that

2    right?

3    A.    Correct.

4    Q.    How, generally, did you go about determining what the

5    reasonable royalty should be in this case?

6    A.    To determine a reasonable royalty, you set up in your

7    mind what's called a hypothetical negotiation.  You say, the

8    parties understand that if they make this stuff, they will

9    be infringing unless they have a license.  What would they

10   reasonably negotiate?

11          On the one hand, Edwards would recognize that if

12   they don't get a license -- if they don't give a license,

13   rather, and CoreValve goes overseas, Edwards would get

14   nothing, because they don't need a license to manufacture

15   overseas.  That's allowed.  So anything they get would be

16   better than nothing.

17          From CoreValve's position, CoreValve says, I am

18   happy in Irvine.  I don't want to move.  It's going to cost

19   me money.  It's going to cost me annoyance and hassle to

20   move overseas.  So I would be willing to pay something to

21   avoid the hassle of leaving.

22          The way you do that is you set up the extra

23   costs.  You say, how much would it cost to go overseas and

24   how much extra would CoreValve have to spend?  And then you

25   compare those.

Kinrich - direct

1    If they would have to spend a certain amount,

2  then they might split that, say, you know what, Edwards?  I

3  will give you half of it or I will give you a third of it to

4  avoid the hassle of going overseas.

5    That is the kind of negotiation that you

6  envision.  And that's what I did.

7  Q.    In looking at the hypothetical negotiation, what date

8  or time frame did you consider for when this hypothetical

9  negotiation would have taken place?

10  A.    I considered that it would take place in the period

11  from late '04 to spring '05, when CoreValve started to set

12  up its facility to manufacture these plants and when the

13  clinical manufacturing was being done.

14  Q.    And if you could put up Demonstrative 3, please, Mr.

15  Hugo?

16    Okay.  So this is the time frame that you

17  considered?

18  A.    Yes.

19  Q.    And do you recall that Dr. Leonard had this

20  hypothetical negotiation taking place in January of '06?

21  A.    I do.

22  Q.    And why do you think that your time for the

23  hypothetical negotiation is more correct?

24  A.    Well, first, nothing in particular in terms of

25  manufacturing happened in January '06.  So there is nothing

Kinrich - direct

1      about that date that is magical.  There was a design

2      document that was finalized then.  But that is not a trigger

3      for infringement.

4                  The frames for Generation 2 and Generation 3 are

5      identical.  And CoreValve would have known, under our

6      hypothetical, that if they make those, they would be

7      infringing.

8                  So they would sit there and say we are not going

9      to build a plant to make something that is infringing.  We

10     are going to figure out what our alternatives are at that

11     point.

12                 That triggers the time period.

13     Q.    You testified earlier that in looking at the

14     hypothetical negotiation you looked at the cost to go

15     overseas.

16                 Let's put up Demonstrative 9.

17                 Would you briefly explain what this is and how

18     this impacted your determination of the reasonable royalty?

19     A.    Yes.  This is one page out of a large analysis.

20                 What I did was consider two dates, fall of '04

21     and spring of '05.  I considered two possible locations,

22     Singapore and Ireland, both of which were viable locations

23     that Mr. Michiels talked about.  There are others, but I

24     just picked two.

25                 And I looked at all of the costs that might be

1    involved in moving:  how much it takes for facilities, for

2    equipment, to do some start-up manufacturing, and I then

3    computed what is called the present value, an accounting

4    term that says you compare them all on today's dollars so

5    that you are not comparing 2009 dollars to 2010 dollars to

6    2011 dollars.  You are comparing them all in the same dollar

7    value.

8             When you do that, you find the total costs in

9    Singapore are actually less.  If they had moved to

10   Singapore, because Singapore is a lower-cost manufacturing

11   location, they actually save money.  That doesn't mean they

12   would have done it immediately, because they liked Irvine.

13   But they would have saved some money.

14            If they moved to Ireland, it would cost them

15   some extra money.  Then if they move a little later, in the

16   spring of 2005, it cost them even more money, because,

17   remember, they have to then spend that extra money for that

18   contract manufacturing facility that will get them over the

19   hump to get that facility up and running.  And that cost

20   them an extra few million dollars.

21            So when you get done, you find at the bottom

22   there that, as a percentage of sales, in 2004, Singapore

23   actually saves you about 3.6 percent of sales.  Ireland

24   costs you just about two percent of sales.

25            If you go to the same things in the spring of

1    2005, Singapore saves you about 2.8 percent of sales, and

2    Ireland costs you about two and three-quarters percent, 2.76

3    percent of sales.

4    Q.    How did you use these percentages to determine what

5    the reasonable royalty would be in this case?

6    A.    Well, I recognized that Singapore saves them money,

7    and if they truly would have gone to Singapore, there would

8    be zero reasonable royalty.  Nobody would pay something just

9    to go to Singapore, on the numbers.  But there is still the

10   hassle factor.  There is still the fact they liked Irvine.

11             So I focused on the Ireland numbers, and talked

12   about splitting the difference.  This is about 2 percent,

13   this 1.98.  I said, what if we cut that in half and share

14   it?  You, Edwards, get half of our savings.  We, CoreValve,

15   keep the other half.  That makes a one-percent royalty.

16             It's a little bit different in 2005.  But I

17   still have the Singapore numbers.

18             So in my judgment, one percent was a reasonable

19   number for anywhere in this period.  It basically shares the

20   costs and says to Edwards, don't make us move overseas, we

21   will pay you one percent to avoid the hassle of doing so.

22   Q.    Okay.  So once you figured out that cost analysis,

23   what did you next do in determining your reasonable royalty?

24   A.    I multiplied.

25   Q.    Before you get there, did you consider -- we heard

1    from Dr. Leonard of the Georgia-Pacific factors, which are

2    15 factors that courts consider in looking at a reasonable

3    royalty.  Did you look at all 15 of the Georgia-Pacific

4    factors?

5    A.    I did.  I did that.  Georgia-Pacific is a common basis

6    for royalty.

7              This analysis I just talked about actually is

8    part of the Georgia-Pacific analysis.  I looked at all the

9    other factors.  But this really dominates the analysis.

10   Everything else did not really have any impact as we are

11   talking about.

12   Q.    So if there is liability in this case, what is the

13   reasonable royalty that you think applies?

14   A.    One percent of sales based on this analysis.

15   Q.    And then you said you multiplied it.  What do you mean

16   by that?

17   A.    Well, you have to multiply the actual sales by one

18   percent.

19   Q.    Let's pull up Demonstrative 10.  What is this?

20   A.    The sales for CoreValve through December of 2009, as I

21   mentioned, were about 120 million dollars.  My reasonable

22   royalty rate is one percent.  This is not the hardest

23   arithmetic.  You take one percent of 120 million, and you

24   get about 1.2 million dollars as the reasonable royalty.

25   Q.    Okay.  And that is looking at it as of the date of

Kinrich - direct

1    2004-2005.  Right?

2    A.    That's if the hypothetical negotiation is in that time

3    period.

4    Q.    Did you also do an analysis of the hypothetical

5    negotiation if it took place at the date that Dr. Leonard

6    used of 2006?

7    A.    I did.  I changed the analysis for that.

8    Q.    If you could put up the rest of this.

9          What is your conclusion if the hypothetical

10   negotiation were in January of 2006?

11   A.    Well, if the negotiation is in that period, then it's

12   a little harder for CoreValve.  They are a little later.  It

13   means they will have some delay in getting their product on

14   the market.

15         Mr. Michiels talked about it being a couple

16   months.  I used three months delay.  And that means they

17   will lose some sales.

18         They will also have to spend a little bit more

19   to be overseas because they just have a little less time in

20   which to operate, about six or eight months less than in my

21   analysis.

22         That will move the royalty rate -- that will

23   move the expenses that CoreValve would be forced to endure

24   up.  And that will move the reasonable royalty up, because

25   they are saying, we have to spend more, so we will pay you

```
 1    more to avoid the hassle.
 2              That moves the royalty rate from one percent, in
 3    my opinion, to 1.5 percent.  And that means a royalty of
 4    about 1.8 million dollars.
 5    Q.    That is assuming no lost profits in this scenario?
 6    A.    Yes.  It is assuming some lost sales.  That is, there
 7    are sales at the beginning that CoreValve can't get.  But
 8    because of the early ramp-up issues, these are the very
 9    first few months that the parties are on the market, because
10    of the ramp-up, there would be no lost sales that Edwards
11    would get, even though there are sales that CoreValve would
12    lose.  That's taken into account in the 1.5 percent.
13    Q.    You also testified earlier that you made some
14    assumptions using Dr. Leonard's timeline and that you made
15    some corrections and give Edwards some lost sales, it was
16    about 900,000.
17    A.    Yes.
18    Q.    Do you have yet another alternative number -- let's go
19    to Slide 11 -- if you accept that there might be some lost
20    sales in using the January '06 starting date?
21    A.    Yes.
22    Q.    Would you explain very briefly what is shown here?
23    A.    Yes.  Again, this is December '09.  Dr. Leonard's lost
24    profits through that date are 60 million.  He talked about a
25    70-some-odd-million number, but that brings it through
```

1    March.  But I wanted to be fair and do a comparison of

2    apples to apples.  So 60 million of his is for the period

3    before December of 2009.  He set an eight-percent royalty

4    rate.  So he had some reasonable royalty on top of that.

5    And he came up with about 62 million during that time

6    period.

7              I compute, if you ignore the training issues and

8    say that whatever CoreValve loses would be available for

9    Edwards to possibly capture, that there would be $900,000 of

10   lost profits at the maximum.  I then apply a royalty rate of

11   one and a half percent, the one I just described a minute

12   ago, to what's left.

13             That's another 1.8 million, for a grand total

14   under that scenario of 2.7 million.  That is the 1.8 plus

15   the .9 number.

16   Q.    Just to wrap this up, if we can go to Demonstrative

17   12.  These are combining the three scenarios that you just

18   gave, no lost profits using hypothetical negotiation in the

19   fall of '04 to spring of '05 of 1.2, no lost profits,

20   hypothetical negotiation January of '06 of 1.8, and the

21   correction of Dr. Leonard's analysis resulting in damages of

22   2.7 million.

23             Of these three, which one do you believe is the

24   correct damages number if liability is found in this case?

25   A.    I believe it's the first one, because I believe that

Kinrich - direct

1    the period of time for the hypothetical negotiation is

2    '04-'05.  And that's the analysis that's based on the

3    2004-2005 time, when the parties would recognize that they

4    have to negotiate a royalty if infringement is assumed.

5    Q.    And do you believe that that damages number, 1.2

6    million, is a fair reflection of the cost to CoreValve and

7    the hassle to move overseas?

8    A.    Yes.

9    Q.    Do you think that Dr. Leonard's 75-million-dollar

10   number is a fair calculation of the cost and hassle for

11   CoreValve to go overseas?

12   A.    No.  It just doesn't reflect what would have happened.

13             MS. WEIL:  Thank you, Mr. Kinrich.  I have no

14   further questions.

15             THE COURT:  All right, Mr. Blumenfeld.

16   Cross-examine.

17             MR. BLUMENFELD:  Thank you, Your Honor.

18             Can we pass up cross-notebooks before we start.

19             THE COURT:  You may proceed.

20             MR. BLUMENFELD:  Thank you, Your Honor.

21                      CROSS-EXAMINATION

22   BY MR. BLUMENFELD:

23   Q.    Good morning, Mr. Kinrich.  How are you today?

24   A.    Good morning.

25             Hold on a second.  Your notebook is falling

1 apart. I want to keep it from exploding.

2 Q. Sorry about that.

3 Mr. Kinrich, you are not an economist, are you?

4 A. I am not an economist in the sense I don't have a

5 degree in economics. What I do, because of finance,

6 accounting, the other things, are things that are around the

7 same area. But my degree is not in economics.

8 Q. Now, you said that Dr. Leonard used numbers through

9 trial and you used numbers through December 31st, 2009. Do

10 you recall that?

11 A. I do.

12 Q. And you said that was because the parties only

13 produced documents through December 31st, 2009. Right?

14 A. Yes.

15 Q. In fact, Edwards produced documents through February

16 of 2010, and it was CoreValve that didn't produce documents

17 after December 31st, 2009. Right?

18 A. That's certainly possible. It's only CoreValve sales

19 that are at issue here so the other wouldn't have come into

20 play.

21 Q. Right. And it was CoreValve that didn't produce its

22 sales documents after December 31st, 2009. Right?

23 A. I accept that. I don't remember specifically but that

24 is certainly not inconsistent with what I reviewed.

25 Q. Do you understand that the accused product here is the

1   Generation 3 device?

2   A.    Well, yes and no.  I heard in court that that is what

3   people keep saying.  But I also heard Dr. Buller say, and I

4   read his report saying that the Generation 2 was also

5   accused.

6   Q.    But you understand the damages you calculated were on

7   sales of Generation 3 devices.  Right?

8   A.    Well, yes, because Generation 2 devices weren't sold.

9   Q.    Correct.  And you said a couple times in your

10  testimony that the Generation 2 and Generation 3 frames were

11  the same.  Right?

12  A.    Yes.

13  Q.    There is more to the accused devices than the frames.

14  Correct?

15  A.    I understand that, yes.

16  Q.    And you heard Mr. Michiels testify yesterday about all

17  the differences in the leaflets and the skirts that happened

18  between Generation 2 and Generation 3.  Right?

19  A.    I did.

20  Q.    And you also heard him testify that Generation 3 was

21  conceived in September 2005.  Correct?

22  A.    I think the Summer of 2005, if that -- August or

23  September.  I don't know what he said but I've been working

24  as if it was August or September, 2005.

25  Q.    You remember the pizza and beer lunch where Than

Kinrich - direct

1    Nguyen had the idea?

2    A.    I do.

3    Q.    And that was in September of 2005?

4    A.    Same answer.  I think I remember it being Summer of

5    2005.  If it's September, I'm not arguing with you.  I

6    merely can't agree with you.  All I remember is Summer.

7    Q.    Okay.  And the Generation 3 design, you heard

8    Mr. Michiels, say was frozen in early 2006.  Correct?

9    A.    Yes.

10   Q.    Now, you said early in your testimony that the

11   differences between you and Dr. Leonard were all in the

12   timing.  Right?

13   A.    I did say that.  That's the major issue.  There are

14   certain other issues, and I talked about several of them.

15   Timing generates a lot of them.

16   Q.    Let's look at your time line.  I think it's

17   Demonstrative 5 that you looked at.  The Spring 2005.  And

18   on this time line, let's look at the real world on the

19   bottom.

20          You said the first manufacture of clinical grade

21   Gen 2 was March 2005.  Right?

22   A.    Yes.

23   Q.    You heard Mr. Michiels testify yesterday that that

24   happened in April or May of 2005.  Correct?

25   A.    I did.  But I've seen the documents that says it was

1    March.

2    Q.    Actually, I think I got that wrong.  I think you said

3    May or June.  But Mr. Michiels said May or June, you said

4    March.  Correct?

5    A.    Yes.

6    Q.    And then you said that the first manufacture of a Gen

7    3 prototype was late Summer 2005.  Correct?

8    A.    Yes.

9    Q.    And we heard yesterday Mr. Michiels say that it wasn't

10   even conceived until that September launch in 2005.

11   Correct?

12   A.    Which is not inconsistent since that is still late

13   Summer.

14   Q.    Well, that's conception.  That is not manufacture.

15   Correct?

16   A.    My understanding that that is one followed closely on

17   the other, but they were both consistent.  And Mr. Michiels

18   and I have been on the time line and concurred on the

19   specifics.

20   Q.    Well, you may have concurred with Mr. Michiels but

21   that is not what he testified to yesterday.

22   A.    Well, actually I disagree with you.  I think that is

23   very much what he said.

24   Q.    And on the top half of this line, you're assuming

25   that the first manufacture of Gen 2 would have occurred in

Kinrich - direct

1       the United States.   Correct?

2       A.      It depends on which -- remember, I had two time lines.

3       This is the one, Spring 2004 -- excuse me -- Spring 2005

4       start date.

5              I gave one where all of the manufacture and R&D

6       is overseas.   That is one that starts in the Fall of 2004.

7              And the alternative is this one, which since the

8       negotiation isn't until Spring, anything that happened up

9       until then would have remained in the United States.

10      Q.      Including first manufacture of Gen 2 prototype?

11      A.      Correct.   On this alternative.

12      Q.      Right.   Now, all these things that you put on the top

13      in the but-for world, none of those happened.   Correct?

14      A.      Not by definition.   That is the but-for world.

15      Q.      Now, one of the assumptions you made was that these

16      things that happened overseas could have happened in

17      Singapore.   Right?

18      A.      Well, no, I did not assume they would happen in

19      Singapore.   There is one of many places they could have

20      happened.   I used Singapore and Ireland as examples.   There

21      are many other locations -- Canada, Italy, other places --

22      that Mr. Michiels talked about and I have discussed with

23      other CoreValve and Medtronic people.

24      Q.      Right.   You said you picked Singapore and Ireland as

25      examples.   Right?

Kinrich - direct

1    A.    Yes.

2    Q.    And those examples came from Mr. Michiels.  Correct?

3    A.    Well, I certainly didn't make them up.  They were

4    examples that were reasonable, realistic and likely

5    alternatives.  They were not the only likely alternatives.

6    Q.    You didn't independently come up with the opinion that

7    they could move to Singapore or Ireland.  Right?

8    A.    That's correct.

9    Q.    That's outside the area of your expertise.  Correct?

10   A.    Yes.  I would not know where to find heart valve

11   manufacturing facilities.  Mr. Michiels and numerous other

12   people at CoreValve provided those locations.

13   Q.    And you have no idea where a plant in Singapore would

14   have been located, do you?

15   A.    I have no idea of what the geography of Singapore is.

16   Q.    You have no idea where in Ireland the plant would have

17   been located?

18   A.    Not in the sense of the city or town.

19   Q.    And the cost of moving that you put up -- let's put up

20   Slide 9.  I think your Demonstrative Slide 9.

21         The cost that you put up here in 2004, 2005,

22   those aren't costs you came up with either, are they?

23   A.    No, they're costs that were developed at my request by

24   people at CoreValve and Medtronic using their expertise in

25   locating plants overseas from -- done by people whose job it

Kinrich - direct

1   is to locate plants overseas in Singapore and Ireland.

2   Q.   The number on this chart are not numbers you

3   developed?

4   A.   I think I just answered that question to say, no, they

5   are done by others who have the expertise in locating plants

6   in these cities, these countries.

7   Q.   Now, on the Singapore side of Demonstrative Exhibit 9,

8   you said that if there had been a move in the Fall of 2004

9   to Singapore, CoreValve would have saved between -- well,

10  present value of almost $10 million?

11  A.   Yes.   It would have cost them more to set up

12  initially, which is the first line, the $1,230,000 present

13  value, but because the Singapore labor rates are cheaper,

14  the actual cost of producing the valve after they get the

15  setup would be cheaper.   But it's more to make it -- to move

16  and then less to manufacture.

17  Q.   And if they had moved in Spring of 2005, they would

18  have saved $7 and-a-half million?

19  A.   Right.   Because, again, it's more to move and, in that

20  case, it's even more to move because you have to spend some

21  extra money on certain things because you have less time and

22  so it costs you a little more money.

23       But, again, because the labor rates are cheaper,

24  then you can save money on the manufacturing costs.

25  Q.   And even though, in your opinion, CoreValve could have

Kinrich - direct

1  saved a lot of money by moving, it didn't move to Singapore.

2  Correct?

3  A.    It didn't.  And as I talked about, I didn't base my

4  royalty on this partly because that didn't happen, although

5  it was an option if they couldn't be in Irvine.  It was, in

6  fact, one of the most viable options if they couldn't be

7  Irvine.  But they wanted to be there, which is why I have a

8  royalty greater than zero even though Singapore would have

9  been a savings.

10 Q.    Right.  They wanted to be in Irvine.  They could have

11 saved money by moving to Singapore, they considered moving

12 to Singapore, and they decided against it.  Correct?

13 A.    No, that's not true.  They didn't consider moving to

14 Singapore at the time.  Had they considered it, they may

15 very well have moved, but they were in a place.  Just like I

16 have a house, I can save money by moving to somewhere else,

17 but I'm not moving.  And there was no incentive for them to

18 consider moving.

19        In the hypothetical, they have to consider

20 moving.  Once you have to consider moving, you then look and

21 say what are my choices?  Now that I have to do it, I have

22 to go through the hassle of moving, I will then say maybe

23 Singapore, maybe Ireland.  Oh, look, Singapore would save me

24 money.  That is wonderful.

25        But they didn't consider it then.  It wasn't

1    something that was on their radar screen.

2    Q.    Mr. Kinrich, they did consider it in 2008 and they

3    rejected it.  Right?

4    A.    In 2008, for a different apples and oranges

5    comparison.  For a much bigger plant, they considered it,

6    and instead built a plant where they already were.

7    Q.    Now, the numbers on this chart, they were actually

8    developed for Singapore by a Medtronic employee named

9    Mr. McMatt (phonetic); correct?

10   A.    Yes.

11   Q.    And he developed that in 2009; correct?

12   A.    With data.  He developed it after I spoke to him,

13   which was 2009.  He did not develop it -- he developed it

14   using 2006 information -- 2005 -- excuse me -- 2004-2005

15   information, but he did the work at my request in 2009.

16   Q.    And he is not coming to trial to testify about what he

17   did.  Right?

18   A.    That's my understanding.

19   Q.    And you are just accepting his numbers.  Correct?

20   A.    Well, I am accepting them after examining them.  I

21   didn't just say give me the numbers, they're fine.

22         I had discussions with him.  I challenged them.

23   I asked for support.  I looked at the analysis.  I figured

24   out how he did it.  I figured out what he knew.  I figured

25   out who he knew in Singapore and how he developed those

Kinrich - direct

1    numbers.  And then I used them going forward.

2    Q.    And Mr. McMatt was not a CoreValve employee in 2004 or

3    2005, was he?

4    A.    That's correct.  He was at Medtronic, which is where

5    the expertise in this lies.

6    Q.    And Medtronic is, and was in 2004 and 2005, a lot

7    bigger company than CoreValve?

8    A.    It was a bigger company.  That didn't affect the

9    analysis, but because he did it for a small company, not for

10   a Medtronic-sized company.

11   Q.    And he didn't talk to anyone at CoreValve about this

12   analysis, did he?

13   A.    I don't remember whether he did or didn't.

14   Q.    And you didn't talk to anyone at CoreValve about this

15   analysis except for Mr. Michiels; correct?

16   A.    Yes, Mr. Michiels was my prime contact at CoreValve.

17   Q.    Now, on this Spring 2005 side, whether it's Ireland or

18   Singapore, you have, up front, incremental costs of about

19   $2 million.  Right?

20   A.    Yes.

21   Q.    And that meant $2 million that had to be available in

22   the Spring of 2005.  Right?

23   A.    Yes.

24   Q.    And could you turn to PX-1900?  It's Tab 8 in the book

25   that you have.

Kinrich - direct

1    A.    I'm sorry.  Could you give me the tab number again?

2    Q.    Eight.

3    A.    (Witness complies.)

4    Q.    This is CoreValve's financial report from April of

5    2005.  Correct?

6    A.    Yes.

7    Q.    Spring of 2005.  Right?

8    A.    Yes.

9    Q.    And if you turn to Page 4.

10   A.    Hold on.

11            Got it.

12   Q.    And we look right down here at the bottom, it has

13   CoreValve's cash and cash equivalents at the end of the

14   period.  And that's the period ending April 30th, 2005.

15   Right?

16   A.    Yes.

17   Q.    And their cash and cash equivalents were about, --

18   this is in Euros -- about 400,000 Euros.  Right?

19   A.    I will accept your word that it's in Euros.  That

20   makes sense to me.  I don't see that but I certainly accept

21   that.

22   Q.    And 400,000 Euros would have been 500,000 and some

23   dollars?

24   A.    600,000, I think about then.

25   Q.    Between 500,000 and 600,000?

1    A.    Something like that.

2    Q.    So that was the cash that the company had on hand in

3    April of 2005.  Right?

4    A.    Yes.

5    Q.    And then if you turn to Page 10 of this document.

6    A.    (Witness complies.)

7    Q.    Do you see there is a chart called -- I'm sorry --

8    Page 11.  Do you see there is a chart called CoreValve cash

9    indicator.  And what it shows, in Euros again, for

10   April 2005, is something under 500,000, and from May 2005

11   going down to zero.  Correct?

12   A.    That appears to be a projection.  But, yes, I see

13   that.

14   Q.    And that is the amount of cash that CoreValve had on

15   hand in April and May of 2005.  Right?

16   A.    Yes.  It didn't need the amount of cash at the point

17   you are talking about.  This is what it had then.  You have

18   more cash immediately thereafter.  But, yes, that is

19   correct.

20   Q.    Now, it had more cash later, but it didn't have the

21   cash in April and May of 2005?

22   A.    Right.  But it didn't need it then either.

23   Q.    Now, you talked a little bit about capacity.  The

24   documents you pointed to were all in a world where CoreValve

25   was a competitor with Edwards.  Right?

1     A.    Yes.

2     Q.    And you understand of the centers that do this type of

3     procedure, there are bigger centers and smaller centers.

4     Right?

5     A.    I do.

6     Q.    And if CoreValve had not been in the market, it

7     wouldn't have gotten into the centers it got into. Correct?

8     A.    Well, if I understand your question, by definition, if

9     CoreValve is not on the market it wouldn't be in certain --

10     in those centers. It wouldn't have any business at that

11     point.

12     Q.    And that would have included the bigger centers in the

13     market. Correct?

14     A.    It would be all of them, if your hypothetical is that

15     they wouldn't be in the market.

16     Q.    Including the bigger centers?

17     A.    All of them.

18     Q.    Now, you know that CoreValve has sold roughly

19     $150 million of Gen 3 devices to date.

20     A.    I know they sold about $120 million through December.

21     I think it's probably reasonable to believe it's probably

22     something on that order through today, though I don't have

23     those numbers.

24     Q.    And you know that Medtronic has paid $700 million to

25     acquire CoreValve?

Kinrich - direct

1    A.    I do.

2    Q.    And it's your opinion that damages through the end of

3    last year were $1.2 million.  Is that right?

4    A.    Yes.  It's all based on simply moving overseas.  It's

5    not about making the product, itself.  If it were the

6    product, it would be much higher.  But because it's all

7    about moving and all about hassle, it's obviously not

8    anywhere close to the total amount of the sales or profits

9    that were made.  It's just the cost of getting to another

10   geography.

11   Q.    And you know that that $1.2 million that CoreValve --

12   that you say is an appropriate royalty is far less than

13   CoreValve has paid in attorney fees in this case.  Correct?

14              MS. WEIL:  Objection.

15              THE COURT:  Let me see counsel.

16              (The following took place at sidebar.)

17              THE COURT:  Read back the question.

18              (The court reporter read back the requested

19   information.)

20              THE COURT:  The objection is?

21              MS. WEIL:  It's relevance and 402, 403.

22              MR. BLUMENFELD:  I think it's perfectly relevant

23   where he is coming up and saying here is a number they would

24   have agreed to pay, and instead they didn't move overseas,

25   and they chose to pay more attorney fees than the amount

Kinrich - direct

1      that they would have agreed to in a hypothetical

2      negotiation.  It's another cost.

3                    THE COURT:  Well, but this -- how would this

4      witness know what CoreValve has paid in attorney fees?

5                    MR. BLUMENFELD:  Just from his experience in

6      litigation.  He does this for a living.  If he says he

7      doesn't know, that's fine.  But ...

8                    THE COURT:  Well, you can ask him if he knows,

9      but you don't want to say --

10                   MS. WEIL:  I think it's 402, 403.  I mean --

11                   THE COURT:  Don't just recite numbers.  What do

12     you mean?

13                   MS. WEIL:  I understand.  Thank you.

14                   The amount of money that is spent on attorney

15     fees is not a consideration for determining reasonable

16     royalty.  There is no support for that at all.  There are

17     reasons to fight a lawsuit that have nothing to do with

18     moving overseas.  There has been testimony that throughout

19     CoreValve thought there was no liability, so there was no

20     reason for it to pick up and move overseas.

21                   THE COURT:  Now I'd made a record, counsel.

22     Sustained.

23                   MS. WEIL:  Okay.

24                   (Sidebar conference ends.)

25                   MR. BLUMENFELD:  I have no further questions.

Kinrich - redirect

1      THE COURT:  All right.  Your redirect.

2      MS. WEIL:  Mr. Hugo, could you put up

3  Demonstrative 9, please.

4                 REDIRECT EXAMINATION

5  BY MS. WEIL:

6  Q.   Mr. Kinrich, Mr. Blumenfeld asked you some questions

7  about CoreValve's money that it had in the bank.  Do you

8  recall that testimony?

9  A.   I do.

10  Q.   Okay.  In evaluating whether, in this but-for world

11  that didn't exist, CoreValve could have moved overseas and

12  spent the money that is shown on Demonstrative 9, did you

13  consider whether CoreValve could have afforded to make this

14  move?

15  A.   Yes, I did.

16  Q.   And what did you learn and what did you conclude from

17  that investigation?

18  A.   That prior counsel was correct that they don't have

19  that cash at that date, but just because it says present

20  valve doesn't mean you spend it all on that day.  You spend

21  it over time.  That's simply the present value as if you

22  ready had it then.  But if you spend it over a year or two

23  or three to do the equipment, or, in this case, maybe a year

24  or so, not two or three, and the funds that CoreValve had

25  available to it increased right after this period, and they

Knudsen - depo.

1    had enough funds to do the expenditures that would have been

2    forecast; further, Mr. Michiels has explained that had they

3    needed more funds, their investors were not stupid.  The

4    investors were not to going to say we're not going to give

5    you a couple hundred thousand dollars for an investment we

6    hope will pay off quite well.  That they would be able to

7    raise this money even if they needed it, but it turns out

8    they didn't need it.

9               MS. WEIL:  Thank you.  I have no further

10   questions.

11              THE COURT:  Thank you.  You are excused.

12              THE WITNESS:  Thank you.

13              (Witness excused.)

14              MR. VAN NEST:  Good morning, Your Honor.  At

15   this time, we're going to play some additional testimony

16   from Dr. Knudsen, one of the inventors of the '552 patent.

17              In this testimony, Dr. Knudsen is going to

18   discuss the prototypes that he used in the early pig

19   experiments and his paper describing those experiments.

20              THE COURT:  Thank you, Mr. Van Nest.

21              (Video of Dr. Knudsen played.)

22              "Question:  Could you describe to me what the

23   first prototype looked like?

24              "Answer:  Yes.  Do you want me to show pictures?

25              "Question:  I'll let you draw it on this paper.

Knudsen - depo.

1    "Mr. Re:  I will mark a plain piece of paper as

2    our next exhibit, Exhibit 68, on Radisson Hotel and Resorts

3    graph paper.

4    "That might help you describe to me -- here we

5    go.  Have a nice marker.

6    "If you could draw for me what you remember the

7    first prototype, what it looked like, that you and your

8    colleagues made in 1989?

9    "Answer:  Yeah.  You know, it's a process when

10   you make things like this.  So when you mean prototype, you

11   mean the one we designed for implantation?

12   "Question:  For whatever purpose you had.  What

13   did the first physical specimen look like that was made by

14   you and your colleagues?

15   "Answer:  Oh, okay.  You know, we tried some

16   forms, right.  We were thinking of a lot of things at that

17   time.

18   "Question:  Mm-hmm?

19   "Answer:  But the first one -- well, it was a

20   process.  It's very difficult to answer exactly.  But the

21   first one was looking -- we remember actually thinking of a

22   lot of things, too, at the same time.  So as far as I recall

23   was that we -- the first one was -- it's just -- no, I

24   cannot -- to be honest, there was a couple, but I cannot say

25   absolutely which one it was.

Knudsen - depo.

1           "Question:  Draw them both.  Do the best you can

2     to the extent you can really recall.  And if you can't

3     recall, just draw what you can recall.

4           "Yeah, if you can't recall the entire design,

5     draw the parts that you can recall.

6           "Answer:  Yeah.

7           "Question:  So if you drew a loop, you are going

8     to say, okay?

9           "Answer:  Yeah, I think the first one was like

10    this, you know, it was a long wire.  Okay?  Going like this.

11    And then it was -- I think it was welded together here at

12    the end.

13          "Question:  Okay.

14          "Answer:  I think the first one looked like

15    that.

16          "Question:  What do you call these tall loops at

17    the top of Exhibit 68?

18          "Answer:  Well, we call -- I think we call it

19    commissures or towers.

20          "Question:  Or towers.  Is that what you said?

21          "Answer:  Yeah, you can call it a tower.

22          "Question:  Do you recall how many commissures

23    or towers that you had on your --

24          "Answer:  Three.

25          "Question:  Three?

1    "Answer:  Do you want me to do it exactly?

2    "Question:  Sure.

3    "Answer:  It was just a cartoon.  I can't do

4    it -- I have to look at it in the notes to get the real one.

5    "Question:  So if I understand your testimony

6    this morning, your recollection -- your recollection is that

7    all of the prototypes were made with three commissures or

8    towers similar to what you've drawn on Exhibit 68 and shown

9    on Edwards 60256?

10   "Answer:  Yes.  It's because, you know, we made

11   this one for experiments, right?  And we decided on the

12   design.  And then we tested this design, okay?

13   "So it was what was available at that time.

14   "Question:  Could you identify Exhibit 72?

15   "Answer:  Yes, this looks like my final thesis

16   for university.

17   "Question:  This is the final?

18   "Answer:  Yeah.

19   "Question:  Okay.  'The stainless surgical steel

20   .55-millimeter wire had the properties expected in the form

21   of site spontaneous elasticity and contraction recoil after

22   compression and expansion.'

23   "Do you see that?

24   "Answer:  Mm-hmm.

25   "Question:  Do you know why .55-millimeter wire

Knudsen - depo.

1    was selected?

2              "Answer:  Because that's what was available at

3    the time, and I was -- you know, we could use it.

4              "Question:  Did you try --

5              "Answer:  Yeah, we tried a little thinner one

6    and thicker one, and we felt this one was the right one.

7              "Question:  Okay.  What was wrong with the

8    thinner one?

9              "Answer:  The thinner one was too wobbly.

10             "Question:  Too wobbly?

11             "Answer:  Mm-hmm.

12             "Question:  Unstable?

13             "Answer:  Uh-huh, how you say --

14             "Question:  Weak?

15             "Answer:  Yeah.  When you -- when you want to --

16   you have to be -- it has to be expandable and collapsible,

17   okay?

18             "And then if the weak hole is too much, you

19   know, you could say it was weak in your terminology, then it

20   would collapse again.  And if it was too thick, it was -- it

21   was too hard to expand.

22             "Question:  I'd like to take you back to your

23   Exhibit 72, which is your 1992 paper.

24             "Answer:  Yes.

25             "Question:  And I'm reading the section that

1  says 'The experiments undertaken are of the nature of a

2  preliminary technical investigation and many important

3  questions still remain open, questions such as size

4  reduction, material and design optimization, and stent valve

5  sterilization, remain unsolved.'

6              "Do you see that?

7              "Answer:  Mm-hmm, yeah.

8              "Question:  Did you and your colleagues ever

9  attempt to resolve any of those important questions that

10  still remain open as referred to by you on Page 307615?

11             "Answer:  Not to my knowledge after I read this,

12  no.

13             "Question:  No?

14             "Answer:  No, no.

15             "Question:  Did you in any way make any changes

16  to your prototypes to account for the difference in human

17  and pig aortas?

18             "Answer:  No.

19             "Question:  Well, I'm trying to explore the fact

20  that when you wrote this paper, and you recognized much more

21  work had to be done.  Correct?

22             "Answer:  Yes.

23             "Question:  And much more work had to be done

24  before anybody ever even contemplated using this for a

25  human.  Correct?

1    "Answer:  Yes.

2         "Question:  And did you have any intention that

3    you and your colleagues would try to tackle any of the major

4    problems that still remained for your prototype to have any

5    value in a human?

6         "Answer:  As I told you before, we made an

7    experiment, right, where we did these -- or we made

8    experiments and we made these experiments with the available

9    material we had at that time.  Okay?

10        "We didn't have an economy to test heart valves

11   for human implantation.  Because we know although it's a

12   long list of things you have to approve, have approved,

13   okay, and, you know, you have to have sterilization

14   procedures, and, you know, and -- but the issue was that we

15   made this stent valve and could implant it in our pig model.

16        "But we were aware that, of course, something

17   about the perfection of the valve, stent valve, before

18   commercialization should, okay, it should be done -- sure,

19   it should have sterilization procedures and it should be

20   minimized as I wrote down there.

21        "Question:  Okay.  But did you also realize that

22   you didn't just need to do additional study, there also had

23   to be some design modifications to make your prototypes

24   smaller for it to have any applicability for humans?

25        "Answer:  Yes.

Knudsen - depo.

1          "Question:  You understood that.  Right?

2          "Answer:  Yes."

3          MR. VAN NEST:  Your Honor, at this time we are

4    going to play some testimony from Stan Rowe.  Stan Rowe was

5    one of the founders of PVT.  And he will discuss PVT's

6    efforts to develop a transcatheter heart valve replacement.

7          "Question:  Good morning, Mr. Rowe.  Could you

8    state your full name for the record, please?

9          "Answer:  Stanton Jeffrey Rowe.

10         "Question:  What do you currently do at Edwards?

11   What is your current job responsibility?

12         "Answer:  I develop products, and I oversee at

13   least to some extent the development process and services

14   for Edwards Lifesciences.

15         "Question:  And for how long have you been doing

16   that at Edwards?

17         "Answer:  My current role -- well, I was made

18   chief scientific officer late last year, so that -- I'm not

19   sure that fundamentally changed my responsibilities, but at

20   some level I'm probably more involved with other divisions

21   due to that.  But generally I've had the role of running

22   Advanced Technology since late '07.

23         "Question:  I'd like to take you to what is now

24   Exhibit 104, particularly Page 7, which is Page 7, which is

25   Edwards 58900.

Rowe - depo.

1               "Answer:  Okay.  Got it.

2               "Question:  It's called Andersen Patent

3       Limitations.  Do you see that?

4               "Answer:  I presume it says limitations, but

5       yes.

6               "Question:  I'd like to ask you about the next

7       bullet.  It says, 'The cylindrical support for the valve is

8       described as .55-millimeter stainless wires.'

9               Do you see that?

10              "Answer:  Yes.

11              "Question:  'These lack sufficient strength to

12      oppose a stenotic valve placement site.'

13              "Can you just explain to me what you're

14      conveying in your presentation to Evergreen by that third

15      bullet in this Exhibit 104?

16              "Answer:  I'm conveying my opinion that the

17      diameter of these wires was insufficient to prevent or to

18      hold open a stenotic valve.

19              "Question:  And how did you know that at the

20      time you wrote this?

21              "Answer:  I didn't know it.  It was my belief.

22              "Question:  You didn't know it, you said?

23              "Answer:  No, I didn't know it.

24              "Question:  Why would you write such a thing if

25      you didn't know it?

Rowe - depo.

1           "Answer:  It was my opinion.

2           "Question:  It was your opinion based on what?

3           "Answer:  Thinking about the stents that he

4    designed.  I mean, I do believe I was probably wrong.  I

5    don't know that this statement is correct in any way, shape

6    or form, but it was my opinion at the time.

7           "Question:  When did you come to the belief that

8    you think you were probably wrong?

9           "Answer:  Well, if I think today about again the

10   thickness of the Palmaz stent and the thickness of the PVT

11   stent, they are all around .5 millimeters.

12          "Question:  But those are completely different

13   designs, aren't they?

14          "Answer:  Well, they are different designs, but

15   I'm referring specifically to the diameter of stainless

16   steel wires.

17          "Question:  No, but you're referring to the

18   diameter of stainless steel wires using the cylindrical

19   support design shown in the Andersen patent, aren't you?

20          "Answer:  Again, it's hard to figure out if

21   you're talking about the cylindrical support.  These are

22   stainless steel wires.  You can configure these a lot of

23   different ways.  How many different ways did Dr. Andersen

24   configure stainless steel wires?

25          "Question:  I know the answer to that question.

Rowe - depo.

1          "Answer:  I don't.

2          "Question:  I am asking you, isn't it true on

3     this bullet, and you're referring to the thickness of the

4     stainless steel wires as constructed pursuant to the design

5     Dr. Andersen showed in his patent.  Isn't that correct?

6          "Answer:  I'm not sure that that is correct.

7          "Question:  Why are you not sure?

8          "Answer:  Well, again, because you are asking me

9     to affirm what I was thinking over nine years ago.

10    Q.    If you don't know, you can say, I have no idea.  That

11    would be fine.

12         "Answer:  I'm saying I can't really answer that

13    question.  I can't tell you specifically what was in my mind

14    when I wrote that sentence.

15         "Question:  Okay.  No recollection?

16         "Answer:  I can't answer the specific question

17    you answered.

18         "Question:  Do you have any recollection as to

19    what design you're referring to as lacking sufficient

20    strength to oppose a stenotic valve placement site?

21         "Answer:  No.

22         "Question:  No recollection?

23         "Answer:  This was my criticism of the Andersen

24    technology in general at that time.

25         "Question:  Correct.  And for how long did you

Rowe - depo.

1    have this criticism of the Andersen technology?

2              "Answer:  That's an interesting question.  I

3    don't think that -- again, I sought the Andersen license

4    months after this.

5              "Question:  I bet it was months after this.  I

6    agree with that.

7              "Answer:  And paid a fortune for it because I

8    believed that it was going to be extremely valuable and that

9    it was an important guide to us and that we were practicing

10   it.  So I can only say that this view of limitations had to

11   be passing, meaning a short period of time.

12             "Question:  Now, I think you played a little bit

13   of a patent lawyer on me in that last answer.  I was

14   referring to just the technology, not the legal rights that

15   may accompany the Andersen patents.  So let's talk about the

16   design itself.  The design of the Andersen stent as shown in

17   his patent, were you referring to that design on this page

18   of Exhibit 104?  Yes or no.

19             "Answer:  I can't answer that question.

20             "Question:  Because you lack recollection?

21             "Answer:  Yes.

22             "Question:  How did you come across the

23   thickness of the stainless steel wire as being .55

24   millimeters?

25             "Answer:  I don't recall.

Rowe - depo.

1              "Question:  You don't recall where that number

2      came from?

3              "Answer:  No, I don't.

4              "Question:  No recollection?

5              "Answer:  No.

6              "Question:  Let's go to the last entry.  It

7      says, 'Dimensions specified are much too large for

8      percutaneous placement (ten-millimeter diameter).'

9              "Do you recall what you were referring to by

10     that bullet in your presentation to Evergreen in Exhibit

11     104?

12             "Answer:  Generally, yes.  Again, Dr. Andersen's

13     technology as he was able to configure it at that time would

14     have been very challenging to put in, at least in a large

15     number of patients in a percutaneous method.

16             "Question:  And why was it very challenging?

17             "Answer:  Because not many patients have

18     ten-millimeter vessels.

19             "Question:  Why?

20             "Answer:  Because it is easier to close the

21     vessel, and you can treat a larger number of patients the

22     smaller it is.

23             "Question:  Where did you come across the

24     ten-millimeter diameter measurement?

25             "Answer:  I don't know.  I don't recall.

Rowe - depo.

1          "Question:  If the valve prosthesis is

2    approximately ten millimeters when fully compressed, is that

3    small enough to be used percutaneously in humans?

4          "Answer:  I believe it would be possible in some

5    patients and in some etiologies, yes.

6          "Question:  In fact, you then continue with your

7    position, 'I think the description that Dr. Andersen

8    provided to us when we were designing the product of PVT was

9    invaluable.'

10         "Answer:  Uh-huh.

11         "Question:  Do you have any document, sir, that

12   ever shows your opinion that the Andersen disclosure was

13   invaluable?

14         "Answer:  No.

15         "Question:  When was the first time you ever

16   attributed to Dr. Andersen as having provided an invaluable

17   disclosure in his patent?

18         "Answer:  Well, it seems like it would be clear

19   that if we -- I'm going to try to answer you.

20         "Question:  I think my question started with a

21   when.

22         "Answer:  Would you please state the question

23   again.

24         "Question:  When was the first time that you

25   ever attributed to Dr. Andersen as having provided an

Rowe - depo.

1    invaluable disclosure in his patents?

2                    "Answer:  So my best answer to you would be

3    December 21st, 2000.

4                    "Question:  The day PVT purchased the license?

5                    "Answer:  Yes.

6                    "Question:  My question related to the

7    disclosure, not to the legal rights that you purchased under

8    the patent.

9                    "Answer:  Yes, but -- I understand.  But it's

10   hard.  Again, we put our money where our mouth was.  Okay?

11   So if we didn't think Andersen was not something that we

12   were going to practice, okay, we got 5.5 million in Series

13   A.  We spent almost 20 percent of that on buying a patent.

14   Okay?

15                   "Question:  Buying the legal rights?

16                   "Answer:  Buying the rights to the Andersen

17   patent with the promise of paying him two million more.  And

18   we were going to give him a percentage of the company.  So

19   it was a huge investment for a company to make at that

20   stage, but we believed we were going to practice Andersen

21   because we were guided by Andersen.  And so my answer to you

22   is, we bought this patent because it was our guide and

23   because we thought it was extremely valuable for the company

24   to own as a guide to develop percutaneous heart valves.

25                   "Question:  Was it really as a guide, or was it

Rowe - depo.

1   because you wanted the legal rights represented by the

2   Andersen patent?

3              "Answer:  Well, we followed it -- look, the fact

4   that we were practicing it was a guide that we practiced it,

5   and therefore we needed to purchase it or have rights to it.

6   Okay?  The form of those rights, okay, you can argue, well,

7   if you had nonexclusive rights, that would have been fine.

8   Okay?  But okay, but we --

9              "Question:  Correct.  I think that was one good

10  point.  I wasn't even thinking of that, but you make a good

11  point.

12             "Answer:  But we felt we needed to own rights to

13  practice it.  Okay?  So the optimal way to practice that is

14  to have exclusive rights, right?  Because we are investing

15  our time, our money, our careers in developing this

16  technology, so the optimal way is to own exclusive rights.

17  But one way or the other we knew, we voted with our money

18  and our actions.  So when you say what documents do we have

19  to show for it, I would say the Andersen license is the best

20  document I could tell you we have, and the date of that is

21  December 21st, 2000.

22             "Question:  Did you prepare Exhibit 112?

23             "Answer:  Yes.

24             "Question:  Does it look like you prepared this

25  in or about February of 2000?

Rowe - depo.

1              "Answer:  Yes.

2              "Question:  I'd like to take you to the front

3       page of this document where you write, 'Andersen sadly does

4       not describe a method or design that if constructed is

5       percutaneous and functional over any durable period.'

6              "Do you see that?

7              "Answer:  No.  Where is that?

8              "Question:  Third paragraph, second-to-last

9       sentence.

10             "Answer:  Yes.

11             "Question:  What were you trying to convey with

12      that sentence to potential investors?

13             "Answer:  Well, we have to develop a durable

14      product to be commercial for one thing.  And we need to

15      reduce the diameter I think to create a commercial product.

16             "Question:  Anything else?

17             "Answer:  That's it.

18             "Question:  What were you intending to convey by

19      the use of the word 'sadly'?

20             "Answer:  It's going to take money.

21             "Question:  It's going to take money to do what?

22             "Answer:  To develop this.

23             "Question:  To make a method or design that if

24      constructed is percutaneous and functional over any durable

25      period?

Rowe - depo.

1                "Answer:  It's going to take development money

2       to, you know, refine this to a point where it's commercial,

3       and that means proving durability and working to reduce its

4       size to address a broader population.

5                "Question:  That's what you meant by that

6       sentence?

7                "Answer:  Yes, I believe so.

8                "Question:  I would like to mark as our next

9       exhibit a multi-paged document bearing the production number

10      of Edwards 133069 running consecutively through 133086.

11               "This will be Exhibit 161.

12               "Could you identify Exhibit 161?

13               "Answer:  Is this the entire document?

14               "Question:  Are you suggesting that it was part

15      of something else?

16               "Answer:  It looks like a design review, but it

17      doesn't look like the front cover page on this.  So my best

18      answer is it looks like a design review document.

19               "Question:  And the design review documents,

20      what were their purposes?"

21               "Answer:  For the entire team to get together

22      and review the current design concepts and issues and make

23      decisions about which design approaches we would take.

24               "Question:  And from looking at this document,

25      you can't date it?

Rowe - depo.

1              "Answer:  Well, within some range I can date it,

2       Mr. Re.

3              "Question:  Okay.  Whatever range you can get is

4       what?

5              "Answer:  Somewhere between August of 2000 and

6       December of 2001.  I would tend to favor that it's later

7       rather than earlier.

8              "Question:  I want to take you back to

9       Exhibit 163.  And I want to direct your attention to, under

10      4.3, it refers to stent protrusions.  On Page 4 of

11      Exhibit 163.

12             Do you see the section under, 'Stent,' the last

13      sentence.  'We also found that in such strut thickness, the

14      stent protrusions, which were designed to support the valve,

15      bend in result of the hydraulic pressure and don't fulfill

16      their function.'

17             "Do you see that?

18             "Answer:  Yes.

19             "Question:  What is referred to as the stent

20      protrusion?

21             "Answer:  I believe that those are the three

22      projecting apices that -- yes, that you can see on the first

23      page of 161.

24             "Question:  And that is in the middle picture?

25             "Answer:  That's correct.

Rowe - depo.

1          "Question:  The lower middle picture.  There is

2     three apices.  Is that what you are referring to?

3          "Answer:  Yes.

4          "Question:  Okay.  I notice on Page 6, under

5     Section 5.2 entitled, "Stent Conclusion From First Design

6     Iteration," it states "we prefer not to have protrusions,

7     i.e., have a cylindrical shaped stent."

8          "Do you see that?

9          "Answer:  Yes.

10         "Question:  Do you know what is being referred

11    to by that sentence?

12         "Answer:  Yes.  Although it's not

13    extraordinarily clear.

14         "Question:  Okay.  But let me just ask you:  Why

15    was there a conclusion not to have protrusions?

16         "Answer:  Well, because at the desired

17    thicknesses, you could -- again, this is about optimization.

18    So at the thicknesses that they were testing here, the

19    protrusions are basically -- the apices are cantilever

20    beams.  They are like a diving board.  Right?  And so they

21    cannot bear the same weight without support.  Okay?

22         "And the engineers had developed some kind of

23    test.  I don't know specifically how much load they were

24    placing on the stents because we don't know even to this day

25    the appropriate load.  But when they stress the stent, they

Rowe - depo.

1    note that those apices, those protrusions bend inwardly,

2    which affects valve function.  So their conclusion was that

3    the valve protrusions would be attached to the inner part of

4    the cylindrical stent.

5         "So you think of it as one or two ways.  You can

6    take the apices and move them down into the stent design, or

7    you move the stent design up to support the three apices.

8    So either way you get the same effect, but you increase the

9    load-bearing capability of the valve.

10        "Question:  And so after the first design

11   iteration, were there any more designs where the apices were

12   part of the stent as shown in the first design iteration?

13        "Answer:  So the -- after this design, the --

14   you have -- the three protrusions were moved into the stent

15   structure.

16        "Question:  Can you show me a picture on

17   Exhibit 161 where that is shown?

18        "Answer:  In 161?

19        "Question:  Yeah.  There are some pictures on

20   the front.  Or if you look at 164.

21        "Answer:  I think, I mean, I would contend that

22   the valve in the upper left of 161 represents this same

23   concept that the three apices are now supported by upper

24   struts.

25        "Question:  As opposed to having the stent

Rowe - depo.

1    itself form the cantilever?

2         "Answer:  As opposed to the cantilever being

3    free, the cantilever is supported.  So this is a better

4    load-bearing structure.

5         "Now, you could do it other ways, okay?  We

6    could have chosen to probably support the cantilevers

7    through thicknesses or other mechanisms, but this was a

8    simple iteration to preserve the apices within the stent.

9         (Video ends.)

10        MR. VAN NEST:  I believe we're ready to call our

11   next live witness, Your Honor.

12        THE COURT:  All right.  Why don't we take our

13   morning break then.

14        (Brief recess taken.)

15        THE COURT:  Do we have an additional witness?

16        MR. FERRALL:  We do have one more witness, Your

17   Honor.

18        THE COURT:  Let's bring in the jury.

19        (Jury enters courtroom at 11:18 a.m.)

20        THE COURT:  Please, ladies and gentlemen, take

21   your seats.

22        Mr. Ferrall.

23        MR. FERRALL:  Thank you, Your Honor.  CoreValve

24   calls as its next witness Dr. Martin Rothman.

25        ... MARTIN ROTHMAN, having been duly sworn as a

Rowe - depo.

1                   witness, was examined and testified as follows ...

2                        MR. FERRALL:  With the Court's permission, I

3       would like to do my morning exercise and place the board

4       there.  Thank you.

5                            DIRECT EXAMINATION

6       BY MR. FERRALL:

7       Q.     Good morning, Dr. Rothman.

8       A.     Good morning.

9       Q.     Can you please introduce yourself to the jury?

10      A.     Yes.  My name is Martin Rothman.  I am another

11      cardiologist from London, England.

12      Q.     Are you testifying as an expert witness today in the

13      case?

14      A.     I am.

15      Q.     Can you tell us what your field of expertise is?

16      A.     Today I would be called an interventional

17      cardiologist.  That is somebody who repairs or opens narrow

18      channels in the coronaries of the heart using balloons and

19      stents.

20                  I also close holes in the heart, and actually

21      also do valve replacements of the type we are talking about

22      today.

23      Q.     Can you tell the jury a little bit about your personal

24      background, where you grew up and so forth?

25      A.     Yes.  I am a Londoner.  I have lived and worked in

Rothman - direct

1   London most of my wife.  I have only one wife and three

2   children.

3               My oldest child is actually training to be a

4   cardiologist.  I have tried to put him off, but that has

5   failed.

6               My eldest daughter is actually an opera singer

7   trainee, strangely enough.

8   Q.   How did you get interested in medicine?

9   A.   Well, looking at me, you wouldn't believe it.  But I

10  used to be quite a sportsman.  I used to break everything.

11  I played basketball and broke all my fingers, and various

12  other limbs at various times.  I went to the hospital quite

13  a lot.  I quite liked what they did and the service I got.

14              I thought, naively, that's what I wanted to do.

15  But subsequently, when I got into training, I really found

16  out that I really enjoyed helping people.  And cardiology

17  was my particular chosen area.

18              That was probably reinforced, when I was

19  actually doing cardiology, as a junior adult, my father had

20  a heart attack at age 54 and subsequently died.  It sort of

21  reinforced my interest in the subject.

22  Q.   Where did you attend medical school?

23  A.   I attended medical school in Manchester, which is in

24  the north of England.  And it's also where my favorite

25  soccer team, Manchester United, where David Beckham comes

Rothman - direct

1        from, is.

2                    And I then went on to various institutions in

3        England, in London, on the South Coast in Brighton, back to

4        London, and then over to the USA for training and a

5        fellowship at Stanford University in California.

6        Q.    What did you focus on in your fellowship at Stanford?

7        A.    That was 1980.  So that was the beginning era of

8        balloon angioplasty, stretching balloons, narrowing in

9        coronary arteries.

10                   When I went to Stanford, I joined up with the

11       staff cardiologist who was doing angioplasty.  He had done

12       25 when I arrived.  That was sort of the first 25 in

13       America, virtually.  I worked with him for two, two and a

14       half years.  And by the time I left we had done 75.

15                   Slow progress.  But we did quite a lot of

16       research on the process, the effects on the heart of doing

17       angioplasty.  And we published quite a lot of work on that.

18                   Those were my main areas.  And also, if you

19       like, the metabolism or the feeding habits of the heart at

20       rest and under stress.

21       Q.    Have you had a role in developing any cardiological

22       practices or procedures in the U.K. during the course of

23       your career?

24       A.    Practices I could do first, if you wouldn't mind.

25                   When I came back to England, I set up our own

Rothman - direct

1    angioplasty service.  We didn't have one.  So I set up a

2    service in 1982.  And we grew very slowly.  But I sort of

3    grew to practice the art of angioplasty.

4              And in 1986 I helped found our Professional

5    Society of Interventional Cardiologists in the United

6    Kingdom.  That has gone on to become a role model all over

7    Europe.  It is a professional body that, if you like, takes

8    an interest in angioplasty from a patient perspective and a

9    doctor perspective.

10             So from professional practice, I have done that.

11   And I have also been involved in lots of other first-in-man

12   technologies that we can talk about if you would like.

13   Q.    Perhaps you could give one example of those.

14   A.    Yes.  The original role of angioplasty was to take a

15   balloon and put it into the artery and stretch the artery to

16   relieve the narrowing.

17             Unfortunately, that had a rather unpredictable

18   outcome.  If you were fortunate, the artery would open and

19   stay open, and then I could go home and sleep at nights,

20   possibly, if it stayed open.  But frequently, you couldn't,

21   because these arteries used to collapse, rather

22   unpredictably, after we had done the procedure, and it was a

23   rather unpredictable period for the first 24 to 36 hours

24   after the procedure.

25             Then in 1987, I had the good fortune to become

Rothman - direct

1    one of the first people in the U.K., in Europe, to put in

2    coronary stents.  And a chap called Richard Schatz, who is

3    the partner of Julio Palmaz -- and we have seen the Palmaz

4    stent before that, the big elephant-like stent -- Richard

5    Schatz came to my institution and taught me how to put in

6    stents in 1987.

7             We put them in then to try and what we call bail

8    out, hold open or sure open the artery to stop it from

9    collapsing, a bit like in a mine shaft you sure it open.

10            My wife at the time said she was rather grateful

11   for this because actually it was the first time I started to

12   sleep at night, rather than when I was in the practice of

13   angioplasty, because you could reliably depend on the

14   patient to keep the artery open.

15   Q.    Do you hold any current posts in the hospitals at the

16   U.K. or elsewhere?

17   A.    Yes.  I am a consultant cardiologist.  That is our

18   term for a staff cardiologist.  In the United Kingdom I have

19   held the post as a staff cardiologist since 1982.  I still

20   hold that post.

21            I was awarded the title of Professor of

22   Cardiology, Professor of Interventional Cardiology, about

23   ten years ago.

24   Q.    Have you conducted any research in the field of

25   biomedical devices?

1  A.    Yes, quite a lot.  I mean, apart from doing my

2  clinical work in looking after patients and doing

3  angioplasties, et cetera, and teaching and training, I have

4  always had an interest in research.  So I have continued

5  quite a strong research program.  For example -- and I have

6  been involved in the introduction of drugs for heart

7  disease, particularly related to the practice of stenting,

8  and angioplasty.

9          I have also been involved in quite a lot of the

10  trials of stents, because you have to prove things work.

11  You can't just say, oh, that's a good idea.  It looks like

12  it works.

13          You have to prove it to the community, that it's

14  better than some of the other stents.

15          So I have participated in a lot of stent

16  research.  I have also led those as a principal

17  investigator, in other words, the person who sets it up,

18  maybe runs it.  I just recently completed a study of 8,000

19  patients worldwide on a stent, looking at the effects of

20  that stent versus other technologies.

21          I have also created new devices, tested devices

22  and created my own new devices or tested other people's new

23  devices.

24  Q.    Do you have any patents?

25  A.    Yes, I have a few.  I have somewhere around 50

Rothman - direct

1    patents.

2    Q.    Can you just give us some ideas about what those

3    patents relate to?

4    A.    My first sort of series of patents, family of patents,

5    was related to a problem that I saw while doing

6    angioplasty -- didn't see, actually.  The problem was when

7    you do angioplasty, you look at the pictures on an x-ray

8    screen, the patient is lying on the table, we manipulate

9    things inside the patient, and we look at a screen that

10   shows a picture based on the x-rays going through the

11   patient.

12            Those screens and that x-ray technology doesn't

13   give you very fine detail.

14            Today, better.  But in 1980s, not very good.

15            So I was working with wires going down arteries,

16   little tears occurring in arteries, in the walls, that

17   eventually might suddenly close off the artery.  You

18   couldn't see them.

19            So I was with a friend, in a pub, and on the

20   back of an envelope he drew an idea to create a tool to look

21   inside arteries.

22            Now, you can't look with the ordinary eye,

23   because the blood is red and you can't see through it.  So

24   we used the principle that bats use, ultrasound,

25   high-frequency ultrasound.

Rothman - direct

1    And you can use ultrasound to go through blood

2    and see a picture.

3    So we spent the next years developing an imaging

4    technology to look inside human coronary arteries.  And we

5    evolved that and developed it.  And eventually that company

6    got sold.  We created a company out of it.  We sold that, on

7    what is now a technology that is used worldwide.  I don't

8    have any interest in that, unfortunately, anymore.  But we

9    sold that technology, and it's now used.

10   That is one technology, for example.

11   Q.    Okay.  Dr. Rothman, do you have any personal

12   experience implanting artificial heart valves?

13   A.    There is a two-part answer to that, if I may.

14   The conventional way, until recently, was to do

15   open chest, as you have heard over and over again.  I love

16   the American expression, "cracking the chest."  It is not a

17   term I would use.  Not many patients like that concept.

18   But the conventional way of doing it is, as you

19   know, is to saw through the sternum, the bone here, open the

20   chest and put a valve in.  I don't do that.  That's a

21   surgeon's job.

22   It is a great procedure.  I don't do that.

23   I do the angioplasty or the catheter-based

24   technique in which you go up hopefully through a groin hole,

25   a hole in the groin, through an artery or through the chest

1    wall.  And I do those procedures to replace valves now.

2    Q.    Have you used any of the devices that are made by

3    either CoreValve or Edwards?

4    A.    Yes, I have.  Surprisingly, I actually used the

5    Edwards device, the Edwards SAPIEN device, and have used

6    that since the end of 1998.

7    Q.    And why is it that you used the Edwards SAPIEN device?

8    A.    Well, the normal concept of running a heart valve

9    program is to have a team, requires a team.  You have heard,

10   it requires a cardiac surgeon, a cardiologist, something I

11   called an anesthetist, you call an anesthesiologist, and all

12   of those people.

13            And when I wanted to approach my team, the

14   cardiac surgeons are very influential, I wanted to get their

15   buy-in to the process.  So we sort of said, okay, let's have

16   a conversation about what technology we should use.

17            And the answer from them was, well, we know

18   Edwards extremely well.  We use their technology.  We know

19   it's reliable from a surgical point of view.  And we don't

20   know anything about the longevity, how long the CoreValve

21   technology will last, it's a small company.

22            So they felt much more secure at that time about

23   using the Edwards technology.  And I stood away from that

24   decision.  I wanted everybody comfortable.  And I was

25   willing to go along with the group decision, which is what

Rothman - direct

1    we did.

2    Q.    Do you have any experience observing the use of a

3    CoreValve device?

4    A.    Oh, yes.  I have seen the CoreValve device in use

5    either by being in the angiographic laboratory or catheter

6    laboratory, as you call it.  I have also watched it on live

7    case meetings, where you sit in a room like this and we

8    watch on the screen a procedure being done.  I have actually

9    chaired sessions in those conferences, chairing sessions

10   while a procedure is being done live, talking to the

11   operator, asking him questions, explaining to the audience

12   what is going on.

13          So I have quite a lot of experience with the

14   CoreValve.  I have no hands-on experience.  But in about a

15   month's time I am about to learn how to do CoreValve, and in

16   fact next week I am going over to London to do two more

17   Edwards valves.  So we will do both.

18   Q.    Now, you do not live in the U.K. anymore, or right

19   now?

20   A.    No, I don't live in the U.K. now.  I moved to

21   California about five weeks ago, four or five weeks.

22   Q.    Why did you do that?

23   A.    I became -- I took up a post of vice president of

24   medical affairs for Medtronic in Santa Rosa, in the division

25   of coronary and peripheral -- coronary and peripheral

Rothman - direct

1    division.

2    Q.    When did you accept your position with Medtronic?

3    A.    Probably November of last year, 2009.

4    Q.    When were you retained by CoreValve to examine the

5    issues in this case?

6    A.    I originally was asked to look at the Andersen patent,

7    family of patents, about two and a half years ago, and

8    consider the patent amongst many others, and wrote reports

9    at that time.  And that was a long time before.  I convinced

10   myself in reports to what I thought.  I haven't changed my

11   views since then.  I have sort of given a view a long time

12   ago, way, way before I even though of joining Medtronic, and

13   I didn't think of that, really, until last year.

14   Q.    Does your work at Medtronic have any relation to the

15   CoreValve device?

16   A.    Not at all.  CoreValve is held and managed in the

17   structural heart disease division.  And that is the division

18   that deals with heart surgery.  That's based in Minneapolis.

19   And my position deals with coronary stents, balloons and

20   devices relating to coronary treatment.  We have no

21   relationship -- we have a relationship with the people, but

22   I have no responsibilities in that area.

23   Q.    All right.  Dr. Rothman, I would like to turn to your

24   opinions.  If you could perhaps just gives a quick summary

25   of the opinions that you have reached in this case?

Rothman - direct

1  A.     Well, I was asked to consider two issues.  The first

2  was, does the Generation 3 CoreValve device infringe the

3  Andersen '552 patent, Claim 1?  And I was also asked to give

4  an opinion on the validity of the patent in relation to

5  whether it is enabled.  That means, does it enable a person

6  of ordinary skill in the art, that is somebody like me, to

7  be able to make and use the scope of the patent, the terms

8  of the patent, without undue experimentation?

9            That is the full definition of what I was asked

10 to do.  That means does this device -- is it enabled?

11 Q.    And before we move on, let me ask you, did you ask

12 that some presentation slides be prepared to discuss your

13 testimony?

14 A.     Yes, I have.  I have got -- yes, I have got a whole

15 series of slides.

16 Q.    Very good.  Before we go into the details of your

17 opinion, if we can take your opinion on noninfringement.

18 Can I ask you to summarize what your opinion is on

19 noninfringement?

20 A.     Yes.  The Generation 3 device to my mind does not

21 infringe the '552 patent, Claim 1.

22 Q.    And before you go on, can we see Slide 2, please.

23 A.     Thank you.  So this is a slide that I have made, which

24 you have seen before, is Figure 1 of the Andersen patent

25 here.  And then the words from the claim itself.  This is

1  the claim, the claim starts down here and is up here.  I

2  forget what page that is on.  But it is in the '552 patent.

3           I didn't say, also -- I should say that I don't

4  believe that the '552 is enabled, either.

5  Q.    Okay.  Thank you.

6           So on infringement, can you explain to the jury,

7  just in summary terms, what your infringement opinion is?

8  A.    Right.  In considering infringement, I have to look at

9  the claim and what are called claim elements.  We have

10  highlighted these in different colors, the ones that I am

11  going to consider are the key ones, to differentiate

12  between -- that are important in this patent.

13           So the first is, a plurality of commissural

14  supports projecting from one side of.  What are they?  These

15  are these elements here.  From the side of the cylindrical

16  support means, this set of zig-zags is a cylindrical support

17  means, and these plurality of commissural supports are

18  conditioned by the next bit, which says in a direction

19  generally parallel to the longitudinal axis thereof.

20           The Court has told us that thereof means from

21  the side of this cylinder.

22           So this has to project in the direction parallel

23  to the long axis, and the long axis goes through here.

24           And those are the elements I considered to make

25  a decision on infringement.

1  Q.   Okay.  And, then, if you could give a similar summary

2  of your opinion about enablement, please?

3  A.   I have another slide of it.

4       I think I have a bullet slide on the next one I

5  can summarize.

6  Q.   Yes.  I am not sure if we do have that.

7  A.   Well, in simple terms, first of all, the device that

8  we are told about is too large to go in a patient.  The

9  device that we have discussed in the preferred embodiment,

10 that's the detailed description we have in the patent, is

11 13.5 millimeters.  And you have heard evidence that the

12 probably largest comfortable size of perhaps the men here is

13 eight millimeters, and the ladies might be a little smaller

14 in femoral artery size.

15      That is the internal dimension this thing has to

16 go through.

17      So the device is too large to go in a human

18 being.

19      I believe the device is not strong enough.  When

20 it gets there an aortic stenosis, this narrow valve has to

21 be held apart and kept apart.  I don't believe the device is

22 strong enough to do that.

23      And I think the arms, these arms that are

24 parallel to the long axis, I believe what they are allowed

25 to flex, in the design of the flex, I think that flexion

Rothman - direct

1    will eventually lead to one of these towers collapsing.

2              So I don't think the device is enabled.

3    Q.    All right.  And can you tell the jury the material

4    that you reviewed in order to reach your opinions?

5    A.    A lot of material.  First of all, I read obviously the

6    Andersen patent, the '552.  I spent a lot of time looking

7    and re-reading that.  I read that many times.

8              I also read the Court's construction of the

9    claims which helps us define the claim language.  And that

10   actually becomes the rules by which we look at the words.

11             I also looked at diagrams of the CoreValve

12   product, specifications of the CoreValve product.

13             I looked at depositions of other patents and I

14   will use my own experience.

15   Q.    And I believe you have up there a model of a CoreValve

16   device.  Do you see?  We've got the big one, but do you also

17   have -- no, I apologize.

18             MR. FERRALL:  May I, Your Honor?

19             THE COURT:  Yes.

20             MR. FERRALL:  Thank you.  (Passing up

21   demonstrative.)

22             THE WITNESS:  Thank you.

23   BY MR. FERRALL:

24   Q.    Dr. Rothman, have you actually looked at CoreValve

25   devices?

Rothman - direct

1    A.    Of course.

2    Q.    And what I have handed you there is an exhibit which

3    we would like to actually -- it was a demonstrative.

4            MR. FERRALL:  We would like to offer it into

5    evidence.  I believe it's Exhibit 1480.

6    BY MR. FERRALL:

7    Q.    And do you recognize that?

8    A.    I recognize the frame of the CoreValve.  This is the

9    frame that is in Gen 2 and in Gen 3.  And there is a

10   representation.  It is made of possibly nylon fabric and

11   attached to the valve.

12           THE COURT:  Did I hear that you want to offer

13   that into evidence?

14           MR. FERRALL:  I would like to, Your Honor.

15           MR. NATHAN:  No objection, Your Honor.

16           THE COURT:  Admitted.  But did you give it a

17   number.

18           MR. FERRALL:  Yes.  1480.  Defendant's 1480.

19           (Defendant's Exhibit 1480 admitted into evidence.)

20           THE WITNESS:  That means you get this.

21   BY MR. FERRALL:

22   Q.    Dr. Rothman, you mentioned earlier a term, "the person

23   of ordinary skill in the art."

24   A.    I did.

25   Q.    And can you explain to the jury what your

1    understanding is of the person of ordinary skill in the art

2    for purposes of the '552 patent?

3    A.    Yes.   The opinion that is rendered, has to be rendered

4    from a position of a somebody called a person of ordinary

5    skill in the art, and that is a piece of legal terminology.

6    And I represent that person of somebody who, in 1990, at the

7    time of the patent, would have had the skill as an

8    interventional cardiologist at the time, the knowledge of an

9    interventional cardiologist.   And it should not be somebody

10   who is a world expert or leader.   It has to be somebody of

11   ordinary skill in the art.   And that means I represent here

12   the views of the majority of cardiologists who would do

13   ballooning and stenting at that time.   And that's the

14   position I take in explaining to you what I believe.

15   Q.    Okay.   And can you explain to us, going back to 1990,

16   what some of the problems a person of ordinary skill in the

17   art would have faced in trying to develop an artificial

18   heart valve for delivery via catheter?

19   A.    Well, the first thing you would have faced would have

20   been immense skepticism from everybody around him.   If you

21   talked to a cardiac surgeon in 1990, and even into 2000, the

22   concept of putting a stent, any form of stent into a patient

23   via a catheter was a ridiculous idea.

24        The surgeon would take a view that the valve is

25   extremely strong.   It's made up of this very heavily

1    calcified, almost like concrete material.  And the surgeon

2    has a lot of difficulty, when he has to cut that out, where

3    bits fall off, and they would be worried about some of this

4    stuff going off to the brain or somewhere in a procedure in

5    which you both stretch and replace the valve.  So the first

6    thing would have been skepticism.

7              The second thing you are going to do if you have

8    to do it by catheterization is you have to get it into a

9    patient.  And the patent requires, by catheterization by

10   known means.  And "by known means," at that time, there were

11   really only two approaches to the heart from the outside

12   world, legal approaches.  And that would have been through a

13   hole in the groin under local anesthetic, putting a needle

14   into the artery and then gaining access in that way or

15   perhaps taking the artery here, the one the doctors do when

16   they measure of your blood pressure, and cutting a little

17   nick in the skin, maybe two millimeters, and getting access

18   to this artery.

19             Now, this artery is probably only about

20   three millimeters at most in internal diameter and the one

21   in the leg is around eight millimeters.  It can be smaller

22   with someone who is diseased and particularly in the

23   elderly.  So we have to get into an eight millimeter artery,

24   let's say.  That is a tough requirement.

25             Then we have to get it all the way up and into

Rothman - direct

```
 1    the valve position.  You have to deliver it in some way, and

 2    you have to deliver it and not obstruct the flow of blood

 3    that is coming out of the heart, because you are conscious

 4    and awake or preferably conscious and awake during the

 5    procedure.  So you have to do this thing quickly because if

 6    you obstruct blood for more than seven to ten seconds, the

 7    blood pressure starts to drop, the patient starts to lose

 8    consciousness; another 10 or 15 seconds, they start to fit.

 9    And you need to ventilate them or do something or take the

10    whole thing out good.  So you have to be pretty quick.  So

11    you need to get this thing in quickly.

12                 You have to anchor it.  You don't get a second

13    chance.  You have to anchor it.  You have to anchor it in

14    the right place.  And, unfortunately, this is a very

15    dangerous area.  It's a mine field because not only do you

16    have to push the valve out of the way just above -- if I can

17    just point to this what you have seen before.

18                 Excuse me.  Can you see that?

19                 (Jurors nod yes.)

20                 THE WITNESS:  Thank you.

21                 Just above the valve here.  Only five to eight

22    millimeters above are the essential orifices or holes to

23    that provide life to all of us.  And you mustn't obstruct

24    those holes under any circumstances.

25                 So there is a series of challenges.
```

Rothman - direct

1          MR. FERRALL:  Okay.  And if we could see Slide

2    No. 4, please.

3    BY MR. FERRALL:

4    Q.    And tell us what you prepared for this slide.

5    A.    So this slide sort of summarizes what I just

6    extemporized.

7               It has to be compressible enough to get there.

8               It has to be is small enough to get into the

9    vessel.

10              You have to align it when you get it there.

11   It's no good at being slightly off axis because if it's off

12   axis, it has a tendency to move, and also off axis could

13   lead to damage to the valve.  I could explain that a bit

14   more later, if you would like.

15              It has to stay in place, in a one shot, almost

16   one shot delivery process.

17              I mentioned it mustn't block the coronary

18   arteries.

19              And it has got to be strong enough to push open

20   these very diseased valves.  And I do, I do a technique

21   called balloon valvuloplasty in which the valve is very

22   narrowed and you balloon open this valve.  And you can see

23   the indent that these valve leaflets cause on the balloon

24   until they suddenly give and they now start to open.  So

25   they are very strong when they're heavily diseased.

Rothman - direct

1    Q.    Dr. Rothman, did you prepare an animation to

2    illustrate some of these issues?

3    A.    I have.

4    Q.    Okay.  If we could see the animation at 5.

5    A.    This is showing the pulsatility of the heart movement.

6    It's a very dynamic area, and this is my visualization of

7    what would happen if the frame is not strong enough to keep

8    this in place.  As we heard yesterday, there are two forces

9    going on.  A number of forces.

10            There is the compression of the ventricle, which

11   is really strong.  There is a rocking motion that is going

12   on in the heart.  The heart rocks up and down.

13            And there is also a backward percussive force,

14   which I think Mr. Michiels called -- another word I never

15   heard before -- a back slam against the valve.

16            So if you could just run that again.

17   Q.    Actually, before we run it, Dr. Rothman, the device

18   that is in there is -- can you tell us, is that a real

19   device?

20   A.    No, no.  It's just any device.  I mean I'm not trying

21   to represent any device here, particularly.  It's just a

22   device placed there.  It's one I constructed earlier.

23   Q.    Okay.

24   A.    So we have, it's placed here.  Let's say we balloon

25   deployed it.  It's in place.  Perhaps it's not anchored

Rothman - direct

1   properly.  It's not pressed into the wall far enough.

2           And then if you wouldn't mind running that.

3           You can see the heart is moving, the force.

4   There is a back push on the valve, back push.  And we just

5   get the ventricular dislodgement, potentially.

6           And I actually have had this happen whilst I was

7   doing a procedure.

8   Q.    And what are the consequences?

9   A.    It scares the life out of you as an operator, I can

10   tell you.  It's frightening.

11           And, also, if you balloon open the valve at the

12   time and the valve is now leaking and you are about to

13   deliver a stent into it, and you don't get it in perfectly,

14   and it comes out you have a leaky valve in place, you got to

15   put another one in a hurry, plus you also have to deal with

16   wherever that has gone and make it not obstruct blood flow.

17   So that is quite a challenge.

18           It happens rarely, thank goodness, in my

19   experience and in the literature but it does happen.

20   Q.    Okay.  And what I would like to do now -- thank you,

21   Mr. Hugo -- is talk about the CoreValve device.  Have you

22   analyzed whether the CoreValve device solved some or all of

23   the problems that you have identified?

24   A.    Yes.

25   Q.    Okay.  And can you explain perhaps with the magnet

1    board?

2    A.    Could I put my problem slide back up?

3    Q.    Sure.  That is Slide No. 4.

4    A.    So this is -- sorry.  Can you hear this?

5              THE COURT:  It's okay.  It's important they hear

6    you.

7              THE WITNESS:  I had my back to you.  Sorry.

8              THE COURT:  That's all right.

9              THE WITNESS:  This is a representation of the

10   CoreValve, Generation 2, Generation 3.  And the points that

11   we talked about before is this is compressible by nature of

12   several things.  One is by the design of it, which we'll go

13   into in a bit more detail.  But it's made of a nitinol

14   material and it's delivered without a balloon inside it.  In

15   the other design of Andersen, you require a balloon to

16   expand it, although that is not a limitation because you are

17   allowed in the Andersen patent to do it.  But, particularly,

18   this is designed to be very compressible.

19             But it's also designed to have a lot of power

20   down here to help it sit and hold the valve open.  But the

21   design is also --

22             THE COURT:  So, Mr. Ferrall, you might have the

23   witness, when he says here or there --

24             THE WITNESS:  I'm sorry.

25             THE COURT:  -- identify.

Rothman - direct

1           THE WITNESS:  I'm sorry, Your Honor.

2           MR. FERRALL:  Yes.  If you could, Dr. Rothman,

3    perhaps describe where you are pointing.

4           THE WITNESS:  Yes.  I'll start again.

5           MR. FERRALL:  No.  You can just continue.

6           THE WITNESS:  So the bottom of the device is a

7    very strong section of the valve designed in part to hold

8    the native or diseased valve open.  That's at the bottom.

9           It's also shaped like a cone.  And if I can just

10   point to this, if I may.

11          You can see the cone shape here.  And that is

12   designed to, when you put it in, you release the bottom

13   part, and you pull it up so it seats nicely in the bottom

14   here.

15          And the idea of that is to stop it migrating,

16   cone shape.  It is much more difficult to migrate because

17   it's locked in place.

18          And also that cone shape actually makes the flow

19   of blood more directed over the valve.  The orientation

20   question I mentioned about alignment.

21          The top end of this device, this wide top of the

22   device, another cone or cone shape, actually helps orientate

23   the bottom.  So as you release this and then release this,

24   if you are slightly off axis, it aligns it.  So it's

25   designed to center.

Rothman - direct

1          Another thing about alignment in the top end is

2     you get anchoring in two places rather than anchoring in one

3     place.  So those are important elements there.

4          It's also designed not to block the coronary

5     arteries.  I set that a little low there, perhaps.  But it's

6     designed by this conical shape here.  Pulls in, pulls away

7     from the coronary arteries, and that is by design.  And that

8     is strong enough to support the valve.

9          So I think that sort of explains how the

10    CoreValve is designed to overcome these issues.

11    Q.    Thank you, Dr. Rothman.  If you could return to your

12    seat.

13    A.    (Witness complies.)

14    Q.    And let's turn to the Andersen patent.  You have

15    studied the patent, I take it?

16    A.    Yes.

17    Q.    And you have studied the Court's claim construction?

18    A.    I have.

19    Q.    And you're following the claim construction in your

20    testimony?

21    A.    You have to.  Yes.

22    Q.    And let's actually keep that Slide 6 up.

23         Because I'd like you, again, with respect to

24    these problems that you identified, tell us how you

25    understand the '552 patent attempts to solve them.

1   A.      Yes, I have a little ...

2   Q.      Yes.  If you could, Dr. Rothman.

3           And for the record, that is a magnet that is

4   roughly in the form of the Andersen '552 prototype.

5   A.      It seems to have had a little damage.  Anyway, don't

6   worry about that.  That is meant to represent wear and tear.

7           The Andersen patent calls for compression of the

8   device to deliver it.  I already mentioned that they didn't

9   tell us how to make it small enough to go into a femoral

10  artery.

11          The idea of seating it here is to balloon expand

12  it, and the patent tells us balloon expand it to greater

13  than the size of the channel that it sits in.

14          So its anchoring method is not like the

15  CoreValve, which is a cone that seats here.  It's actually a

16  cylinder which is expanded to compress itself into the wall.

17          And, of course, a cylinder can move or can tilt.

18  So that is the solution that they offer for anchoring is to

19  do that.  There is no upper anchoring point.  There is just

20  this one anchor point.

21          The idea is to put this in the right place, not

22  too high, and in that way avoid the coronary artery orifice

23  or beginning.  And we can talk a little bit later whether

24  they achieve it, but the idea is to keep it out of the way

25  of the coronary arteries.

Rothman - direct

1           The next part is, it is supposed to push the

2   damage or diseased valve that sits there, can't be moved,

3   sits there, out of the way.  It does that by pushing or

4   expansion outward of the Andersen device.

5           And, actually, the patent doesn't tell you what

6   to do with this damaged valve.  It's silent on how you

7   manage those valves -- those leaflets that are there.  But

8   the concept is you would manage, you attempt to push them

9   out of the way with this device.

10  Q.   And how was the valve supported in the Andersen

11  design?

12  A.   In the Andersen design, the valve is supported on

13  these.  The commissural points are supported on these

14  projections which are parallel to the long axis of the

15  device.

16          So they're supported on these three loops of

17  metal.  That's how the valve is supported.

18  Q.   Okay.

19          THE COURT:  Doctor, why don't you resume the

20  stand.

21          THE WITNESS:  Thank you.  (Witness complies.)

22  BY MR. FERRALL:

23  Q.   Dr. Rothman, if we could turn to your first claim

24  limitation we're going to discuss regarding infringement.

25          And if we could see Slide 8, please.

Rothman - direct

1      Can you tell us what your opinion is with

2   respect to the claim element, a plurality of commissural

3   supports projecting from one side of the support means.

4   A.   Well, the requirement for literal infringement is that

5   we have to have a plurality, a number of, commissural

6   supports projecting from one side.

7      So here is these projecting.  And I guess -- and

8   the claim construction is here.  This is what we are guided

9   to use, to actually understand what this means.  And it says

10   virtually the same thing.

11      And it talks about projections.  My simple

12   understanding, as a person in 1990 and today, is a

13   projection is something that projects just like if you look

14   at the two pegs here on the bottom of this board -- holding

15   this up -- they project.  That is projection.  So it

16   projects.

17      Is the claim element met?  No, because of what

18   comes next.

19   Q.   Well, and why don't you tell us that.

20   A.   Well, it says here, plurality of commissural supports

21   projecting from one side of the cylindrical support means in

22   a direction generally parallel.

23      Well, that is not parallel.  These pegs at the

24   bottom of the board are not parallel.  To be parallel, they

25   have to point that way.  The pegs on the board are at right

Rothman - direct

1    angle.  So those pegs don't meet the claim.

2    Q.    Dr. Rothman, before we talk about "generally

3    parallel," do you have an opinion whether the CoreValve

4    device has any commissural supports projecting from one side

5    of this cylindrical support means?

6    A.    Could I point to that?

7    Q.    Yes.  Use the magnet board, if you can.

8    A.    So by looking at the CoreValve device here and the

9    commissural supports, they are in the device, but they are

10   supported not on pillars like here but are supported on the

11   cells.  And the actual mechanic mechanism of supporting the

12   valve is squared over the whole integrated unit rather than

13   just here.  We heard already, but the support comes from

14   this cell and this cell and this cell and this.  I'm sorry.

15   The adjacent cells around and elsewhere on the device.

16              So the load is shared across the whole device as

17   opposed to the load just being shared on a point that we

18   know can weaken and collapse.

19   Q.    Now, you have been attending the trial this past six

20   or seven days?

21   A.    Unfortunately, yes.

22   Q.    And you witnessed Dr. Buller's testimony.  Correct ?

23   A.    I did.

24   Q.    If we could pull up Plaintiffs' Exhibit 2136, please?

25              I am sorry.  I must have the wrong number.

Rothman - direct

1        It's 2137.

2            Dr. Rothman, were you here when this exhibit was

3    created by Dr. Buller?

4    A.    I was.

5    Q.    And do you understand his contention about what

6    constitutes a commissural support projecting from one side?

7    Do you understand what --

8    A.    I heard his description of that.  I can't see a

9    commissural support projecting.  I think that's a fanciful

10   description.

11   Q.    Do you agree or disagree with his outlining in green

12   portions of the CoreValve frame and labeling them a

13   commissural support?

14   A.    Well, this is a commissural support.  But there is no

15   commissural support projecting from anything.  I mean, it's

16   part of the integrated structure of the whole device.  And

17   the Andersen, you can see the three posts.  Here, you can't

18   see the posts at all.  There are no posts as such.

19            This is just a selection by Dr. Buller of

20   something to try and make it look like a post.

21   Q.    Are you familiar with the concept called the doctrine

22   of equivalents?

23   A.    I am, yes.

24   Q.    And have you rendered an opinion about whether the

25   CoreValve device may infringe under the doctrine of

Rothman - direct

1    equivalents even if it doesn't literally infringe?

2    A.    I understand the -- yes, the doctrine of equivalents,

3    yes.

4    Q.    Can you explain what you do to determine whether the

5    CoreValve device infringes under the doctrine of

6    equivalents?

7    A.    Yes.  You have to see -- we have discussed already

8    literal, is there a post, is there not a post.  Then there

9    is a second way of analyzing the same question of

10   infringement, which is to look at the device and say, well,

11   does that function do the same thing in a different way to

12   achieve the same result?

13            It's called a function, way, result analysis.

14   Q.    In your opinion, does the CoreValve device perform,

15   function in substantially the same way as the claimed

16   invention with respect to this term commissural supports

17   projecting?

18   A.    No.  It performs a function.  You have to support the

19   valve.  So that's yes to the function.

20            But the way and the result are not the same.

21   Q.    Can you explain to the jury the difference, if any,

22   that you observed between the CoreValve device and the

23   claimed invention in the way and result?

24   A.    May I stand?

25   Q.    Please do.  Thank you.

Rothman - direct

1       **(Witness steps down from stand.)**

2    A.      So the function we are looking at is supporting the

3    valve.  The way in which the CoreValve does it is to

4    actually have the points of attachment here.  And they are

5    fixed on the slope, the 30-degree slope, by intention and

6    design, they are fixed on this slope.

7             And we heard yesterday, that's to share the load

8    and spread it out.  This is a circular device in this plane.

9    And we share the load not only upwards that way and

10   downwards, but also around the device.  So it does it in a

11   completely different way.

12            This creates -- there is a design element which

13   says 30 degree, and that actually creates some other

14   benefits, because it actually creates this narrow waist.

15   You need a narrow waist to feed off to get the 30 degree.

16            And you also need this conical shape here to

17   feed in to get from the bottom, to get the waist, the

18   30-degree angle, before you go up to the other point of

19   attachment.

20            So it's there by design to share the load and to

21   stop fatigue and tearing of the valve.

22            If you didn't share the load, and you did it,

23   attached the posts and you continually had this black-slam,

24   you could get wear and tear.  As you know, on a tent or a

25   marquee, if you don't allow some slack in it or some design,

Rothman - direct

1    you will get tearing and ripping.

2              We have seen experience of that with an early

3    valve, the Ianesque (phonetic) valve that we had put in

4    patients, where they were fixed onto a point, no give, and

5    the valve tore.  So we had disastrous consequences from

6    that.

7              So this is a specific design to avoid that sort

8    of situation.

9    Q.    So, Dr. Rothman, perhaps you could just summarize the

10   differences between the CoreValve device and the claimed

11   invention in terms of the results achieved by this claim

12   term, the commissural supports projecting from one side of

13   the device?

14   A.    Well, the result is that in this device, as we were

15   shown, there is give in the top.  There is movement by

16   design.  Here, there is no movement by design.  So this is a

17   fixed -- this is a moving device, and so the result is

18   different.

19             The load is shared.  This waist is created,

20   which has a value, which I will explain in a minute.  And

21   the cylinder has a value because it stops migration.

22             It's a complicated analysis.  But you get a lot

23   of benefits by having that angulation on that waist.

24   Q.    Thank you, Dr. Rothman.  You can return to the stand.

25             (Witness resumes stand.)

Rothman - direct

1    Q.    Do you consider these differences to be insubstantial

2    or substantial?

3    A.    Oh, no.  They are substantial.  Without doubt, they

4    are substantial.

5    Q.    Let's turn to the next limitation you were going to

6    opine upon, which you have already talked about a little

7    bit, I believe.  That is the generally parallel.

8          If we could get up Slide 14.

9    A.    Yes.  I prepared this to indicate, again, we have the

10   commissural supports projecting from, these are now colored

11   in yellow.  Here is the patent claim, called a claim

12   limitation.  And this is in a direction generally parallel

13   to the longitudinal axis thereof.

14         Now we have the Court's claim construction here

15   above and underneath.

16         And this, again, really doesn't -- please read

17   that -- but it doesn't change the need to have it parallel

18   to the long axis and coming from the side of the cylindrical

19   support means.

20   Q.    And again, you looked at the opinion of Dr. Buller on

21   this?

22   A.    I did.

23   Q.    And did Dr. Buller identify, in your view, a

24   commissural support that was projecting generally parallel

25   to the longitudinal axis?

Rothman - direct

1   A.    Can I just have his --

2   Q.    Sure.  That is 2137, Plaintiffs' 2137, please.

3   A.    To remind you, if you need reminding, this is the --

4   sorry.  The commissural point projecting from, this is the

5   post that looks like Andersen or is supposed to look like

6   Andersen.

7           Conveniently, you are looking at it face-on.

8   You can't tell, but it's actually coming towards you.  So

9   look at the side post.  The side post comes up here and

10  splays away.  And the point of attachment is on this 30

11  degree.

12          That is in no way, to my mind, parallel to the

13  long axis.  Dr. Buller and I agree on one thing, and that is

14  the long axis, it is this line in red.  That is the long

15  axis.  This to me is not parallel.  30 degrees is not

16  parallel.

17  Q.    Perhaps you can, if you want, Dr. Rothman, you have

18  got the large CoreValve model you can show?

19  A.    If we look at this, this is the 30-degree angle.  To

20  my mind, you can't get anywhere near parallel.  It actually

21  is almost a cone shape sitting upside-down here.

22          The definition of a cone is, you have sides that

23  come to a point.  And the cone here, you can see from above,

24  is coming to a point down here.  That's a cone.  That's not

25  parallel.

Rothman - direct

1           Parallel means generally parallel (indicating).

2    Q.    I want to go a step deeper on this issue.  Do you

3    remember Dr. Buller's testimony about where the commissural

4    points are located on the CoreValve device?

5    A.    I do.

6    Q.    Can you explain with reference to the claim, if

7    need -- actually, if we could get Slide No. 14 up again.

8    There you go.

9           So the claim has in it this term "for supporting

10   the commissural points of the collapsible valve."

11          Can you explain what the commissural points are

12   according to the Court's construction?

13   A.    Yes.  The commissural point is the point at which the

14   valve joins.  I don't know whether we could pull that claim

15   construction or not up on the screen.  Can we?

16   Q.    Thank you.

17          So the Court's construction of commissural

18   points here is listed Item 3?

19   A.    Yes, I wanted to, A, refresh my own memory, which is

20   correct, but also for the jury to see what Judge Sleet has

21   told us.

22          Commissural point is the points or locations

23   where the leaflets of the valve are joined.

24          It sounds simple.

25   Q.    Did you analyze the CoreValve actual device with the

Rothman - direct

1    valve in it to see where the commissural points are?

2    A.    Yes.   The one that we were looking at here is the

3    model.   So it doesn't actually show you the commissural

4    points very long.

5             So what I did, at great expense to CoreValve, is

6    to open a real one.

7             This is in water.   What -- if I may show --

8             THE COURT:   Any objection?

9             MR. NATHAN:   No, Your Honor.

10            THE COURT:   Yes, you may.

11            (Witness steps down from stand.)

12            THE WITNESS:   If I can show you the point, if I

13   put my finger in there, I will walk up and do it, the point

14   of separation, you can see, is actually on the tab, that is

15   the point of attachment at the top, this tab point that we

16   have referred to.   And it's halfway up that tab.

17            THE COURT:   Doctor, you might want to move a

18   little more to your right there so all the jurors can see

19   it.

20            THE WITNESS:   So the commissural point as I have

21   separated is actually halfway up the tab.   So it's on the

22   slope of the 30-degree shoulder.

23            We may have to pass that around.   Just put your

24   finger in there.   It won't hurt you.

25            (Witness resumes stand.)

Rothman - direct

1    BY MR. FERRALL:

2    Q.    Just to clarify, Dr. Rothman, that one is not going to

3    be used in any patient.   Right?

4    A.    I am sorry.   I am going to take it back to my

5    third-world country, England, and use it.

6                (Laughter.)

7                That is a porcine, or pig, pericardium valve.

8    That is a real one.

9    Q.    Can we get up Plaintiffs' Exhibit 2135?

10               Dr. Rothman, I would like to try to tie this

11   together now with the claim language.

12               You recognize this as another exhibit created by

13   Dr. Buller.

14   A.    Yes.   The reason I wanted to show where the

15   commissural point is, the point of join, is because it does

16   make a difference in how you appreciate the claim language

17   and infringement.

18               So if I could just show you this.

19               This is a top view, top view, like you just

20   looked at it, of the real valve.   And Dr. Buller has marked

21   the commissural point as down here.   You see, that's on the

22   ring of the -- it looks like it's virtually on a ring.   And

23   I have just shown you that actually it's not there.   It's

24   here.   It's halfway up the tab.

25               The reason I point that out to you is, this is

Rothman - direct

1  set on a 30-degree point.  And Dr. Buller has conveniently

2  put it, I think, further down, down the valve, so to put it

3  on what could be on the perpendicular part or -- I have said

4  all along this is a cone.  But if we are going to argue

5  about whether it is really a cone, if you put it on there,

6  it's closer to the concept of infringing.  And I don't

7  believe this does infringe.

8          I wanted you to be very clear that the

9  commissural point, the point of attachment of the leaflets,

10  is most definitely, as you have just seen, on the 30-degree

11  slope.

12          So it is not perpendicular -- sorry -- not

13  parallel to the long axis.

14  Q.    Dr. Rothman, did you evaluate whether there are

15  substantial differences in the way and the result obtained

16  in the CoreValve device as opposed to the claimed device

17  with respect to the angle of attachment for the valve?

18  A.    Yes.  In looking at the doctrine of equivalents, I

19  have been sort of unable to separate all the different bits

20  out, because when you look at one bit, it has a number of

21  consequences.

22          If I may stand up.

23          Thank you.

24          (Witness steps down from stand.)

25          In making the attachment at 30 degrees, you get

Rothman - direct

1   this slope.  In getting the slope, the slope comes into a

2   point.  And you have to end that slope somewhere.  And you

3   end it in the waist, as I said before.

4            And the waist has -- I would like to put this

5   back here.  The waist that's here, which is there by design

6   in this unit, the waist pulls the device away from the

7   coronary arteries.  That is really an essential piece of it.

8            Also, in so doing, in having a waist, the cone

9   at the bottom, which stops migration, holds the valve open

10   because it's more powerful than the top part, holds the

11   valve open, stops migration, actually channels the blood to

12   flow over this valve.

13            And the ventricle, as I think Dr. Seguin, the

14   surgeon, said, this ventricle down here is actually

15   cone-shaped.  And he designed this to fit into that cone

16   smoothly, rather than like this (indicating), which disturbs

17   the blood flow, he made it go like this (indicating), which

18   follows the line of flow.  That is important, because that

19   forces the blood flow over the valve in a uniform way.

20            Why is that important?

21            If you actually had the flow hit the valve in a

22   slightly off-axis way, you might cause turbulence, more on

23   one valve than the other.  And that might make it

24   incompetent or it actually might make it slam together more

25   and wear it.  So you might actually get a leak.

Rothman - direct

1   Another point about this is if we put the

2   balloon-expandable device in here, it sets to the eventual

3   size that it takes inside this catheter.  So I might choose

4   to put it in at 26 millimeters, let's say.  But if the

5   calcium in here of the valve doesn't let it go out, it might

6   be 25.

7   If this is 25, but it's designed to be 26, it

8   will bang together more.

9   If the tissue is a little bit relaxed in that

10  state, and I dilate to what I think is 26 but it goes up to

11  27, the valve will now not meet properly and I will get

12  leak.

13  The conical device here, the idea of a fixed

14  waist here means that whatever happens down there at the

15  bottom doesn't change the fixed waist.  This is always the

16  right size, independent of what size you are.

17  And that's very important, because this won't

18  leak, by intent, it won't leak, it won't get extra wear on

19  it.

20  So the slope of the shoulders gives you the

21  ability to specify the waist and independent of the strong

22  bottom.

23  Q.   Does the slope of the attachment have any effect on

24  the movement of the device in the body?

25  A.   Does it move as a consequence?

Rothman - direct

1   Q.   Yes.

2   A.   No, because it's such an integrated unit and the load

3   on these tabs is shared across, there is no effective

4   movement of this device inside the body.

5        I have seen this on angiograms and x-rays.  This

6   device does not move at all.

7        Sorry.  The last part is to get the alignment,

8   to ensure that the slope comes up properly, you have this

9   top part, which also gives you the waist.

10  Q.   Thank you.  You can take your seat again.

11       (Witness resumes stand.)

12  Q.   Again, do you consider the differences that you have

13  just described between the CoreValve device and the claimed

14  device to be insubstantial or substantial?

15  A.   In no way are they insubstantial.  They are very

16  substantial differences.

17  Q.   Now, you mentioned, you were just talking about

18  movement.  And you were here when some videos were shown of

19  the CoreValve device yesterday?

20  A.   Yes.

21  Q.   Have you considered those videos in evaluating whether

22  the CoreValve device, in fact, moves in physiological

23  conditions?

24  A.   Yes, I have.

25  Q.   And what have you concluded from those videos?

1   A.      Well, I think there were three shown yesterday.

2   Should we consider each of them?

3   Q.      Sure.

4   A.      Let me just -- the first one that Mr. Michiels showed,

5   where the device was fixed in a clamp with fluid running

6   through it, I think we all saw that actually the whole

7   device was moving.  That was my impression as well.  And I

8   have looked at that in detail.

9           That one I am unconcerned about.

10  Q.      Did that video shown by Mr. Michiels demonstrate

11  anything about whether the frame deflects?

12  A.      No, it did not.  And there was a report that showed

13  that it deflected less than .25 millimeters.  That doesn't

14  mean it deflected .249.  It means it was less than and it

15  could have been zero.  We don't know.  The sensitivity of

16  the test is at the top point of .25.

17          So all we know from that test is that that

18  device does not move any substantial amount.  And we don't

19  know because of the sensitivity of the device from that test

20  whether it moves at all.

21  Q.      Okay.  And there was another video or image shown that

22  was described as I believe an FEA.  And are you familiar

23  with those?

24  A.      I am familiar with what they are.  I don't perform

25  them myself.  I'm not it a computer technologist to do that

Rothman - direct

1    sort of work.  What that means, it is a finite element

2    analysis.  And what it is, it's a computer simulation, and

3    like all computer simulations, you tell the computer what

4    the parameters are that you want it to simulate.

5          So you say what blood pressure do I want it to

6    be that I'm playing in this simulation?  What size of

7    channel am I putting it in?  What size is the top of the

8    channel?  What size is the bottom of the channel?  What is

9    the blood pressure on the other side of the valve?  All

10   simulations.  Not a real valve.

11   Q.    So the images we saw weren't a picture of the valve?

12   A.    Oh, no, they weren't the valve.  And, moreover, if

13   that FEA was the one I think it is, because Mr. Nathan

14   didn't tell us what it was, but if it's the one I think it

15   is, it is actually simulating a worst case scenario under a

16   number of different headings and actually was simulating

17   what would happen under a very worst case scenario.  That is

18   not real life in a simulation.  Sorry.  It's not simulating

19   real life even in the simulation.

20         MR. FERRALL:  The other video was -- maybe we

21   can get up Plaintiffs' Demonstrative -- I think it's 56.  If

22   we can get the still up there.  Actually, it must be 58.

23   BY MR. FERRALL:

24   Q.    That's the FEA?

25   A.    That is the FEA.

Rothman - direct

1   Q.    There we go.  This was another video that was run?

2   A.    This was another video that was run.

3   Q.    And do you have any view as to whether this

4   demonstration tells one how the CoreValve device would flex

5   under physiological conditions?

6   A.    Yes.  Well, I have a report that goes with that, if we

7   may refer to it.

8   Q.    That is Defendant's Exhibit 1477.

9         And if we could turn to the page beginning or

10  ending in 921, I believe.

11  A.    I think it's Page 5 of the report.  Can you go to the

12  next page?  Oh, I'm sorry.  No, let's start -- let's start

13  here.  Yes.

14  Q.    Yes.  If you could just explain what this report tells

15  you about the test?

16  A.    As it says at the top, it's a nitinol -- which is the

17  fabric of the frame -- fatigue test analysis.

18        And what we're trying to do in this fatigue test

19  is, it's to look at when this device will fail and trying to

20  find when it will fail.  And it's a sort of standard

21  evaluation.  In some tests, you take it to extreme

22  conditions and see if it works.

23  Q.    So based upon your review of this description of the

24  test, do you believe that that video is attempting to

25  replicate physiological conditions?

Rothman - direct

1   A.     No.   If we turn to the table slightly further on --

2   the next page, I think.   Nope, not that page.

3   Q.     The page ending 921, Mr. Hugo.   Next one.

4   A.     There it is.   This bit at the top, if you could blow

5   that up for me.   My eyesight is not that good.

6          The conditions that are being set up here are an

7   arterial blood pressure of 200 -- so that is about my blood

8   pressure right now.   That is not physiological -- and the

9   diastolic of 110.   And as you know, these are very high

10  blood pressures and these would actually render a patient at

11  risk of stroke or heart attack.   So this is not a

12  physiological condition.

13         The thing here is actually that is very

14  interesting, this is called the Delta -- that is what that

15  symbol means -- P across the closed valve.

16         Now, normally, when you eject blood, as we were

17  told yesterday, your blood pressure, say, is at 140 over 80,

18  the blood goes out at 140 and comes back and back slams at

19  80.   What is the pressure across the valve, the back

20  pressure?   It's 60.   That is 140 minus 80:   60.

21         Here, even though the blood pressure difference

22  is 90, the back pressure, the difference on the valve is

23  160.   How do they do that?   They've added pressure

24  downstream of the valve and slammed it back, even more

25  pressure.   So, first, it goes through the valve at high

Rothman - direct

1    pressure, 200, and it slams back at 160.

2              So I think in Dr. Pinchuk's analysis yesterday,

3    he said, you know, sort of the 30 to 40 millimeters of

4    mercury was about a basketball dropping three feet.  Well,

5    this is four times that.  This is a slam-down with a

6    basketball.  This is a destructive test on the valve.

7              And so this is a very, very significant test.

8    And this is a test to test the destructive forces.

9              Is that a fair test to show the jury does it

10   move?  No.

11   Q.    Thank you, Dr. Rothman.

12             We can pull that down, Mr. Hugo.  Thank you.

13             Now, one more question still on this claim

14   element about "generally parallel."

15             Did you review the prosecution history of the

16   '552 patent, Dr. Rothman?

17   A.    Yes, I did.

18   Q.    In the prosecution history, what we mean is the back

19   and forth with the Patent Office in order to obtain the

20   patent.  Right?

21   A.    Yes.  It's a communication between presumably the

22   patent lawyers for the Andersen team and the Patent Office,

23   back and forth, to try to get a patent.

24   Q.    And did you see how, if at all, the claim limitations

25   we're talking about today came about during the prosecution

Rothman - direct

1    of the '552 patent?

2    A.    Yes.   In the patent prosecution history, as it is

3    called, the documentation between the inventor and the

4    Patent Office, there is quite a bit of to-ing and fro-ing in

5    between.   And from my reading of the patent history, the

6    patent was about to be rejected.   In fact, on two occasions

7    was near to rejection.

8               And in 1993 -- the patent was filed in 1990, but

9    in 1993, some language was added to the Claim 1.   And maybe

10   we can put that up.

11   Q.    Yes.   If we can look at Plaintiffs' Exhibit 3, the

12   page ending in 313.

13              And do you recognize this as the original

14   proposed claim?

15   A.    Yes.   And we can see -- I'm sorry -- wherein the

16   commissural points of the elastical collapsible valves are

17   mounted on the cylinder surface of the elastical stent.

18              There is no mention of commissional supports

19   projecting from, et cetera.

20   Q.    Or "generally parallel" language?

21   A.    Thank you.   Or "generally parallel."   So that is

22   missing up until.

23   Q.    And then if we could look at Page 427, at page ending

24   in 427 of the same exhibit.   And if we could blow up the top

25   half of that, Mr. Hugo.

1    Can you explain what you found here in this

2    document?  Actually, why don't you first explain what this

3    document is.

4    A.    This is an amended submission to the Patent Office.

5    And the underlined part is the new elements that have been

6    added to the patent in 1993 to avoid rejection.

7    So these become part of the patent.  These

8    become part of the claim language.  And you have to carry

9    out all these or your invention must have these elements in

10   it to be protected by this patent.  So what has been added

11   has -- right.  Where are we?

12   Has a plurality of circumferentially expandable

13   sections such that the cylindrical support means, et cetera.

14   A plurality -- I can say that word; right?  A

15   plurality of commissural supports projecting from one side

16   of the cylindrical support means -- which was there

17   before -- in a direction generally parallel to the

18   longitudinal axis thereof.

19   That is added in 1993.  The other bit is added

20   as well, but I don't think we're worried about that.

21   Q.    And based on these facts, Dr. Rothman, is it your

22   opinion --

23   MR. NATHAN:  Objection.  Can I have a sidebar at

24   this point?

25   THE COURT:  What is the basis of the objection?

 1                    MR. NATHAN:  There is an opinion about this.

 2                    THE COURT:  All right.

 3                    (The following took place at sidebar.)

 4                    THE COURT:  There is an opinion about what?

 5                    MR. NATHAN:  He is going down the Festo track.

 6     This is exactly the basis of their Festo motion.  I don't

 7     mind him saying that the language was added in 1993.  That

 8     is accurate, but he is now going to ask opinions about the

 9     significance.

10                    THE COURT:  Well, Festo is a matter for the

11     Court.

12                    MR. NATHAN:  Exactly.

13                    THE COURT:  So is that what you are doing?

14                    MR. FERRALL:  I don't have to ask the next

15     question.  We weren't sure whether it was going to be

16     submitted to the jury.

17                    THE COURT:  Come on, counsel.  That has been

18     your position right along, it's a matter for the Court.  You

19     understand.

20                    Listen, counsel.  I want you to move the

21     examination along.  It's taking too long, okay?

22                    MR. NATHAN:  Thank you, Your Honor.

23                    THE COURT:  The objection is sustained.

24                    MR. FERRALL:  Thank you.

25                    (Sidebar conference over.)

Rothman - direct

1    BY MR. FERRALL:

2    Q.    Dr. Rothman, let's turn to the last limitation that

3    you're providing an opinion on.  And that is the

4    "cylindrical supports means."

5              If we can look at Slide 16, please.

6              And can you tell us what you followed from the

7    Court's claim construction to render an opinion about this

8    claim element?

9    A.    Okay.  Well, again, claim element of the '552 patent,

10   Claim 1, is there is a cylindrical support means.  And in

11   the patent, itself, in the figures, this is the portion we

12   have called the cylindrical support means.

13             And the construction here is, Judge Sleet's

14   construction, "a portion of the stent supporting the valve

15   that has a shape of or relating to a cylinder."

16   Q.    And what is your opinion as to whether the CoreValve

17   device meets that claim limitation?

18   A.    To my mind, there is no cylinder in this device.  On

19   the bottom, as I have explained over and over again, is a

20   cone shape, and the top is an hourglass or a second cone

21   inverted into that.  So I don't believe there is any cone

22   shape in there.

23   Q.    Okay.  Have you considered whether the CoreValve

24   shape, in its various parts, is related to a cylinder?

25   A.    Yes.  Well, to my mind, again, the related to, we're

Rothman - direct

1   not taught related by how much.  And I take the cylinder to

2   have parallel sides or virtually parallel sides and that is

3   my definition, general definition of a cylinder.

4            And the base of the CoreValve is not intended to

5   be a cylinder, by mistake, misshapen.  It's intended to be a

6   cone.

7   Q.    Can you explain briefly whether in your view there are

8   any differences in the way or the result of the CoreValve

9   device as a result of its shape as compared to the claim

10  language?

11  A.    Well, at the risk of being repetitious, if I may.

12  Q.    Well, and you can hit your points very briefly,

13  Dr. Rothman.

14  A.    This is a cylinder.  It's designed to be a cylinder.

15  It has the risk of, it has to be overexpanded to anchor it

16  in the annulus or valve area.  And it has, as I showed

17  before, the risk of moving, the risk of misalignment and,

18  therefore, the risk of moving again or even wear and tear on

19  here, and also has the risk of blocking the coronary

20  arteries if placed incorrectly.

21           And the difference here is the conical shape is

22  designed to seat up in the valve and sit in the bottom of

23  the ventricle to lock in place.  That cone, not cylinder, is

24  designed to lead to a point and, in leading to the point,

25  create this narrow waist.  So the cone is thereby designed

Rothman - direct

1    and it gives you the features I mentioned of protecting the

2    coronary arteries, the tissues, the CoreValve, away from it.

3    It gives you the blood flow over the valve that is uniform.

4    So very different function, very different way, very

5    different result, or substantially different result.

6    Q.    Thank you.  Now, Dr. Buller testified about an opinion

7    he had about what was disclosed in the '552 patent.

8          If we could get up Plaintiffs' Demonstrative

9    Exhibit 28.  I think that will ...

10         That's not right.  That's not the right drawing.

11    Mr. Hugo, that's okay.  You can put that down.

12         Do you recall Dr. Buller's testimony about what

13    he contended was disclosed by a certain passage in the

14    patent at Column 6?

15         Maybe we can pull that up, Mr. Hugo.

16         And if we could just highlight the last full

17    paragraph there in Column 6.

18    A.    Right.  Sorry.

19    Q.    So, Dr. Rothman, do you remember the testimony about

20    this portion of the patent?

21    A.    Yes, I do.  And the particular portion I think we're

22    talking about starts here, really.  And we're considering

23    where we place the valve in the patient.  We're considering

24    placing the valve in what is called in the outflow track,

25    the same place we talked about before, below the coronaries.

Rothman - direct

1    So that's the position we're talking about.

2             And if we're doing just a little bit above, by

3    placing the cardiac valve prosthesis, the Andersen

4    invention, as shown in Figure 8.

5             I don't know whether you can pop up Figure 8.

6    Can you?

7             THE COURT:  The question isn't so much if they

8    can, it's if they need to.

9             THE WITNESS:  It would be helpful.

10            THE COURT:  Okay.

11            THE WITNESS:  It would help me.

12            They're talking about putting this in this

13   position.  And this is the position of the native valve.

14   And, remember, this is a figure from their patent.  The

15   Andersen patent.  So we're trying to put it here below the

16   origin of the coronary arteries as shown here in their

17   diagram.

18            So I mentioned the risk of this thing.  You've

19   got to get it in the right place.  You get a one time shot

20   at it.  If you cut the coronary arteries, you are in

21   trouble.

22            So if we can go back to the actual document --

23   patent.  I'm sorry.

24            So by placing the cardiac valve prosthesis as

25   shown in Figure 8 -- Figure 8 -- there is a risk of

Rothman - direct

1   detachment -- this is coming from the patent.  They're

2   actually acknowledging there is a risk of detachment --

3   and/or covering the mouth of the coronary arteries --

4   here -- and therefore it is preferred to use a higher

5   stent -- there is a problem with the word there.  What does

6   that mean? -- which, for instance, comprises several rings,

7   7 and 8 -- those are additional rings like this -- placed on

8   top of each other.

9            Let's not worry about the rings for a moment.

10  This allows -- sorry.  This allows a fixation of the

11  prosthesis at a place after the mouth of the coronary

12  arteries.

13           So if there is a risk of detachment and covering

14  the coronary arteries, don't go there.  Put this device

15  after the mouth of the coronary arteries even though the

16  valve itself is in the position between the coronary

17  arteries and left ventricle.

18           So we've put the Andersen invention here.  And I

19  believe this paragraph is saying, by the way, your native

20  valve, not prosthetic valve, is still sitting here by

21  reference.  Put this up here, don't go near the coronaries.

22  And, by the way, the valve is here in the normal position.

23  It's still there.

24  Q.   Now, why don't we leave this up, Dr. Rothman.

25           I just want to focus the jury on what was said

Rothman - direct

1    before.

2              If you could move the CoreValve magnet, please.

3              (Witness steps down from stand.)

4    Q.    Thank you.  You will recall, Dr. Buller drew in his

5    interpretation.  It had two points of fixation.

6    A.    Yeah.  I have a picture of it.  Can we put that up, do

7    you think?  There is a picture of Dr. Buller's drawing.

8    Q.    Do we have that?

9    A.    It was Slide 29, I think, in Dr. Buller's set.

10             That's the one.

11   Q.    Your memory is better than mine.  Thank you.

12             (Witness resumes stand.)

13   Q.    In your view, does that passage from the '552 patent

14   disclose a device such as this?

15   A.    Only if you wanted to create something that looked

16   like a CoreValve.  I don't think it says that at all.  I

17   think it says put the device here and the valve -- the

18   native valve, my valve, that I am trying to treat, which is,

19   of course, leaking, not narrowed, because this wouldn't

20   treat a narrowed valve, if you place it up here, the native

21   valve is still here.

22             Now, I don't think that in 1990 any

23   interventional cardiologist in his right mind would have

24   considered this sort of device.  This covers the coronary

25   arteries.  And in 1990 we would have been terrified of

Rothman - direct

1   covering the coronary arteries or going near them with

2   metal, because in 1990 we were only really just at the very

3   early stages of putting stents in coronary arteries, and we

4   had lots of complications in the early days putting stents

5   in coronary arteries.

6              We had them suddenly block, thrombose with your

7   blood.  In treating patients, to try to prevent the

8   blocking, we made them bleed excessively because we gave

9   them what in England is called rat poison, which makes your

10  blood thinner.

11             THE COURT:  Counsel, I don't mean to cut the

12  Doctor off, but can you ask another question?

13             MR. FERRALL:  Thank you.

14  BY MR. FERRALL:

15  Q.    Doctor, in light of your view about the disclosure in

16  the patent, does that Column 6 language affect your opinion

17  whatsoever about the scope of equivalents available under

18  Claim 1?

19  A.    No.  Claim 1 requires, as I have said over and over

20  again, commissural supports projecting from.  This has no

21  projections, and I don't think this is covered by Claim 1.

22  Q.    Thank you.  We can take that down, Mr. Hugo.

23             Did you review the CoreValve patents?

24  A.    Yes, I did.

25  Q.    Did you have any view as to whether one or more claims

Rothman - direct

1    of the CoreValve patents covered the CoreValve GEN 3 device?

2    A.    Yes.

3    Q.    And if we could pull up Defendant's Exhibit 1276,

4    please?

5          Do you understand, this is one of the patents to

6    Dr. Seguin?

7    A.    This is the '682 patent up here.

8          If we, for example, go to Claim 17.

9    Q.    Can we pull that up, Mr. Hugo?

10         Do you have an opinion as to whether this claim

11   covers the CoreValve device?

12   A.    I do.  And I believe it does.

13   Q.    Can you just briefly identify the elements that cover

14   the CoreValve device?

15   A.    Well, I think I need to read it all the way:

16         A radially expandable stent comprising at least

17   one expandable zone that is configured in an expanded state,

18   to bear against a wall of the native body lumen in a manner

19   so as to resist migration, and means for mounting the valve

20   on the stent such that, when expanded, the valve is

21   positioned outside of the zone, which is the zone of the

22   valve, wherein the stent comprises a middle portion having a

23   smaller diameter than at end portions thereof; the valve

24   having a shape corresponding to that zone of the stent in

25   whose area it is intended to be mounted; and wherein the

Rothman - direct

1    middle portion forms two inverted truncated cones.

2    Q.    That middle portion, where is that on the CoreValve

3    device?

4    A.    That is here.  And these are the two inverted cones.

5    Q.    Are you familiar whether the Patent and Trademark

6    Office was informed of the disclosure of the Andersen

7    invention when this patent was applied for?

8    A.    Yes.  The Andersen inventions are mentioned as prior

9    art.

10   Q.    And if we could look at Defendant's Exhibit 140,

11   please.

12   A.    This is probably the patent.

13            This is patent '406.  We need to look at Claim

14   8.  It's not just one claim.  There are a number of claims.

15   Q.    The claim -- Mr. Hugo, Claim 8 is a combination.  If

16   you can put up Claim 1 and Claim 8.

17   A.    So this is what I showed was a dependent claim on

18   Claim 1.

19            So, again, A valve having a plurality of

20   resilient leaflets; a valve supporting comprising a central

21   band, comprising a plurality of expandable cells, the valve

22   support configured to be collapsible for transluminal

23   delivery and expandable to contact the anatomical annulus of

24   the native valve when the assembly is positioned in situ,

25   said valve support supporting the base and the commissure

1    points of the valve; and an anchor for engaging the lumen

2    wall when expanded in place for preventing substantial

3    migration of the valve assembly after deployment; wherein

4    the anchor is itself configured to be expandable -- that

5    talks about the bottom, that last bit.

6              Then in 8, which is a claim dependent on Claim

7    1, The valve assembly of Claim 1, further comprising a

8    second anchor.

9              The top part of the CoreValve.

10             So this claim, Claim 1 with Claim 8, has two

11   anchors, and has a waist.

12   Q.   Dr. Rothman, can you explain how the fact that

13   CoreValve has some patents that in your opinion cover the

14   CoreValve device, how that affects your opinion regarding

15   the doctrine of equivalents?

16   A.   The Patent Office knew about this.

17             I am sorry.  I don't think I understand your

18   question.

19   Q.   Did the Patent Office know -- for this patent, also,

20   did the Patent Office know about the '552 patent?

21   A.   Yes, it did.

22             MR. NATHAN:  It's leading.

23             THE COURT:  Overruled.

24   BY MR. FERRALL:

25   Q.   In light of the Patent Office's awareness of the

1    Andersen patent, and their granting, their allowance of this

2    claim, how does that affect your opinion about the doctrine

3    of equivalents?

4    A.    The Patent Office knew about this and decided that

5    this was an invention.  It was novel.  And it was novel over

6    every other piece of art that they considered.  So this is

7    by definition an invention.

8    Q.    Thank you.  Dr. Rothman, let's turn to your opinion on

9    validity briefly.

10         You said you had an opinion about enablement.

11   A.    Yes.

12   Q.    We have heard a lot.  So I am just going to go

13   straight to the conclusion.  Can you tell us why, in your

14   opinion, the Andersen patents are not enabled?  I believe we

15   have a slide.

16   A.    Yes, I do have a slide.

17   Q.    If we can see Slide No. 20.

18   A.    In looking at enablement, I have chosen just a small

19   number of reasons which I think are very important.

20         Enablement means, again, if I may, it has to be

21   made or used, the patent, the scope of the patent has to be

22   made or used by somebody like me, a person of ordinary skill

23   in the art.  I don't believe the device was small enough nor

24   does the patent tell me how to make it small.

25         The second part of enablement is without undue

Rothman - direct

1    experimentation.  I think there is a huge amount of work --

2    I don't know whether you could even do it even with work,

3    but there is a huge amount of work in front of you to make

4    it small enough.

5              You also have to make it strong enough.  And

6    that runs counter to making it small enough.  You need

7    strength.  But if you make it so small you can get it in,

8    you probably make it weak or flimsy.  There is another

9    challenge.

10             And it has to be safely and effectively placed

11   in this one-time shot of delivery in there and it has to

12   stay where you put it.

13             I think the Andersen patent fails to enable me

14   to be able to do this in 1990 and perhaps even today.

15   Q.    Did you review some of the events that occurred after

16   the patent application, like the animal studies that the

17   inventors performed?

18   A.    Yes.

19   Q.    Did those affect your opinion about enablement?

20   A.    Yes.  Well, in the patent itself, there is a section

21   which talks about, make it out of .55-millimeter wire, et

22   cetera.  Then goes on to the fact, it strongly suggests that

23   it has been used in animals but doesn't tell us the results.

24             In 1992 there is a paper eventually describing

25   the results.  And in the paper, there were eight pig

1    experiments.  And in three of them, the device was placed in

2    the annulus where the valve was of a pig and moved

3    immediately.  And in three of them it occluded, blocked the

4    coronary artery either partially or completely.

5              Subsequently, over the next year or so, there

6    were a total of 42 pigs, and there was a 34-percent, one in

7    three, success rate for partial or total success in placing

8    the device.  And actually, in the latter half of that 42

9    pigs, they didn't even try to put it in the valve position.

10   They put it in the descending aorta, on the arch of the

11   aorta, but not in the valve.  They stopped doing that.  And

12   one of the inventors actually gave evidence to say they

13   stopped doing it because they couldn't do it.

14             So I think I have another slide to follow that.

15   That just hits at the fact that they couldn't make it work.

16   Q.    That was Slide 21.

17   A.    Yes.  So from their own studies, their 42 studies, we

18   know it moved.  They had situations where they landed it in

19   the valve and it moved.

20             We heard Dr. Andersen, one of the inventors, on

21   video say what is success?  And his definition of success

22   was five minutes.  Well, five minutes is nothing.  I can't

23   put -- even start to think a device is successful based on

24   five minutes experience.

25   Q.    Dr. Rothman, to this day, are you aware of any device

Rothman - direct

1    that has been approved for human use that is designed

2    according to the claim limitations of Claim 1 with

3    projecting commissural supports that are generally parallel,

4    et cetera?

5    A.    No.

6    Q.    Thank you.

7              MR. FERRALL:  Your Honor, may I approach?

8              THE COURT:  Yes.

9              (The following took place at sidebar.)

10             THE COURT:  Yes.

11             MR. FERRALL:  I want to propose a proffer about

12   evidence concerning the cylindrical rotation that would be

13   pursuant to our proposed claim construction.

14             THE COURT:  No, counsel.

15             MR. FERRALL:  That is fine.

16             THE COURT:  And I really, I want you to

17   communicate this to your team, stop pushing the issue.  You

18   have preserved your position.  Stop pushing it.

19             (End of sidebar conference.)

20             MR. FERRALL:  Thank you, Dr. Rothman.

21             Your Honor, I have no further questions.

22             THE COURT:  Ladies and gentlemen, Ms. Walker has

23   reported to me that you have inquired whether there will be

24   any limitations on the duration of your deliberations.  I

25   will place no constraints on the length of your

1   deliberations by way of time.

2          I am told that at least a couple of you have

3   some Easter plans, but are willing to return on Monday if

4   you were given early enough notice so you can make

5   arrangements.

6          I hope this is early enough notice, because I

7   don't think you are going to get this case until sometime

8   tomorrow.

9          I suspect that you may well need more time than

10  the balance of the day on Thursday to properly consider the

11  evidence.

12         So that's my guidance to you.

13         You may go to lunch and we will be back at 2:00.

14         (Jury leaves courtroom at 12:53 p.m.)

15         (Luncheon recess taken.)

16         THE COURT:  All right, Ms. Walker.  Let's bring

17  in the jury.

18         (Jury returned.)

19         THE COURT:  All right, members of the jury.

20  Please take your seats.  We'll now have Mr. Nathan's

21  cross-examination.

22         MR. NATHAN:  Thank you, Your Honor.  Before I

23  start, let me hand up some binders.  Two for the Court, one

24  for the witness.

25         I would also like to hand up, these were too

Rothman - cross

1   bulky to put in notebooks.

2           THE COURT:  Is that for the doctor?

3           MR. NATHAN:  Yes.  I have two copies.  This is

4   the '706 file history.  I gave a copy yesterday.

5           THE COURT:  I can do without that.

6           MR. NATHAN:  I'm sure.

7           Anybody else I want a copy?

8           THE COURT:  I don't need it.

9           Does Dr. Rothman need it?

10          MR. NATHAN:  He will.

11          THE WITNESS:  Can I do without it?

12          THE COURT:  Probably not.

13          MR. NATHAN:  And I have copies of the other

14  Dr. Seguin patent file history.

15          THE COURT:  Would you like the doctor to have

16  that as well?

17          MR. NATHAN:  Yes, please.  I guess you don't

18  care for it.

19          THE COURT:  No, thank you.  I'll watch the

20  screen.

21          MR. NATHAN:  All right.  It's not a page turner.

22                      CROSS-EXAMINATION

23  BY MR. NATHAN:

24  Q.   Good afternoon, Dr. Rothman.  Nice to see you again.

25  A.   Good afternoon, Mr. Nathan.  I've been looking toward

Rothman - cross

1    with it.

2    Q.    As with other witnesses, we met before.  I took your

3    deposition?

4    A.    You did.

5    Q.    In Washington?

6    A.    Yes.

7    Q.    And you testified truthfully then?

8    A.    I beg your pardon?

9    Q.    You testified truthfully then?

10   A.    Of course.

11   Q.    I want to understand, because your deposition was

12   taken in October of last year.

13   A.    Yes.

14   Q.    Starting in November, you signed some papers with

15   Medtronic, and you are now a full-time Medtronic employee.

16   Is that correct?

17   A.    Not quite.  I signed at the end of November, and I am

18   a full-time employee of Medtronic; but I also have -- I

19   still retain a contract with my hospital to be able to

20   undertake procedures.  I'll be there probably every fourth

21   or fifth week doing a week's work.  So I think I hold two

22   jobs.

23   Q.    But, essentially, most of your time is spent working

24   for Medtronic?

25   A.    As others have said, I do more than a 40-hour week.

```
 1   And, yes, I do a lot of my time with Medtronic, but I also
 2   do clinical work.
 3   Q.    And your paychecks, however you are paid, wire
 4   transfers or whatever, they come from Medtronic, do they
 5   not?
 6   A.    One comes from Medtronic and one comes from Boston to
 7   London National Health Service.
 8   Q.    The one from Medtronic, that comes from Medtronic?
 9   A.    Yes.
10   Q.    From Minneapolis?
11   A.    I don't know where it comes from.
12   Q.    And Medtronic owns Medtronic CoreValve?
13   A.    Correct.
14   Q.    Now, you testified this morning that you have 50
15   patents?
16   A.    Around that.
17   Q.    Yes.  And you mentioned one on -- an early one on
18   ultrasound, if I heard you correctly?
19   A.    Correct.
20   Q.    So you are an inventor?
21   A.    I am.
22   Q.    Do you have any patents on what we've been calling in
23   this courtroom, THV, transcatheter heart valves?
24   A.    I have no patent on a transcatheter heart valve.  I
25   have a patent application on a repair technology for the
```

1    ascending aortic valve.  That is the area immediately above

2    the aortic valve.

3    Q.    But the answer to my question is --

4    A.    It's submission, not a patent.

5    Q.    -- you have no THV patents?

6    A.    I have not.

7    Q.    Now, you testified this morning that you were trained

8    by Dr. Palmaz.  Is that right?

9    A.    For coronary stent implantation.

10   Q.    And just so we're talking about the same thing, this

11   is a large model.  That you have been here throughout the

12   trial?

13   A.    I'm sorry.  I need to correct that.  I haven't been

14   trained by Dr. Palmaz.  I was trained by Dr. Schatz who is

15   Julio Palmaz's partner.

16   Q.    And you were trained by Dr. Palmaz's partner on how to

17   use this stent?

18   A.    Actually, the next -- the generation for coronaries,

19   similar to that, but it has got a little bridge in the

20   middle that is one millimeter.

21   Q.    And it is your testimony that you did this in 1987.

22   Is that right?

23   A.    Yes.

24   Q.    What is the priority date in this case for the

25   Andersen invention?

1    A.    The patent here is -- oh, the priority date.  Can I

2    look at the patent?

3    Q.    Yes.  If you look in your cross-examination notebook,

4    I'm going to drive you into the smaller volume.

5    A.    Thank you.

6    Q.    If you look at Tab 4.

7    A.    (Witness complies.)  Yes, May 18th, 1990.

8    Q.    May 18th, 1990.

9    A.    That's the foreign application priority date.

10   Q.    My question is between 1987, when you said that you

11   first did a stent procedure, between 1987 and 1990, that was

12   three years.

13   A.    Yes.

14   Q.    You didn't think of this invention, did you?

15   A.    No.

16   Q.    Now, in 1987, you had actually gotten a patent on

17   your -- I've forgotten -- the ultrasound device; is that

18   right?

19   A.    Yes.

20   Q.    So you were an active inventor in the time period

21   starting in 1987 and going right up to the time the

22   inventors filed their application in 1990?

23   A.    Yes.  My serious research interest was the development

24   an ultrasound imaging system.  That is what I was focusing

25   on in terms of invention.

Rothman - cross

1   Q.    But between '87 and 1990, you didn't think of the

2   Andersen invention, did you?

3   A.    No.

4   Q.    Now, we heard some testimony about other medical

5   device companies:  Medtronic, Edwards.  Do you know a

6   company called Cook?

7   A.    Yes.

8   Q.    You have been an expert in some litigation on behalf

9   of Cook, have you not?

10  A.    I have.

11  Q.    And you actually made some comments during that trial

12  on the Andersen '552 patent, did you not?

13  A.    Almost certainly.

14  Q.    Could you look in your notebook at Tab 5?

15        Could you put this up on the screen?

16        Let me start with just the first page to orient

17  everybody.  Plaintiffs' Trial Exhibit 1178.  This is

18  testimony from last May 6th, 2009?

19  A.    Correct.

20  Q.    And actually this case is where Cook sued Edwards?

21  A.    Yes.

22  Q.    And you testified on behalf of Cook?

23  A.    Yes.

24  Q.    Now, could you turn to Page 179, starting at Line 9

25  and going through Line 13.

Rothman - cross

1

2          If I could have those lines highlighted, please.

3          It's 179, Mr. Stevenson.  Thank you.

4          Did you testify on behalf of Cook about Andersen

5   as follows:

6          "Answer:  Yes, I think there are some things,

7   ideas, in Andersen that actually sound quite interesting and

8   I quite like his concept for trying to avoid the coronary

9   ostia, you know, these apices where you try and get them to

10  avoid covering the coronary ostia, is a good idea."

11  A.    Yes, it is an idea and an appropriate idea to try to

12  avoid the coronary arteries.

13  Q.    Is that an accurate transcription of what you

14  testified in the Cook case?

15  A.    Well, as you will understand, I can't remember exactly

16  what I said, but if that is the transcript, that is what I

17  said.

18  Q.    Could you look in your notebook at Tab 9.  And I'll

19  take you to Page 186 of the transcript.

20  A.    I'm sorry.  I couldn't hear you, Mr. Nathan.

21  Q.    It's Tab No. 9 in your notebook.

22  A.    Yes.

23  Q.    And it's Plaintiffs' Trial Exhibit 1178, Page 188 at

24  the bottom.  If you look in your notebook, you will see this

25  at the bottom, 188 of 658.

1      Do you see that?

2    A.    Okay.  Yes.  Sorry.  I see where you are looking now,

3    yes.

4    Q.    And if you could highlight for us, Mr. Stevenson, the

5    paragraph beginning at Line 2, all the way down to 21.

6          "Answer:  My Lord" -- and I guess that is the

7    way you address the judge in England?  My Lord?

8    A.    You do indeed, yes.

9    Q.    So you were addressing the judge?

10   A.    I was addressing the judge.  I might get confused

11   here, but ...

12         THE COURT:  I'll have to go get my wig.

13         THE WITNESS:  Thank you.  Thank you, my Lord.

14         MR. VAN NEST:  Let's not start tossing ideas

15   around.  (Laughter.)

16   BY MR. NATHAN:

17   Q.    And when you testified to "my Lord," you wanted that

18   judge to believe you, didn't you?

19   A.    Of course.  I was under oath.

20   Q.          "Answer:  My Lord, I think it's an

21   interesting perspective, but I do not know for a fact but I

22   would assume that the valve industry will have seen Andersen

23   when it was published and will have known about it and they

24   chose not to pursue it in great depth, because they felt

25   that there was a pressure within their client base, the

1   cardiac surgeons, that this was not an idea to pursue."

2              Did you testify to that?

3   A.    That is what I testified, yes.

4   Q.    Now, do you know Dr. Cribier?

5   A.    I do.  I know Alain Cribier.

6   Q.    And you know him personally?  You have known him for

7   years?

8   A.    A very long time.

9   Q.    And were you in the courtroom when he testified by

10  video?

11  A.    I saw the video, yes.

12  Q.    Okay.  How long have you known Dr. Cribier?

13  A.    Probably 25 years.

14  Q.    And do you value his opinion and judgment?

15  A.    Let me just tell you that I don't know him as a

16  personal friend in the socializing way.  We don't dine

17  together or go out drinking together, but I know him at

18  conferences.  I certainly respect his medical and

19  entrepreneurial, innovative activities, certainly.  And I

20  respect him as a very honest individual.

21  Q.    And so you know him professionally and you respect his

22  judgment?

23  A.    Absolutely.

24  Q.    And were you here when he testified about what his

25  view of the Andersen patent was and the accomplishment that

1  Dr. Andersen and his colleagues had achieved?

2  A.   I understand that for an innovator, the idea of a new

3  idea, the concept of a new idea --

4         THE COURT:  Doctor, I think the question was

5  "were you here."

6         MR. NATHAN:  Yes, that's all.  Were you here.

7         THE WITNESS:  I think so.  I'm not absolutely

8  sure.  I think so.

9  BY MR. NATHAN:

10  Q.   Now, would you describe Dr. Cribier as a leader in the

11  field of interventional cardiology?

12  A.   He is a leader amongst a lot of leaders.

13  Q.   But if you had to pick some of the top leaders, would

14  you certainly classify him as one?

15  A.   He certainly, as I said, as I was saying before, he is

16  an innovator and he is passionately committed to improving

17  the lot of his patients.  So, yes.

18  Q.   Now, what about Dr. Grube?  And I hope I'm saying that

19  right?

20  A.   Eberhard Grube.

21  Q.   Eberhard Grube.  Do you know him?

22  A.   Yes, same way.

23  Q.   Same way.  And for how long?

24  A.   Less time.  Probably 10 years or less.

25  Q.   Do you value his judgment and statute in the

1    interventional cardiology field?

2    A.    That is a more difficult question.  I think he is a

3    superb operator, doing procedures.  And I think he is very

4    good at spotting new ideas and new innovations.

5             As a patient care and physician, I don't know

6    his practice.

7    Q.    Do you read his publications?

8    A.    A few, yes.  I more listen to him at conferences and I

9    watch him operate on either live cases, video cases or live

10   transmissions.

11   Q.    And when he talks, you listen?

12   A.    Yeah.  More often, I watch.  I'm very impressed by

13   what he does rather less on what necessarily he says.

14   Q.    Were you here in the courtroom -- and again,

15   apologies, I don't have eyes in the back of the head.  Were

16   you here when Dr. Seguin testified that Dr. Grube was one of

17   the CoreValve early investigators or proctors, if not the

18   earliest?

19   A.    I heard that from Dr. Seguin and I know it.

20   Q.    Could you put up on the screen the Grube 2005 article,

21   which is Plaintiffs' Trial Exhibit 158.  You will find it in

22   Tab 8 of the notebook?

23   A.    Thank you.

24   Q.    When you testified here today and gave your opinions

25   to the jury, my question is, did you take into account this

1    article?

2    A.    Yes, I know about this article.  Yes, I do.

3    Q.    Would you go to Page 2 of 5?

4    A.    Yes.

5    Q.    What we have up on the screen is a composite of a

6    piece of Page 2 and a piece of Page 5, because there is a

7    reference, No. 1 here, and we pulled out from Page 5 the

8    reference.  I want to be sure you understand what we have

9    done.

10   A.    I can see what you did.

11   Q.    All right.  Did not Dr. Grube write in 2005, "Few

12   years ago, treatment of aortic valve disease with

13   percutaneous transluminal implantation of stent-based valve

14   prostheses has been introduced and successfully tested in

15   animal models"?

16          And the reference was the Andersen 1992

17   publication?

18   A.    I heard the testimony that you elicited from Dr.

19   Seguin, I think it was.  And I know that paper very well

20   that that refers to.  And the term successfully, as Dr.

21   Andersen admitted to on the video, success in his testing

22   was 60 seconds to five minutes and occasionally up to 90

23   minutes.

24          The word success needs to be carefully

25   interpreted in a scientific appraisal of a paper.

Rothman - cross

1    Q.    That is not what Dr. Grube said?

2    A.    I don't know, I don't know what you take from Dr.

3    Grube.  I take what I read.  It says stent-based valve

4    protheses have been introduced and successfully tested in

5    animal models.

6              I then go to the paper.  And the paper says,

7    short-term tests.  That is the term.

8              He doesn't define success in any way.  That is

9    the paper -- that paper you are making reference to, that is

10   the term of success, five minutes.

11   Q.    Dr. Grube said, based on that, that the device had

12   been successfully tested in animals?

13   A.    Bearing that caveat in mind, I agree.

14   Q.    These were the same pigs that you have tested, you

15   talked about this morning and you said many of them failed?

16   A.    The paper looked at eight pigs.  Three had implants in

17   the annular position, subcoronary, and three had immediate

18   or partial death -- I am sorry, had immediate or partial

19   covering of the coronary arteries.  A number of the other

20   implants in that paper were not even attempted in the

21   coronary position.  They were attempted either in the

22   supracoronary position or in what you called yesterday or

23   the day before the Hufnagel position, the position down the

24   descending thoracic aorta.

25              Success in putting them in there, yes, Dr.

1    Andersen demonstrated success in putting them in all three

2    places, for minutes at a time.

3    Q.    So I understand your testimony, Doctor, Dr. Grube

4    says it was successfully tested and you say it was not

5    successfully tested?

6    A.    No.  I am using the word success with a definition

7    that fits the paper you are referring to.  Success in one of

8    the other papers you were referring to might mean something

9    else.

10   Q.    I am talking about this paper.

11   A.    I am defining success for that paper.

12   Q.    So you would agree based on that paper that the tests

13   were successful?

14   A.    Within the caveats I have said, yes.

15   Q.    Now, do you know a Steven Bailey?

16   A.    Yes, I do, actually.

17   Q.    Who was or is he?

18   A.    If I am thinking about the Steven Bailey you are

19   talking about, he is a cardiologist from Texas,

20   interventional cardiologist from Texas.  Am I correct?

21   Q.    Let me put up a document that might help refresh you.

22           Do you, in your former home in England or your

23   new home in California, do you have a personal library of

24   textbooks?

25   A.    I do, yes.  It's somewhere on the high seas at the

Rothman - cross

1    moment.

2    Q.    In some container, it is coming over here?

3    A.    I hope so.

4    Q.    So you are moving to Medtronic permanently?

5    A.    For a number of years, yes.

6    Q.    Do you know about a Topol textbook, a rather thick

7    book, Textbook of Interventional Cardiology?

8    A.    Yes, I know it well, Eric Topol's textbook.

9    Q.    You actually have a copy?

10   A.    I actually don't have a copy.  I think we had a

11   discussion about this previously.

12   Q.    Thank you.  Your memory on that is better than mine.

13         You have read it?

14   A.    No, I actually haven't read it.

15   Q.    Let me show you something that might be of interest to

16   you.

17         Would you put up -- you will find this, Dr.

18   Rothman, in Tab No. 10 of your notebook.  This, for the

19   record, Judge, is Plaintiffs' Trial Exhibit 700.

20         Do you recognize the cover page of the notebook,

21   the Second Edition, Textbook of Interventional Cardiology by

22   Eric Topol?

23   A.    I do recognize this as being one of the older

24   textbooks.  I think this is the second edition, and there

25   are now four or five, I believe, if I remember right.

1    Q.    So you have seen this textbook?

2    A.    Yes.  As I say, this is, I believe, an old edition.

3    Q.    If you would turn to the next page that's in your tab,

4    No. 10, Page 3 of 13, just for reference, in the lower left,

5    there is a copyright date, do you see, 1994, this is the

6    1994 edition?

7    A.    I thought so.

8    Q.    Just to give you a frame of reference.

9          Would you turn to Page 5 of 13, the chapter

10   Percutaneous Expandable Prosthetic Valves, Steven R. Bailey?

11   A.    Yes.

12   Q.    Is that the Steven R. Bailey that you know?

13   A.    It is, because if you look on Page 4 it lists the

14   contributors as Steven Bailey, associate professor at Texas

15   San Antonio, so it is the same one.

16   Q.    How long have you known him?

17   A.    I know him a little.  Maybe eight to ten years.

18   Q.    Is he someone whose opinion you would respect as well?

19   A.    I can't answer.  I don't know him well enough.  I know

20   that he has written a patent or two that I have come across,

21   and I know that he has written this chapter and other

22   chapters.  I know he is a good chap.

23         Respect, value his opinion?  I can't be definite

24   to say that.

25   Q.    But you know about this chapter?

Rothman - cross

1    A.    I know that chapter.

2    Q.    And you have read it?

3    A.    I read it in connection with the case you drew my

4    attention to, the Cook case.  I had never read this chapter

5    before nor had I opened this textbook before giving evidence

6    in preparation for the Cook trial last year.

7    Q.    So you read it last year?

8    A.    I read it, because it was given as a piece of evidence

9    from the other side.

10   Q.    Did you have it in mind when you gave your opinions

11   this morning?

12   A.    Yes.  I remember it.  I read it fully.

13   Q.    Would you turn to Page 9 of 13.  Can you tell me

14   whether you recognize anything there?

15   A.    These are pictures that are almost virtually the same

16   as taken from Andersen's paper that you referred to in the

17   European Heart Journal in 1992.

18   Q.    So Dr. Bailey was writing about and actually showing

19   graphic pictures of the Anderson prototype device?

20   A.    Yes.  He was showing pictures of the very rudimentary

21   prototypes, here with sutures actually tying the wires

22   together.  This is actually a valve taken from an -- intact

23   valve taken from an animal and stitched onto the frame, yes.

24   Q.    Would you turn to Page 13 out of 13.  The last page.

25   I am going to direct your attention, where it says Current

1    Investigations, this is 1994 now, the first sentence, which

2    I will come back to, then there is again one of these

3    annoying footnotes, Footnote 13, if you could call that up

4    and put them together, and Dr. Bailey wrote, "The most

5    exciting published work in this area to date is the

6    investigations by Andersen et al. from Denmark published in

7    1992."

8             Footnote 13, that is that same European Heart

9    Journal, 1992 publication that we have been talking about in

10   this trial?

11   A.    Correct.

12   Q.    And you studied this in connection with the Cook case?

13   A.    Well, it was repetition of the same thing you just

14   drew my attention to.  It is repetition of the same whisper,

15   this is a good idea, an interesting idea from Andersen.  And

16   it is repeated several times over.  All you are doing is

17   citing the same piece of information several times.  It

18   doesn't change it, it doesn't make it more important because

19   it is repeated.

20   Q.    But you didn't mention this in your direct examination

21   this morning, did you?

22   A.    No.  Why should I?

23   Q.    Would you turn to the right-hand column of Page 13,

24   and just the text, if I could just have you start the text

25   where it says, "In ten years"?

1       Do you see that?

2   A.      Yes, I do.

3   Q.      "In ten years we shall very probably look back on the

4   pioneering work described above in the same" -- that

5   includes Andersen -- "in the same way we respect the work of

6   Hufnagle, Gruentzig and Palmaz today.  Certainly heart

7   valves will undergo radical changes in design in the

8   decade."

9           Did you take that into account when you

10  testified in Cook?

11  A.      Did I take it into account?

12  Q.      Yes, sir.

13  A.      I don't know what I am supposed to take into account.

14  Maybe you could rephrase the question.

15  Q.      Did you study this in connection with the Cook case?

16  A.      Yes.

17  Q.      Did you take it into account in formulating your

18  opinions in the Cook case?

19  A.      No.

20  Q.      Now, just so we can get the period here, these words

21  were written and published in 1994.  You would agree with

22  that?

23  A.      I agree with that.  Copyright 1994.

24  Q.      In ten years, that would take us to 2000 --

25          THE COURT:  The jury can figure that out.

Rothman - cross

1   BY MR. NATHAN:

2   Q.    Did what Dr. Bailey write about come to pass?

3   A.    Could you -- when an idea comes --

4             THE COURT:  Doctor, he gets to ask the

5   questions.

6             THE WITNESS:  I was trying to answer it.

7   BY MR. NATHAN:

8   Q.    You can answer it yes or no.  Your counsel can bring

9   out further testimony.

10  A.    I was trying to be helpful, I am sorry.

11  Q.    I wanted to know, did what Dr. Bailey wrote about,

12  saying in ten years things were going to happen, did what

13  Dr. Bailey wrote about come to pass in 2004 and later?

14  A.    I think the idea, the principle of doing this, has

15  come to pass in around ten years or so.

16  Q.    Now, can I go -- we have to switch the computers.

17            Could you put up the animation, which is in

18  CoreValve Slide No. 5.

19            MR. NATHAN:  Judge, we rehearsed this just to

20  make sure we cut this to a minimum.

21  BY MR. NATHAN:

22  Q.    Do you recall playing this animation this morning?

23  A.    I do.

24  Q.    And testifying about it and how this valve sort of

25  detaches and floats away?

Rothman - cross

1    A.    Yes.

2    Q.    Now, you did this video?  It was your idea to do this

3    video?

4    A.    Yes.

5    Q.    You instructed someone to prepare the graphics?

6    A.    I did.

7    Q.    It was all your idea?

8    A.    Yes.

9    Q.    Would you go back to the opening frame shot, Slide No.

10   5.  Just hold it there.

11            Is it possible for you to give us an

12   enlargement, Mr. Hugo, of the valve portion?

13            All right.  Do you know -- did you design for

14   this graphic this actual -- it's on the screen there.  It

15   should be on your screen.

16   A.    I designed that.  I remember it.

17   Q.    You actually designed the metal part, the stent part

18   to go into this graphic?

19   A.    It is a cartoon.  Yes.

20   Q.    It is a cartoon.  In fact, it is a cartoon of Palmaz,

21   isn't it?  It's not a cartoon of Andersen?

22   A.    It is a cartoon of a chicken wire fence, as we call

23   it.  It is just a structure to give the resemblance to a

24   stent.

25   Q.    This is not Dr. Andersen's invention, is it?

Rothman - cross

1    A.    No.   It's not intended to be.   I was not intending to

2    criticize specifically Dr. Andersen with this cartoon.

3    Q.    So this cartoon, when you talked about dislodgement

4    and the catastrophic failures and so on, this was not

5    intended to be criticism of the Andersen invention?

6    A.    Dr. Andersen's pig experiments lasted five minutes.

7    Q.    Answer my question, please, Doctor.   Was this intended

8    to be the Andersen invention?

9    A.    No, it was not.

10   Q.    Now, in the course of your studies for this case, and

11   I am sure you have looked through a lot of materials, you

12   said you talked to people and so on, did you study what

13   happened to the Andersen invention after 1990?

14   A.    What specifically are you referring to?

15   Q.    Did you look into who they licensed it to first?

16   A.    I have heard the testimony in court about the order of

17   things.

18   Q.    So you are aware that, again, 1990, it took them three

19   years to find Stanford Surgical, which sort of got renamed

20   to Heartport.   Heartport had it for seven years.   So it was

21   a ten-year period?

22   A.    I heard all that.

23   Q.    I would like to focus on, I am going to call it

24   Heartport, initially it was Stanford Surgical, just change

25   of names.   Let's call it Heartport.

Rothman - cross

1    Did you study what happened at Heartport?

2    A.    With respect, my role was to actually look at

3    infringement and enablement matters relating to that.

4    The history of the invention, I am not sure that

5    directly relates to whether Claim 1 is infringed or the

6    device is enabled.  I heard in court the elements.  But I am

7    not an expert in those areas.

8    Q.    Did you not testify on direct examination from your

9    lawyer this morning to this very day no one has ever been

10   able to make the Andersen invention?  Didn't you say that

11   this morning?

12   A.    I testified that I have never seen the Andersen device

13   used in man.

14   Q.    Now, let's focus on Heartport.  Does the same Mitzy

15   Garrison, a woman -- does that mean anything to you?

16   A.    I do.  I know the name and I have read testimony from

17   her.

18   Q.    So you read her testimony in this case about what

19   Heartport did with the Andersen invention when they had it

20   for those seven years?

21   A.    Yes.

22   Q.    And do you recall that she testified that for a while

23   she was the only --

24   MR. FERRALL:  Objection, Your Honor.

25   THE COURT:  Basis, Mr. Ferrall?

Rothman - cross

```
 1              MR. FERRALL:  It's improper impeachment,

 2    reading --

 3              MR. NATHAN:  I am not reading anything.  I am

 4    asking whether he recalls --

 5              THE COURT:  I will let you ask the question.

 6    BY MR. NATHAN:

 7    Q.    Do you recall reading testimony about what Mitzy

 8    Garrison did during those seven years?

 9    A.    Not in great detail, no.  I do remember some of the

10    discussions taking place, yes.

11    Q.    Do you recall that she testified about being the only

12    engineer?

13    A.    I can't remember that piece of testimony.

14    Q.    Do you recall she testified that Heartport stopped

15    work on the project?

16    A.    I believe I know that Heartport moved on to trying to

17    deal with the problem of the aortic valve and it being in

18    the way and they moved in that direction, as a surgical

19    company, that had more interest for them, removing the

20    aortic valve, I believe.  I am not expert in Heartport, I am

21    afraid.

22    Q.    You know that Heartport moved in other directions, but

23    didn't work on the Andersen invention?

24    A.    I am sorry.  I can't answer that.

25    Q.    Do you recall that Heartport never made an implant in
```

Rothman - cross

1   an animal with the Andersen invention?

2   A.   I don't know the answer to that.

3   Q.   Do you recall that Heartport never even tried to

4   implant the Andersen invention in a cadaver?

5   A.   I don't know the answer to that, either.

6           MR. NATHAN:  Your Honor, for the next topics,

7   I'm going to need the big board.

8           THE COURT:  Go right ahead.

9           MR. NATHAN:  This one I can lift.  (Setting up

10  easel and board.)

11          I'm not sure that is in the same place it was.

12          THE COURT:  Members of the jury, can you see

13  that?

14          Yes, they've indicated they can.

15  BY MR. NATHAN:

16  Q.   All right.  You were here when Dr. Buller made this

17  analysis of how the patent Claim 1 is embodied in the

18  CoreValve Gen 3 device?

19  A.   I saw this in his answers.  Yes.

20  Q.   Can I have you on the computer screen, Plaintiffs'

21  Demonstrative 37?  It's a little version, just in case

22  people want to watch it on the screen.

23          You were here when Dr. Buller took the blame and

24  broke it down into 12 parts?

25  A.   I recall.

Rothman - cross

1   Q.    And he found each of the 12 parts in the CoreValve

2   device.

3              Now, do you recall earlier testifying about

4   CoreValve's patents this morning?  Do you recall that?

5   A.    Yes.

6   Q.    And my question is, let's take the bigger binder.  The

7   bigger group of the file history there.

8   A.    This brown one?

9   Q.    Yes.  The one that ...

10  A.    Am I done with the other binder?  For the moment.

11  Q.    For the moment, yes, you can put that aside.

12             And perhaps, doctor, you might want to put that

13  fish bowl aside before we have a calamity with water.

14             THE WITNESS:  Right here, Your Honor?

15             THE COURT:  That's fine.

16             (Witness places fish bowl on bench.)

17  BY MR. NATHAN:

18  Q.    For the record, I'm giving you the file history of the

19  '406 patent which is Defendant's Trial Exhibit 148.

20             Have you studied that file history?

21  A.    No, I have not.

22  Q.    And do you understand what a file history is?

23  A.    Yes, I explained what it was this morning.

24  Q.    I'll represent to you that that big stack is the

25  history of what happened in the '406 patent in the United

Rothman - cross

1   States Patent Office.  All right?

2   A.   Yes.

3   Q.   All right.  So as you sit here today, do you know

4   whether the United States Patent Office considered and went

5   through -- if I could have Plaintiffs' Demonstrative 37

6   again?

7          Do you know whether or not the United States

8   Patent and Trademark Office, when they considered the '406

9   patent, went through each of these 12 parts and considered

10  whether or not they were found in the Generation 3 physical

11  device, which is the device that is involved in this case?

12  A.   I am -- I am not qualified to answer that question

13  because I haven't read this file history, as I just

14  acknowledged.

15  Q.   No one ever asked you to look at this file history,

16  did they?

17  A.   No.

18  Q.   How about the smaller one -- you can put that aside

19  then -- smaller file history for the '682 patent?

20          And for the record, this is Defendant's Trial

21  Exhibit 1276, I believe.

22  A.   This one?

23  Q.   Yes.  It's about half the volume of the other one.

24  A.   Sorry.  I picked up Mr. Kinrich's file.  I thought you

25  asked about that.

Rothman - cross

1    Q.    Could I have 1276 up on the screen?  Defendant's

2    Exhibit 1276.

3              This is the '682 patent that Dr. Seguin talked

4    about, which was filed in 2002?

5    A.    Is that in this binder?

6    Q.    Yes.

7    A.    I'll believe you.  Yes.  Okay.

8    Q.    Well, you testified about this patent this morning.

9    A.    No, I asked you whether it was in the binder.  I can't

10   see it.

11   Q.    Well, do you recall testifying this morning about the

12   '682 patent?

13   A.    Yes, I do.

14   Q.    If I could go back to Plaintiffs' Demonstrative 37.

15             Have you read the file history of this patent?

16   A.    No, I have not.

17   Q.    You haven't a clue what is in there?

18   A.    That is not relevant to this case.

19   Q.    Nobody asked you to look at that?

20   A.    That was not relevant to the question that I was

21   tasked with which I told the jury about this morning, which

22   is looking at infringement of whether the CoreValve

23   Generation 3 infringed and whether the Andersen '552 is

24   enabled.  So, no, I didn't read this document.

25   Q.    But you gave specific testimony, did you not, this

Rothman - cross

1  morning about the '682 patent?  And you said --

2  A.    Yes, I pointed to the claim.

3              THE COURT:  Doctor, let him finish the question.

4  I'm going to insist you finish your answers.  Okay?

5              THE WITNESS:  Thank you.

6              MR. NATHAN:  I'll rephrase it, judge.

7  BY MR. NATHAN:

8  Q.    You gave specific testimony this morning about the

9  '682 patent?

10             If I could have it back up on the screen, 1276.

11 A.    Yep.

12 Q.    Did you not?

13 A.    I did.

14 Q.    And no one asked you to look at the file history of

15 the '682 patent?

16 A.    I'll answer again, no.

17 Q.    Now, if I could go back to Plaintiffs' Demonstrative

18 37.

19             As you sit here today, you don't know whether

20 the Patent Office considered the question that the jury has

21 to decide of whether these 12 parts are included in the

22 physical device that is charged to infringer the Andersen

23 patent.

24 A.    I don't know the Patent Office.  I know the Patent

25 Office had the patent in front of them when they considered

1    and awarded this, the Andersen -- the Seguin patent.  And

2    that's what I said this morning.

3    Q.    Yes.  You said this morning that the Patent Office had

4    the Andersen patent in front of them.  My question was, did

5    the Patent Office have in front of it the actual physical

6    device and do this 12 part analysis?

7    A.    I can't answer that.

8    Q.    You don't know?

9    A.    I'm in no position to answer it.

10   Q.    Now, let me ask you -- you can put that file history

11   aside.

12   A.    (Witness complies.)

13   Q.    I'm going to ask you some detailed questions about

14   some of the 12 items, but the first question I have is, is

15   the size of the device anywhere mentioned in Claim 1?

16   A.    No, it is not.

17   Q.    So if you're wrong --

18   A.    I'm sorry.  I'm sorry.  There is one element which is

19   there by inference.  The last point in Dr. Buller's

20   analysis, point 12, for implantation in the body channel by

21   means of a technique of catheterization.

22         That actually implies size to me.  And in 1990,

23   as I explained to the jury, that implies size for two access

24   ports:  one in the brachial artery and the other in the

25   femoral.  And as I also pointed out, that tends to have me

Rothman - cross

1    think, no bigger than 8 millimeters for the device or no

2    bigger than 3 millimeters for the device if I go from here.

3              So, yes, I think Claim 1 does tell me that I

4    have to have a device that is implantable by catheter means,

5    and I know what a catheter means is.

6    Q.    Well, let me follow up on that then.  First of all,

7    there is nothing in the claim that says anything about

8    implanting in a human, does it?  This could work in animals.

9    A.    Well, if you want to replace valves in animal, yes.

10   I'm sure this could do it.

11   Q.    Yes.

12   A.    But the background says in humans.

13   Q.    Ah.  But the claim doesn't say that, does it?

14   A.    It wouldn't be a very invaluable patent we would be

15   fighting over.

16   Q.    Well, let's put aside how valuable it will be.

17   Perhaps CoreValve will figure out a way to make these and

18   sell them in elephants or something, and I'm going to come

19   to that.

20              THE COURT:  Mr. Nathan, come on.

21   BY MR. NATHAN:

22   Q.    There is nothing in here about humans, is there?  In

23   Claim 1?

24   A.    I'm sorry.  The implication of the whole patent is

25   about finding a way, the whole of the background states,

Rothman - cross

1  specifically, on Column 1, with a direction to consider this

2  as a claim heading to the management of human valvular

3  disease.

4          So if you wanted to ignore that instruction that

5  goes through the whole of the background and then reach this

6  and say, but this doesn't apply to man, then as a lawyer,

7  I'll take your advice, and that is exactly what.

8  Q.    Well, let's go to part 12, where you were.  Technique

9  of catheterization.

10          There is nothing in that that says anything

11  about specific size, like 24 French, or 21 French, or 18

12  French, or 30 French?  There is nothing about that, is

13  there?

14  A.    No.  But I'm reading this as a man of ordinary -- a

15  person of ordinary skill in 1990, and a cardiologist, which

16  you and I know, by the definition of a person of ordinary

17  skill, is an interventional cardiologist.  That is what we

18  both agreed was the reader of this patent in 1990.  I'm that

19  person.  And as that person, I know what catheterization

20  means.

21  Q.    So the answer to my question is that the size, 18

22  French, 21 French, 24 French and so on, is not written down

23  there in part 12?

24  A.    Nor is 46 French, which is the actual size of the

25  device in the preferred embodiment.

Rothman - cross

1    Q.    There is nothing, nothing in part 12 about that

2    specific size?

3    A.    No.

4    Q.    Now, let's talk about the preferred embodiment.   If

5    you can go to your smaller notebook.

6    A.    I'm sorry.   I'm having trouble because when you move

7    away from the microphone, I can't hear you, sir.

8              THE COURT:   He wants to talk about the preferred

9    embodiment, so he wants you to go to the smaller notebook.

10             THE WITNESS:   Thank you very much.   I'm sorry

11   about that.

12             MR. NATHAN:   And you are absolutely right,

13   Dr. Rothman.

14   BY MR. NATHAN:

15   Q.    If you can go to your small notebook, Tab 4, which is

16   Plaintiffs' Exhibit 2.

17   A.    Yes.

18   Q.    And if you could turn to -- you have seen this

19   before -- Page 2 of 9.

20   A.    (Witness complies.)

21   Q.    Would you agree with Dr. Pinchuk and Dr. Buller that

22   Figures 1 and 2 are Dr. Andersen's preferred embodiment?

23   A.    Correct.

24   Q.    And would you also agree, as Dr. Buller and

25   Dr. Pinchuk testified, that the claim is not limited to the

Rothman - cross

1  preferred embodiment?

2  A.    As long as the embodiment contains all the elements of

3  the claim.

4  Q.    Do you understand that there can be other embodiments

5  other than the preferred embodiment that are covered by a

6  claim?

7  A.    Absolutely, as long as they contain all the elements

8  of the claim.

9  Q.    Now, would you turn to -- there was some talk this

10  morning about wires, 55 millimeter wires and so on?

11  A.    .55 millimeter wires.

12  Q.    .55 millimeter wires?

13  A.    Yes.

14  Q.    Could you turn to Page 8 of 9, which is Column 5?

15  A.    Yes.

16  Q.    And, Mr. Stevenson, if you could highlight the first

17  full paragraph, starting with detailed description of the

18  preferred embodiment and call that up.

19        Do you understand that this material is a

20  description -- starting at Column 5, about Line 5, that this

21  is a detailed description of the preferred embodiments?

22  A.    I understand that.

23  Q.    And do you understand that when the inventors talked

24  about using .55 millimeter surgical stainless steel wires,

25  they were talking about their preferred embodiment?

Rothman - cross

1    A.    Yes.

2    Q.    And were you here this morning when Dr. Knudsen was

3    asked by CoreValve's counsel on his deposition, why did you

4    pick .55 wire?  And the answer was, because that is what was

5    available?

6    A.    I heard that.

7    Q.    So would you agree with me that the .55 wire was just

8    the best that they had at the time and that is why they

9    disclosed it as their preferred embodiment?

10   A.    Yes, I have no argument with that.

11   Q.    Now, you mentioned earlier with respect to the

12   CoreValve device, the large model, that it's an integral

13   structure?

14   A.    Yes.

15   Q.    If you could leave that up there and call out Figure 1

16   and sort of paste it on there a little bit.  If you could do

17   that, Mr. Stevenson.  I don't know if that is possible.

18         Now, is Figure 1 an integral structure?

19   A.    Right.  Sorry.  The figure itself or the device made

20   from the figure?

21   Q.    If someone were to build exactly what is in Figure 1,

22   right now, today, and hold it in their hand, would that be,

23   in your view, an integral structure?

24   A.    I'm sorry.  I need to ask another question.  Is it

25   constructed in the way of the constructions on the right or

Rothman - cross

1    am I going to modulate it or modify it to something else?

2    Q.     I want you to build, to consider this device in Figure

3    1 as the inventors described it, including two folded wires,

4    2 and 3, which are welded at the ends, and two rings that

5    are secured by means of a number of sutures, not shown.

6           And my question is if you were to build that as

7    the inventors taught, would that be an integral structure?

8    A.     I don't see it as such, no.  It's held together by

9    sutures.  The two wire rings, the rings themselves, the top

10   one and the lower one, are only welded at the end.  They are

11   tied together with sutures.  That, to me, is not an integral

12   structure.  The Palmaz structure that you held before is an

13   integral structure.

14   Q.     So your definition of integral structure doesn't mean

15   one piece, it means something that is made out of some

16   common material and it has no beginning and end?

17   A.     No.  I mean it's sort of -- I think I mean that

18   it's -- that's why I struggled with the answer to the

19   question.  I would think that if I were considering this for

20   use in human, it would have to be a lot better than this, a

21   lot stronger than this, and integrated into a much better

22   fabricated unit.  So I'm struggling with having something

23   that is tied together with sutures as being an integral

24   structure.

25   Q.     Doctor, I'm not interested in -- you're downstream of

Rothman - cross

1    my question.  I'm only interested in, this is what they

2    taught to build?

3    A.    Yes.

4    Q.    If they build it this way, welded and sutured

5    together, and the device, the ultimate device was in Figure

6    1, would that be an integral structure?

7    A.    I'm really struggling with the word.

8               THE COURT:  Doctor, that is regardless of the

9    intended use.  When he says you are downstream, indeed, you

10   are.  If you could listen carefully to his question and

11   answer his question, that would help the jury.

12              THE WITNESS:  Your Honor, I agree.  I'm just

13   thinking about this thing coming apart.

14              THE COURT:  That is exactly the point.  Don't

15   think about it coming apart.  Think about it as built as

16   described, regardless of the intended use.

17              THE WITNESS:  I don't wish to argue, Your Honor.

18              THE COURT:  No.  And I don't want you to argue

19   with me, because I'm going to start acting like "My Lord."

20   Okay?  All right.  (Laughter.)

21              THE WITNESS:  Okay.  I'm warned.  Thank you.

22              THE COURT:  Okay.  All right.

23   BY MR. NATHAN:

24   Q.    So my question is, is Figure 1, built as the inventors

25   taught to build it for their preferred embodiment, an

1    integral structure?

2    A.    It is what it is.  Yes.

3    Q.    Now, can I -- I'm going to have to switch the

4    computers, Mr. Hugo.

5            Could you pull up CoreValve's Demonstration No.

6    2, which I believe is Figure 1?

7            And, first, I want to ask you, Dr. Rothman,

8    looking at the 12 parts of Dr. Buller identified, I gather

9    that you agree that all but parts 4, 8 and 9 are in the

10   CoreValve device?

11   A.    Can I just read through this?

12   Q.    Please.

13           THE COURT:  For the benefit of counsel, could

14   you put it on the screen?

15           MR. NATHAN:  Yes.  Could you go back to

16   Demonstrative 37?  Thank you.

17           THE WITNESS:  I'm sorry.  What was the question,

18   now that I read it again?

19   BY MR. NATHAN:

20   Q.    The question is -- if you could just answer yes or no

21   as just go through this because I want to save time.

22           You agree that the CoreValve device has

23   Part No. 1?

24   A.    Yes.

25   Q.    Does it have Part No. 2?

Rothman - cross

1    A.    The stent is elastic.  Yes.

2    Q.    Does it have Part No. 3?

3    A.    It has commissural points.

4    Q.    So the answer is yes?

5    A.    Yes.

6    Q.    Okay.  And we'll pass 4 because I understand you

7    dispute that.

8              Does it have 5?

9    A.    I'm sorry.  Did you -- you took that I disputed 4.

10   Q.    Yes.  Absolutely.  We'll come back to 4.

11   A.    You went too fast for me.

12   Q.    We will come back to 4.  I am trying to get off the

13   table things that you don't dispute.

14             No. 5 is there?

15   A.    Yes.

16   Q.    No. 6?

17   A.    Yes.

18   Q.    No. 7?

19   A.    Yes.

20   Q.    What about No. 8?

21   A.    It has a plurality of commissural supports, yes.

22   Q.    And I know you dispute No. 9.

23   A.    Yes.

24   Q.    What about No. 10?

25   A.    Yes.

Rothman - cross

1    Q.    No. 11?

2    A.    Again, we have an issue, because I believe the support

3    for the commissure is spread over a number of cells and such

4    that it's over the whole unit.  So I have trouble answering

5    that one in a straightforward way.

6    Q.    You didn't mention anything about it in your direct

7    examination as to why they don't infringe?

8              THE COURT:  Mr. Nathan, that is an argumentative

9    question.  Ask another one.

10             MR. NATHAN:  I will.

11   BY MR. NATHAN:

12   Q.    Does the CoreValve device have any circumferential

13   expandable sections between the commissural supports?

14   A.    The reason I am having trouble is the word between,

15   because the bits that are between the tabs are part of a

16   structure that -- part of a support of the commissure.  So

17   between, the answer has got to be no, if you want to be that

18   specific, because the whole frame provides support.

19   Q.    When it collapses down and it expands out, isn't there

20   material that expands between the commissural supports, the

21   tabs that you have identified --

22   A.    You are identifying the commissural support.  I am

23   saying the whole device is the commisural support.

24   Q.    This morning, did you not testify that the commissural

25   supports are the tabs?

Rothman - cross

1    A.    No, I didn't say that.  I said the commissural support

2    is on the tab, but the whole device, I put the two together,

3    the whole device provides support to the valve.

4    Q.    Were you here yesterday when Dr. Pinchuk testified?

5    A.    Yes.

6    Q.    And did you hear him identify that the CoreValve

7    device has commissural supports?

8    A.    I am only giving my evidence now.

9    Q.    If your evidence conflicts with his --

10   A.    I am not saying that.  I am saying I am giving my

11   evidence and I will stand by that.

12   Q.    All right.

13         Then what about 11.  Does the CoreValve device

14   have that?

15   A.    Yes.

16   Q.    And No. 12?

17   A.    No. 12, it is most definitely by means of a

18   catheterization technique.

19   Q.    Can we go back to CoreValve Demonstrative No. 2, Mr.

20   Hugo?

21         When you did this analysis, this is the first

22   slide that you put up, "a plurality of commissural supports

23   project," and so on.  The picture that you put up, to be

24   clear, was the preferred embodiment?

25   A.    Correct, yes.

Rothman - cross

1    Q.    Can I have Plaintiffs' Demonstrative -- let me ask

2    this.  Would you hold up the CoreValve device?

3    A.    The big one?

4    Q.    Yes.

5          And I see, you have got your hand around the

6    bottom portion.  This morning you motioned to the jury that

7    you didn't find a cylinder in the bottom portion of the

8    device because it had a slope or cone.  Do you remember

9    saying that?

10   A.    I do.  I am sorry.  There is background noise.  If you

11   could stand a little closer to the microphone.  Thank you.

12   Q.    I will ask it again.  Do you remember holding that

13   device up to the jury and saying that the bottom portion,

14   you find no cylinder in there because it is a cone or

15   conical section?

16   A.    That is what I intended to say, yes.

17   Q.    Is it your testimony that in order to meet Element No.

18   4 -- if I could have Plaintiffs' Demonstrative 37 up, for

19   the benefit of counsel and the Judge -- in order to meet

20   Element 4, that it has to have a cylinder at the bottom?

21   A.    Bearing in mind the Court's construction of the term,

22   yes.

23   Q.    Can I have Plaintiffs' Demonstrative 86.

24         Do you know what that is?

25   A.    Well, it's the first time I have seen it.  I know what

1    it is.  It is a representation of a cylinder.

2    Q.    A perfect cylinder?

3    A.    What is called a right cylinder.

4    Q.    Right cylinder, perfect cylinder, right cylinder.

5          Is it your testimony that CoreValve does not

6    infringe because the bottom portion doesn't have a right or

7    perfect cylinder?

8    A.    I am sorry, I don't understand the question directly.

9          I have said that this is conical and that the

10   claim calls for something that is cylindrical.  I am saying

11   that this is conical.

12   Q.    And is it your testimony that when the claim calls for

13   something cylindrical, it means a perfect right cylinder?

14   A.    Well, I tend to think of a cylinder having a distance

15   between the sides, the opposite sides, the diameter to

16   remain constant.

17   Q.    Can we go to -- I am almost at the end, Judge, for the

18   benefit of everyone in the room.

19         Can we go to Plaintiffs' Trial Exhibit 2, pull

20   up Column 6.  If you could, I don't know if you can do this,

21   but if you could grab this paragraph beginning at Column 6

22   of the patent, if you could just show what the lines show,

23   because I am going to ask about the lines.

24         Then if you could also shrink that a little bit

25   and put up Plaintiffs' Demonstrative 29.  If we can put this

Rothman - cross

1  picture up at the same time.  I don't know if that is

2  possible.

3           Now, Dr. Rothman, did you need a moment?

4  A.    No, that's all right.

5  Q.    Do you recognize that you were asked about the Column

6  6 higher stent embodiment of the Andersen patent?

7  A.    Yes.

8  Q.    And let me just highlight those two words, "higher

9  stent," in Line 56.  And would you also highlight in Line 61

10 "valve itself," then I will ask you a couple of questions.

11          Now, you were here when Dr. Buller testified

12 that the higher stent shown -- sorry, described in Column 6

13 was what he depicted in Plaintiffs' Demonstrative 29?

14 A.    Correct.  I was here.

15 Q.    And this morning, you said that that can't be right

16 because, in Line 61, the valve itself was a reference to the

17 native valve?

18 A.    That was my -- that is my interpretation.

19 Q.    I would like to show you another demonstrative.  Could

20 you put up Plaintiffs' Demonstrative 85.  How many -- do you

21 have any idea how many times valve is referred to in the

22 '552 patent?

23 A.    Yes.  Almost every time the word valve is used to

24 describe the invention, it has the word prosthesis beside

25 it.  And you have highlighted just valve.  But it is almost

1    always followed by the word prosthesis.

2    Q.    Whenever the inventors were talking about a valve,

3    they were talking about their invention?

4    A.    No.   Whenever they said valve prosthesis, they were

5    talking about their invention.   If you look at the columns

6    you have highlighted in 5 and 6, if we take, for example --

7    I am sorry, I can't read this very well.   If we take --

8    Q.    Could you go back to the previous composite?   It might

9    be easier.

10             MR. VAN NEST:   Blow this up.

11             THE WITNESS:   If you could blow up Column 5 to

12   start with, left-hand side, just go down, including all the

13   yellows, the whole paragraph, if you wouldn't mind.

14             If you would go further down the page, where

15   there are lots of yellows.

16             If we look at the beginning of -- Line 29, the

17   biological valve, that is the native valve was removed from

18   a slaughtered pig.   The valve was cleaned, clean valve, et

19   cetera.

20             Then we go down to Line 35 and say the contact

21   valve prosthesis.

22             The next line we say valve prosthesis.

23             The next line we say valve prosthesis.

24             The next line we say valve prosthesis.   This

25   describes the innovation.   That was the innovation, contact

Rothman - cross

1    valve prosthesis or it is sometimes valve prosthesis.

2            What Dr. Buller misunderstands there is the word

3    prosthesis.

4    Q.    Let me go back and ask it another way then about

5    Column 6, if you could have that side by side.

6            If Dr. Buller is incorrect, and you are correct,

7    that this device, when they talk about using a higher stent,

8    would be all up here, past the coronary ostea, and that the

9    valve itself is the native valve down here --

10   A.    That is my interpretation.

11   Q.    -- wouldn't this not work because the native valve

12   would still not function, and then it doesn't make any

13   difference what you put above it, the native valve would

14   still not open and close properly or leak?  And isn't the

15   whole point of this to put the --

16           THE COURT:  So you have one question, then you

17   can ask the next.

18   BY MR. NATHAN:

19   Q.    Isn't that the whole point?

20   A.    As you read the patent from 1990, the general

21   direction of travel for the whole patent is in the

22   management of aortic regurgitation or aortic leakage.

23           If I can point you to Figure 9, where the valve

24   is put in the descending aorta, that is for the treatment --

25   that's what Hufnagel proposed as a treatment for aortic

1    regurgitation, that wouldn't work for stenosis.  If you have

2    a stenosed valve that won't open, putting a prosthesis down

3    the aorta doesn't help this.

4              This is for a leaking valve.  When it opens, it

5    opens okay; when it closes, it doesn't close completely.  It

6    leaks back.  If this invention worked, if you put the

7    invention somewhere else, then you will reduce the

8    regurgitation.

9              That was the intent in the main about the paper.

10             You are quite right, Mr. Nathan.  Putting a

11   valve in the supracoronary position, above the coronary

12   arteries, will not treat aortic stenosis.  So you are right.

13   Aortic stenosis is not treated by that maneuver.

14   Q.    The answer to my question is that your interpretation,

15   which is that the whole device has been moved up in the

16   supracoronary position, up here and towards the ceiling, and

17   that the valve itself is a reference to the native valve, it

18   won't work for aortic stenosis?

19   A.    It won't work for aortic stenosis, correct.  That's

20   what I said.

21   Q.    Do you recall some testimony this morning about -- if

22   you could put the big model in front of you.

23             MR. FERRALL:  Your Honor, may we approach?

24             THE COURT:  Yes.

25             (The following took place at sidebar.)

```
 1              MR. FERRALL:  I believe Edwards's time is up.
 2              THE COURT:  Oh.
 3              MR. NATHAN:  I have three questions and there
 4   will be no rebuttal case.
 5              THE COURT:  Three questions?
 6              Mr. Nathan, I just want you to know, I don't
 7   know how many patent cases I have tried, a lot, in addition
 8   to many, many other trials.  I have never had this happen.
 9   Never had it happen.
10              (End of sidebar conference.)
11              THE COURT:  Three questions.
12   BY MR. NATHAN:
13   Q.    On the model there, you testified this morning about
14   30 degrees?
15   A.    Yes.
16   Q.    When the device is collapsed on a catheter, is at 30
17   degrees?
18   A.    Of course not, no.
19   Q.    Do you remember being asked about a video this
20   morning, and you said it was a video that was done at some
21   elevated pressures, 200, that's a high pressure?
22   A.    Systolic blood pressure, yes.
23   Q.    Do you know that the FDA required that test?
24   A.    I am sorry, that particular test?
25   Q.    Yes, sir.
```

Rothman - redirect

1   A.    No.  My understanding is that that test was never used

2   for the FDA.

3   Q.    My final question.  You are aware, are you not,

4   Dr. Rothman, that the FDA has never approved the CoreValve

5   device?

6   A.    I don't believe it's been asked to approve the

7   CoreValve device yet.

8   Q.    So the answer to my question is they have not approved

9   it?

10   A.    I think you are right.  I am not actually certain.

11   I'm not qualified to answer that question.

12          MR. NATHAN:  Thank you, Judge.  No further

13   questions.

14          THE COURT:  Thank you, Mr. Nathan.

15          Your redirect.

16          MR. FERRALL:  Just one question, Dr. Rothman.

17                     REDIRECT EXAMINATION

18   BY MR. FERRALL:

19   Q.    When you gave your opinion on the term, on the claim

20   limitation "cylindrical support means," did you have the

21   Court's claim construction here under Item No. 4 in mind?

22   A.    Yes.

23   Q.    And you applied that?

24   A.    Absolutely.

25          MR. FERRALL:  No further questions, Your Honor.

```
 1                    THE COURT:  Thank you, doctor.  You are excused.
 2                    THE WITNESS:  Thank you very much.
 3                    (Witness excused.)
 4                    THE COURT:  All right.  Mr. Van Nest.
 5                    MR. VAN NEST:  Good afternoon, Your Honor,
 6       CoreValve has no further evidence to present.  We have some
 7       housekeeping for the Court at this time.
 8                    THE COURT:  Okay.  Let join together at sidebar.
 9                    Yes, Mr. Nathan.
10                    MR. NATHAN:  Can I also announce, Your Honor, we
11       have no rebuttal witnesses.  We have just housekeeping
12       matters.
13                    THE COURT:  All right.  Should I let the jury go
14       back?
15                    MR. VAN NEST:  I think it would be wise.
16                    THE COURT:  Let's do that.  Why don't we allow
17       you to go back to your deliberating area.
18                    Oh, yes.  Let's move that out of the way.
19       Mr. Ferrall is going to get that out of the way.
20                    (Jury left courtroom.)
21                    THE COURT:  Counsel, let's everybody take a
22       short break.
23                    (Brief recess taken.)
24                    THE COURT:  All right, counsel.  Let's take our
25       seats.
```

1        So, counsel, what I propose at this time right

2    now is to let the jury go home.  You finished the evidence.

3    And I'm sure there are some housekeeping matters you want to

4    revisit with me -- not revisit but, you know, and if you

5    could give me some idea of how long it's going to take to

6    have the discussion that you want to have.

7        Mr. Van Nest.

8        MR. VAN NEST:  I don't think it will take long,

9    Your Honor, because our plan was we're almost straight on

10   exhibits.  We have a few to move in.  We have -- both sides

11   may have but certainly we have some JMOLs, but those would

12   be placed in your hands later on.  We would just note we

13   would be making them nunc pro tunc.

14       The real question is --

15       THE COURT:  I'm not going to charge this jury

16   tonight.

17       MR. VAN NEST:  Okay.  If you are not going to

18   charge the jury tonight, we don't see any point.  We thought

19   perhaps we would be in a position to do that.

20       THE COURT:  No, because we're going to have to

21   have some discussion about the still disputed areas.

22       MR. VAN NEST:  Right.

23       THE COURT:  And then counsel for Edwards is

24   going to need some time to word process, perhaps.  Well,

25   they will.

```
 1              MR. VAN NEST:  Yes, I think you are right.  I

 2    think you are right.

 3              THE COURT:  Do you agree, Mr. Nathan?

 4              MR. NATHAN:  I do, with a couple of housekeeping

 5    issues.

 6              That was some talk about some 600 exhibits.

 7    We've cut it way back.

 8              THE COURT:  Well, we can have that discussion,

 9    but I'd like to let these folks go home.

10              MR. NATHAN:  Absolutely.

11              THE COURT:  So, Ms. Walker, will you bring them

12    back in.

13              THE DEPUTY CLERK:  Okay.

14              THE COURT:  Well, it seems that, unless I'm

15    delirious, which is entirely possible, that you've agreed on

16    a verdict form.

17              MR. VAN NEST:  I think that is right.  I don't

18    think there is a lot of issues on the instructions.  But the

19    only issue is if you don't want to charge the jury tonight,

20    we should send them home.

21              THE COURT:  Oh, no, no.  They're going home.

22              MR. VAN NEST:  Yes.  But I don't think the

23    discussion we're going to have will take that long.

24              MR. NATHAN:  Judge, I'm sorry.  I don't -- we

25    have not agreed on the verdict form.
```

```
 1              MR. VAN NEST:  I apologize.

 2              THE COURT:  Oh, you don't.  Okay.

 3              MR. NATHAN:  We're close.

 4              THE COURT:  The form that I have must be one

 5    side's.  It doesn't identify which side it's from.  It just

 6    says verdict form.

 7              MR. BLUMENFELD:  I think CoreValve, Your Honor,

 8    filed one this morning while we were in court.  And, you

 9    know, I saw it on my Blackberry.  I don't know if we have

10    seen it yet.

11              THE COURT:  Just for future reference, not that

12    we're going to need it, but a parenthetical would have been

13    helpful.

14              MR. VAN NEST:  Yes.

15              MR. NATHAN:  Remember, judge, I reported I got

16    it down to five questions?  I sent it over, they came back

17    with some additional ones, and I haven't seen it, and we

18    told them that there were some issues.  And I guess they

19    filed it without consulting me.

20              THE COURT:  It's okay.

21              MR. NATHAN:  We're very close.

22              THE COURT:  Well, good.  Good.

23              Counsel, while we're waiting, we're going to

24    start at 9:30 tomorrow.  I've got a meeting at 8:30.  A

25    judges' meeting.
```

```
 1                   (Jury returned.)

 2              THE COURT:  All right.  Ladies and gentlemen,

 3    please take your seats.  Sorry to rush you.

 4              So we've now completed the evidence, members of

 5    the jury.  I'm going to let you go a little early, in just a

 6    few moments.

 7              Counsel and I will spend the remainder of our

 8    time together getting your final jury instructions ready and

 9    dealing with some other housekeeping matters so that we can

10    have you in your seats tomorrow by 9:30.  I have a meeting

11    first thing in the morning at 8:30, it will take about an

12    hour, that I can't avoid.

13              And my time prediction is this for your planning

14    purposes.  It should take me roughly about an hour and

15    20 minutes is my suspicion, based upon what I have seen

16    regarding the jury instructions, to instruct you.  And then

17    I'm going to give you about a 10-minute break because you

18    are going to need it, please believe me, after.  I'll need

19    it as well.

20              And then you are going to hear from each side.

21              I think we've agreed on just two rounds; right?

22              MR. NATHAN:  Yes, Your Honor.

23              MR. VAN NEST:  That's right, Your Honor.

24              THE COURT:  And so here is where I'm going to

25    impose a strict limitation on counsel.  They will each have
```

1   an hour to discuss their cases and their points of view with

2   you.

3           Then you will get the case for your

4   deliberations.

5           So that puts us at roughly the noon hour.  Okay?

6   Ms. Walker will take care of you, make sure you ordered your

7   lunch so you won't be going without.  She'll provide you

8   with that tomorrow, you will make your selections, and then

9   we'll put the case in your hands.

10          Again, there will be no time constraints.  That

11  issue will be entirely in your hands.  And if needed and

12  necessary, and I wouldn't be at all surprised that it would

13  be, you will be free and welcome to resume deliberations,

14  should you not be at the point of unanimous verdict on

15  Monday.  Okay?  Travel safely.

16          (Juror No. 8 indicating.)

17          THE COURT:  You can pose it to Ms. Walker, okay,

18  Juror No. 8?  And she will communicate the question to me.

19  Okay?

20          And she can do that right now when you go out so

21  that if you would all just hang around for a moment, maybe

22  it might pertain to all of you.  Does it pertain to

23  everyone?

24          (Juror No. 8 indicating yes.)

25          THE COURT:  Okay.  Why don't you take them out.

```
 1              CHIEF DEPUTY CLERK WALKER:  All right.

 2              THE COURT:  Remember my earlier instructions.

 3    Let me remind you of them.  I know you probably have them

 4    engrained.  But now that the evidence is completed, you must

 5    keep those minds open, you really must, not do any research,

 6    listen to anything about the case or read anything during

 7    your research.  I did see a member of the media here.  I

 8    don't know if there is going to be any reporting, but you

 9    need to avoid any reporting that you might see on the

10    topics, not just the case specifically but the topics in

11    general that we've discussed here over these last days.  And

12    don't discuss the case with anyone.

13              All right.  We'll see you tomorrow.  I'm going

14    to have Ms. Walker communicate the question to me, and if

15    necessary, I'll feed right back, and I may need to discuss

16    it with counsel.  I don't know.  Okay?  All right.

17              (Jury left courtroom.)

18              THE COURT:  Please take your seats.  Let's see

19    what the question is.

20              Yes.

21              MR. NATHAN:  I'm sorry, I spoke too fast.  When

22    I said two rounds, we agreed before that there would about

23    my closing --

24              THE COURT:  Okay.  So we're going to have a

25    rebuttal closing?
```

```
 1                    MR. NATHAN:  Yes.

 2                    THE COURT:  Okay.

 3                    MR. NATHAN:  I'm going to split it so it's 45

 4    and 15.

 5                    THE COURT:  That's fine.  I'll amend my advice

 6    to them tomorrow.

 7                    Insofar as the final jury instructions are

 8    concerned, were there any other -- I counted eight disputed

 9    areas.  Are there still eight or have you arrived at some

10    additional accommodations?

11                    MS. NYARADY:  We have not made any further

12    agreements.

13                    THE COURT:  That's fine.  I'm prepared to

14    discuss them.

15                    It would probably be helpful for me to see the

16    competing jury forms, proposed verdict forms now, if you

17    have them.

18                    I think I have CoreValve's.

19                    MR. VAN NEST:  You do.

20                    MS. NYARADY:  May I approach, Your Honor?

21                    THE COURT:  Please, Ms. Nyarady.

22                    While we're waiting, here is what I have still

23    in dispute from the table.

24                    Yes?  Okay.  Hold on.

25                    (Court and chief deputy clerk confer.)
```

```
 1              THE COURT:  Counsel, here is the question that
 2     was propounded to Ms. Walker by Juror No. 8 on behalf of the
 3     jury.
 4              If they arrive at the 4:30 tomorrow and want to
 5     continue their deliberations, are there any time constraints
 6     in that regard?
 7              My response -- I'll invite counsel's feedback,
 8     but my response would be no.  And I would leave it up to
 9     them.
10              And then they asked, well, then, if we don't
11     have to go home at 4:30, how long can we stay?
12              My response will be we will allow you to stay as
13     long as you want.  We'll provide dinner.  And they can
14     determine the answer to that question depending upon where
15     they are in their deliberations.
16              Is that acceptable?
17              MR. VAN NEST:  Yes, Your Honor.
18              MR. NATHAN:  Yes, Your Honor.
19              THE COURT:  Ms. Walker, you got that?
20              CHIEF DEPUTY CLERK WALKER:  Yes.
21              THE COURT:  Why don't we deal with the
22     housekeeping matters first.
23              I will certainly accept your proposal, Mr. Van
24     Nest, to just receive any additional or new JMOLs by
25     submission, unless you want to say something additional?
```

1          MR. VAN NEST:  The only thing that I would say

2    on that is, with respect to our JMOL on noninfringement and

3    willfulness, we would simply renew those now without

4    argument, for further supplementation.

5          THE COURT:  I expected that you would.  And I

6    have thought about it.  And there is nothing in the interim,

7    that is between the time that I ruled and now, that would

8    cause me to change my mind as to my previous ruling.

9          So I won't reconsider it.  I will deny them.

10         MR. VAN NEST:  Fine.  We will then submit

11   motions for judgment on the law, judgment as a matter of

12   law, on damages and on enablement.  But we will submit those

13   on paper before the jury begins to deliberate.  We will try

14   to get those in this evening.  They will be bullet-

15   point-type items.

16         The only other items we have, we have two

17   exhibits that we would like to move in that are not objected

18   to on the defense side.  One is DTX-1481.  That is Dr.

19   Seguin's drawing of his early prototype -- early concept.

20         THE COURT:  Yes.  There is no objection?

21         MR. NATHAN:  No objection, no.

22         MR. VAN NEST:  The other is DTX-1482.  It's a

23   CoreValve catheter and control device.

24         THE COURT:  No objection to that?

25         MR. NATHAN:  None.

```
1              THE COURT:  That is admitted as well.

2              MR. VAN NEST:  The parties are discussing, we

3    don't have yet agreement but we hope to soon, there were

4    some damage report type exhibits that plaintiffs had from

5    Dr. Leonard and we had some from Dr. Kinrich that were

6    marked and whatnot.

7              We are hoping to agree on a set for both sides

8    that we can submit that are not objected to, and those can

9    go in.  And they can have those in the jury room instead of

10   lots of other things.

11             THE COURT:  That would be helpful.

12             MR. VAN NEST:  I think, from our standpoint, the

13   only thing left is to argue the jury instructions and settle

14   those.

15             THE COURT:  I am probably not going to entertain

16   a lot of argument.  I think I have a pretty firm mind on how

17   I want to go with these.  I will allow in some places brief

18   discussion.

19             MR. BLUMENFELD:  Your Honor, on our side, we

20   also intend to move for JMOL on infringement, enablement,

21   willfulness and damages.  And as with CoreValve, we will put

22   them in writing and make sure they are submitted before the

23   case goes to the jury.

24             On exhibits, Mr. Van Nest just mentioned the

25   damages demonstratives.  They just made a proposal to us
```

1    after we are done with this.  I will discuss that with our

2    client and see whether we can agree on damages

3    demonstratives going to the jury room and if so which ones.

4         We have a few other exhibit issues that Ms.

5    Nyarady will address.  Then the jury instructions and the

6    verdict sheet.

7         THE COURT:  Ms. Nyarady.

8         MS. NYARADY:  We have I guess two separate lists

9    of some exhibits that we have been conferring with counsel

10   on.  I am going to read into the record the few that we have

11   agreed on today.  So we would like to admit Plaintiffs'

12   Trial Exhibit No. 173 and No. 2060.

13        THE COURT:  These are all agreed?

14        MR. CIANFRANI:  Yes, Your Honor.

15        THE COURT:  Where they are agreed, they are

16   admitted.  Just go ahead and read it.

17        MR. NYARADY:  We have got some other exhibits

18   that were in binders, not specifically mentioned in the

19   record, but were not objected to.

20        THE COURT:  Those are admitted by operation of

21   the pretrial order.

22        MR. NYARADY:  Should I read the numbers into the

23   record?

24        THE COURT:  If you would like.  I don't think

25   it's necessary.

```
1              MS. NYARADY:  I will be brief.  So it's

2    Plaintiffs' Trial Exhibit 83.  Plaintiffs' Trial Exhibit

3    144.  Plaintiffs' Trial Exhibit 266.  I should say these are

4    all plaintiffs' trial exhibits.  777.  898.  1113.  1143.

5    1159, 1434.  1667.  1706.  2031.  2033.  And 2124.

6              THE COURT:  All right.  These are admitted.

7              MR. NYARADY:  Your Honor, one housekeeping issue

8    with respect to documents, Your Honor.  There are few, and

9    very few, less than ten, financial-type documents that are

10   very sensitive to the clients.  Opposing counsel and I would

11   like to confer this evening and make a short list of

12   documents we would like to offer under seal.  We will get

13   that to you in the morning.

14             THE COURT:  Okay.

15             MS. NYARADY:  I think those are all the issues

16   on documents.

17             THE COURT:  Okay.

18             So I have still at Issue 2.1 -- this is the

19   parties -- I think 2.2 is actually -- let me go through what

20   I perceive to be at issue.  If it appears not at issue, that

21   is fine.

22             MR. NYARADY:  Your Honor, I may be able to help

23   with this one.  That was a typo.  In my haste yesterday, I

24   forgot to remove the Edwards proposed instruction.  2.1 was

25   actually agreed to.
```

```
 1              THE COURT:  Let me see if I had a suggestion on

 2    2.1.

 3              I have a little wordsmithing I would like to do.

 4    So maybe you want to take some notes down.

 5              MR. NYARADY:  Certainly.

 6              THE COURT:  These may seem like nudges.  But

 7    when you are reading 61 pages of instructions, every little

 8    bit that I can eliminate is helpful.

 9              I don't think, unless the parties are in strong

10    disagreement with the Court -- I am at Page 11, Ms.

11    Nyarady -- that the last sentence is necessary.

12              This is a nit.  They know we are going to refer

13    to the patents by the last three numbers.

14              MR. NYARADY:  I will take that out, Your Honor.

15              THE COURT:  This next one is at Page 12.  This

16    is going to show up, this question, in later instructions.

17    The sentence, "Those products are then exported to foreign

18    countries where they are implanted into patients."

19              I am not certain why that needs to be there.

20    You can disabuse me of any notions about that.  But it seems

21    to me what happens in foreign countries is not at issue in

22    this case.

23              MR. NYARADY:  No, Your Honor.  But the intended

24    use of the product is.  And it ties into the collapsible and

25    expandable and implanted.
```

```
1              MR. VAN NEST:  That term, collapsible and

2     expandable is not a term at issue.

3              THE COURT:  It's not.  My distinct and decided

4     point of view on that is that that language needs to come

5     out there, and it needs to come out, also, since we are

6     talking about it --

7              MR. NYARADY:  I believe it's on Page 23 as well,

8     Your Honor.

9              THE COURT:  Yes.  I have a strike-through at

10    Page 23 as well.  Any objection to that?

11             MR. CIANFRANI:  No, Your Honor.

12             THE COURT:  And then, Ms. Nyarady, back to Page

13    12, I would just add between "Edwards" and "alleges," I

14    would just say "Edwards also alleges."

15             And I would, in the last sentence, rather than

16    refer to the contentions as allegations, make it

17    contentions.  It just seems consistent with the language

18    that is used in other places and earlier.

19             On the next page, at Page 13, in the first line,

20    you use the past tense, "the ReValving did."  Aren't we

21    speaking of the present tense here, shouldn't it be "does"?

22             MS. NYARADY:  I would agree with that.

23             THE COURT:  Later on again in that same

24    paragraph, rather than "met every limitation," it should be

25    "meets every element of the asserted claim."  Again, at the
```

1   bottom, instead of "allegations," "contentions."

2              Do you see that, last sentence?

3              MS. NYARADY:  Yes.

4              THE COURT:  That was wordsmithing stuff.

5              Let's just make sure the others are correctly

6   identified by the Court as in dispute.

7              2.4 and 5, we have summary of patent issues.  I

8   have two proposals on that.  That is still in dispute.

9   Right?

10             MR. NYARADY:  Yes, Your Honor.

11             THE COURT:  3.2 and 3, construction of claims.

12             MR. NATHAN:  Yes, Your Honor.

13             THE COURT:  3.4 and 5, patent infringement

14   generally.

15             And 3.6 and 7, infringement open-ended or

16   comprising claims.

17             3.8 and 9, literal infringement.

18             And 5.1 and 2, damages -- compensatory damages.

19             And 5.3 and 4, reasonable certainty.

20             Are those the remaining disputes?

21             MS. NYARADY:  I have one more, unless it's been

22   resolved by the sidebar today, which is 3.11, which is the

23   prosecution history estoppel instruction that CoreValve

24   proposes.

25             THE COURT:  Prosecution history estoppel is not

1    going to this jury.

2              Let's go through them, then.  You can resume

3    your seat.

4              I agree, this is not open to discussion or

5    debate, with Edwards at 2.4, positioning of the willfulness

6    question.  That is a question that will, in terms of the

7    patent issues, rather, the second issue, with which the jury

8    will have to contend is willfulness, right after

9    infringement, literal and DOE.

10             I think that was the only disagreement as to

11   that particular instruction.  Is that right?

12             MR. CIANFRANI:  That's correct, Your Honor.

13             MR. NYARADY:  Your Honor, unless there has been

14   a withdrawal of the proposal at Paragraph 5 in that

15   instruction.

16             THE COURT:  Yes.  I have -- let me see my notes

17   here.

18             Yes.  I have a strike through the entire

19   paragraph.  I don't see the relevance.  Let me make sure I

20   am talking about the right one.

21             I will hear from you, Mr. Cianfrani.  This is

22   your proposal.  Right?  I don't see the relevance.  Also,

23   the way it's phrased is argumentative.

24             A jury instruction is a jury instruction.  It's

25   not an argument.  It's not an opportunity for counsel to

1        continue to advance a position one way or the other.

2                  Did you want to say something, also?

3                  MR. CIANFRANI:  Yes, Your Honor.  With respect

4        to this instruction, with almost every one of the

5        CoreValve's witnesses, the plaintiff would be asking

6        questions, Aren't they from Irvine?  Didn't they used to

7        work for Edwards?  An implication of all of those -- in our

8        letter to you last night we cited some of the transcript.

9        The implication is that CoreValve either did something wrong

10       because its employees stole secrets from Edwards or that

11       CoreValve did something wrong because it hired Edwards

12       employees.

13                 The reason we asked for the instruction was to

14       let the jury know that there is no trade secret allegations

15       or unfair business practices.  The fact that the witnesses

16       may live in Irvine, it may be relevant to damages, but it's

17       not opening any allegation of wrongdoing.

18                 MS. NYARADY:  Your Honor, I would just say I do

19       not think there has been any implication of any impropriety

20       in the questions.  I think we have made our Irvine point

21       very clear, several times.

22                 The fact of the matter is that the damages

23       question, it does involve whether or not there is a need for

24       experienced, trained people in this field, and that they are

25       concentrated in Irvine, and that they have been trained by

1    companies that are well known in the field.  That's what it

2    goes to.

3             I don't think the jury has taken anything away

4    other than that point.

5             THE COURT:  How do you know what the jury has

6    taken away?

7             MS. NYARADY:  I just mean I don't think there

8    has been an implication of impropriety in the questions.  We

9    have not talked about them taking any information or

10   documents.  It's been clear on the record that they were not

11   Edwards employees at the time that they started working for

12   CoreValve.  The timeline is very clear that many of these

13   people were retired or they had moved on to other things.  I

14   don't see the record in the same way Mr. Cianfrani does.

15            THE COURT:  Well, frankly, as I sat here and

16   listened, there was -- I have to agree with Mr. Cianfrani,

17   Ms. Nyarady, that there were a number of questions along

18   these lines.  Of course, it's not the questions that are the

19   evidence, but the answers.  Oftentimes, it seemed to me at

20   the time that the jury could take away some negative

21   inference from that.

22            So are you saying that, as we discuss this now,

23   on reflection, Paragraph No. 5 -- what is the prejudice?

24   Why wouldn't this help to clarify the purpose of the

25   questioning?

1    I would add, also -- let me just refresh my

2    recollection on what you wrote in your objections, perhaps

3    not individually.

4    You write, just as you said, that Edwards has

5    not alleged or intimated during the trial that former

6    Edwards employees stole secrets.  And you say the jury would

7    likely be confused by an instruction regarding trade

8    secrets.

9    MS. NYARADY:  Your Honor, if I may add one more?

10    THE COURT:  Yes.

11    MR. NYARADY:  The instruction here is a summary

12    of patent issues.  The instruction starts out by saying

13    these are a list of issues that you are being asked to

14    decide.  Then they are asking to insert at the very end, by

15    the way, we are not asking you to decide this issue.

16    There were many other things that have come up

17    in this trial, such as the relevance of the Dr. Seguin

18    patents and relevance of whether the Dr. Seguin patents

19    covers GEN 3.  If we start down this track of what we are

20    not asking them to decide --

21    THE COURT:  I agree.  Good argument.  Yes.  We

22    will strike Paragraph 5.

23    MR. CIANFRANI:  Your Honor, may I make one

24    further point on that?

25    THE COURT:  Yes.

```
 1              MR. CIANFRANI:  In Mr. Nathan's opening, we have

 2    the transcript of the opening, he promised the evidence will

 3    show that CoreValve hired engineer after engineer that had

 4    been trained and used to work for Edwards.

 5              THE COURT:  Is there somewhere else in the

 6    instructions?  Because I do agree with Ms. Nyarady's point

 7    just made, that you might, counsel, might want to agree that

 8    language like this should appear.  You talked about it in

 9    terms of damages.  We can think about that while we are

10    here.

11              MR. CIANFRANI:  Your Honor, I would be perfectly

12    happy to work with Ms. Nyarady to craft something

13    appropriate.

14              THE COURT:  That is fair, what you just said.

15    I don't think this is the place for it.  I agree with you.

16              You know, again, you folks are advocates, I

17    understand that, but Mr. Cianfrani's point sort of

18    underscores that it's a little disingenuous to suggest that

19    the jury might not be left with that impression, that is, a

20    negative impression, that there was some kind of nefarious

21    behavior here in continually reaching out to the, albeit at

22    some distance, in terms of time, former Edwards employees.

23              Okay.  Enough of that.

24              So, Mr. Van Nest and Mr. Cianfrani, do you want

25    to continue to beat the claim construction dead horse as to
```

1    3.2?

2              It's dead.  Okay?  I am not revisiting that, as

3    Mr. Ferrall found out, again, at sidebar.  The Court has

4    ruled.  You have preserved your position well.  Quite

5    frankly, you preserved it at Markman.

6              Continuing to raise the issue does nothing but

7    pluck the Judge's nerves.  That is what you have succeeded

8    in doing on this particular point.

9              Yes, Mr. Van Nest, do you want to pluck them

10   some more?

11             MR. VAN NEST:  No, I don't, Your Honor, I assure

12   you.  I just want to understand.  Is the instruction that is

13   going to be read, will that be the one we discussed at the

14   pretrial?

15             THE COURT:  Indeed, it is.

16             MR. VAN NEST:  Markman, with two sentences --

17             THE COURT:  It is a jury instruction.  It is an

18   expansion that I think is consistent with the Court's

19   understanding of the claims of the patent, the

20   specification, and the prosecution history, intrinsic

21   evidence.

22             MR. VAN NEST:  Your Honor indicated, as we just

23   opened the trial, the possibility of considering --

24             THE COURT:  Not giving it.

25             MR. VAN NEST:  Fair enough.  I understand.

1      THE COURT:  I think it's going to help the jury,

2   perhaps not help it in a way that you would like, but I

3   think this jury has a lot to wrestle with on that subject,

4   and they have got very clear positions taken by the

5   competing experts on that subject, who stood their ground,

6   as did Dr. Rothman on the subject, in spite of lengthy and

7   vigorous cross-examination.

8      I think the issue has been squarely met and the

9   jury will decide in light of the testimony of those of skill

10  in the art, who, it appears, had in mind the Court's claim

11  construction.  I am not so sure, but we will see.

12     I am leaving myself a little wiggle room, Mr.

13  Van Nest.

14     I was being facetious.

15     MR. VAN NEST:  I was hoping for some wiggle

16  room, but just a little.

17     THE COURT:  Yes.

18     Just small comfort.  But I want you to know that

19  I didn't just make the pronouncement at the pretrial and not

20  revisit it in my own mind and continue to reconsider your

21  positions.  But finally, a position did lock up in my mind.

22  I think it's the correct position.

23     Look, the Federal Circuit, you have got at least

24  a 50-percent shot.  I don't mind that I am not going down

25  there, frankly.  That's just fine.  With all due respect to

1    my good colleagues on the Federal Circuit.

2            Okay.  I think we are up to 3.4, patent

3    infringement generally?  If I didn't, I intended to imply

4    that I am rather drawn to plaintiffs' 3.4, absent the last

5    sentence.  Are we together on that?

6            MS. NYARADY:  Yes, Your Honor.  We will strike

7    the last sentence.

8            THE COURT:  I think Mr. Cianfrani might want to

9    say something.

10           MR. CIANFRANI:  Your Honor, the last two

11   sentences of the proposal that we had raised on Page 25.

12           THE COURT:  I have those in mind.  I have a

13   delete edit of them.

14           MR. CIANFRANI:  That goes to the 271(f).  We

15   have kind of beaten that horse to death as well.  We do want

16   to make the proposal that the jury be instructed that

17   activities outside the United States shouldn't be considered

18   for purposes of evaluating infringement, particularly the

19   shape --

20           THE COURT:  What is your recollection of what

21   you think this jury heard on that subject, activities

22   outside the U.S.?

23           MR. CIANFRANI:  I believe, I am quite confident

24   the jury heard that the device is compressed into a

25   catheter.  I even heard today that it was cylindrical, or

1    something similar to that, what was in the catheter.  I

2    think we saw some pictures of the device in the body.

3             So I did want --

4             THE COURT:  Was it clear at the time of the

5    presentation of those pictures that that was from activity

6    outside of the United States?  I don't recall.  You may have

7    a different recollection.

8             MR. CIANFRANI:  It may have just been clear to

9    me.  I am not exactly sure of the context, not having sat in

10   those chairs.

11            THE COURT:  Let's get a reaction from Ms.

12   Nyarady.

13            MS. NYARADY:  Well, Your Honor, with the

14   deletion of the sentence regarding them being implanted

15   abroad and sold abroad, I don't think there is a need for

16   these two sentences.  The instructions are very clear that

17   the accusation here is the making in California.  We have

18   deleted the selling language.  We have deleted the supplying

19   language.

20            I don't think there is any basis for confusion.

21            THE COURT:  I agree.  And so we'll stick by my

22   position, Mr. Cianfrani, and we will delete, not include

23   that sentence that starts with, "However, for the purposes

24   proposed by CoreValve," at Page 25.

25            The previous sentence, Mr. Van Nest, I have

1    already excluded.

2         Okay.  So 3.6 and 7.

3         There is a clause, a phrase that is objected to

4    by Edwards that reads, "unless those additional features

5    cause the accused device to lack a limitation."

6         I rather agree, Mr. Cianfrani, with plaintiff

7    Edwards point that it is somewhat duplicative of the clause

8    and phrase and misleading and also perhaps confusing.  I

9    really don't see what this adds to the instruction.

10        MR. CIANFRANI:  Yes, Your Honor.  Well, as you

11   know, we've been talking about projections ad nauseam over

12   the last few days.

13        THE COURT:  I know.

14        MR. CIANFRANI:  And you, I'm sure, know our view

15   you can't have projections if there are things in between

16   it.  So in our view, it would be kind of like -- we

17   understand the law, of course, is that additional elements

18   can't avoid infringement.  But, for example, if you claim a

19   hole and somebody fills in the hole, you can't say that all

20   you did was add additional elements to your hole.

21        And so what I wanted the jury to take away from

22   that was that there are occasions, depending on what the

23   claim limitation is, where additional material could

24   illuminate the fact there are objections in this case or a

25   hole, something along those lines.

1    THE COURT:  I think the sentence as it reads,

2    "the presence of additional features or components of the

3    Gen 3 ReValving system would not avoid infringement of Claim

4    1, period, is adequate instruction.  So I'm going to

5    disagree with CoreValve on that.

6         I have a proposed fix, as it were, for 3.8

7    and -- the dispute over 3.8 and 3.9.  I'm at 3.8.  And

8    counsel may not see this as a fix, but here is what I would

9    suggest the change, the edit I would make.

10        To the last paragraph, the first sentence reads,

11   "In addition, later filed patents are not relevant to

12   literal infringement."  And then I would add, "but, as I

13   will now explain, be relevant to infringement under the

14   doctrine of equivalents."

15        Do you want me to do it again?

16        MS. NYARADY:  One more time, Your Honor.

17        THE COURT:  That's okay.

18        "But, as I will now explain, be relevant to

19   infringement under the doctrine of equivalents."

20        And then go look at the DOE instruction.  I

21   think as it reads rather than as it is proposed to read by

22   Edwards might take care of the problem.

23        Mr. Cianfrani, did you catch that?

24        MR. CIANFRANI:  Oh.  Yes, Your Honor.  We don't

25   have any objection to the additional language.

```
 1                    THE COURT:  Okay.  Ms. Nyarady.

 2                    MS. NYARADY:  I want to make sure this is clear.

 3       So we're keeping the paragraph and just adding that one

 4       sentence.

 5                    THE COURT:  Well, we're getting rid of the

 6       second and third sentence in the paragraph, and we're just

 7       adding that one sentence, that one phrase to the first

 8       phrase that you have already proposed.

 9                    Did you understand that to be the case as well?

10                    MR. CIANFRANI:  Yes, Your Honor.  That's fine.

11                    THE COURT:  Okay.  Ms. Nyarady, did you get

12       that?

13                    MS. NYARADY:  I did, Your Honor.

14                    THE COURT:  Do you have anything else you want

15       to say?

16                    MS. NYARADY:  Yes.

17                    THE COURT:  Go ahead.  Say it.

18                    MS. NYARADY:  I would like to keep the last

19       sentence in that paragraph.

20                    THE COURT:  Last sentence.

21                    MS. NYARADY:  I think that saying they're not

22       relevant to literal infringement, I think we need to

23       reiterate if every element is met that the later patents do

24       not avoid infringement.  Maybe I could craft something.

25                    THE COURT:  What page are you on?
```

```
 1                    MS. NYARADY:  29 at 3.8.

 2                    THE COURT:  I think this is the language that is

 3     particularly troublesome to CoreValve.

 4                    MR. CIANFRANI:  That's correct.

 5                    THE COURT:  And I see no reason for it.  I see

 6     no reason for it.  So there is no point in wasting your

 7     time.

 8                    MS. NYARADY:  For the record, we maintain our

 9     objection.

10                    THE COURT:  I understand.  You have your

11     objection.  It's overruled.

12                    All right.  Let's go to Page 40.  I think 5.2 is

13     next, if I didn't skip anything.

14                    CoreValve proposes that this -- I think this is

15     the only difference in the two proposed instructions.  The

16     last complete paragraph, the sentence, is, "They are not

17     meant to punish an infringer."  I think that is the

18     offending language from Edwards' point of view.  Is that

19     correct?

20                    MS. NYARADY:  Yes, Your Honor.

21                    MR. CIANFRANI:  I believe so.

22                    THE COURT:  It's a correct statement of the law.

23     I see no difficulty with it.

24                    MS. NYARADY:  If I may just say one thing, Your

25     Honor?
```

1    THE COURT:  Yes.

2    MS. NYARADY:  I do think this is a little bit of

3    a unique set of facts in this case with respect to damages.

4    We heard testimony from Dr. Leonard about the

5    reasonable royalty, the hypothetical negotiation in this

6    case.  And this is one of those rare instances where the

7    rate that he is setting forth may actually be higher, he

8    testified to this, than what CoreValve would have been

9    willing to pay.  And my fear is that by putting in "this is

10   not punitive," the jury might misunderstand because the rate

11   comes above what CoreValve hypothetically would have paid,

12   if that somehow doesn't enter into punitive rather than

13   compensatory damages.

14   MR. CIANFRANI:  Your Honor, the concern from our

15   standpoint is that there are allegations of willfulness

16   here.

17   THE COURT:  Yes.

18   MR. CIANFRANI:  And, you're right, I believe

19   this is a correct statement of the law.  The idea is so they

20   don't say, well, it's $25 million but they're willful so

21   let's make it $50.

22   THE COURT:  I think the reasons for the doctor's

23   testimony he made clear.  Yes, I'm going to stand by my

24   ruling.  I will include this.

25   Okay.  There is one more.  Yes.

```
 1              CoreValve, do you dispute that the last sentence
 2   on Page 42 is a correct statement of the law?  That, yes,
 3   here it reads:  "Finally, any doubt regarding the
 4   computation of the amount of damages should be resolved
 5   against CoreValve."
 6              MR. CIANFRANI:  It's almost a correct statement
 7   of the law.
 8              THE COURT:  Almost.
 9              MR. CIANFRANI:  It's a half correct statement of
10   the law.
11              THE COURT:  All right.
12              MR. CIANFRANI:  And so in the letter that we
13   sent last night, I don't believe that --
14              THE COURT:  I haven't seen that letter.  I meant
15   to tell you that.
16              MR. CIANFRANI:  I gathered that.  And so we did
17   have a few case cites.
18              THE COURT:  You are wondering, oh, don't you
19   have anything else to do, judge, but read our letters?  I
20   mean, okay, no.  Yes, I do.  Okay.
21              MR. CIANFRANI:  And the reason is that this
22   language appears in all the models:  the Federal Circuit Bar
23   Association, the AIPLA.
24              THE COURT:  It does appear?
25              MR. CIANFRANI:  Not as it appears here.
```

1       THE COURT:  Okay.

2       MR. CIANFRANI:  And so we cited some of the

3   models and the cases that those models rely on, and even if

4   the case that Edwards --

5       THE COURT:  Did you cite Judge Robinson's case?

6       MR. CIANFRANI:  I don't know if we cited Judge

7   Robinson's case.

8       THE COURT:  It might be a good one to look at.

9       MR. CIANFRANI:  But this language is reserved in

10  the case law and in the models.  And, in fact, if you look

11  at plaintiffs' objections in the Sensonics case, the quote

12  that they provided actually spells that out where the

13  defendant doesn't provide adequate record keeping.

14      So if we didn't produce any of our records, then

15  you do resolve the doubts against the defendant.  But there

16  is no allegation like that here.

17      So if you look at the quote from Sensonics there

18  on Page 43, "If actual damages cannot be ascertained with

19  precision because the evidence available from the infringer

20  is inadequate, then damages can -- the doubts can be

21  resolved against the infringer."

22      And that is what all of the models say, the

23  AIPLA, the Federal Circuit Bar Association, the national

24  patent jury instructions.

25      THE COURT:  I take it Lam, Inc. -- well, this is

1   based on Sensonics.  It's still good law.

2           MR. CIANFRANI:  Yes, Your Honor.  And I believe

3   Lam, Inc. is consistent with that.

4           And so to just put all doubts are resolved

5   against the defendant, that is not an accurate statement of

6   the law.  So, I guess you could go either way.

7           THE COURT:  I think you did cite Judge

8   Longobardi, whose seat I took.  So that's not bad.

9           MR. CIANFRANI:  Intentionally so, no doubt.

10          MR. VAN NEST:  We incorporate Judge Robinson's

11  ruling.

12          THE COURT:  You incorporate.

13          MR. CIANFRANI:  In almost every submission.

14          THE COURT:  It would seem that counsel has a

15  pretty good position on this.

16          MS. NYARADY:  Yes, Your Honor.  I might have

17  agreed up until this morning, but this morning we heard from

18  CoreValve's damages expert, and the damages expert

19  specifically criticized Dr. Leonard for using projections

20  and estimates.

21          And then we heard the cross-examination where it

22  came out that, in fact, CoreValve did not give us its

23  updated financial documents as the parties had agreed prior

24  to the trial.  And it's set forth -- the agreement is set

25  forth undisputed in the pretrial order.  We did not get

1   those numbers.

2          THE COURT:  So you are saying that as a result

3   of that fact being developed, it falls directly and squarely

4   within the Sensonics holding.

5          MS. NYARADY:  Absolutely, Your Honor.

6          THE COURT:  Yes.  How about that, Mr. Cianfrani?

7          MR. CIANFRANI:  Well, Your Honor, I don't think

8   there is an allegation that we failed to keep accurate

9   records.  At some point, there has to be a cutoff in the

10  financial statements so that the experts can --

11         THE COURT:  Well, yes, I understand.  Well, I

12  should have said, by analogy, it doesn't fall four square

13  within Sensonics and the related cases.  But do you think

14  that the spirit of Sensonics, wouldn't it be alive, given

15  the testimony, were I to not agree with you?  It's a

16  convoluted question.  It's a bad way of proposing the

17  question.

18         In other words, Ms. Nyarady, you have heard what

19  she said.  There was a cutoff in the documentation you

20  provided contrary to an agreement.

21         Two things.  There was a cutoff, and contrary to

22  an agreement that you had arrived with your opponents.

23         No. 1.  Do you agree or disagree with that

24  statement?

25         MR. CIANFRANI:  Your Honor, we agreed to --

```
 1              THE COURT:  Because Ms. Weil doesn't, but go

 2     ahead.

 3              MR. CIANFRANI:  Yes please.  The damages expert.

 4              MS. WEIL:  There was no agreement as to a

 5     specific cutoff date.  We produced the most current sales

 6     data that we had for CoreValve.  There was no sinister

 7     motive here.  That's when we had data.  Even if we carried

 8     it forward, as Mr. Kinrich said today, there would still be

 9     subsequent sales.  And no matter what date you pick, you are

10     still going to have to carry it forward.  So if there is

11     liability and damages are awarded, we're going to have to

12     carry it forward from some date.

13              But this was not the situation addressed in

14     Sensonic.  There was not an agreement that we didn't abide

15     by.  We fully produced up until the moment that we had the

16     data to produce.  And this will be a housekeeping matter, as

17     it is in any case where liability is found to bring any

18     damages current.

19              THE COURT:  Okay.  Ms. Nyarady.

20              MS. NYARADY:  Your Honor, it might have been a

21     housekeeping matter if their expert hasn't criticized our

22     expert for it.

23              THE COURT:  I'm sorry.  Say it again.

24              MS. NYARADY:  I said it might have been a

25     housekeeping matter if CoreValve's expert had not commented
```

1    on our expert's projections based on the fact that we didn't

2    have the data.

3            I think this instruction is entirely proper in

4    light of testimony we heard this morning.

5            THE COURT:  I'm constrained to disagree with

6    you.  Okay?

7            All right.  I think there are no other --

8            Now, how about, can you give me some guidance

9    so we can try to put the verdict form to bed, as it were?

10           MR. CIANFRANI:  Your Honor, one more thing.

11           THE COURT:  Yes.

12           MR. CIANFRANI:  In Instruction 5.5, I believe

13   there is a typo.  Hopefully Ms. Nyarady will agree with me.

14   And that is on Page -- it's in 5.5 and 5.7.

15           And No. 3.  It should say that "Edwards had and

16   would have expanded" instead of "or would have expanded."

17           THE COURT:  Do you agree with that, Ms. Nyarady?

18           MS. NYARADY:  Yes, Your Honor.

19           MR. CIANFRANI:  And same errors in 5.7.

20           MS. NYARADY:  Yes, Your Honor.  And just for the

21   record, I just want to state that we maintain the objections

22   to 5.1 and 5.3.

23           THE COURT:  That's fine.  Overruled.

24           So, counsel, these competing verdict forms,

25   where do they -- you now know, based on my ruling on the

```
1    positioning of the issues, patent issues for the jury, that
2    willfulness should come after infringement.  That was one
3    difference.
4            What are the other differences?  I haven't had a
5    chance to look.
6            MS. NYARADY:  Your Honor, one thing we made some
7    progress on, and correct me if I'm wrong, but I think the
8    proposal of this morning was that we could agree up through
9    Question 4 if we remove the language from this, from the
10   Edwards' version, if we remove the language of, the words
11   "artificial valve" that precede the word "art."  This is in
12   Question 4 of patent validity.  And this is the enablement
13   question.
14           THE COURT:  So this is on the Edwards form.
15           MS. NYARADY:  This is on the Edwards form.  So
16   we can agree 1 through 4 on the Edwards form if we remove
17   the term "artificial valve" in our Question No. 4, and we
18   agree to do that.
19           THE COURT:  Is that correct?
20           MR. CIANFRANI:  I believe so.
21           THE COURT:  Go ahead, Ms. Nyarady.
22           MS. NYARADY:  So the disputes are then limited
23   to just the damages questions.  And I apologize, Your Honor,
24   but we don't have a current version of CoreValve's verdict
25   form.  I understand it was filed but we weren't given a copy
```

```
 1    this morning.

 2                   (Verdict form handed to Ms. Nyarady.)

 3                   THE COURT:  I'll let them digest that a little

 4    bit.

 5                   (Pause.)

 6                   THE COURT:  Let me make sure I marked these

 7    forms correctly.

 8                   As to Question Roman Numeral -- do you use roman

 9    numerals in yours?

10                   MR. CIANFRANI:  We do, Your Honor.

11                   THE COURT:  Okay.  That doesn't help.  Both of

12    you do.

13                   Did you break down the damages question into

14    three separate questions?

15                   MR. CIANFRANI:  That was us, Your Honor.

16                   THE COURT:  Okay.  Fine.

17                   Mr. Blumenfeld.

18                   MR. BLUMENFELD:  Your Honor, we think the

19    easiest way to do it is the way we did it, which was just to

20    ask the jury one question:  If you found the patent valid

21    and infringed, what was the damages?

22                   We have a lot of problems with CoreValve's

23    proposal starting from the bottom, asking for the data

24    point.

25                   THE COURT:  Yes, No. 7.  I didn't know that was
```

1    an issue.

2              MR. BLUMENFELD:  Well, it may or may not be an

3    issue.  But the way they are creating it, they put in a

4    period for themselves and a date for us.  And I don't even

5    know how that is supposed to work, so I think that one has

6    to go.

7              The problem with the royalty, if we're going to

8    split it, which we would prefer not to do, is that our

9    expert testified on a royalty rate for the residual portion

10   on which there were no lost profits.  He didn't testify as

11   to a specific rate if it was a total reasonable royalty.  He

12   testified as to a number.

13             THE COURT:  So one wonders how the jury would

14   determine a royalty other than based upon CoreValve's --

15             MR. BLUMENFELD:  Correct, Your Honor.

16             So we think that the way we've done it, which is

17   just what are the damages you find is the right way to do

18   it; but certainly the second half of 6 and 7 we think ought

19   to come out.  I think it's designed to be somewhat confusing

20   to the jury.

21             THE COURT:  Well, whether it's designed to be or

22   intentionally, I would suggest an intention to confuse the

23   jury, I won't adopt that.  But I think it could be confusing

24   to the jury.

25             Here is what we'll do with the verdict form.

1    I'm going to let you discuss this some more -- we have some

2    time -- and hope you will achieve an agreement.

3              Let me offer this guidance.  I'm rather

4    persuaded by Mr. Blumenfeld's argument that the way

5    CoreValve has crafted the damages question and the way the

6    evidence was presented would not fully account for

7    Dr. Leonard's period of damages and not give the jury an

8    opportunity to make a finding based on that testimony.  It

9    cuts the heart out of it, just doesn't account for it at

10   all.  I think that is undisputed.

11             So if you are going to work on this and can

12   agree on a refinement, and maybe that is what it's going to

13   take or maybe it's going to take a ruling of the Court, at

14   least you have a basis now to discuss how you might refine

15   that part of the question.

16             Mr. Blumenfeld is absolutely correct.  You

17   provided a period, Fall 2004 to Spring 2005.  And this is

18   under Question 7.  Please indicate below the date for the

19   hypothetical negotiation to be used.

20             I didn't really realize, and that may have just

21   gone right over my head, that there was a real difference.

22   I just don't recall this being an issue.

23             Ms. Weil.

24             MS. WEIL:  Yes.  If I can address that, Your

25   Honor.

1          It is an issue.  And Dr. Leonard's analysis for

2    both lost profits and reasonable royalty was based on the

3    date of January 3, 2006.  And, in fact, this is going to be

4    the basis for our JMOL.

5          There is no evidence whatsoever that there was

6    any act within Section 271(a), and now we're limited to

7    manufacturing that occurred on that date.  That date is just

8    completely unsupportable.

9          THE COURT:  January 3?

10         MS. WEIL:  2006.

11         THE COURT:  2006.

12         MS. WEIL:  And so our position is that

13   Dr. Leonard's entire testimony is wrong as a matter of law

14   because there is no factual basis to support it.

15         That being said, that is now going to be the

16   basis of our JMOL.

17         This Question 7 is in the event you deny our

18   JMOL, we need to know what the date is that the jury used

19   for purposes of damages.

20         And I would refer the Court to the Integra Life

21   Sciences v Merck case.  It's 331 F.3d 860, a Federal Circuit

22   case in 2003.

23         THE COURT:  Could you give me the cite again?

24         MS. WEIL:  Sure.  331 F.3d, 860.  And its

25   Integra v Merck.

1       In that case, the Federal Circuit remanded a

2   decision back to the District Court because there was not

3   evidence -- there wasn't a determination of what the

4   reasonable royalty date was.  And the Federal Circuit said,

5   emphasized the importance of the date of the hypothetical

6   negotiation, and because there wasn't a determination,

7   remanded.

8       I am sure we would all like to avoid that.  So

9   in the event --

10      THE COURT:  That has got to be an unusual

11  occurrence, because usually, that is not an issue.

12      MS. WEIL:  And it is an issue here.  Sometimes

13  it isn't an issue.  Sometimes it's not, you are right.  But

14  it is here, especially in light of this case and to avoid a

15  remand.

16      THE COURT:  I don't worry about that kind of

17  thing, except that I don't want to see all of you again.

18      (Laughter.)

19      I don't mean to be unkind.  I'm teasing.

20      MR. BLUMENFELD:  Your Honor, some of this goes,

21  unfortunately, to the merits.  But the hypothetical

22  negotiation obviously goes to the reasonable royalty.  The

23  hypothetical negotiation is not part of the lost profits.

24  We will look at that case and see what it says.

25      The notion that this was pulled out of thin air,

1    we heard from Dr. Leonard.  We heard from their expert

2    today.  We heard from Mr. Michiels yesterday that January

3    3rd, 2006 was the date that the design was frozen for the

4    accused device.  It wasn't like that was some date that was

5    just made up.

6              And I think their own expert -- I don't have the

7    transcript, obviously, yet -- but I think their own expert

8    said today that it didn't really matter whether you took

9    that date or took Dr. Leonard's date.

10             So I am not sure why any of this matters very

11   much.

12             I don't think this is a case, under the

13   testimony of either expert, where it's going to turn on,

14   well, was it this date in 2005 or was it this date in 2006?

15   They didn't go to market until the spring of 2007.  I just

16   don't think it has the significance.  We will look at the

17   case.

18             MS. WEIL:  I think it has tremendous

19   significance.  First of all, Mr. Blumenfeld correctly

20   reported on the testimony.  The testimony was, and the only

21   testimony was that as of that date the design was frozen.

22   271(a) does not make an infringing act the date that a

23   design is frozen.  That is the only evidence to support that

24   date.

25             So, you know, there is just nothing to support

```
 1    it.  And because there is nothing to support it, then all of

 2    Dr. Leonard's testimony fails, because he relies on that,

 3    not only for the reasonable royalty and hypothetical

 4    negotiation, but he also relies on that for his lost profits

 5    analysis.

 6             So his entire damages analysis is 100 percent

 7    based on that date, which is not, even if there is

 8    liability, an infringing act under the patent law.  If that

 9    date goes, there is nothing to support his testimony, and

10    there wouldn't be any damages presentation by Edwards that

11    is relevant in the record.

12             THE COURT:  Let's give Mr. Blumenfeld and

13    company a chance to read the case, give the Court a chance

14    to read the case.

15             Read the case.  Hopefully, you will be able to

16    talk.  Maybe agree, or maybe agree to disagree.  We will

17    have time before the jury needs to have use of the verdict

18    form.

19             It may put a -- I won't be able to discuss, nor

20    you able to discuss, if you choose to, with the jury, the

21    form in its entirety, if we don't have agreement by the time

22    of your closings.  Do you see what I am saying?  It would be

23    a good thing if you could agree, or at least, probably, have

24    the Court address the matter before your closings, and give

25    a chance to have the final product, at least one iteration
```

```
 1   of it, for use by the jury.

 2             MR. VAN NEST:  I would assume, Your Honor, if we

 3   do have agreement, and Your Honor has approved the verdict,

 4   Your Honor would reject a discussion of that with the jury

 5   in closing.

 6             THE COURT:  No, not at all.  What I was really

 7   referring to was, frequently, as you know in the

 8   instructions, judges say, I am going to discuss the possible

 9   verdicts with you.  And frequently I do not.  And let

10   counsel, because I know that oftentimes the lawyers like to

11   talk about the verdict form.  That is fine.

12             MR. VAN NEST:  I certainly do.  We will make

13   every effort to get that agreed tonight.

14             MR. NATHAN:   I will be discussing the verdict

15   form.

16             THE COURT:  Yes.  That saves my voice as well.

17             All right, counsel.  Have a good night.

18             (Court recessed at 4:20 p.m.)

19

20

21

22

23

24

25
```