```
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3                          -   -   -

 4    EDWARDS LIFESCIENCES AG and    :      Civil Action
      EDWARDS LIFESCIENCES LLC,      :
 5                                   :
                  Plaintiffs,        :
 6                                   :
             v.                      :
 7                                   :
      COREVALVE, INC.,               :
 8                                   :
                  Defendant.         :      No. 08-91(GMS)
 9
                              -   -   -
10
                          Wilmington, Delaware
11                        Thursday, April 1, 2010
                              9:30 a.m.
12                        Day 8 of Trial

13                            -   -   -

14    BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
                                       and a Jury
15
      APPEARANCES:
16
                 JACK B. BLUMENFELD, ESQ.
17               Morris, Nichols, Arsht & Tunnell LLP
                      -and-
18               JOHN E. NATHAN, ESQ.,
                 CATHERINE NYARADY, ESQ.,
19               BRIAN EGAN, ESQ., and
                 KRIPA RAMAN, ESQ.
20               Paul, Weiss, Rifkind, Wharton & Garrison LLP
                 (New York, N.Y.)
21
                              Counsel for Plaintiffs
22

23

24

25
```

1   APPEARANCES CONTINUED:

2           JOHN W. SHAW, ESQ.
            Young Conaway Stargatt & Taylor LLP
3                   -and-
            ROBERT A. VAN NEST, ESQ.,
4           BRIAN FERRALL, ESQ., and
            KAREN VOGEL WEIL, ESQ.
5                   -and-
            JOSEPH S. CIANFRANI, ESQ.
6           Knobbe Martens Olson & Bear LLP
            (Irvine, CA)
7
                            Counsel for Defendant
8

9                       -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       THE COURT:  Good morning.

2       (Counsel respond "Good morning.")

3       THE COURT:  Counsel, please be seated.

4       Counsel, here is what I have printed off the

5  docket.  I have CoreValve's motion, JMOL on enablement and

6  damages, JMOLs on enablement and damages, and Edwards's JMOL

7  on literal infringement and doctrine of equivalents, as well

8  as on the issues of willfulness, enablement and damages.

9       I will reserve on these, counsel, perhaps rule

10  before the jury comes back, I don't know.  But I am going to

11  reserve for now, because I have not had the time to address

12  these.  And we have a jury that is waiting to be charged.

13       I am disappointed, but I am not shocked, that

14  there is not agreement on the verdict form.

15       The last iteration of any form that I see on the

16  docket is plaintiffs' proposed verdict form.  I was looking

17  around for CoreValve's.

18       Do you have it, Ms. Walker?

19       Let's see what we have.

20       I think I now have CoreValve's.  CoreValve had,

21  in its last iteration, proposed Question 7, the date of the

22  hypothetical negotiations.

23       MS. WEIL:  Question 7 and Question 8.

24       THE COURT:  So I don't have your most recent.

25       MS. WEIL:  It was filed -- I have a red line.

1    THE COURT:  Yes, Mr. Shaw?

2    MR. SHAW:  Yes, Your Honor (handing to Court.)

3    THE COURT:  So, Ms. Weil, this is not the

4  version we were discussing yesterday?

5    MS. WEIL:  That's right.  What happened last

6  night was Edwards sent over a revised verdict in which they

7  had two damages questions instead of one.  Originally it was

8  one, total damages.  Now there is lost profits, reasonable

9  royalty.  Then we added 2.

10    THE COURT:  And you and Mr. Blumenfeld didn't go

11  to dinner and work this out?

12    MS. WEIL:  No, we didn't.

13    MR. BLUMENFELD:  Neither, Your Honor.

14    THE COURT:  Who wants to go first?

15    MS. WEIL:  I will.

16    Question 7, this was intended to address Mr.

17  Blumenfeld's comments yesterday, where we had originally had

18  question on the royalty rate.  So he made the argument that

19  that kind of played into our hands because we had a rate and

20  they didn't.

21    So to address that, I changed the question to

22  state the quantity of CoreValve sales in units or revenues

23  for which they were awarding reasonable royalty damages.

24  That way we can figure out what the rate is.

25    The reason why I put that question in there is

1    that if the jury does get to the issue of damages, if they

2    don't have that, it will be impossible to try to figure out

3    how to carry damages forward.

4              We need some way to give be able to do that.

5              I think that this should address Mr.

6    Blumenfeld's concerns yesterday.  And that's why that is

7    there.

8              Question 8 is the question on the hypothetical

9    negotiation.  Rather than having it be a multiple-choice

10   question, which they were concerned about, I just made it

11   open-ended and was trying to accommodate their concern on

12   that.

13             THE COURT:  Okay.  What I will do is now ask Mr.

14   Blumenfeld to explain the rationale for your verdict form.

15   And I will give you both a chance to tell me why you feel

16   that the other's doesn't work.

17             MR. BLUMENFELD:  Your Honor, first of all, the

18   version we got late last night is different than what Ms.

19   Weil said.  The version we got back says in answer to

20   question 6 please state the royalty rate you applied.  That

21   is what I got last night.

22             THE COURT:  Here is what I have in my hands:  In

23   answering Question 6, please state the quantity of

24   CoreValve's sales in units or revenues in which you awarded

25   reasonable royalty damages.

1          MS. WEIL:  I can share this.

2          MR. BLUMENFELD:  At any rate, Your Honor, what

3    we tried to do last night was separate out the lost profits

4    and the reasonable royalty.  And we think that's fair.

5          To put on the jury the burden of saying I now

6    have the version, tell us the quantity in units or revenues

7    on which you awarded them, is just putting a big burden on

8    the jury.  And the hypothetical negotiation, also.

9          I guess what I would say is, I have been

10   litigating patent cases in this Court for a long time.  I

11   have never seen questions like this.  If you are going to

12   start getting into subsidiary questions on verdict sheets --

13   no one did this with enablement and no one it with any other

14   issue.

15         We are not asking, what's the level of skill

16   that you found or things like that.  And it really is

17   putting a burden on the jury to have to go through and

18   quantify units or revenues, and then say, and what date did

19   you apply.

20         The way the Courts have done it, at least in my

21   experience, even the Integra Court where they reversed,

22   which they talked about, said we are sending it back to the

23   judge to do a proper calculation of damages, nobody said we

24   are sending it back and the verdict sheet has to have these

25   questions on it.

```
 1              THE COURT:  Yes.  I read the relevant portions
 2     of the case.
 3              Mr. Blumenfeld, does CoreValve have a complaint,
 4     nonetheless, that perhaps your verdict form doesn't account
 5     for their theory?
 6              As I understood Mr. Kinrich's testimony, he
 7     disagrees with Dr. Leonard, I thought he disagreed that
 8     Edwards was entitled to any lost profits, and he had
 9     calculated a royalty, an amount of royalty.  Do you account
10     for that?
11              MR. BLUMENFELD:  That is correct.  He did two
12     things.  One, he said I think there should just be a
13     reasonable royalty.  Here's what it is.  But if you find
14     lost profits, it should be this amount.  But I think we have
15     accounted for that, because in Question 5, we say, If you
16     believe that Edwards has proven by a preponderance of the
17     evidence it is entitled to lost profits for a portion of the
18     infringing sales, please enter the amount.
19              And then the next question is, for those
20     CoreValve infringing sales for which you did not award
21     Edwards lost profits, what is the amount of reasonable
22     royalty?
23              So if they don't find lost profits, the answer
24     to 5 will be zero, and then they will fill in a reasonable
25     royalty number in 6.
```

 1          So I don't think there is any prejudice to

 2   CoreValve from the way 5 and 6 are lined up.  And I don't

 3   think that they had any objection to 5 and 6.

 4          THE COURT:  Let's find out.  That was just a

 5   question that came up in my mind.

 6          MS. WEIL:  That is correct.  We don't have an

 7   objection to 5 and 6.  We just don't think that is enough.

 8   So we wanted to add 7 and 8.

 9          THE COURT:  I agree with Mr. Blumenfeld that 7

10   and 8 are unnecessary.  I don't think that the case you

11   cited stands for the proposition for which you cited it.  I

12   disagree with you in that regard, that the case stands for

13   the reasons you articulated yesterday, at least insofar as I

14   believe Mr. Blumenfeld has accurately interpreted the

15   circuit's decision as saying you have to have this issue in

16   the verdict form, and, quite frankly, I have never seen it,

17   either, and I don't intend to start with this case.

18          MR. BLUMENFELD:  Your Honor, we do have several

19   sets of these.  If I can hand them to Ms. Walker.

20          THE COURT:  Please do, yes.

21          So the Court will adopt plaintiffs' proposed

22   form.  And the Court will assume, as you indicated

23   yesterday, counsel, that both of you intend to talk about

24   the verdict form.  So I will forego my discussion of it in

25   my instructions.  Is that correct?

1    MR. VAN NEST:  Yes, Your Honor.

2    THE COURT:  Okay.

3    Any other issues before the jury comes out?

4    MR. NATHAN:  Yes, Your Honor.  Just one.

5    Judge, we exchanged slides last night on

6    closings.  There is one issue.

7    This is CoreValve's Slide 13, where they are

8    putting in something regarding the original claim and the

9    amended claim.  Your Honor will recall that we went down

10   this track yesterday, on sidebar.

11   They danced up to the Festo issue.  The Festo

12   issue is a question for the Court, not for the jury.  I have

13   been told by Mr. Van Nest that he intends to argue that this

14   is important.  And I believe it's just going to cause jury

15   confusion.

16   And I object to it, Your Honor.

17   The whole prosecution history amendment --

18   THE COURT:  Important in what regard?

19   MR. NATHAN:  I have no idea.  It is either

20   Festo --

21   MR. VAN NEST:  It is not Festo, Your Honor.  The

22   only thing I want to point out is this is an important

23   limitation.  This projecting from the side was important,

24   and they pointed it out to the Patent Office, kind of along

25   the lines of my cross-examination of Dr. Buller, which was

```
 1    never objected to.

 2                  THE COURT:  That is fine.

 3                  Mr. Blumenfeld.

 4                  MR. BLUMENFELD:  We worked out last night some

 5    issues of what goes to the jury.  Ms. Weil and I agreed

 6    that, as we discussed in court yesterday, that seven

 7    demonstratives from each of the damages experts could go to

 8    the jury.  I think we are together on that.  I don't know

 9    whether --

10                  THE COURT:  Can we locate them now, for Ms.

11    Walker's convenience?

12                  MR. BLUMENFELD:  I think they have already been

13    included in what is going to go.

14                  THE COURT:  Okay.

15                  MR. BLUMENFELD:  The only issue left is -- we

16    agreed to put in the final demonstratives.  Each of us put

17    into the jury notebooks for the damages expert their

18    workpapers, the backup material.  We thought if they are

19    going to get the demonstratives it would be helpful for them

20    to also have the backup material if they wanted to look at

21    it.

22                  I think Ms. Weil's' position was it would be

23    confusing.  I would think if they are going to get the final

24    sheet with the numbers, having the backup material in case

25    they want to look at it would be helpful to them rather than
```

1       confusing.

2                     THE COURT:  If they want the backup material,

3       they can ask for it.  So we can take it out.  I think it

4       might be confusing.

5                     MR. BLUMENFELD:  Thank you.

6                     THE COURT:  Are we ready?

7                     Ms. Walker.

8                     Mr. Cianfrani?

9                     Jury is coming in.

10                    (Jury enters courtroom at 9:45 a.m.)

11                    THE COURT:  Good morning, ladies and gentlemen.

12                    Please take your seats.  I apologize, we are 15

13      minutes off our time.  We will hopefully make that up.

14                    I misspoke yesterday a little bit.  In terms of

15      the lawyers' closings, we are not going to just have two

16      rounds.  There will be three.  It still amounts to an hour

17      apiece.  Mr. Nathan will have the opening 45 minutes.  Mr.

18      Van Nest will have an hour's response.  And then Mr. Nathan,

19      because they are the plaintiff, gets to offer 15 minutes in

20      rebuttal closing, if he chooses.

21                    All right.  Each of you now has in your hands a

22      copy of the final instructions and a verdict form.

23                    I will tell you right now, I am not going to

24      discuss the verdict form.  The instructions will say

25      something to the contrary, probably.  But the lawyers will

1    talk about the verdict form with you.  Frankly, it's rather

2    self-explanatory.  It doesn't require, I think, a lot of

3    explanation.  But there may be certain things that they

4    would like to highlight for you in their discussion with

5    you.

6               Members of the jury, now it is time for me to

7    instruct you about the law that you must follow in deciding

8    this case.

9               This will take some time, so bear with me.

10              Each of you, as I have said, has a copy of the

11   instructions.  Again, you can read along or pay attention to

12   the Bench, however you choose.

13              I am going to start by explaining your duties

14   and general rules that apply in every civil case.  Then I

15   will explain some rules that you must use in evaluating

16   particular testimony and evidence.

17              Then I will explain the positions of the parties

18   and the law that you will apply in this case.

19              And last, I will explain the rules that you must

20   follow during your deliberations in the jury room.

21              Again, the last part, the verdict form, is going

22   to be discussed with you by the lawyers.

23              Listen carefully to everything I have to say.

24              Members of the jury, it is important that you

25   bear in mind the distinction between your duties and mine.

1    You have two main duties as jurors.  The first one is to

2    decide what the facts are from the evidence that you saw and

3    heard here in court.  You, as you know, are the sole judges

4    of the facts.  It is your judgment and your judgment alone

5    to determine what the facts are.  And nothing at all that I

6    have said or done during this trial was meant to influence

7    your decision about the facts in any way.

8            Your second duty is to take the law that I give

9    to you, apply it to the facts, and decide if CoreValve is

10   liable, and if so, what monetary damages should be awarded

11   to Edwards.

12           Now, as far as my duty is concerned, I have the

13   duty of advising you about the law.  You should apply that

14   law to the facts as you find them.  You are not to consider

15   whether the principles I state are sound or whether they

16   accord with your own views about policy.

17           You are bound by the oath that you took at the

18   beginning of the trial to follow the instructions that I

19   give you, even if you personally disagree with them.  You

20   must accept them despite how you feel about their wisdom.

21   This includes the instructions that I gave you before and

22   during the trial, and these instructions.  All the

23   instructions are important, and you should consider them

24   together as a whole.

25           Perform these duties fairly.  Do not let any

1  bias, sympathy or prejudice that you may feel toward one

2  side or the other influence your decision in any way.

3            Now, as you know, you must make your decision

4  based only on the evidence that you saw and heard here in

5  court.  Do not let rumors, suspicions, or anything else that

6  you may have seen or heard outside of court influence your

7  decision in any way.

8            The evidence in this case includes only what the

9  witnesses said while they were testifying under oath,

10  deposition transcript testimony that was presented to you,

11  the exhibits that I allowed into evidence, and the

12  stipulations to which the lawyers agreed.

13            I think we should include video deposition in

14  that as well.

15            Nothing else is evidence.  The lawyers'

16  statements and argument are not evidence.  The arguments of

17  the lawyers are offered solely as an aid to help you in your

18  determination of the facts.  Their questions, as you know,

19  and objections are not evidence.  My rulings on those

20  objections are not evidence.  And my comments and questions

21  I might have asked or made during the course of the trial

22  are not evidence.

23            During the trial I may not have let you, as you

24  know, hear the answers to certain questions the lawyers may

25  have asked.  I also may have ruled that you could not see

1    some of the exhibits that the lawyers wanted you to see.

2    You must completely ignore all of these things.  Do not

3    speculate about what a witness might have said, or what an

4    exhibit might have shown.  And sometimes I may have ordered

5    you to disregard things that you saw or heard or I struck

6    things from the record.  I think I did the former a time or

7    two.  These things are not evidence, and you are bound by

8    your oath not to let them influence your decision in any

9    way.

10           Make your decision based only on the evidence,

11   as I have defined it, and nothing else.

12           Let's revisit direct and circumstantial

13   evidence.  You have heard these terms before.

14           Direct evidence is simply evidence like the

15   testimony of an eyewitness which, if you believe it,

16   directly proves a fact.  If a witness testified that she saw

17   it raining outside, and you believed her, that would be

18   direct evidence that it was raining.

19           Circumstantial evidence is simply a chain of

20   circumstances that indirectly proves a fact.  If someone

21   walked into the courtroom today wearing a raincoat covered

22   with drops of water and carrying a wet umbrella, that would

23   be circumstantial evidence from which you could conclude

24   that it was raining outside.

25           It is your job to decide how much weight to give

1    the direct and circumstantial evidence.  The law makes no

2    distinction between the weight that you should give to one

3    or the other, nor does it say that any one is better than

4    the other.  You should consider all the evidence, both

5    direct and circumstantial, and give it whatever weight you

6    think it deserves.

7              You should use your common sense in weighing the

8    evidence.  Consider it in light of your everyday experience

9    with people and events, and give it whatever weight you

10   believe it deserves.  If your experience tells you that

11   certain evidence reasonably leads to a conclusion, you are

12   free to reach that conclusion.

13             A further word about statements and arguments

14   of counsel.  The attorneys' statements and arguments, as you

15   know by now, are not evidence.  Instead their statements and

16   arguments are intended to help you review the evidence

17   presented.  If you remember the evidence differently from

18   the lawyers or the attorneys, you should rely on your own

19   recollection.

20             The role of attorneys is to zealously and

21   effectively advance the claims of the parties they represent

22   within the bounds of the law.  An attorney may argue all

23   reasonable conclusions from the evidence in the record.  It

24   is not proper, however, for an attorney to state an opinion

25   as to the truth or falsity of any testimony or evidence.

1    What an attorney personally thinks or believes about the

2    testimony or evidence in a case is simply not relevant, and

3    you are instructed to disregard any personal opinion or

4    evidence that an attorney has offered during the openings or

5    the coming closing statements, or at any other time during

6    the course of these proceedings.

7              Now, you are the sole judges of each witness's

8    credibility.  You should consider each witness's means of

9    knowledge; strength of memory; opportunity to observe; how

10   reasonable or unreasonable the testimony is; whether it is

11   consistent or inconsistent; whether it has been contradicted;

12   the witness's biases, prejudice or interests; the witness's

13   manner or demeanor on the witness stand; and all

14   circumstances that, according to the evidence, could affect

15   the credibility of the testimony.

16             If you find the testimony to be contradictory,

17   you must try to reconcile it, if reasonably possible, so as

18   to make a harmonious story of it all.  But if you can't do

19   this, then it is your duty and privilege to believe the

20   testimony that, in your judgment, is most believable and

21   disregard any testimony that, in your judgment, is not

22   believable.

23             Now, in determining the weight to give the

24   testimony of a witness, you should ask yourself whether

25   there is evidence tending to prove that the witness

1  testified falsely about some important fact, or, whether

2  there was evidence that at some other time the witness said

3  or did something, or failed to say or do something that was

4  different from the testimony he or she gave at trial or

5  during a deposition.  You have the right to distrust such

6  witness's testimony in other particulars and you may reject

7  all or some of the testimony of that witness or give it such

8  credibility as you think it deserves.

9          You should remember that a simple mistake by a

10  witness does not necessarily mean that the witness was not

11  telling the truth.  People may tend to forget some things or

12  remember other things inaccurately.  If a witness has made a

13  misstatement, you must consider whether it was simply an

14  innocent lapse of memory or an intentional falsehood, and

15  that may depend upon whether it concerns an important fact

16  or an unimportant detail.

17          Now, expert testimony -- you've heard a lot of

18  that -- is testimony from a person who has special skill or

19  knowledge in some science, profession or business.  This

20  knowledge is not common to the average person but has been

21  acquired by the expert through special training and/or

22  experience.

23          In weighing expert testimony, you may consider

24  the expert's qualifications, the bases for the expert's

25  opinion, and the reliability of the information supporting

1   the expert's opinions or opinion, as well the factors I have

2   previously mentioned for weighing the testimony of any other

3   witness.  You are not required to accept an expert's

4   opinions.  Expert testimony should receive whatever weight

5   and credit you think appropriate, given all the other

6   evidence in the case.

7          Now, two more points about the witnesses.

8          Sometimes jurors wonder if the number of

9   witnesses who testified makes my difference.  Do not make

10  any decisions based only on the number of witnesses who

11  testified.  What is more important is how believable the

12  witnesses were, and how much weight you think their

13  testimony deserves.  Concentrate one that, ladies and

14  gentlemen, not the numbers.

15         Second, do not make any decision based on

16  whether the witness appeared to testify live or if the

17  witness testified by pre-recorded video examination.  Both

18  forms of testimony are entitled to equal weight.  No

19  inferences should be drawn from whether a witness testified

20  live or by video.

21         As you know, this is a civil case in which the

22  plaintiffs, Edwards are charging the defendant -- and I'm

23  going to shorten this down to "Edwards" and "CoreValve,"

24  okay? -- with patent infringement.  Now, CoreValve denies

25  this charge.  Edwards has the burden of proving its patent

infringement claim by a preponderance of the evidence.  That

means Edwards has to produce evidence, which, when

considered in light of all the facts, leads you to believe

that what Edwards claims is more likely true than not.  To

put it differently, if you were to put Edwards' and

CoreValve's evidence on opposite sides of the scale, the

evidence supporting Edwards' claims would have to make the

scales tip somewhat on Edwards' side.

Edwards also asserts that CoreValve's

infringement has been willful.  Edwards has the burden of

proving this by clear and convincing evidence.  Now, clear

and convincing evidence is evidence that produces in you an

abiding conviction that the truth of a factual contention is

highly probable.  Proof by clear and convincing evidence is

thus a higher burden of proof than proof by a preponderance

of the evidence.

Now, CoreValve also asserts that Edwards patent

is invalid.  A patent is presumed to be valid.  Accordingly,

CoreValve has the burden of proving by clear and convincing

evidence that the patent is invalid.

Those of you who are familiar with criminal

cases will recall the term "proof beyond a reasonable

doubt."  Now, that standard, that burden does not apply in a

civil case.  Therefore, you should put that out of your mind

in considering whether or not the parties have met their

1    burdens in this case.

2            I already told you -- well, let's go through

3    this.

4            As you know, the plaintiffs in this case I

5    continue to refer to as "Edwards," which is a short form of

6    Edwards Lifesciences AG and Edwards Lifesciences LLC.  And

7    you know that Edwards owns the '552 patent.

8            On the other hand, we have Medtronic CoreValve

9    LLC and CoreValve Inc.  And as I have done throughout the

10   trial and will continue to do for the balance of these

11   instructions, I will refer to the parties as "Edwards" and

12   "CoreValve."  Okay?

13           Now, Edwards seeks a determination that

14   CoreValve has infringed the '552 patent as a result of

15   unauthorized manufacture of CoreValve's products known as

16   the GEN 3 (or third generation) ReValving system.

17           Edwards contends that CoreValve manufactures the

18   accused ReValving system in California, and thereby

19   infringes the Edwards patent.

20           Edwards also contends that this infringement is

21   was willful and that it is entitled to damages.

22           There is no allegation in this case that

23   CoreValve's employees took any trade secrets from Edwards or

24   that CoreValve act improperly in hiring former Edwards

25   employees.

1       I will explain further each of these

2  contentions.

3       CoreValve contends that the accused ReValving

4  system does not infringe Claim 1 of the '552 patent because

5  Edwards has not proven that the accused ReValving system

6  meets every element of the asserted claim.

7       CoreValve further contends that the Edwards

8  patent is invalid because it was not enabled.

9       CoreValve also denies Edwards' allegation of

10  willful infringement and denies that Edwards is entitled to

11  any damages.

12       I will explain these contentions further.

13       Let me summarize the patent issues for you.

14       First.  Whether Edwards has proven by a

15  preponderance of the evidence that the CoreValve GEN 3

16  ReValving system infringes, literally or under the doctrine

17  of equivalents, Claim 1 of the '552 patent.

18       Next.  Whether Edwards proved by clear and

19  convincing evidence that CoreValve's infringement was

20  willful.

21       Whether CoreValve has proven by clear and

22  convincing evidence that Claim 1 of the '552 patent is

23  invalid for lack of enablement because the specification of

24  the patent (the text and drawings that appear in the patent

25  before the patent claims) did not contain a disclosure that

1   would enable one of ordinary skill in the art to make and

2   use the inventions of Claim 1 without undue experimentation.

3          Finally, yes.  If, in answering the above

4   questions, you find CoreValve liable for patent

5   infringement, you must then decide the amount of damages

6   adequate to compensate Edwards for CoreValve's infringement.

7   Edwards has the burden to establish the amount of its

8   damages by a preponderance of the evidence.

9          Now, before you can decide whether CoreValve

10  has infringed Claim 1 of the '552 patent, you will have to

11  understand patent "claims."  Now, patent claims, as you have

12  heard a number of times during this trial, define in words

13  the boundaries of what is Edwards' protected invention.  The

14  patent claims are the numbered paragraphs at the end of the

15  patent.  The patent claim at issue here (the asserted claim,

16  we call it) is Claim 1 of the '552 patent, beginning at

17  Column 7, Line 57 of the '552 patent.  Only the claims of

18  the patent can be infringed.  Neither the specification,

19  which, as you know, is the description of the invention, nor

20  the drawings of the patent can be infringed.

21         Now, you have a copy of the '552 patent in your

22  jury binder.  I told you that it's Claim 1 that is at issue

23  here of the '552 patent.

24         The meaning of a patent claim -- what we call

25  claim construction -- is a question of law over which I have

1    exclusive or sole jurisdiction.  I have already made, as you

2    know, the legal determination as to what the patent claims

3    mean.  You must apply the definitions for certain claims in

4    Claim 1 of the '552 patent as I have construed them, or

5    defined them.  In determining whether CoreValve infringes

6    Claim 1 of the '552 patent, you may not assign your own

7    meaning or understanding of these terms --  you must follow

8    my definitions.  For any words in the claim for which I have

9    not provided you with a definition, you should apply their

10   ordinary meaning to one of skill in the art.

11             I will now provide you with a list of the claim

12   terms from Claim 1 of the '552 patent and meaning of the

13   claim terms the Court has construed.  For your convenience

14   and reference, a copy of these claim territories are set

15   forth I think in Appendix A -- yes, it is there -- of the

16   instructions.

17             Okay.  So Claim 1, here we go, of the '552

18   patent.

19             "elastical" means "capable of returning to an

20   original shape when forces are removed;"

21             next, "stent" means "a medical device that is

22   inserted into an anatomical vessel or passageway to provide

23   support;"

24             "commissural points" means "points or locations

25   where the leaflets of the valve are joined;"

1        "cylindrical support means" means "a portion of

2    the stent supporting the valve that has a shape of or

3    relating to a cylinder."  Now, the term "cylindrical" does

4    not mean that the object described must be a cylinder with a

5    diameter that is constant along its length or longitudinal

6    axis.  To put it another way, the term "cylindrical" as used

7    in the patent in this case does not require the presence of

8    a perfect geometric cylinder;

9        "radially collapsible" means "capable of

10   reducing or of being reduced in diameter along a cross

11   section of the cylindrical support means;"

12       "circumferentially expendable section" -- should

13   be that expandable section, or is it expendable?

14           MR. VAN NEST:  Expandable.

15           THE COURT:  Expandable.  Okay.  There is a typo

16   there.

17       "Circumferentially-expandable section" means --

18   do you see that in No. 6?  Okay -- means "a section of the

19   cylindrical support means that is capable of increasing or

20   of being increased in diameter;"

21       next, "radially expandable" means "capable of

22   increasing or of being increased in diameter along a cross

23   section of the cylindrical support means;

24       "commissural supports" means "portions of the

25   stent that support the commissural points of the valve;"

1    next, "projecting from one side of the

2    cylindrical support" means in a direction generally parallel

3    to the longitudinal axis thereof" means "projecting from one

4    side of the cylindrical support means in a direction

5    generally parallel to the longitudinal axis of the

6    cylindrical support means;"

7    and, finally, "by means of a technique of

8    catheterization" means "use of a catheter to deliver the

9    valve prosthesis."

10    Now, a patent, as you know, confers on its owner

11    the right to exclude others from doing a number of things,

12    such as making, using, selling, or offering to sell,

13    importing or supplying the patented invention in the U.S.,

14    in the United States, during the term of its patent.  Any

15    company which makes, uses, sells, offers to sell, imports or

16    supplies without the patent owner's permission, any product

17    in the U.S. legally protected by at least one claim of a

18    patent before the patent expires, infringes the patent.  It

19    is as simple as that.

20    The patent owner may enforce his rights or her

21    rights by filing a lawsuit for patent infringement.  Here,

22    Edwards, the patent owner, has sued for its rights for that

23    matter, I would imagine.  Here, Edwards, the patent owner,

24    has sued CoreValve, the accused infringer, and has alleged

25    that CoreValve's GEN 3 ReValving system infringes Claim 1 of

1  the Edwards '552 patent.

2         You must decide whether Edwards has proven by a

3  preponderance of the evidence that CoreValve's GEN 3

4  ReValving system infringes Claim 1 of the '552 patent either

5  literally or under the doctrine of equivalents.

6         Now, in this case, Edwards contends that

7  CoreValve manufactures the accused GEN 3 ReValving system in

8  California, and thus infringes the '552 patent.

9         Let me say something about the term comprising.

10  You have heard that term here.

11         The preamble of Claim 1 of the '552 patent uses

12  the phrase "the stent comprises."  This claim is what we

13  call open-ended.  The word "comprising" means "including" or

14  "containing."  As such, the claim is not limited to only

15  what is in the claim.

16         If you find that the CoreValve GEN 3 ReValving

17  system includes all of the elements of Claim 1 of the '552

18  patent, the fact that the CoreValve GEN 3 ReValving system

19  also may include features or components not required by the

20  claims is irrelevant.  The presence of additional features

21  or components in the ReValving system would not avoid

22  infringement of Claim 1.

23         The first type of infringement, literal

24  infringement.

25         As you know, there are two ways in this case

1    that you are going to consider, two ways in which a patent

2    claim may be infringed.  First, a claim may be literally

3    infringed.  Second, a claim may be infringed under what is

4    known as the doctrine of equivalents.  I will address this

5    shortly.

6         For the GEN 3 system to literally infringe Claim

7    1, the elements of the patent claim must be found in the

8    CoreValve product.  In other words, the asserted claim is

9    literally infringed if CoreValve's GEN 3 product includes

10   each and every element in the asserted claim.  The scope of

11   Claim 1 is not limited to the preferred embodiments set

12   forth in the patent.  If CoreValve's GEN 3 product does not

13   contain one or more elements recited in Claim 1, then

14   CoreValve does not literally infringe that claim.

15        Remember, the question is whether CoreValve's

16   product infringes the claim of the Edwards patent, and not

17   whether CoreValve's product is similar or even identical to

18   a product made by Edwards.  It's accused product to claim,

19   claim to accused product.

20        In addition, later filed patents are not

21   relevant to literal infringement.  But, as I will now

22   explain, it will be relevant to infringement under the

23   doctrine of equivalents.

24        Let's talk about that.

25        If you do not find literal infringement, you may

1  consider infringement under the doctrine of equivalents.  I

2  have referred to the doctrine of equivalents.  Now it is

3  time to explain this term.

4  You may find that the GEN 3 product infringes

5  the asserted claim even if not all the elements of the claim

6  are present in CoreValve's product.  You may find

7  infringement in such circumstances if the elements of

8  CoreValve's GEN 3 product are equivalent to the claim

9  elements.  This is called the doctrine of equivalents.

10  Application of the doctrine of equivalents is

11  the exception, however, not the rule.  Patent claims must be

12  clear enough so that the public has fair notice of what was

13  patented.  Notice permits other parties to avoid actions

14  which infringe the patent and to design around the patent.

15  On the other hand, the patent owner should not be deprived

16  of the benefits of his patent or her patent by competitors

17  who appropriate the essence of an invention while barely

18  avoiding the literal language of the patent claims.

19  The test under the doctrine of equivalents is

20  whether certain of the CoreValve GEN 3 product components

21  involve no substantial differences from the elements of the

22  asserted claim.  Another way to prove infringement under the

23  doctrine of equivalents is to determine whether each

24  component of CoreValve's GEN 3 product performs

25  substantially the same function, in substantially the same

1    way, to produce substantially the same result as the

2    corresponding element in the asserted claim.

3            It is not a requirement under the doctrine of

4    equivalents that those of ordinary skill in the art knew of

5    the equivalent when the patent application was filed or when

6    the patent issued, the patent was granted.

7            For the doctrine of equivalents only, a later

8    filed patent covering CoreValve's GEN 3 product may be

9    relevant to whether CoreValve's product substantially

10   differs from the elements of Claim 1 of the '552 patent.  To

11   be relevant, you must find that the later filed patent

12   covers the CoreValve GEN 3 product.  The later issuance of a

13   patent for a device raises no presumption of noninfringement

14   of the earlier patent.  It is for you to decide whether

15   CoreValve's product is an equivalent to the elements of

16   Edwards's asserted claim.

17           On the subject of willful infringement.

18           If you find on the basis of the evidence and the

19   law as I have explained it to you that CoreValve's product

20   infringes Claim 1, you must further decide whether or not

21   Edwards has proven by clear and convincing evidence that

22   CoreValve's infringement was willful.

23           Willful infringement is established if Edwards

24   has proven that CoreValve proceeded with infringing

25   activities despite an objectively high likelihood that

1   CoreValve's actions constituted infringement of a valid

2   patent.  CoreValve's state of mind is not relevant to this

3   inquiry.

4           Edwards must also prove that this objectively

5   high risk or likelihood of infringement was either known, or

6   so obvious that it should have been known, to CoreValve.

7           CoreValve contends that Claim 1 of the Edwards

8   patent is invalid.  Because the claims, as you know, of an

9   issued patent are presumed to be valid, CoreValve has the

10  burden of proving by clear and convincing evidence that

11  Claim 1 is invalid.  You must determine whether Claim 1 is

12  invalid.

13          I will now instruct you in more detail on the

14  law concerning CoreValve's contentions of patent invalidity.

15          Enablement.

16          The patent laws require that the patent be

17  sufficiently detailed to enable those skilled in the art to

18  practice the invention.  The purpose of this requirement is

19  to ensure that the public, in exchange for the patent rights

20  given to the inventor, obtains from the inventor a full

21  disclosure of how to make and use the invention.

22          If the inventors failed to provide an enabling

23  disclosure, the patent is invalid.  However, because

24  descriptions in patents are addressed to those skilled in

25  the art to which the invention pertains, an applicant for a

1  patent need not expressly set forth in his specification

2  subject matter which is commonly understood by persons

3  skilled in the art.

4          The enablement defense does not require an

5  intent to withhold.  All that is required is a failure to

6  teach how to practice the full scope of the claimed

7  invention.  In other words, if a person of ordinary skill in

8  the art could not make and use the invention disclosed in

9  the patent without undue experimentation, the patent is

10  invalid.  However, some routine amount of experimentation to

11  make and use the invention is allowable.

12          The patent need not contain a working example if

13  the invention is otherwise disclosed in such a manner that

14  one skilled in the art to which the invention pertains will

15  be able to practice it without an undue amount of

16  experimentation.

17          Now, the determination of whether a claimed

18  invention is obvious is, as you know, based on the

19  perspective of a person of ordinary skill in the pertinent

20  art field.  For this case, the relevant time is as of May

21  18, 1990.  That is the relevant time frame that we are

22  looking at for determining the person of skill.  The person

23  of ordinary skill is presumed to know all prior art that you

24  have determined to be reasonably relevant.  The person of

25  ordinary skill is also a person of ordinary creativity that

1       can use common sense to solve problems.

2               When determining the level of ordinary skill in

3       the art, you should consider all the evidence submitted by

4       the parties, including evidence of:

5               The level of education and experience of persons

6       actively working in the field at the time of the invention,

7       including the inventor;

8               Next.  The types of problems encountered in the

9       art at the time of the invention;

10              And finally.  The sophistication of the

11      technology in the art at the time of the invention,

12      including the prior art patents and publications.

13              If, after considering all of the evidence and

14      the law as I have stated it, you are convinced that the

15      Edwards patent is not infringed or invalid, your verdict

16      should be for CoreValve, and you need not go further in your

17      deliberations.  On the other hand, if you decide that the

18      Edwards patent is not invalid and that Claim 1 of the patent

19      has been infringed by CoreValve, you must then turn to the

20      subject or the issue of damages.  Edwards has the burden to

21      establish the amount of its damages by proof by a

22      preponderance of the evidence.

23              The patent laws provide that in the case of

24      infringement of a valid patent claim, the owner of the

25      patent, Edwards, shall be awarded damages adequate to

1    compensate for the infringement, but in no event less than a

2    reasonable royalty for the use made of the invention by the

3    infringer.  Damages are compensation for all losses suffered

4    as a result of the infringement.

5         It is not relevant to the question of damages

6    whether CoreValve has benefited from, realized profits from,

7    or even lost money as a result of the acts of infringement.

8    The only issue is the amount necessary to adequately

9    compensate Edwards for CoreValve's infringement.  They are

10    not meant to punish an infringer.  Similarly, whether the

11    infringer knew that it would cause the patent owner harm is

12    also irrelevant to the computation of damages.

13         Adequate compensation should return Edwards to

14    the position it would have occupied had there been no

15    infringement.  You must consider the amount of injury

16    suffered by Edwards without regard to CoreValve's gains or

17    losses from the infringement.

18         Once the fact of damages has been proven by a

19    finding of infringement, you must determine the extent of

20    damages.  Under the patent law, Edwards is entitled to all

21    damages that can be proven with reasonable certainty.  On

22    the one hand, reasonable certainty does not require proof of

23    damages with mathematical precision.  Mere difficulty in

24    ascertaining damages is not fatal to Edwards.  On the other

25    hand, Edwards is not entitled to speculative damages, that

1  is, you should not award any amount for loss which, although

2  possible, is wholly remote or left to conjecture and/or

3  guess.  You may base your evaluation of reasonable certainty

4  on opinion evidence.

5           The but-for test in lost profits.

6           As you know, in this case Edwards seeks to

7  recover lost profits for some of CoreValve's sales of its

8  ReValving system, and a reasonable royalty on the rest of

9  CoreValve's sales.

10          To recover lost profits, as opposed to

11  reasonable royalties, Edwards must show a causal

12  relationship between the infringement and Edwards's loss of

13  profit.  In other words, Edwards must show that but for the

14  infringement there is a reasonable probability that it would

15  have earned higher profits.  To show this, Edwards must

16  prove that if there had been no infringement, it would have

17  made some portion of the sales that CoreValve made of the

18  infringing product.  Edwards is entitled to lost profits if

19  it establishes each of the following:

20          First.  That there was a demand for the patented

21  product.

22          That there were no available, acceptable,

23  noninfringing substitute products, or, if there were, its

24  market share of the number of the sales made by CoreValve

25  that Edwards would have made, despite the availability of

1    other acceptable noninfringing substitutes.

2         Third.  That Edwards had or could and would have

3    expanded to have the manufacturing and marketing capacity to

4    make any infringing sales actually made by CoreValve and for

5    which Edwards seeks an award of lost profits - in other

6    words, that Edwards was capable of satisfying the demand.

7         And finally.  The amount of profit that Edwards

8    would have made if CoreValve had not infringed.

9         Demand for the patented product can be proven by

10   significant sales of a patent holder's patented product or

11   significant sales of an infringing product containing the

12   patented features.

13        A patent holder is only entitled to lost profits

14   for sales it could have actually made.  In other words,

15   Edwards must show that it had or could and would have

16   expanded to have the manufacturing and marketing capability

17   to make the sales it said it lost.  This means Edwards must

18   prove it is more probable than not that it could have made

19   and sold, or could have had someone else make or sell for

20   it, the additional products it says it could have sold but

21   for the infringement.

22        A patent holder may calculate its lost profits

23   on lost sales by computing the lost revenue for sales it

24   claims it would have made but for the infringement and

25   subtracting from that figure the amount of additional costs

1   or expenses it would have incurred in making those lost

2   sales, such as cost of goods, sales costs, packaging costs,

3   and shipping costs.  Certain fixed costs that do not vary

4   with increases in production or scale, such as taxes,

5   insurance, rent, and administrative overhead, should not be

6   subtracted from a patent holder's lost revenue.

7              Reasonable royalty.

8              If you find that Edwards has established

9   infringement, Edwards is entitled to at least a reasonable

10  royalty to compensate for that infringement.  If you find

11  that Edwards has not proven its claim for lost profits or

12  has proved its claim for lost profits for only a portion of

13  the infringing sales, then you must award Edwards a

14  reasonable royalty for all infringing sales for which it has

15  not been awarded lost profits damages.

16             A royalty is a payment made to a patent holder

17  in exchange for the right to make, use, or sell the claimed

18  invention.  A reasonable royalty is the amount of royalty

19  payment that a patent holder and the infringer would have

20  agreed to in a hypothetical negotiation taking place at the

21  time of or prior to when the infringement first began.  In

22  considering this hypothetical negotiation, you should focus

23  on what the expectations of the patent holder and the

24  infringer would have been had they entered into an agreement

25  at that time and had they acted reasonably in their

negotiations.  In determining this, you must assume that

both parties believed that the patent was valid and

infringed and the patent holder and infringer were willing

to enter into an agreement.  The reasonable royalty you

determine must be a royalty that would have resulted from

the hypothetical negotiation and not simply a royalty either

party would have preferred.  Evidence of things that

happened after the infringement first began can be

considered in evaluating the reasonable royalty only to the

extent that the evidence aids in assessing what royalty

would have resulted from a hypothetical negotiation.

Although evidence of the actual profits an alleged infringer

made may be used to determine the anticipated profits at the

time of the hypothetical negotiation, the royalty may not be

limited or increased based on the actual profits the alleged

infringer made.

       The relevant factors in this calculation.

       In determining the reasonable royalty, you

should consider all of the facts known and available to the

parties at the time the infringement began.  Some of the

kinds of factors that you may consider in making your

determination are as follows.

       As you know, you have heard about the

Georgia-Pacific factors, there are 15.  Let me go through

them with you.

1    The royalties received by the patentee for the

2    licensing of the patent in suit, proving or tending to prove

3    an established royalty.

4    The rates paid by the licensee for the use of

5    other patents comparable to the patent in suit.

6    The nature and scope of the license, as

7    exclusive or nonexclusive, or as restricted or nonrestricted

8    in terms of territory or with respect to whom the

9    manufactured product may be sold.

10    The licensor's established policy and marketing

11    program to maintain his or her or its patent monopoly by not

12    licensing others, to use the invention or by granting

13    licenses under special conditions designed to preserve that

14    monopoly.

15    The commercial relationship between the licensor

16    and licensee, such as whether they are competitors in the

17    same territory, in the same line of business, or whether

18    they are inventor and promoter.

19    The effect of selling the patented specialty in

20    promoting sales of other products of the licensee, the

21    existing value of the invention to the licensor as a

22    generator of sales of its nonpatented items, and the extent

23    of such derivative or convoyed sales.

24    The duration of the patent and the term of the

25    license.

1     The established profitability of the product

2     made under the patent, its commercial success, and its

3     current popularity.

4     Ninth.  The utility and advantages of the

5     patented property over the old modes or devices, if any,

6     that had been used for working out similar results.

7     Next.  The nature of the patented invention, the

8     character of the commercial embodiment of it as owned and

9     produced by the licensor, and the benefits to those who have

10    used the invention.

11    The extent to which the infringer has made use

12    of the invention and any evidence probative of the value of

13    that use.

14    The portion of the profit or of the selling

15    price that may be customary in the particular business or in

16    comparable businesses to allow for the use of the invention

17    or analogous inventions.

18    Next.  The portion of the realizable profits

19    that should be credited to the invention as distinguished

20    from non-patented elements, the manufacturing process,

21    business risks, or significant features or improvements

22    added by the infringer.

23    The opinion testimony of qualified experts.

24    And, finally, the amount that a licensor (such

25    as the patentee) and a licensee (such as the infringer)

1    would have agreed upon (at the time of or prior to the

2    infringement) if both had been reasonably and voluntarily

3    trying to reach an agreement; that is, the amount which a

4    prudent licensee -- who desired, as a business proposition,

5    to obtain a license to manufacture and sell a particular

6    article embodying the patented invention -- would have been

7    willing to pay as a royalty and yet be able to make a

8    reasonable profit and which amount would have been

9    acceptable by an prudent patentee who was willing to grant a

10   license.

11          No one factor is dispositive and you can and

12   should consider the evidence that has been presented to you

13   in this case on each of these factors.  You may also

14   consider any other factors which in your mind would have

15   increased or decreased the royalty the infringer would have

16   been willing to pay and the patent holder would have been

17   willing to accept, acting as normally prudent business

18   people.  The final factor establishes the framework which

19   you should use in determining a reasonable royalty, that is,

20   the payment that would have resulted from a negotiation

21   between the patent holder and the infringer taking place at

22   a time prior to when the infringement began.

23          Now we're coming down to the home stretch,

24   ladies and gentlemen.

25          Once you adjourn to the jury deliberation room,

1   the first thing I recommend you do is select a foreperson.

2   How you conduct your deliberations, however, is entirely up

3   to you.  But however you conduct them, please remember that

4   your verdict must represent the considered judgment of each

5   of you, each juror.

6           It is your duty, as jurors, to consult with one

7   another and to deliberate with a view towards reaching an

8   agreement, if you can do so without violence to your

9   individual judgment.  Each of you must decide the case for

10  yourself, but do so only after an impartial contribution of

11  the evidence with your fellow jurors.  In the course of your

12  deliberations, do not hesitate to reexamine your own views

13  and change your opinion, if convinced it is erroneous.  But

14  do not surrender your honest conviction as to the weight or

15  effect of evidence solely because of the opinion of your

16  fellow jurors, or for the purpose of returning a verdict.

17  Remember at all times that you are not partisans.  You are

18  judges -- judges of the facts, not me.  Your sole interest

19  is to seek the truth from the evidence in the case.  In

20  order for you, as a jury, to return a verdict, it is

21  necessary that each juror agree to the verdict.  In other

22  words, your verdict must be unanimous.

23          A form of verdict has been prepared, as you know

24  and should have.  You will take this form into your jury

25  deliberation area.  And when you reached unanimous agreement

1    as to your verdict, just have the foreperson fill in and

2    sign and date the form.  You will then come back to the

3    courtroom, and your foreperson will be asked to hand the

4    form over to Ms. Walker, and she will announce your verdict.

5              It is proper to add the caution that nothing

6    said in these instructions and nothing in the form of

7    verdict is meant to suggest or convey in any way or manner

8    any intimation as to what verdict I think you should find.

9    What the verdict shall be is your sole and exclusive duty

10   and responsibility.

11             That concludes the part of my instructions

12   explaining the rules for considering the testimony and

13   evidence.  Let me finish up by telling you how to

14   communicate questions or messages to the Court.

15             Once you start deliberating, do not talk to the

16   Jury Officer, or to my Chief Deputy Clerk, or to me, or to

17   anyone else except one another about the case.  If you have

18   any questions or messages, you must write them down on a

19   piece of paper, sign them, and give them to the Jury

20   Officer.  That individual will be stationed outside of your

21   deliberation area.  The question will be given to me, and I

22   will respond as soon as I can.

23             Now, keep in mind I may have to talk to the

24   lawyers about what you have asked so it may take me a bit of

25   time to get back to you.  Please be patient.  Any questions

1    or messages, again, send them through your foreperson.

2              One more thing about messages.  Do not ever

3    write down or tell anyone how you stand on your vote or

4    votes.  For example, do not write down or tell anyone that

5    you are split on your vote, whatever the number might happen

6    to be.  That should stay secret until you are finished.

7              Now that all the evidence is in, once the

8    arguments are completed, you will be free to return or go

9    back to your deliberation room and deliberate.  It will, in

10   fact, be your duty to talk with each other about the

11   evidence and to make, as I told you, every reasonable effort

12   to reach a unanimous agreement.  Talk with each other,

13   listen carefully and respectfully to each others view's,

14   keep an open mind as you listen to what your fellow jurors

15   have to say.

16             Try your best to work out your differences.  Do

17   not hesitate to change your mind if you are convinced that

18   other jurors are right and that your original position was

19   wrong.

20             Again, don't change your mind, ever, just

21   because other jurors see things differently or just to get

22   the case over with.  In the end, your vote must be exactly

23   that -- your own vote.  It is important for you to reach

24   unanimous agreement, but only if you can do so honestly and

25   in good conscience.

1          No one will be allowed to hear your discussions

2    in the juryroom, and no record will be made of what you say.

3    So you should feel free to speak your minds.

4          Listen carefully to what your fellow jurors have

5    to say, and then decide the case for yourselves.

6          Let me finish up by repeating something that I

7    said several times; and that is that nothing I have said or

8    done during this trial was meant to influence your decision

9    in any way in favor of either party.  You must decide the

10   case for yourself based on the evidence presented.

11         Does any member of the jury need a break?

12         (Jurors indicate no.)

13         THE COURT:  Are you sure.

14         (Jurors indicate yes.)

15         THE COURT:  Do counsel need a break?  Are we

16   okay?

17         MR. NATHAN:  I just need a minute to set up a

18   few things.

19         THE COURT:  Okay.  All right.  Then we'll go

20   right into our arguments.

21         (Pause.)

22         THE COURT:  Counsel, before you start, let me

23   see Mr. Nathan and Mr. Van Nest briefly at sidebar.  It

24   doesn't need to be on the record.

25         (Brief discussion held off the record.)

```
 1                  THE COURT:  Ladies and gentlemen, we're going to

 2    need a few more minutes to set up so let's take a break.

 3                  (Brief recess taken.)

 4                  THE COURT:  All right, Ms. Walker.

 5                  So, counsel, I think what we should do is use

 6    the courtroom clock.  And I will alert you at the ten minute

 7    mark.  So for you, Mr. Nathan, that is going to be in the

 8    area of 11:18 or so.  Okay?

 9                  MR. VAN NEST:  35 minutes.

10                  THE COURT:  He is going 45 minutes.  Yes, I will

11    alert Mr. Nathan at the 35 minute mark.

12                  (Jury returned.)

13                  Ladies and gentlemen, please take your seats.

14                  THE COURT:  All right, counsel.

15                  Please be seated in the well of the court as

16    well.

17                  Mr. Nathan.

18                  MR. NATHAN:  Thank you, Your Honor.  May we put

19    up the chart?

20                  THE COURT:  You may.  Yes, indeed.

21                  (Easel board set up.)

22                  MR. NATHAN:  Thank you, Your Honor.

23                  Good morning, ladies and gentlemen.

24                  Your Honor, I'd like to thank a number of people

25    starting with yourself for the courtesies that you have
```

1   extended during this trial.

2        I'd like to also thank members of the jury for

3   your attentiveness and your service.  I have actually sat on

4   three juries.  I know how tough it is to sit here day after

5   day, take notes, pay attention; and I really appreciate it,

6   and I know I speak for both sides.

7        I'd also like to thank the young lawyers in this

8   courtroom on both sides.  You have not seen what they have

9   been doing in the evening preparing all these slides, all

10  this evidence, all these binders.  Many of them have gone

11  without sleep for days on end.  Many of them did not have a

12  chance to speak with you and to you during this trial, but

13  they're all very fine lawyers, and their day will come, and

14  I want to express my appreciation.

15       Let me start where I left off when we spoke last

16  in opening, taking you back to 1990 when these three doctors

17  had a crazy idea.

18       Dr. Rothman testified about it yesterday that

19  there was immense skepticism that would have been engendered

20  by this.

21       Dr. Hasenkam himself testified that when

22  Dr. Andersen came and told him about the idea, he thought it

23  was wild.

24       And Dr. Andersen testified that it was crazy.

25       Well, that crazy idea is the reason why Justin

1    is still alive today.

2           This is something that happens once in an

3    inventor's lifetime.  You recall Dr. Hasenkam talking about

4    this being an inventor's dream, a researcher's dream.

5           Now, how did they do this?  You have seen

6    prototypes.  You recall they had no budget whatsoever.  They

7    had to scrounge around the hospital.  They had used

8    balloons, used catheters.  They grabbed whatever wire they

9    could out of the operating room.  That's why they used the

10   .55-millimeter wire.  That is why that wire is in the

11   patent.  That is all they had.

12          And it worked.  Dr. Cribier testified that this

13   was an unbelievable achievement.  And you will recall

14   Dr. Rothman who testified yesterday spoke about the stature

15   of Dr. Cribier.

16          Dr. Cribier, you will recall, was the first

17   person to ever place an aortic valve in a human being using

18   a catheter.  He was the first-in-man doctor and he thought

19   this was an amazing achievement.

20          Now, there are others who felt the same way.

21          CoreValve's principal doctor, Dr. Grube -- I

22   always worry about mispronouncing -- wrote a paper in 2005,

23   a few years ago:  Treatment of aortic disease with

24   percutaneous transluminal implantation of stent-based valve

25   prosthesis have been introduced and successfully tested in

1     animal models -- successfully tested.  And the reference was

2     to the Andersen paper.

3             And Dr. Seguin who was here testified that as

4     far as he knew, that was an accurate statement.

5             Now, you heard yesterday about this great big

6     textbook, the Bailey textbook.  He appraised the invention

7     in 1994, and described it as the most exciting published

8     work in this area to date is the investigations of Andersen,

9     et al from Denmark, published in 1992.  Again, the reference

10     to the '92 paper.

11            And he was very prophetic in his forecast.

12     Because he said, in 10 years, we shall very probably look

13     back on the pioneering work described above in the same way

14     with respect the work of Hufnagel, Gruentrig, and Palmaz.

15            Palmaz being the inventor of the Palmaz stent.

16     That is what Dr. Bailey wrote.  And he was right.

17            2004, Edwards had purchased PVT and had gone

18     down the track with SAPIEN and, of course, CoreValve.

19            Now, CoreValve's own expert, Dr. Rothman, you

20     heard him testify yesterday, appraised the invention when he

21     testified in another case for a company called Cook.  And he

22     spoke about this very same Andersen patent.

23            "Question:  Did you testify on behalf of Cook

24     about Andersen as follows?

25            "Answer:  Yes, I think there are some things,

1  ideas in Andersen that actually sound quite interesting and

2  I quite like his concept for trying to avoid the coronary

3  ostia, you know, these apices where you try and get them to

4  avoid covering the coronary ostia, is a good idea."

5          That was Dr. Rothman, CoreValve's own expert.

6          He also testified that there was tremendous

7  resistance that the inventors met.  Why?  Because the

8  cardiac surgeons didn't want to have this idea

9  commercialized.

10          There was plenty of testimony that CoreValve

11  itself praised the '552 patent and the invention.

12          You will recall that Dr. Seguin was here, and he

13  affirmed that when he spoke with analysts in 2005 -- these

14  are people he was trying to convince to invest in his

15  company.  That he said very clearly the Andersen patents

16  have been shown as being a very strong patent -- a very

17  strong patent.  This is what Dr. Seguin told the analysts in

18  2005.  And he affirmed that, indeed, he had uttered those

19  words.

20          And his partner, Georg Bortlien, who founded

21  CoreValve, also said that it was very important.  He was

22  monitoring that PVT had acquired the Andersen rights.

23          And then the actual designer of the CoreValve

24  GEN 3 device, Than Nguyen, testified that he admired

25  Dr. Andersen very much.

1    You will see back in the juryroom -- you will
2    have a chance to look at it -- the inventors were awarded
3    the '552 patent.  This is what it looks like.  It's
4    Plaintiffs' Exhibit 1.  You will have a chance to see it.
5    You will find on the inside, it's an original copy of what
6    you have in your original jury notebook at Tab 1.

7    Now, the inventors knew that they were not able
8    to commercialize this.  Very self-effacing, Dr. Hasenkam
9    described himself as simple doctors.  That is not exactly
10   how I would describe them, but he did say we were not design
11   engineers.  They weren't manufacturers.  They needed help.

12   You heard about they spent three years trying to
13   find a partner, from 1990 to 1993.  And, ultimately, they
14   found Stanford Surgical, which became Heartport.  And
15   Stanford Surgical and Heartport did absolutely nothing for
16   seven years.  So they lost three years searching for a
17   partner and seven years while the partner did nothing.

18   Dr. Andersen wrote a letter, and you will find
19   it in Plaintiffs' Trial Exhibit 565:  I feel that you are
20   doing nothing.

21   That is what he wrote to Heartport.

22   And just by coincidence, Dr. Hasenkam was on
23   sabbatical, was at Stanford and he went over to Heartport.
24   And he asked, show me what you have done with my invention
25   -- our invention.  What have you got to show me?

1    I took the opportunity to visit Heartport

2  myself.  We asked to see what level of development they had

3  come to so far that they couldn't.  They hadn't done

4  anything.  We were extremely frustrated.

5    They lost ten years while the invention was in

6  the hands of Heartport.

7    Then, as I said to you in opening, there was a

8  breakthrough.  The small company PVT in Israel got rights to

9  the Andersen patents from Heartport.

10    You will remember Stan Rowe testified yesterday

11  that he paid a king's ransom for the Andersen patent -- a

12  king's ransom.  He said I put my money -- we voted with our

13  money.  And, actually, he put a figure on it.  20 percent of

14  the money that PVT had went into buying the rights to the

15  Andersen invention.

16    And within two years, they took that patent,

17  built a device and placed it in a human being.  And that, of

18  course, is Dr. Cribier's first-in-man in April of 2002.

19    There was testimony in this case, uncontradicted

20  by the defendant, that the '552 patent covers the ultimate

21  device that emerged from PVT and Edwards, the SAPIEN device.

22    Mr. Wood testified that Edwards paid royalties

23  to Drs. Andersen, Hasenkam and Knudsen for the rights to

24  sell and make the SAPIEN device.  And the '552 patent is

25  actually marked on the box and on the instructions of the

1    SAPIEN device.

2           All told, you heard from Mr. Wood that Edwards

3    invested over $400 million to bring this product to market

4    not only in terms of the acquisition of PVT, the acquisition

5    of the Andersen patent, the clinical studies, all the

6    associated expenses.  They sunk $400 million into this.

7           That is what the Edwards' side of the room did.

8    Let me now turn to the CoreValve side of the room.  And to

9    do that, I have to talk about Dr. Seguin.

10          You will recall that Dr. Seguin testified that

11   he had this idea.  He had a revelation in the early '90s --

12   '92, '93, '94 -- that this could be done without open heart

13   surgery.  That it would be possible to do this with a

14   catheter.

15          And you heard him affirm that he hasn't got a

16   scrap of paper that would back up his story that he had done

17   this, anything on this before 1995.  Absolutely nothing.

18   The testimony was clear and uncontradicted on that.

19          What was also clear, and it has been admitted by

20   CoreValve, that he actually got a copy of the '552 patent in

21   1996.  He studied it.  He had it.  That was the first

22   activity in the case that has been documented about what

23   Dr. Seguin did.

24          Not only did they know about the patent, they

25   also praised it over and over again; not only Dr. Seguin but

1       George Bortlien and Than Nguyen.

2               CoreValve also knew about the very first

3       article, the '92 article, which you have heard about over

4       and over again.  And I urge you to consider looking at that

5       article.  It's Plaintiffs' Trial Exhibit 477.

6               Dr. Seguin got a copy of that article and he

7       studied it.  Georg Bortlien got a copy of that article and

8       he studied it.  What did they do?

9               They set up a plant to have a single product

10      with a single strategy:  make the product, and then have an

11      exit strategy.  Infringe, and sell it.  And that's what

12      happened.

13              You heard that Dr. Seguin moved the company to

14      Irvine.  You also heard that he now lives in England and

15      France.  He made the company, set it up, he infringed, and

16      then he left, having sold the company for 700 million

17      dollars plus the possibility of another 150 million dollars.

18              In the middle of all this, Edwards found out

19      about some of this activity and wrote a formal letter to Dr.

20      Seguin, not to just anybody within CoreValve.  The letter

21      was addressed to Dr. Seguin himself.

22              And you heard Dr. Seguin say -- actually, let me

23      give you the citation on it.  It's Plaintiffs' Trial Exhibit

24      155.

25              And I should have said in the opening that you

1   will be given all these exhibits and have an opportunity to

2   look at them.

3           Take a look at Plaintiffs' Trial Exhibit 155

4   where this letter came in.  And Dr. Seguin never answered

5   that letter.  Yes, he said he had a conversation with the

6   CEO of Edwards.  But did he ever give an explanation?  Was

7   there any testimony of the explanation of why they didn't

8   infringe or why the patent was invalid?  That's what the

9   letter called for.  "We would appreciate hearing your

10  explanation."

11          None was ever given.  They have an explanation

12  in this courtroom.  Why didn't they give it then?  The

13  answer is they didn't believe that they had that

14  explanation.

15          What did they do?  They moved the company.

16          You have heard counsel say during opening that

17  they went in a different direction, with different

18  technology.  I agree, they went in a different direction.

19  They went from Paris to Irvine.  They moved the entire

20  company to Irvine in order to be able to commercialize it in

21  this country, using the local talent.  And, remember, there

22  was only one place in the world where they had that

23  combination of engineers and that clean room from VenPro,

24  and that was in Irvine.

25          Not only did they go to Irvine, they never

1  considered moving out of Irvine in 2005, 2006, 2007.  The

2  lawsuit, the one that brings us here today, was filed in

3  February of 2008.  And CoreValve then considered moving

4  offshore.  They investigated it.  You heard that from

5  witness after witness, Mr. Michiels, Mr. Kinrich, and

6  others.  And they decided not to move.

7          What did they do?  They doubled down.  They

8  actually built a new plant right across the street from

9  their existing plant, in order to reaffirm their plan to

10  make as much product as they could, as fast as they could,

11  in order to sell the company.  And, of course, the motive

12  was money.  And, of course, the plan worked.  They sold so

13  much Generation 3 product that they were able to sell the

14  company to Medtronic for the 700 million dollars, and then

15  they left the country.

16          Now, there has been a number of defenses that

17  have been raised.  The Judge has mentioned them to you.

18          One of the things I should say at the outset, I

19  showed you a picture of George Washington's signature on the

20  very first patent that was ever issued in this country back

21  in 1790.  Patents have been part of our tradition, our

22  Constitution, for over 200 years.  They are designed to stop

23  just this kind of conduct.  That's what patents are for.

24          When you read the original patent, you will see

25  right on the front cover, it says, "Therefore, this United

1    States patent grants to the persons having title to this

2    patent," which is Edwards, "the right to exclude others from

3    making..."

4           It's right on the front of the patent.  That's

5    what patents are for.

6           You heard Mr. Wood testify that if people can do

7    this kind of thing, medical companies will not make the

8    investments in order to bring these products to market.  And

9    then you can imagine the effect that would have had on

10   patients like Justin and others.

11          Now, they say, well, the patent, it was not

12   enabled, the patent was no good.  That is what they say in

13   this courtroom.  You will recall earlier, they told the

14   analysts that it was strong.

15          The patent has been presumed valid.  You heard

16   that this morning in the Judge's instructions.  And if you

17   look in the instructions on Page 25, you will see the test

18   for enablement is set forth with great clarity by the

19   Judge:

20          The important thing to remember is that routine

21   experimentation, routine engineering, is not undue

22   experimentation.  The test is whether or not one could have

23   picked up the patent and built what is claimed.

24          Let's talk about what is claimed.

25          Do you remember, I went through the 12 parts of

1    the claim.  What we heard over and over and over again in

2    this courtroom was, well, I cannot use this patent to make

3    an 18 size French device small enough to go in the femoral

4    artery.

5              The claim does not have anything in it about

6    size.

7              You can read that claim from now to eternity,

8    you will not see French sizes.  You will not see 18 size.

9    You will not see anything.

10             What has happened here in this courtroom is that

11   CoreValve, in order to excuse their conduct, has read that

12   into the patent.  It's not there.  What they are doing is

13   rewriting the claim.

14             Now, was it successful?  Their own doctor, Dr.

15   Grube, wrote that it was successful.

16             I thought it would be interesting to bring up a

17   slide they showed during opening about the Wright Brothers.

18   They described this as an enabled invention.  Well,

19   actually, my law firm represented the Wright Brothers.  I

20   want to make it perfectly clear, I wasn't involved in that

21   case.  As old as I am, I wasn't involved.  But I know a lot

22   about it.  And I know that the very first flight that they

23   did -- and there is a picture, it is the most famous

24   photograph in the history of aviation -- lasted for 12

25   seconds, and it went 120 feet.  12 seconds, 120 feet.

1    What that means is that if the plane had been

2    sitting on the end of a 747 and it took off there, it would

3    have landed before it got to the other wing tip.  That's how

4    short it was.

5    But it was enabled, according to CoreValve.  It

6    was an enabled invention.  People attacked the Wright

7    Brothers' patent, just like the Andersen patent is being

8    attacked here.  They lost.

9    The point is that the Wright Brothers, 12

10   seconds and 120 feet later, were the fathers of aviation.

11   These doctors, working with their own hands,

12   putting this successfully into pigs, are the fathers of THV.

13   Every single witness testified about that, Dr. Cribier, Dr.

14   Bailey, and the others.

15   Now, let me talk a little bit about

16   infringement.  You will recall -- and I should also say that

17   the experience that CoreValve had was comparable to the

18   experience that PVT had.

19   Yes, they spent a lot of time with all these

20   models that they built in France.  But those models were all

21   built by Dr. Seguin after 1999, Georg Bortlien, who came

22   from the banking industry, and two students.  Not to run

23   down the French students, but they were not persons of

24   ordinary skill in the art.

25   What happened was they turned it over to ADMEDES

1   in Germany.  And within six months, this is Georg Bortlien's

2   own testimony, they built Generation 1, in six months.

3              When they turned it over to people who knew what

4   they were doing, it was not a problem.  In this courtroom,

5   they are telling you that it took years.

6              Now, let me talk about literal infringement.

7              You will recall -- I know you are sick of

8   hearing my voice on this subject -- about the 12 parts.  But

9   it's very important.

10             Dr. Buller broke down the parts of the claim

11  into these 12 parts.  I asked Dr. Rothman yesterday, their

12  own witness, how many of these parts are we fighting about?

13  And he said that there were only two.  Only Part 4 and only

14  Part 9.  Parts 1, 2, 3, 5, 6, 7, 8, 10, 11 and 12, he

15  admitted, are all in the CoreValve device.

16             The only issue is whether the CoreValve device

17  has a stent comprising, meaning including, a cylindrical

18  support means.

19             What you heard from the Judge this morning in

20  his final instructions, that cylindrical support means

21  doesn't mean a rigid, perfect cylinder.  You will find that

22  in the final instructions on Page 17, Page 4, and it's also

23  in your juror notebooks, which have been updated to include

24  the Judge's instruction.  You will see that in Tab 3, Page

25  1.

1     I would like to reiterate it for emphasis:

2           The term cylindrical does not mean that the

3     object described must be a cylinder with a diameter that is

4     constant along its length or longitudinal axis.  That is a

5     perfect cylinder.

6           To put it another way, the Judge's instructions

7     read, The term cylindrical as used in the patent in this

8     case does not require the presence of a perfect geometric

9     cylinder.

10          Now, did Dr. Rothman, who contested whether or

11    not it had a cylindrical support means, follow that

12    instruction?  The answer is no.  He said in his testimony,

13    Is it your testimony that when the claim calls for something

14    cylindrical it means a perfect cylinder?

15          Dr. Rothman:  Well, I tend to think of a

16    cylinder having a distance between the sides, the opposite

17    sides, that the diameter remains constant.

18          He was talking about a perfect cylinder.

19          And witness after witness after witness for

20    CoreValve, the model, they held that up, and said, gee, the

21    bottom slopes like this and therefore it is not cylindrical.

22          The claim doesn't use the term cylinder.  You

23    can read that from now until eternity.  The claim says

24    cylindrical.  And cylindrical does not require a perfect

25    cylinder.

1    On top of that, Dr. Pinchuk, another expert for

2    CoreValve, testified that, indeed, there was a cylindrical

3    support means in the CoreValve device.

4    Now, we heard witness after witness for

5    CoreValve talk about Figure 1 and Figure 2.  I am sure you

6    are never going to want to hear the term preferred

7    embodiment again as long as you live.

8    I think we can agree that Figures 1 and 2 come

9    in the section of the patent under the preferred embodiment.

10   And the Court has instructed you this morning that the scope

11   of the claim is not limited to the preferred embodiment

12   shown in the claim.  And on top of that, every expert who

13   testified, the one point they agreed on -- Dr. Buller, Dr.

14   Pinchuk, and Dr. Rothman -- is that the claim is not

15   restricted to the preferred embodiment.

16   What that means is that when you go through that

17   claim, you will not see .55-millimeter wire.  You will not

18   see anything like the preferred embodiment, because the

19   claim is much broader.

20   You will recall that Dr. Buller, who was here,

21   testified at length, and then came over to the Elmo that was

22   set up on the side.  And he actually did these drawings.

23   And you will find those in your juror notebooks at Tab 6,

24   the drawings, color copies have been provided for you.

25   And he demonstrated where the cylindrical

1    support means was.  And, yes, it is slightly tapered on the

2    bottom.  But the Judge's instructions make it clear that the

3    word cylindrical support means does not require it to be

4    absolutely vertical.  And so there is no dispute or can be

5    no dispute that there is the absence of a cylindrical

6    support means.

7              Now, let's go to commissural supports.

8              This is Item No. 9.  First of all, if I could

9    have -- I guess I can do it myself.  Item No. 8, a plurality

10   of commissural supports.  Both Dr. Rothman and Dr. Pinchuk

11   conceded that the CoreValve device has commissural supports.

12   So there is no question about that.

13             The only issue in the case remaining is whether

14   they project from one side of the cylindrical support means

15   in a direction generally parallel to a longitudinal axis.

16             Now, we heard over and over and over again words

17   like projections, posts, protrusions, towers.  Remember

18   that?  Over and over and over again.  Those words do not

19   appear in the claim.  What appears in the claim is in Item

20   No. 8, a plurality of commissural supports, which they

21   agreed they have, and the only thing that is required in No.

22   9 is that they project from one side of the cylindrical

23   support means in a direction generally parallel.

24             Well, Dr. Buller drew that for you.  The

25   cylindrical supports is the green structure.  And you will

1    recall, when Dr. Rothman passed around the actual sample,

2    the $20,000 sample that he opened up, that you could

3    actually look down the side and see where the commissural

4    points were, and that's where these tabs are, and he

5    identified this green structure which projects, not

6    projections, but projecting from the cylindrical support

7    means upwards towards the ceiling.

8              Indeed, the top of the commissural supports kind

9    of look like an arrow, pointing up.  And that's what he

10   identified.

11             Now, probably this is the most famous fork in

12   the history of patent litigation.  This is the actual fork

13   that was used by Dr. Buller and is in the graphics.  He

14   talked about how, if I point this at you -- you will forgive

15   me -- this is pointing in a direction generally parallel,

16   even though it has a bend in it.  That is exactly what

17   CoreValve has.

18             The commissural supports are actually, as a

19   totality, they actually project in a direction generally

20   parallel to that axis.

21             Now, CoreValve has seized on one point.  They

22   say 30 degrees.  That is not what the claim calls for.  The

23   claim calls for a cylindrical support means projecting

24   generally -- in a direction generally parallel.

25             What that means is the entirety of the

1    cylindrical support means not the neck of the fork, but the

2    entirety of it.  That's what is important.  You can read

3    that claim, again, for the next two weeks.  You will not see

4    anything about 30 degrees in there or anything of that sort.

5              Now, let me take you to the doctrine of

6    equivalents.

7              Given the fact that Item No. 4 has been conceded

8    by Dr. Pinchuk, that there is a cylindrical support means,

9    the only question then is, that we are debating here, is

10   Item No. 9.  And if you do not believe the fork analogy,

11   then it is our submission that they have the equivalent of

12   Item No. 9.

13             Dr. Buller identified the function, way, and

14   result that Item No. 9 is carried out in the CoreValve

15   device.  The function is to support commissural supports

16   away from the base.  Well, that green material that he

17   identified surely supports the commissural points away from

18   the base, meaning the blue box, the cylindrical support

19   means.

20             How is it done?  It is done in a way having a

21   non-uniform wall structure.  You remember the smaller cells

22   at the bottom and the bigger cells at the top, exactly like

23   Dr. Andersen, Hasenkam and Knudsen.  And also, there was

24   less stiffness at the point of attachment.

25             And CoreValve made a big fuss about this, how

1    the top is more easily squeezed together than the bottom.

2              All three elements were there, the function,

3    way, and result.

4              Now, we heard at great length about CoreValve's

5    own patents.  Dr. Seguin and Georg Bortlien both identified

6    these as anchor patents.  You will recall that CoreValve's

7    device, Dr. Seguin was very proud about it.  This is the

8    drawing Dr. Seguin actually made in the courtroom.

9              And for the record, it's Defendant's Trial

10   Exhibit 1481.

11             And you recall that he made it over there at the

12   board, and he talked about how it had an anchor at the

13   bottom, and it had an anchor at the top, and it had some

14   wires in between.

15             The important thing is that the guts of the

16   Andersen invention was there:  the stent and the valve,

17   exactly where Drs. Andersen, Hasenkam and Knudsen put it.

18             And so if you believe that they were entitled

19   to a patent on the lower anchor, and a patent on the top

20   anchor, that does not excuse them from using the guts of the

21   invention which was where the valve was.

22             Now, we also heard that the Patent Office

23   granted these anchor patents over the Andersen patent.  Not

24   one witness for CoreValve answered my question, did the

25   Patent Office ever consider whether the GEN 3 device was

1    covered by Andersen.

2           Well, you can take a look at the file history of

3    the anchor patents.  They're the great big thick ones that I

4    had Dr. Rothman look at.

5           The GEN 3 device was never before the Patent

6    Office.  They never considered the question that you are

7    considering about whether or not those 12 parts are in this

8    product.  All they considered was whether or not they're

9    entitled to their anchor in the patents.

10          Let me talk a little bit about willful

11   infringement.  And, actually, I should mention just the

12   analogy that I used in opening:  That if you believe that

13   Dr. Seguin actually invented the lower anchor and the top

14   anchor, all he did was add to the infringing device, which

15   is here.  Think of this as the pencil and you can think of

16   this as the eraser.  That is what Dr. Seguin did.

17          Now, with respect to willful infringement, we

18   certainly appreciate that this is our obligation to show you

19   by clear and convincing evidence.  And we believe the record

20   is clear.

21          First of all, you will recall that this was a

22   single product company designed to infringe Edwards patents;

23   and indeed they did that.  Only GEN 3 has been commercialized.

24   Only GEN 3 has been sold.  And Dr. Seguin has not a scrap of

25   paper to back up his story that, indeed, he thought of this

1    on his own, without being prompted by Dr. Andersen's patent

2    and publications.

3              A warning letter was sent.  It wasn't answered.

4              Internally, they were praising the patent.

5    Externally, they were telling the analysts from Wall Street

6    that it was very strong.  And no one came forward to testify

7    on behalf of CoreValve that indeed they thought the patent

8    was invalid.

9              You will recall that when he spoke to the

10   analysts, he said the patent was very strong.  And I urge

11   you to take a look at this analyst call.  It's Plaintiffs'

12   Trial Exhibit 168.  And on the top of the page, he said that

13   the patent was very strong.  And on the bottom of the page,

14   he said, but don't worry because our patent attorneys tell

15   us we don't infringe, and don't worry, the VC attorneys --

16   that means the venture capitalists -- the investors, their

17   attorneys tell us we don't infringe.

18             Not one attorney for CoreValve took the stand

19   to testify about their noninfringement.  Not one venture

20   capital attorney took the stand to tell that story to you.

21   Not one video was played to you by an attorney saying we did

22   an analysis, they don't infringe.  And there is no evidence

23   that they ever obtained such an opinion.

24             What did they do?  They were clever businessmen.

25   They knew how expensive it was going to be to move overseas.

1  You have heard not only Mr. Michiels but you heard the

2  experts talk about that.  And so they doubled down in

3  Irvine, and now in this courtroom they say, well, we could

4  have moved.  It was really simple, something that could have

5  been done very easily.

6            THE COURT:  You have ten minutes, Mr. Nathan.

7            MR. NATHAN:  Thank you, Your Honor.  I'm very

8  close, even under my clock.

9            They say they could have done it, but indeed

10  they didn't do it.  What they did was to cash out and get

11  the $700 million.

12            Now, I showed you this slide in the opening.

13  The sales, as least as of March 15th, the last time we got

14  records from CoreValve when they made projections, was $148

15  million.  And that Edwards damages we are asking you to

16  award is $75 million.  That is $75 million that should be

17  taken into account for a company that was bought for $700

18  million by Medtronic.

19            Now, there is no question that the sales

20  absolutely rocketed once they got CE approval in March of

21  2007.  And you can just look for yourself.  These are all

22  taken from CoreValve's actual sales.  And it's just going --

23  you can imagine where it's going to be if this kind of

24  conduct is not stopped.

25            Larry Wood took the stand and talked about the

1    harm that Edwards had suffered.  They lost transfemoral

2    sales, SAPIEN sales.  They lost transapical sales.  He

3    testified at length about how he and his company had the

4    capacity to make the sales that they lost.  They lost the

5    first mover advantage.  CoreValve locked up doctors and

6    hospitals that Edwards then would have trouble getting into.

7           You've heard that testimony from Mr. Wood.  He

8    testified at great length about the details of the capacity,

9    the ability to make the sales that CoreValve made.  He was

10   examined vigorously by counsel from the other side.  They

11   had an opportunity to examine him on it.  And he maintained

12   that, indeed, Edwards had the capacity.

13          Now, I want you to weigh that testimony by

14   Mr. Wood and also Greg Leonard, our expert, against

15   CoreValve's expert, Mr. Kinrich.  He relied on his figures

16   on an unknown, unseen, non-testifying Medtronic employee who

17   didn't come here for all of his data.  And when the smoke

18   cleared, he said that all that Edwards is entitled to is one

19   percent, which is less than $2 million, for a company that

20   had one product that was sold for $700 million.

21          And, by the way, with respect to people who came

22   forward, I believe you are going to hear from my colleague

23   that a lot of Edwards' witnesses weren't here, like

24   Dr. Andersen, Dr. Knudsen and others.  They were all here.

25   They were all on video and they were all examined.  The

1   voices who asked those questions were CoreValve's lawyers.

2   Be sure there is no mistake about that.

3          Now, finally, I'd like to -- if I can switch to

4   the verdict form.  The judge has granted us permission to

5   take you through it.

6          It's really, compared to most patent trials that

7   I've been involved in, it is user friendly.  There are only

8   five pages, and there are only six questions, which is great

9   news for you and it's great news for us.

10         And the first question is:  Has Edwards proven

11  by a preponderance -- I don't know if I can get the focus in

12  a little better.

13         THE COURT:  That's good.

14         MR. NATHAN:  That's good.

15         Has Edwards proven by a preponderance of the

16  evidence that the CoreValve Generation 3 ReValving system

17  literally infringes all 12 parts?  Are they literally there?

18         Remember, they contest only two.  No. 4 is

19  "cylindrical" and it doesn't require an absolute perfect

20  cylinder.  And the one that they do contest is the

21  "projecting in a direction generally."  And I want you to

22  remember the fork when you consider that.

23         If you answer that question "yes" for Edwards --

24  and we hope and we urge you to do so -- then you don't have

25  to go to the doctrine of equivalents.  That is the end of

1    the infringing inquiry.

2            The instructions will tell you if you answered

3    "yes" to that, you can then skip Question No. 2.

4            If you answered "no" to Question No. 1, there is

5    no literal infringement, which is your prerogative and right

6    to do so, then you have to go to Question No. 2 and answer

7    the question.

8            Well, maybe there is something about this that

9    is not in there literally but is it in there under the

10   doctrine of equivalents?

11           And that question would be answered, we urge

12   you, in the affirmative, "yes."

13           The next question is very simple:

14           If you have found infringement under either one

15   of these tests, either literal infringement or doctrine of

16   equivalents, has Edwards proven by clear and convincing

17   evidence that infringement was willful?

18           And we submit that the evidence shows that that

19   was the case.

20           And you go to Question No. 4:  Has CoreValve

21   proven by clear and convincing evidence that Claim 1 of the

22   '552 patent is invalid because it is not enabled?

23           And you remember, the test here is the patent is

24   presumed valid.  They have to show by clear and convincing

25   evidence.  And we submit that they have not done so and that

1    question we submit should be answered "no."

2              And then, finally, if you have found that

3    CoreValve has infringed Claim 1 of the patent, either

4    literally or under the doctrine of equivalents, one or the

5    other, what is the amount of damages?

6              Now, you will recall that I said at the very

7    outset, we are not claiming that we would have made every

8    sale.  Remember, CoreValve got on the market first before we

9    were on the market, so there was a beginning segment we

10   couldn't make and there were some or things that we couldn't

11   make.

12             But if you look at Dr. Kinrich's analysis, it

13   is our submission that Edwards is entitled to $72 million in

14   lost profits.  $72 million.

15             And for those sales it could not make -- which

16   is Question No. 6.  For those CoreValve infringing sales for

17   which you did not award Edwards lost profits, what is the

18   amount of reasonable royalty?

19             And I'm just using $73 on this figure,

20   $2 million for that.  And that is where the $75 million

21   figure comes from.

22             Did I make it within the 45 minutes?

23             THE COURT:  You did so.  Thank you.  Do you need

24   to set up?

25             MR. VAN NEST:  Just a minute.  If I could ask

1    someone to take down the board?  It will take just a moment.

2                    (Board taken off easel.)

3                    THE COURT:  Mr. Van Nest.

4                    MR. VAN NEST:  May I proceed, Your Honor?

5                    THE COURT:  You may proceed.

6                    MR. VAN NEST:  Thank you very much.

7                    Good morning, ladies and gentlemen.

8                    This is my final opportunity to address you.

9    And I know that is a lot more painful for me than for all of

10   you.

11                   You have been sitting here very patiently for

12   the last couple of weeks, one of the most attentive juries

13   we've seen.  And the notes taking and on time, it's

14   incredible.  We really do appreciate it.

15                   I want to point out today is April 1st.  April

16   Fools.  And I'm a big April Fools Day fan.  I normally play

17   a gag or two in the office.  I thought about coming in this

18   morning and standing up here and announcing that the defense

19   waives their closing argument.

20                   I asked Mr. Shaw whether he thought that would

21   be a good idea.  He said, you will never see Judge Sleet

22   move faster to the gavel.  (Laughter.)  So I decided not to

23   take that chance.

24                   And if we could have the first slide up.

25                   This is where I left off in the opening.  This

1    is where I want to start the closing.

2             There are really two issues, and I want to focus

3    the time I have with you on those two issues.

4             Issue 1.  CoreValve does not use the Andersen

5    patent.  And we have proven that in spades, as I will go

6    through in a minute.

7             And the Andersen patent doesn't teach how to

8    build or use a transcatheter heart valve in a human being.

9    We've proved that, too.  I will spend a few minutes on that

10   at the end of my presentation.

11            The fundamental point that we've been trying to

12   drive home, through all our witnesses and all the exhibits

13   and all of the evidence which I'm going to review in just a

14   moment, is that the CoreValve product which you have seen

15   now many times is a fundamentally different approach to

16   building a replacement heart valve than anything called for

17   in Claim 1 of the Andersen patent.  It's a different shape.

18   It's a different structure.  It works in a fundamentally

19   different way.

20            As you can see, there are no projections, no

21   projecting supports whatsoever.  Nothing is supported at a

22   parallel angle.  And it's intended to be, designed to be a

23   cone, two cones actually, with a waist in the middle, not

24   something that is cylindrical.

25            So for all those reasons, as we will see when we

1    walk through the real relevant stuff, which we didn't hear

2    about really from Mr. Nathan, is the claim, elements of the

3    claim, when we walk through those, you will see that that

4    fundamental difference really informs your decision on

5    whether or not this device meets all the elements of Claim 1.

6         The second point I want to make is that this

7    device was independently developed - independently developed

8    by some very smart people who are inventors and leaders in

9    their own right.  And we brought, for your consideration,

10   into this courtroom our whole invention story.  All four

11   of our major inventors:  Dr. Seguin, Mr. Bortlien, Rob

12   Michiels.  Than Nguyen was unable to travel here.  He

13   appeared on video.

14        We showed you the prototypes.  We showed you the

15   history.  We showed you the lab notebooks.  We showed you

16   the design notebooks.  We showed everything, even those

17   first two crummy prototypes that Dr. Seguin gave to Bortlien

18   back in '99.

19        There isn't a scrap of evidence in any of that

20   that this device was somehow copied or was based on the

21   Andersen patent.  Where is the evidence of that?  Where is

22   the document that shows these guys copying something from

23   Dr. Andersen's patent?

24        The evidence actually is the reverse.

25   Mr. Bortlien testified that they were very careful not to

1   use the Andersen patent, and they didn't use the Andersen

2   patent, as the final product attests.

3         As part of that independent development,

4   Dr. Seguin, Mr. Bortlien, they got their own patents.  They

5   didn't get them through any trickery or deceit.  I mean they

6   showed the Patent Office that Andersen has a patent.  Here

7   it is.  They discussed it in the patent, as we'll look at in

8   a minute.  We're different.  His patent has limits, has

9   problems.  Our invention is intended to overcome those

10  problems.

11        Now, it's true that the Patent Office doesn't

12  decide infringement.  That is something that only you

13  decide.  But the Patent Office does decide whether you're

14  entitled to your own patent.  Are you new and novel over

15  what already exists?  So they made a determination that this

16  was new.

17        What else?

18        We end up with a great product.  Not only that,

19  it's very different from Andersen and very different from

20  SAPIEN, too, as you heard Dr. Manoharan talk about, smaller,

21  easier to get in the femoral artery, different shape, more

22  forgiving for the surgeon, for the cardiologist, easier to

23  use, repositionable.

24        If we were all just using knockoffs or copies of

25  Andersen, how come our products are so different and why is

1    CoreValve the leader, why does CoreValve have the technology

2    that Edwards is trying to catch up to?

3              Okay.  Let's get down to the devices.

4              Can I have the next slide up.

5              You have seen this a few times, you will

6    remember.  This is, really, what were the problems for all

7    of these people in developing a valve?  And what solution

8    did they attempt to come up with?

9              I would like to lift for the last time, I hope,

10   Your Honor, this magnet board, and start right there.

11             Can everyone see that?  You have seen it a few

12   times.

13             Okay.  This is a replica of Figure 1, built to

14   scale, from the Andersen patent.

15             Yes, I know, it is a preferred embodiment.  But

16   I will point out, we will see in a minute it is the only

17   preferred embodiment that the inventors or the patent ever

18   talks about.  That is what the Andersen patent Claim 1

19   discloses.

20             So what is it?  As you can see, it is a short

21   device.  It sits in the annulus.  So it's cylindrical.  As

22   you heard Dr. Rothman describe yesterday, it is intended to

23   stay put by radial force only.  This is a cylinder.  It's

24   not a cone.  There is no anchoring device down here .  It's

25   not tall, so it doesn't worry about the coronaries because

1    it's short.

2              It has these projecting supports, which are part

3    of Claim 1 and were a very important part of Claim 1.  And

4    these points of the valve are attached on those points.  No

5    dispute about that.

6              This device operates by bending.

7              These commissural points bend and flex.  That's

8    the whole point.  If they didn't, the valve would tear off.

9    Everybody admits that.  Dr. Buller admits it.  It's clear

10   from the patent disclosure.

11             These points bend and flex.

12             This is a completely different solution to the

13   problem of building a replacement valve than this.

14             This was the CoreValve solution to the problem.

15             As you can see, it's a completely different

16   structure.  First of all, it has two points of contact with

17   this area.  It has contact here in the annulus and it has

18   contact above.

19             You heard many witnesses tell you, it was

20   designed to be conical on the bottom, in other words, to

21   have something that's flared out, so that it was anchored in

22   the annulus, so the blood would flow up the ventricle in a

23   smooth way.  And it's an inverse cone on the top.  It is a

24   cone on the top so that it can align the device and so that

25   it's anchored both here and here, so it wouldn't move.

1        Remember all the concern about migration,

2    alignment, and anchoring.

3        The way this device is set up, you have got the

4    cone down here, a cone up here, and they come to this waist.

5    And the waist is a fixed waist.  It opens to a fixed size,

6    so the valve is protected, and so that the device keeps the

7    valve away from the coronary arteries.

8        And there is nothing connected -- these points

9    are connected at a 30-degree angle.  That's where they are

10   connected to the device.  And there is a specific design

11   function for that.  You saw Dr. Pinchuk talk about it.  You

12   saw Dr. Rothman talk about it.  It's designed to be a fixed,

13   rigid connection, and a 30-degree angle, so it would not

14   tear, it won't break.  And it's not intended to bend or

15   flex.

16       Now, as to these differences in design, there

17   really is no dispute.  Not even Dr. Buller disputes that

18   that is how the device was designed and how the device was

19   built.  And my fundamental point, our fundamental point is,

20   these differences, measured against the claims of Figure 1,

21   can only lead to one conclusion:  This device does not

22   infringe Claim 1 of the Andersen patent.

23       Let's go to our next slide and start working

24   through the evidence.

25       One point.  I just want to remind everybody that

1    infringement means all elements are present either literally

2    or under the doctrine of equivalents.  There has to be, all

3    of the elements of Andersen Claim 1 have to be found in the

4    CoreValve device one way or the other if there is.  If there

5    is an element missing, there is no infringement.  So you are

6    looking at this on an element-by-element basis.

7              Next slide, please.

8              All right.  What are the three missing

9    requirements?  This is the focus of your work, when we

10   finish in this courtroom.  No projecting supports, not

11   generally parallel, not cylindrical.  Those are all

12   requirements of Claim 1 that this device does not meet.  And

13   there is no equivalence.  And we will talk about equivalence

14   separately.

15             Let's get into the patent.

16             There you have Claim 1.  There are a number of

17   elements, 12 elements.  These are the three we are focusing

18   on:  commissural supports projecting from one side; supports

19   projecting in a direction generally parallel; and

20   cylindrical support means.

21             Let's go to the next one.  This is Judge Sleet's

22   claim construction, which you have.

23             You apply that claim construction in determining

24   whether these elements are found in the CoreValve device.

25             I would say this is a good place to start,

1    because this sort of defines one of the key limitations in

2    this patent.

3              Now, it isn't by accident, by the way, that the

4    patent requires something that is projecting from the side.

5    This was considered an important thing.

6              Dr. Andersen testified by videotape:

7              And did you settle on the stent of Figure 1 as

8    the best?

9              That Figure 1, with the projections coming up

10   the top.

11             Yeah, after ten, 15, 20 trials, we said, okay,

12   now we don't want to do more developing work for that part.

13             So they found that that Figure 1 embodiment --

14   let's go back one, if we could -- that Figure 1 embodiment

15   was the best.  That's what they determined was the best.

16             Let's go forward.  They also testified that they

17   tested a device without those.  Dr. Andersen said, how were

18   they different than Figure 2?  Figure 2 is Figure 1 with the

19   valve inside.  You have seen the same shape over and over.

20   When we started to build valves, we only had one row.

21             One row?  That was the question.

22             Yes.

23             And none of the high ones, none of the tall

24   ones, no high ones, they were all the same height?

25             Yeah.

1    And didn't you implant any of those in pigs?

2    No, they didn't work.

3    They didn't work.

4    Next slide, please.

5    I didn't call it a tower.  That's what Dr.

6    Anderson called it.

7    What do you call these tall loops?

8    We call them a tower.

9    And that's what he drew.  You saw him draw on

10   that on the video testimony yesterday.  They call them

11   towers.

12   And they pointed out, and Dr. Buller confirms

13   they pointed out, that these things are an important part of

14   the invention.

15   Next slide, please.

16   Didn't Dr. Andersen and his co-inventors -- this

17   was testimony given by Dr. Buller from the stand -- actually

18   point out in the patent that it was an advantage to have

19   some tall loops above a row of lower loops?

20   Yes, it's an advantage to have a combination of

21   shorter and taller loops.

22   He wanted a structure which was asymmetrical.

23   So it must have must have some taller structures

24   and some shorter structures?

25   Must have taller structures and shorter

1    structures.

2              He is talking about those projecting supports.

3              Next slide.

4              The patent itself.

5              By the way, most of the designations are bigger.

6    PTX-2 just means the exhibit number.  So if you want to know

7    what exhibit I am talking about, on most of them I have got

8    it much bigger so you can take it down.  This is the patent,

9    which says, The patent inventors, by using a substantially

10   cylindrical thread structure with projecting apices -- that

11   is not my word -- that is the patent's word -- projecting

12   apices, a reduction in weight is obtained.

13             You can see the blue lines show no metal in

14   between those projecting apices, no metal there.  The whole

15   idea of that was to be lighter and reduce the weight of the

16   device overall.

17             Mr. Michiels.

18             This feature, these taller devices, these

19   projecting commissural supports were added to the patent

20   during the prosecution.  The original claim that was

21   submitted by the inventors didn't include it.

22             The next slide shows they actually amended it to

23   make sure that the final Claim 1 that you have and that we

24   are basing our deliberations on today had a plurality of

25   commissural supports projecting from one side of the

1  cylindrical support means in the direction generally

2  parallel.

3            Our point is that there are no projecting

4  commissural supports anywhere in this device.  As you can

5  see, there is nothing projecting from the top.  Nothing

6  projecting from the bottom.  There is nothing projecting

7  from the side of anything, because it's an integrated frame.

8  All of the frame supports all of the valve.  Unlike in

9  Andersen, where the points of the valve are supported on

10  these tall separate stand-alone towers.  All of the valve is

11  supported within the integrated frame.

12            If I could have the next slide.

13            Dr. Buller agrees with our fundamental premise

14  that this is an integrated structure where all of the frame

15  supports the valve.  He admitted, on cross-examination:

16            The entire frame is an integrated frame which

17  supports the valve as a whole?

18            That's correct, he said.

19            I asked him the next question:

20            So all of the cells in this device, all of the

21  cells, are useful in supporting commissural points.  That's

22  what you are telling us?

23            All of them are useful, yes.

24            Next slide.

25            Now, haven't you testified that every cell in

1    the frame is necessary to provide the support?

2              Every cell.  Not just the ones that he drew on

3    his pad.  It's an integrated structure and all of it is

4    important.  There is no part that I could cut out and then

5    use the device.  It's an integrated structure.

6              Our point is, no matter how many times you look

7    at that device, or look at this device, there is nothing

8    like the projecting towers in the Andersen patent.  And

9    those are required in order to meet Claim 1.

10             Dr. Pinchuk said the same thing.  He had

11   evaluated this.

12             By the way, Edwards didn't even call an

13   engineer.  Dr. Buller is not an engineer.  The only engineer

14   that testified in this trial was Dr. Pinchuk.  He is the

15   only one with engineering training.  And his conclusion was,

16   there are no projections, nothing sticking out of the side.

17   This is an integrated structure, much like a honeycomb,

18   where all of the cells are necessary to hold the structure

19   together.

20             We all know what projections are.  I can hold my

21   hands up over my head.  We know that projections are things

22   that stick out from the side, just like the claim says,

23   commissural supports projecting from the side.

24             The goalpost projects, the soccer goal, the net

25   is supported within the frame itself.  I think even Mr.

1    Nathan understands what projecting means.  In his opening

2    statement he said, as the next slide shows, Next are some

3    things sticking up from the cylindrical support means.

4    Sticking up.  We all know what sticking up means.  It

5    doesn't mean part of an integrated, solid structure.

6              Now, this was Dr. Buller's analysis.  And,

7    frankly, this is the only evidence you have in the case that

8    is contrary to the undisputed evidence of how the CoreValve

9    device is structured and how it functions and how it works.

10   The only evidence is this evaluation.

11             This evaluation is not based on any evaluation

12   of the functions, or how this device operates.  Dr. Buller

13   drew a line at the bottom and said, this is what I call a

14   cylindrical support means, even though, by the way, as you

15   know from Dr. Rothman's testimony, what's down here at the

16   bottom is not even the valve.  That's the skirt.  That's the

17   skirt underneath the valve that makes sure that blood can't

18   leak through the device and down into the ventricle.

19             So even under his analysis.

20             Beyond that, he admits that every single cell,

21   not only the ones drawn in green by him, but this one and

22   this one and this one and this one and this one, are all

23   necessary to support the points of the valve.

24             Let's look at the next slide.

25             He admitted that if you took his figures and

1    took out the metal that he has outlined in green, it would

2    fail.

3            If we were to take the figure you drew and take

4    out the metal between the green lines right down the valve,

5    the device would fail.  Right?

6            I don't believe anyone has ever done it.  Of

7    course, not.  But, yes, I would expect it to.  It needs all

8    of the structure in order to function.

9            It's designed in this way.

10           So he is admitting that what he has drawn is not

11   something that is based on how this device operates or how

12   the structure works together.  He is drawing green lines on

13   an integrated structure, and called out separate cells that

14   don't perform the function any better than the cell right

15   next to it or the cell two over or the cell above or the

16   cell below.

17           Why do you know that?  Well, you know that

18   because here is the frame.  When you look at the Andersen

19   device, you know right away what supports the commissural

20   points.  They are sticking up from the top.  It's those tall

21   projecting towers.

22           You can't see any projections in here, because

23   any one of the cells of this frame would be just as good as

24   any other for supporting the valve.

25           It's an integrated structure.  Any single cell

1    in here -- and Dr. Buller admitted that.  He couldn't tell

2    where the commissural points are attached in this until you

3    put them in.  That's completely different from the way

4    Andersen Claim 1 is set up, where they project up from the

5    side, which the inventors said was a very important feature.

6              So this becomes sort of a courtroom game for

7    someone like Dr. Buller.  If you are not going to be limited

8    to the way in which the device actually works, you can just

9    turn any shape into another shape in this fashion.

10             Let's suppose that my patent requires that there

11   be a plurality of triangles.  That's a fancy way of saying

12   more than one triangle.

13             Well, there is my square.  All right.  If the

14   patent calls for a plurality of triangles, most people would

15   say, that's a square.  I am fine.  I am not infringing.

16             Of course, I can get up here just like Dr.

17   Buller did, and I can draw in the square, I have a triangle

18   there and a triangle there, all of a sudden, I have got a

19   plurality of triangles on a square device.

20             That is not an infringement analysis.  That is

21   not evidence upon which an infringement verdict can be

22   based.

23             That is a courtroom game intended to merely meet

24   the elements of the claim without really analyzing what's

25   going on in the device.

1      Let's go on to the next slide, if we could.

2      We can skip forward.

3      So our fundamental point on projections and

4   supports that project is that Anderson requires them, as you

5   can see in Figure 1, and as you will see when you read the

6   claims of the elements of the claim, and that the CoreValve

7   device does not have them.

8      Element 2, generally parallel.  Another big

9   issue where there is a fundamental difference between how

10  these devices work.

11     Let me step up and point out Andersen here again

12  for a moment.

13     In the Andersen device, these supports are

14  generally parallel to the axis.  They stick up, they project

15  up above the frame, they are generally parallel.  And as we

16  will see in a few moments, they bend.

17     But for the time being, we are going to be

18  focusing on the direction in which they are placed.

19     If we could have the next slide, please.

20     Again, you have heard the Court's claim

21  construction, to meet this element, which is in red, you

22  have to have commissural supports that not only project from

23  the side, but they have to be generally parallel to the

24  longitudinal axis.  As you can see in Andersen, they are not

25  just generally parallel.  They are parallel.

1    These are parallel to the base.

2    Now, you know, from the design history, that

3    CoreValve intentionally tried to get away from this type of

4    structure.  They designed something that would be stronger

5    and more durable and would support the valve more safely,

6    because of all of the back-slam and the pounding that you

7    heard Dr. Pinchuk talk about, the basketball, and so on and

8    so forth.  This happens to be from Dr. Michiels' notebook.

9    No posts, use the frame zig durability.  The whole idea was

10   to move the tabs of the valve up the sides of the frame, so

11   that they would be anchored more safely and securely.

12   Next slide, please.

13   You've seen this.  This is DTX-303.  You have

14   this in your notebooks.

15   These are the design specifications to which the

16   CoreValve device was built.  Mr. Michiels testified about

17   this; and Mr. Nguyen, Than Nguyen was testifying about it as

18   well.

19   You know from seeing it that this 64 degree

20   angle means 32 this way and 32 this way.  There is no

21   dispute that this edge of the device is at a 32 degree

22   angle.  So the only really question is, where is the point

23   of the commissure?  Where is the commissural point attached?

24   Dr. Buller tried to tell you that it was

25   attached close down to the middle.  He wanted to drive the

1   point of attachment down as far as he could right down into

2   the base.

3           But you saw yesterday with Dr. Rothman, it's not

4   there.  That was the point of passing out the real valve

5   with the porcine tissue, to point out where exactly those

6   leaflets meet.  Because the commissural point is nothing

7   more than the place where the leaflets join.  And as

8   Dr. Rothman showed you, they do not join where Dr. Buller

9   drew them.  They join further up to the point of the tab.

10          And if they're further up to the point of the

11  tab, as Dr. Buller testified -- let's look at our next

12  slide -- they're clearly at a 30 degree angle.

13          I think that Dr. Buller admitted during his

14  testimony that in some of the CoreValve devices that these

15  are clearly anchored there, attached at a 30 degree angle.

16          Well, you know, just from common sense, that a

17  30 degree angle is not generally parallel to anything, as we

18  see here.  Parallel lines or generally parallel lines, as we

19  know from geometry, typically don't meet.  A 30 degree angle

20  meets within the valve itself, as you can see there.

21          And this was done again for a reason.  I think

22  both Dr. Pinchuk and possibly Dr. Rothman indicated that a

23  device is stronger and will support an attachment more

24  strongly if you are leaning back, like you do in a tug of

25  war.  As we will see in a moment, Dr. Pinchuk gave another

1    example of the hammocks.

2         But this was not something that was random.

3    It's part of the design of the device.  It's something that

4    they intended to create for the purpose of making a better,

5    safer, more durable valve, not generally parallel.

6         Also, not cylindrical.  Remember, in the opening

7    statement, I said, on the point of cylindricality, I leave

8    that to you at jurors.  People know what a cylinder is.

9    People know what cylindrical is.  And as the Court has

10   defined this term, it has to either be the shape of a

11   cylinder or something that is related to the shape of a

12   cylinder.

13        Now, you know from all the testimony that it was

14   the design intention at CoreValve not to have a cylindrical

15   shape.

16        If I could approach this again?

17        Mr. Michiels testified, Dr. Seguin testified,

18   Mr. Bortlien testified, Than Nguyen testified.

19        This is intended here to be conical, not

20   cylindrical, because a cylinder can slide up and down.  A

21   cylinder can slide up and down.

22        They did not want to have a cylinder.  Why?

23   Because they wanted to have something that would anchor this

24   at the bottom.  And as Dr. Rothman testified yesterday, it

25   would help direct the blood flow immediately through the

1    center, because this conical shape at the bottom was a

2    better fit with the ventricle.

3          And they wanted a conical shape at the top.

4    Because, again, a cylinder doesn't make any sense here.  It

5    could slide right out.  It could slide right out.

6          So a conical top, an upside down cone, is what

7    they designed that came to a waist.  And that waist is an

8    important part of this analysis, too.  Because the waist

9    is a critical element in protecting the valve from

10   overexpanding and making sure that the frame and the valve

11   don't block the coronary arteries.

12         And there is a ton of evidence that proves that

13   the intention at CoreValve was to go away from a cylinder,

14   not towards the cylinder.

15         So here we see on the left, Figure 1, the '552,

16   and we have the CoreValve device on the right and the claim

17   construction is, not the shape of a cylinder and not related

18   to a cylinder.  And as Dr. Rothman testified and virtually

19   every percipient witness, CoreValve did not want to be

20   cylindrical.

21         Let's look at the next slide.  Can we just run

22   this?

23         And the point is, the bottom is a cone, the top

24   is a cone, and you have a waist in the middle.  And this was

25   something that the inventors actually set out to accomplish,

1    as our next slide will show.

2            This was Than Nguyen.  He was asked in the

3    testimony that you observed:

4            "Question:  In what way did you deviate?

5            "Answer:  I make it a complete conical part to

6    the lower part of the frame -- that's the bottom -- and I

7    make an upward conical part on the top of the frame that is

8    blend with another cone on the top of it.

9            "So actually it's a three cone conical part that

10    is blended by fillet -- I mean blended radiuses."

11            And this was the intention from the very

12    beginning.

13            The next slide shows minutes from the meeting

14    way back in August 2004, before anybody starting talking

15    about infringement, or the Andersen patent, or anything

16    else.  Mr. Bortlien testified about this.  A meeting in

17    Paris in August of 2004, when they met around the time that

18    Mr. Michiels became the COO, where they met to decide where

19    they were going to move and what needed to be done with the

20    device.  And Than Nguyen said in the very first meeting, we

21    need to make it conical to avoid stretching the valve upon

22    mounting.

23            The conical device is what they intended to get,

24    and a conical structure is what they ended up at the end of

25    the day.

1      Next slide, please.

2      Okay.  No equivalence.  Now, you heard His Honor

3  read an instruction on equivalence.  Equivalence is the

4  exception, not the rule.  Equivalence applies if someone is

5  just barely missing, someone who would otherwise be

6  infringing but barely missing.  It's intended to catch

7  people who are just trying to step a tad outside the claim,

8  not somebody like CoreValve for whom the whole device is

9  fundamentally different.

10      I mean it is undisputed overall that this device

11  looks, is shaped, is structured in a totally different

12  fashion than anything that is disclosed in the Andersen

13  patent in Claim 1.  So equivalence does not apply in a case

14  where you have these fundamental differences between

15  devices.

16      So here is an example.  One measure of

17  equivalence, one way to evaluate it is does it perform

18  substantially the same function in substantially the same

19  way to get substantially the same result?

20      So, for example, with respect to projecting

21  commissural points, you have to ask, does the CoreValve

22  device do what Claim 1 does in the same way, or

23  substantially the same way, and get substantially the same

24  result?

25      Both of these devices can connect two pieces of

 1    wood but they're not equivalent because one operates in a

 2    fundamentally different way.  A screw operates in a

 3    fundamentally different way from a nail and gets a different

 4    result, so those two are not equivalent.

 5              Next slide, please.

 6              All right.  One of the key points on this issue

 7    is, and you heard this a number of times, the Andersen Claim

 8    1, the Andersen invention, the way he tried to solve this

 9    problem was based on the old surgical valves, based on

10    having commissural points that project up above the base and

11    that flex and bend.  That flex and bend when they operate.

12              Why do they flex and bend?

13              Let's run this if we can, Mr. Hugo.

14              They flex and bend so that the valve won't be

15    torn off these tall towers.

16              The Hancock patent on the right, you see the

17    Claim 1 embodiment on the left.  These towers, you see this

18    on the left and right.  They are bending in as the valve

19    closes and the back slam comes so that they don't sheer off.

20              That's what Dr. Pinchuk was talking about in

21    terms of having a device that manages the stress and manages

22    that weight by flexing as these do.

23              Next slide, please.

24              Now, Dr. Buller is on board with this.  Even he

25    concedes that the Andersen Claim 1 device is intended to

1    flex.

2              "Question:  You have testified the device was

3    designed so that the tall posts actually moved during the

4    operation?

5              "Answer:  They will have some elasticity and be

6    capable of moving so when the heart beats, they can bend in

7    slightly.

8              "Question:  And you have actually likened that

9    to a diving board that moves in and out; right?

10             "Answer:  Yes.  Anything that is flexible.  The

11   analogy is to lots of things.  A diving board is a good one,

12   that can bend and then will return.  It's elastic."

13             Let's go back to the last slide, Mr. Hugo.

14             He is talking about the bending.  If we could

15   run it.

16             He is talking about the bending of the

17   commissural supports that have to bend when the back slam

18   comes so the valve won't be torn off.  That is what he is

19   talking about.

20             All right.  Now, you know, again, from the

21   design history, from the testimony of Mr. Bortlien, the

22   testimony of Than Nguyen, the testimony of Rob Michiels,

23   CoreValve intentionally designed their device so that it

24   would not flex.  They wanted a device made of nitinol, it

25   was self-expanding, that doesn't have parts that move.

1       Now, is the point that there is absolutely no

2   movement whatsoever?  No.  I mean any device operating in

3   your body under these conditions will show some small amount

4   of movement.  Our point is we don't have a support system

5   for the valve that is intended to bend or flex in, and our

6   system, the CoreValve system does not do so.

7       On the left, you see Andersen with the arrows

8   showing the bending we saw in the video.  On the right, we

9   see CoreValve with a rigid frame.

10      Again, if I could approach this board.

11      There is nothing in this frame that is intended

12  to flex or bend in.  It's intended to be fixed once it gets

13  in your body.  Why?  You heard from Dr. Rothman and I think

14  Dr. Pinchuk, both, nitinol doesn't do well when it is

15  flexed.  Nitinol, over time, can break if you are flexing it.

16      So the idea was let's move these points up to

17  30 degrees.  Let's put them on the edge of the device here.

18  Let's anchor them within a cell up there, and that way

19  they'll be safe, they won't tear, they won't break, and we

20  don't have to have a system like Andersen's where they have

21  to bend, they have to flex in order to function properly.

22      Let's look at the next slide, please.

23      Okay.  This was Dr. Pinchuk's effort to explain

24  this.  You see on the left you have something like on the

25  top, something like Andersen where we have projecting posts

1    and a hammock supporting it.

2              What he testified was that in this system,

3    because the point of attachment is up on a tall tower, it

4    has to flex.  It has to bend when you put weight on it or

5    the valve will tear off.

6              Whereas, if you put this point of attachment on

7    an angle structure, an angle support, the stress from here

8    is spread all the way down the post and all the way across.

9              So the stress here is pushing down this side.

10   The stress here is pushing down this side.  So when that

11   back slam comes, it's not being absorbed by the points of

12   the valve themselves or not requiring you to flex.

13             You don't have to flex.  You can stay in a rigid

14   frame, which is what CoreValve has, and not tear.

15             We're showing you here inside the device.

16   Andersen flexing and CoreValve with a firm point of

17   attachment at 30 degrees.

18             Now, you saw for yourself the evidence that we

19   presented.  These are two separate tests.  They're DTX-1313

20   and 1314.  They'll be in the juryroom with you.  They were

21   tests intended to show the valve under normal operation.  I

22   want to stress that again.  These tests show the valve under

23   normal operation.

24             And what do they show?  They show no detectable

25   motion of the frame.  No detectable motion of the frame.

1       Why is that significant?  The frame doesn't

2   move.  The commissural supports, the upper end of this frame

3   to which the commissural points are attached, are rigid,

4   firm.  They don't move.  This is what the FDA requires.

5   This is what the FDA shows.

6       Now, as Dr. Rothman testified yesterday, what

7   Edwards presented was a fracture test where they're putting

8   the kind of back slam on the device that no human body could

9   have generated.  If you did, you would be at a stroke

10  condition or near heart attack.

11      The tests that you saw were destructive tests

12  intended to determine when nitinol would actually fracture

13  and break, not a test like these intended to show normal

14  operation.

15      Dr. Rothman added another point of evidence

16  yesterday, which is that he has actually seen these in a

17  human body because he has performed this type of operation,

18  this type of procedure.

19      And he said, because it's an integrated unit and

20  the load is shared across.  There is no effective movement

21  of this device inside the body.  I have seen this on

22  angiograms.  The device does not move at all.

23      So our point is whether you analyze this

24  under literal infringement where every element has to be

25  there exactly or whether you analyze, which you will,

1    under the doctrine of equivalents, the CoreValve device is

2    fundamentally different, does not meet the projected

3    commissural support element, the supports generally

4    parallel, or the cylindrical element and, therefore, it

5    doesn't infringe.

6                Now, if you were to find any one of the elements

7    missing, that is enough.  It is required for the plaintiff

8    to show that every element is present either literally or in

9    equivalent form.  And if they fail to do that, the verdict

10   must be for CoreValve.

11                Next slide, please.

12                Let's go on to the next one.  Well, let's move

13   past that one.

14                Okay.  Now, I want to talk for a minute about

15   the history of these inventions only for the point that

16   CoreValve did this independently.  And I'll let you evaluate

17   the credibility of Dr. Seguin and Mr. Bortlien and

18   Mr. Michiels and Than Nguyen, but I will say that we didn't

19   hold back anything.  CoreValve doesn't have anything to

20   hide.

21                You not only saw all the inventors but you saw

22   prototypes.  You saw the design sheets which are in your

23   tabs.  You saw Mr. Michiels' lab notebook.  You even saw

24   the two prototypes that Dr. Seguin brought in here.  And as

25   I mentioned, there isn't a scrap of evidence that any of

1    that material was copied from anybody else.  That was all

2    independent work, original work that ultimately led to a

3    patent.

4            And they want to say, well, wait a minute.

5    Dr. Seguin was in the wilderness.  He saw the patent.  Oh,

6    all of a sudden, he had a product.

7            Now, you know that is not true.  You know it

8    took years to make this thing work and it took a lot of hard

9    work and a lot of trial and error.

10           He was an inventor going in.  Dr. Seguin has

11   five patents of his own even beyond CoreValve, so he was no

12   stranger to difficulty, no stranger to inventing things.  He

13   had done a lot of that.

14           As the next slide shows, we took Mr. Bortlien

15   and Dr. Seguin and Mr. Michiels through this whole time

16   line.  And you know that in a trial of this length, where

17   we're operating on the clock, we don't have time to show

18   every single prototype.

19           I've got 15 pages of prototypes in my hand with

20   15 to 20 prototypes per page that the CoreValve inventors

21   worked on.  And as you heard from Mr. Bortlien, a lot of

22   them didn't work.  This one didn't work.  That one didn't

23   work.  They tried a lot of different things.

24           If this were just a copy from Andersen, why did

25   it take four years and a lot of engineers and more than 100

1    prototypes to get a device that actually worked?

2             So I'm going to let the evidence speak for

3    itself for just a minute.

4             Mr. Hugo, if you could just run the next slide.

5             These are some of the prototypes that you saw,

6    and some of the prototypes that were in the notebook.

7             The point of this is that CoreValve put in

8    independent work, original work, difficult work over a four

9    year period before they actually came up with something that

10   could be implanted in a human, which did not happen, as you

11   heard from Dr. Seguin, until 2004.

12            Now, in addition to that, in addition to that,

13   CoreValve has at least two patents.  You saw the '682 and

14   the '406.

15            If we could go to the next slide, please, Mr.

16   Hugo.

17            These were awarded to Dr. Seguin and Mr.

18   Bortlien.

19            Let me back up just one minute.

20            You also saw, not every step -- although I think

21   Mr. Michiels tried to give you every step -- but many steps

22   along the way of the development itself.

23            We actually showed you the design notebooks and

24   what they were trying to accomplish and why that was

25   important.

1      We reviewed this one with you.

2          These were inventors trying to solve the problem

3   on their own, without reference to anything else.  And every

4   single page of this confirms what we said, that this device

5   was designed to be different and designed to be better, and

6   designed from scratch by the group that you heard testify

7   here in the courtroom.

8          Next slide, please.

9          We brought all four.  These are the four people

10  most responsible for the design of the CoreValve device.

11  And they were all here.  Mr. Nguyen was unable to travel

12  here, so he was presented by videotape.

13         Okay.  This is the '406 patent, which you heard

14  Dr. Rothman testify about yesterday.  It actually covers the

15  CoreValve device.

16         If we could have the next slide.

17         This is the '682, which I think Mr. Michiels

18  testified about and Dr. Seguin as well.  You can see the

19  shape of Figure 1.  Not exactly like what we ended up with,

20  but it certainly has all the same concepts of a conical

21  base, a wider top, to fit the upper annulus, a waist is

22  fixed in the middle.  It has all the basic features of what

23  eventually became the Generation 3 CoreValve device.

24         How were these patents obtained?

25         They were obtained openly, through an

1    application in the Patent Office, in which Dr. Andersen's

2    patents -- and there were more than one of them -- were

3    disclosed.  Here is the '552, that is the issue in this

4    case -- the '081 and the '614, all disclosed, and not just

5    on a sheet of paper.

6              The application for the '406 actually discussed

7    Andersen.  This is the application.  You have heard a lot

8    about the file history and so on and so forth.  The

9    inventors submit an application.  They told the Patent

10   Office, more recently, '552, that is the patent at issue

11   here, illustrates the technique of this type.

12             In other words, there is someone else in this

13   area that's operating.

14             But the stent-supported systems designed for

15   positioning of a heart valve introduce uncertainties of

16   varying degree with regard to minimizing migration from the

17   target valve site.

18             They are saying, '552 isn't perfect.  There are

19   problems.  Stents of this kind can migrate and cause trouble

20   for patients.

21             So our invention aims to remedy these

22   significant problems.  This invention is different.  We are

23   setting out to solve these problems.

24             And they did.  They did solve the problems.

25             They not only were awarded patents, but they

1    made a product which, as you know, has been successful all

2    around the world.

3              Next slide, please.

4              Now, the claim that somehow -- again, with no

5    evidence whatsoever that anybody was copying Andersen, they

6    stood up a couple of times in opening and closing and

7    suggested that there was something suspicious going on.

8    Take a look at DTX-1277.

9              I mean, Mr. Bortlien testified that everybody

10   was aware of the Andersen patent.  And they actually made a

11   conscious effort to make sure they weren't using it.

12             CoreValve respects patents.  CoreValve has its

13   own patents.  So CoreValve has respect for the patent system

14   in general.

15             And here is Mr. Bortlien testifying that he did

16   a study to see if they could make sure that the device they

17   were developing did not infringe the '552.  He says, The

18   stent cannot have higher commissural supports, higher

19   commissural supports.

20             So they did a study in which they built the

21   device with no projections, no projecting supports, and

22   found, it's fine, it works.  And ultimately they built a

23   device, which is there to your right, in which there are no

24   higher projecting points.

25             And then who would have thought, after all of

1  the disclosure in the Andersen patent about projections,

2  someone would come in and claim that this device, without

3  projections, is infringing?

4            Mr. Bortlien testified, what was the objective

5  of this prototype?  This one was made because we didn't want

6  to infringe the '552.  So we wanted to see if we could

7  attach the valve inside a stent that didn't have these

8  projections.  We didn't want to infringe the '552.

9            Dr. Seguin told investors, as you heard during

10 his examination, when analysts asked, are you infringing --

11 let's go back -- There are a number of elements which have

12 led our patent attorneys and the patent attorneys of VCs to

13 conclude that the way we are building our IP portfolio does

14 not infringe on the Andersen patents today.

15           So the idea that somehow poor little old Edwards

16 is being ignored or we are not responding or we are running

17 around taking, copying things, is nuts, based on this

18 evidence.

19           Now, remember, also, I don't know how many times

20 we have seen the letter that they sent:

21           We would like to know your explanation.

22           Dr. Seguin was meeting with the CEO of this

23 company, Mr. Wood's boss, every two to three months.  And he

24 testified that every two to three months he sat down with

25 Mike Mussallen, who is the CEO of Edwards, and discussed a

1    whole range of subjects:  How are we going to compete in the

2    market?  What is the best way to approach patients?  Let's

3    make sure everybody's devices are safe.  Let's make sure

4    that we are training.  And Dr. Seguin testified, sure,

5    Mussallen told me repeatedly we infringe, and I repeatedly

6    told him we do not infringe your patent.

7              And they went ahead and sued anyway.  And he had

8    a belief that was true, that was proven in this courtroom

9    was right.

10             Okay.  The other point on this issue of

11   independent development is, if we are all just copies of

12   Andersen, why are these devices so different?  Why is the

13   CoreValve device 18 French, repositionable, able to fit

14   easily into a femoral artery, more forgiving, I think is

15   what Dr. Manoharan said, than SAPIEN, why would that be so,

16   if all we are doing is copying off the same basic design?

17             It's not.  Neither company is using Andersen.

18   SAPIEN doesn't use Andersen, either, as we will see in a

19   moment.

20             Certainly, CoreValve doesn't.

21             Okay.  The result has been success.  Patients

22   treated around the world using CoreValve, as Dr. Manoharan

23   indicated.

24             Let's go to the next slide.

25             I want to make two points about quality of

1    evidence.

2          You have heard a lot of stuff from Edwards in

3    this trial that has nothing to do with what they are

4    expected to prove.  Nothing whatsoever to do.  They put up

5    this map and suggested there was something sinister about

6    moving to Irvine.  Six miles away from Edwards, he said in

7    the opening.  Six miles away from Edwards.  Okay.  You now

8    know, thanks to us, that the reason to go to Irvine is there

9    are hundreds of companies in Irvine building these products.

10    So lots of engineers, lots of resources, lots of test

11    facilities.  That is absolute baloney.  And they tried to

12    make that some part of a conspiracy in opening, and they

13    persisted throughout the trial.

14          Next slide.

15          How about this one?

16          Oh, you have gone in and stolen employees.  Wow,

17    all these people are from Edwards.  Than is from Edwards.

18    Stan is from Edwards.  KT is from Edwards.  Rob is from

19    Edwards.

20          They didn't even tell you, until we told you,

21    that these people were all long gone from Edwards before

22    they signed on with CoreValve.  They signed on with

23    CoreValve in 2004.  KT left in the '92.  Michiels in '89.

24    Komatsu in '93.  Nguyen in '96.

25          Come on.  You have an instruction now from Judge

1    Sleet that says -- this is all a sideshow anyway.  There is

2    no claim that anybody that CoreValve hired, there was

3    anything wrong with it or that they acted improperly in

4    hiring former Edwards employees, former Edwards employees.

5    2.2.

6              My point there is, if you had real evidence of

7    infringement and you had a strong infringement case, not

8    just Dr. Buller drawing on a piece of paper, you wouldn't

9    need to vilify people and try to turn Dr. Seguin and

10   Bortlien into criminals and claim that they were out with

11   some nefarious plan, some exit strategy, as though that is

12   wrong or somehow inappropriate.  That is all a bunch of

13   nonsense.

14             What did they do?  They stood up and said, wow.

15   This Andersen patent is the greatest thing since sliced

16   bread.  Everybody in the world is out to have this thing.

17   It is a wonderful device.  They didn't bring any of the

18   people that made the decisions on the Andersen patent.  They

19   brought Mr. Wood, who is a perfectly good witness for

20   Edwards.  But how about the guys that were actually

21   involved?  Mr. Wood didn't have anything to do with

22   Andersen.

23             THE COURT:  Ten minutes, Mr. Van Nest.

24             MR. VAN NEST:  Thank you.

25             Let's go back.  Mr. Rowe -- we brought Mr. Rowe

1  in by video.  He is an Edwards employee.  We can't compel

2  him to come.  We brought Dr. Cribier in.  He is a consultant

3  for Edwards.  We can't force him to come.  Mr. Benichou, who

4  designed the SAPIEN, we brought him.

5         Dr. Knudsen, Dr. Andersen, they didn't come,

6  either, even though they are the No. 1 and No. 2 inventors

7  on this patent, they never set foot in the courtroom.  We

8  are the ones that brought you the whole story, not just part

9  of the story.

10        Last topic -- let me just mention burden of

11  proof.

12        On everything I have been talking about, they

13  have got the burden of proof.

14        If the evidence is inconclusive on infringement,

15  or willfulness, if the evidence isn't there, if you can't

16  make your minds up, they have the burden of proving that, as

17  Judge Sleet has instructed.  They have got to bring it.  And

18  as I mentioned, they didn't bring it.  We are the ones that

19  proved that CoreValve is different and doesn't meet these

20  claim limitations.

21        Okay.  Last topic, very briefly.  Enablement.

22  What is the point of enablement?

23        We have never contended that the Andersen patent

24  didn't have good ideas in it.  That's what is reflected in

25  all the witnesses' testimony and the articles.  It's a great

1    idea.  It's a very good idea.  We don't want to take

2    anything away from the Andersen inventors.

3               As I said in opening, we don't need to have you

4    reach enablement in order for us to prevail, because our

5    device doesn't infringe.

6               So our primary point in this trial, and the

7    evidence that we focused our attention on, is

8    noninfringement.

9               But we are in this market for keeps.  CoreValve

10   is the leader.  They want to stay the leader.  Edwards now

11   has the Andersen patent.  The inventors don't have it

12   anymore.  And it's clear that they are going to keep

13   asserting it against a product that is ahead of them in the

14   market.

15              So our request to you is, we shouldn't have to

16   contend with this patent over and over again in other

17   lawsuits if it's not valid.

18              And you can't have a valid patent if all you

19   have is a good idea.

20              You have got to have more than a good idea.  You

21   have got to have something, as the next slide shows DaVinci

22   had a great idea for a flying machine, but you have got to

23   enable someone to make and use it without undue

24   experimentation.

25              That's what the Wright Brothers did.  That's why

1      they got a patent.  They actually enabled someone to do it.

2                You know, in this case, the following things are

3      undisputed.  No one has ever put an Andersen prototype or an

4      Andersen device into a patient.  No one has done it.

5      Edwards hasn't done it.  Heartport didn't do it.  Stanford

6      Surgical didn't do it.  The inventors didn't do it.  No one

7      has done it.

8                And the patent itself provides little or no

9      guidance how to do it.  They did it in pigs, it's true.

10     They got some of these to stay in pigs for a few minutes.

11               But they said, okay, we are using this in pigs,

12     but the cardiac valve prosthesis has a corresponding form.

13     What the heck does that mean?  A corresponding form.  That

14     is not much guidance.

15               Next slide.

16               And they were the ones that said these aren't

17     really engineering drawings.  They are just schematicals.

18     They don't really show what you are supposed to do.  They

19     are just schematicals.  They told you that over and over

20     again.  And we would quite agree, these are nothing more

21     than schematicals.

22               The inventors acknowledged that they couldn't

23     get this thing to stay in even an animal for more than a few

24     hours.  And they acknowledged that.  And Dr. Hasenkam is a

25     wonderful guy.  He was a good witness.  He had a good idea.

1   But he couldn't get it to work, either.

2           Now let's bring the people that they should have

3   brought and that we brought to explain what's really going

4   on with this patent.

5           Dr. Cribier, in his patent, which is DTX-10,

6   says, too weak to be forcefully imbedded, high risk of

7   regurgitation, impossible to use in clinical practice.  You

8   can read that yourselves in Column 3 of the Cribier patent,

9   which covers SAPIEN.

10          Next.

11          This is what Stan Rowe said:  Stainless steel

12  wires, these lack sufficient strength.  Dimensions specified

13  are much too large.  Same thing.

14          This thing is too big.  That was the point of my

15  dowel.  This is the size of the Andersen device.  It is very

16  small.  If you could build it, it can't ever go into a

17  femoral artery, and never has.

18          Next slide, that PVT did the test.  We brought

19  you those.  They didn't bring you those.

20          The test of those protruding apices failed.  The

21  stent failed, didn't fulfill its function.

22          Next slide.  The conclusion from Rowe was,

23  Andersen, sadly, does not describe a method or design that

24  if constructed is functional over any period.

25          This is their employee.  Stan Rowe is the guy

1   that said, I spent all this money.  Guess what?  He fell in

2   love with the Andersen patent the day he bought it.

3          And as Dr. Buller acknowledged, there are many,

4   many reasons for buying a patent.  You can buy a patent to

5   use it, or you can buy a patent to use it in court.

6          Did PVT use the Andersen patent to build their

7   device?  Absolutely not.  Cribier testified and Benichou

8   testified they didn't use Anderson to build this device.

9          Did you ever try to use a stent that was

10  described by Andersen?

11         Not at all.

12         During this whole process, did you use a wire

13  loop stent as shown in Andersen?

14         No.

15         Next slide.

16         Benichou to the same effect:  Are you aware of

17  any technical details you derived from this patent that

18  contributed to the design of any of these stents?

19         There were no technical details that we learned

20  from Andersen or that we learned from the patent in terms of

21  the design.

22         Remember, Mr. Benichou said he didn't even read

23  the Anderson patent as part of his design work.

24         If I could have the Elmo, please.

25         I want to make a point, also, about the verdict

1   form, which is simply this:  -- I have never heard one

2   called user friendly, but I think it is.  You are going to

3   be asked two questions on Page 1.  I think these are really

4   the key questions in the case and maybe the only two you

5   will ever have to decide, because the way the verdict form

6   is set up, if there is any limitation missing from Claim 1,

7   then CoreValve is entitled to a judgment of noninfringement.

8   And if you answer no to Question 1 and if you answer no to

9   Question 2, which is about equivalents, then you skip over

10  virtually everything else.  You don't consider willfulness,

11  because if there is no infringement there is no willfulness.

12  You don't consider damages, because if there is no

13  infringement there is no damages.

14          So the key focus of your work in just a few

15  minutes is on Questions 1 and 2.  That is infringement.

16  That's what it's all about.

17          It's whether or not this device meets each and

18  every claim limitation, including projecting supports,

19  generally parallel, and cylindrical.

20          That's the focus of it.

21          Obviously, you know what I think about how those

22  deliberations should come out.

23          So you will notice, I have said nothing about

24  damages, and that's because you have a lot of information

25  about that.  You have the expert, you are going to have

1    expert summaries from both of the experts on damages.  I

2    don't feel a need to comment on that today.

3                I will leave that in your hands if you need to

4    get there.

5                So, again, finally, thank you.  We very much

6    appreciate the help and attention you have given us these

7    last couple of weeks.

8                Good luck in your deliberations.

9                Thank you, Your Honor.

10               THE COURT:  Thank you, Mr. Van Nest.

11               Mr. Nathan, you have 15 minutes.

12               MR. NATHAN:  Thank you, Your Honor.

13               Courtroom game.  Courtroom game.  This is not a

14   game.

15               Could I have Slide 48 up, please.

16               Edwards spent 400 million dollars to get into

17   this business with SAPIEN, which is covered by Andersen, and

18   CoreValve's conduct has cost Edwards 75 million dollars.

19               This is not a game.  This is what really

20   happened, in the real world.  75 million dollars.

21               Now, I left up the magnetic board for two

22   reasons.  One, it's too heavy to take down.  And secondly, I

23   would like to just have you look at that board and look at

24   what my colleague has put up there for a comparison.

25               He compared the CoreValve device to the Andersen

1    preferred embodiment.  That's what he compared it to.

2              As the Judge has instructed you, the comparison

3    has to be between the claim and the CoreValve device, not

4    Figure 1, not Figure 2, which is the preferred embodiment.

5              That's the fundamental error in their entire

6    approach in the case.

7              All of the testimony that was put up, all of

8    the figures that was put up during my colleagues closing

9    remarks, were about the preferred embodiment.  You saw

10   Figure 1.  You saw Figure 2.  How many times have you seen

11   it in this trial?  That is not what the scope of the claim

12   is.

13             Now, you remember yesterday, Dr. Rothman?  I

14   asked him about the 12 parts.

15             Part 1, and I asked him, is it in there?  Yes.

16             Part 2?  Yes.

17             Part 3?  Yes.

18             Skip 4 for a moment because he disputed that.

19             Part 5?  Yes.

20             Part 6?  Yes.

21             Part 7?  Yes.

22             Part 8?  Yes.

23             Part 9 he disputes.

24             Part 10?  Yes.

25             Part 11?  Yes.

1       Part 12?  Yes.

2       It's only 4 and 9.  And 4 is the cylindrical

3   support means.

4       Well, my colleagues tells you that this was

5   designed to be a cone.  And it was not designed to be -- and

6   I use the word now that he used -- a cylinder.

7       The judge has instructed you that cylindrical

8   doesn't mean cylinder.  It's something that has the shape of

9   or relating to a cylinder.  It doesn't have to be a perfect

10  cylinder.

11      And, indeed, Dr. Pinchuk has already testified

12  that indeed they have a cylindrical support means.

13      So it comes down to one thing, Part 9.  And Part

14  9 is, do the admitted commissural supports project in a

15  direction generally parallel?

16      Now, I had the fork out here.  I was hoping

17  counsel would address it.  You never heard a word about the

18  fork analogy, about how the entire commissural supports of

19  the CoreValve device projects generally parallel to the

20  axis.  Not a word.  All you heard was about the position of

21  the neck of the fork where they measure the 30 degrees, and

22  that is critical to our case.

23      He says that the CoreValve device is an

24  integrated structure.

25      Can I have Slide 35?

1    This came up yesterday with Dr. Rothman.   I

2    asked him whether or not the preferred embodiment of the

3    Andersen was an integral structure?

4    And we went back and forth and so forth, and

5    ultimately he said:

6    "Question:  Now you mentioned earlier with

7    respect to the CoreValve device, the large model, that it's

8    an integral structure?

9    "Answer:  Yes.

10   "Question:  Is Figure 1, built as the inventors

11   taught to build it for their preferred embodiment, an

12   integral structure?

13   "Answer:  Yes."

14   There was nothing magic about CoreValve's

15   integral structure.  So was Andersen.  That was conceded by

16   Dr. Rothman.

17   We heard about the comparisons between SAPIEN

18   and CoreValve.

19   The final instructions on Page 20 -- and I ask

20   you to take this back into the deliberations room -- made it

21   absolutely clear that the proper comparison is the claim

22   against CoreValve, not SAPIEN against CoreValve.

23   SAPIEN against CoreValve is absolutely

24   irrelevant.  The preferred embodiment against CoreValve is

25   irrelevant.  The only thing that counts are the 12 parts in

```
 1    CoreValve.  They've admitted 10 of them.  There is no doubt
 2    about the cylindrical support means.  Pinchuk, Dr. Pinchuk
 3    admitted that.  It's down to the 4.
 4              Now, I heard and I wrote down these words as
 5    best as I could because I'm not a court reporter.  I heard
 6    bending, flexing, motion, tower, protrusions, projections,
 7    posts, projecting apices.
 8              We don't have any of those things, says
 9    CoreValve.
10              Bending, flexing, motion, tower, protrusions,
11    projections, posts, and projecting apices.  Not one of those
12    words are in the claims.  Not one.  They read them into the
13    claim in order to avoid the claim.
14              They have rewritten the claim in this courtroom.
15    You can't do that.  The claim is the way it is.  It was born
16    in the Patent Office.  It emerged from the Patent Office.
17    That is what you have to deal with.
18              We heard about size, 18 French.  Size is not in
19    the claim.
20              We heard about, there was supposed to be nothing
21    between the commissural supports.  There is nothing in the
22    claim about you can't have material between the commissural
23    supports.
24              Now, I'd like to ask you, as you reflect on this
25    entire experience, to think about the creditability of the
```

witnesses.  I'd like you to think about the nature of their

motive and what they had to stand to gain or lose as a

result of this.

Dr. Seguin.  Dr. Seguin will lose money if he

loses this case.  He is no longer with CoreValve but he has

one job, and that is to testify against Edwards.

Dr. Rothman used to be independent.  He has now

been hired by Medtronic, the company that owns CoreValve.

Georg Bortlien also has a direct interest in

this case.  He also will have to pay money back if the case

is lost.

Dr. Kinrich, their damage expert, relied on a

Medtronic employee who didn't come forward and, therefore,

whatever numbers he, Dr. Kinrich relied on, were given by a

Medtronic employee working for the owners of this company.

Now, I'm very glad that counsel picked this up.

I don't have it on the computer so if I could have the Elmo.

This is the slide that my colleague put up

where he mentioned attorneys.

I mentioned this in my opening and I just want

to point something out to you.

What Dr. Seguin told the analysts, told the

analysts:  What you are addressing is infringement issues.

And there are a number of elements which have led our patent

attorneys, and the patent attorneys of a number of VC firms,

1  to conclude that these -- the way that we are building our

2  IP portfolio does not infringe on the Andersen patents

3  today.

4          And not one of those patent attorneys came

5  forward and testified, not one of them.  Not one of the

6  patent attorneys for the VC companies came forward.

7          Now, think about that, I ask, when you consider

8  whether or not Dr. Seguin, in good faith, proceeded the way

9  he did.

10          Now, with respect to all this independent

11  development, there is one very important thing that is

12  missing here.

13          Dr. Seguin kept no records.  We have no idea of

14  what he did except one thing:  We know he got the patent.

15  We have no idea how he got to where he was, how he built

16  these prototypes.  We have no invoices.  We have nothing

17  dated and so on.

18          And so keep in mind that the absence of records

19  demonstrates -- in my submission demonstrates that he had

20  something to hide.  It's incredible to think that all these

21  prototypes went on without some vendor invoice, some dates,

22  some checkbook, something to date it.  There was absolutely

23  nothing.

24          And I grant that there were lots of prototypes.

25  Counsel pointed them out to you.  Again, not to run down the

1     students, but they were done by the students in France.

2              When they got in the hands of professionals,

3     first Admedes in Germany and then Than Nguyen and the others

4     in Irvine, they did it lickity-split.  GEN 1 was done in six

5     months, GEN 2 was done in a matter of weeks, that's what

6     Than Nguyen testified in 2005, and GEN 3 was done the

7     following year.

8              So that is something that I would ask you to

9     consider.

10             THE COURT:  You have five minutes, Mr. Nathan.

11             MR. NATHAN:  I'm on my final slide.  I'm going

12    to wind up with extra time.

13             THE COURT:  All right.

14             MR. NATHAN:  Can I have Slide No. 50, please.

15             As you deliberate, I'd like you to just consider

16    this point.

17             There is no question that from the very

18    beginning, Dr. Seguin's plan was to build a house that he

19    could sell.  Where I come from, they call it flipping a

20    house.  You buy it, you sell it.

21             That was their exit strategy.  You will find the

22    exit strategy right in your juror notebook.  I believe it's

23    Tab No. 7.

24             CoreValve is focused on offering an exit to its

25    investors and shareholders through a trade sale.

```
 1              Edwards has a different approach.  They sunk

 2   $400 million into this.  Edwards' approach was to buy the

 3   house and live in it.  And they are living in it.  They are

 4   in it for the long haul.  They want to help people like

 5   Justin.  And that's why they did it, and they've been doing

 6   it for 50 years.  And I ask you to consider that and take

 7   that into account in your deliberations.

 8              Thank you, ladies and gentlemen.

 9              THE COURT:  Thank you, Mr. Nathan.

10              All right.  Mr. Van Nest, could I ask you to

11   move the easel and board?

12              MR. VAN NEST:  Yes, Your Honor.

13              THE COURT:  Will our jury officer come forward,

14   please.

15              Ms. Walker, please swear the jury officer.

16              (Jury officer sworn in charge of the jury.)

17              THE COURT:  Ladies and gentlemen, you may now

18   commence your deliberations.

19              (Jury left courtroom.)

20              THE COURT:  All right.  Let's make sure, just

21   housekeeping.  Those who want to sit can sit or leave if you

22   like.  Counsel may sit at counsel table.

23              Have we gathered all of the evidence?  Are we

24   agreed on it?

25              Okay.  Is it already in the back, Ms. Walker?
```

```
 1                    CHIEF DEPUTY CLERK WALKER:  No, it's not in the
 2    back.
 3                    THE COURT:  Okay.  Let's get it on back there.
 4                    Is it jury going to have need?  None of the
 5    animations were admitted; right?
 6                    (Mr. Madies shakes head no.)
 7                    THE COURT:  Mr. Van Nest and Nathan, make sure
 8    Ms. Walker knows where she can get you quickly.  I guess you
 9    will go back to your hotels or wherever you've set up.
10                    MR. VAN NEST:  We'll be right in the building.
11                    THE COURT:  Okay.
12                    Mr. Nathan.
13                    MR. NATHAN:  Judge, where would you like us to
14    be?  In the building?
15                    THE COURT:  No, you don't have to be in the
16    building.  This jury is going to eat its lunch.  Its lunch
17    will be waiting for it.  And I expect they will take some
18    time.  So, no, you don't need to be planted in the building.
19    I just need to know where Ms. Walker -- she needs to know
20    where she can get you reasonably promptly.  I expect the
21    jury to have questions and I'd like the jury not to have to
22    wait too long.
23                    All right, counsel.  We're recessed.
24                    (Recess taken while jury deliberates.)
25                    (Back on the record at 1:25 p.m.)
```

```
 1                   THE COURT:  Please sit down.

 2                   So here is the question.

 3                   Can we have Claim 1, 12 point blue poster?

 4                   They want that.

 5                   MR. NATHAN:  No objection.

 6                   MR. VAN NEST:  It's not evidence, Your Honor.

 7                   MR. NATHAN:  No objection.

 8                   THE COURT:  It's not evidence.  It's a

 9      demonstrative.  Was it reduced and given to them in their

10      jury books?  No?

11                   MR. NATHAN:  No.

12                   MR. VAN NEST:  I don't believe so.

13                   MR. NATHAN:  There is a slide on it.  They only

14      saw it in two forms, one on the screen and then that.

15                   THE COURT:  Is there anything we can direct them

16      to other than the claim that might assist them?

17                   MR. VAN NEST:  I think the claim, isn't the

18      claim in the juror notebook?

19                   MR. NATHAN:  No, no.  But it's the 12 points.

20      We could -- if you will give us five minutes, we can take

21      the slide with the checkmarks and give them that 12 point

22      break down without the checkmarks.

23                   I see Mr. Van Nest giving a negative indication.

24                   MR. VAN NEST:  That is how an expert chopped up

25      the claim.
```

1    MR. NATHAN:  Well, there is nothing that they

2    have, unless I have forgotten something, judge, that parses.

3    I mean the examination of Rothman was the 12 points.  Buller

4    was the 12 points.  I don't think there is anything else

5    that parses it.

6    THE COURT:  I'm going to just write a note back

7    that the 12 point blue poster is not evidence.  That it is a

8    demonstrative exhibit and therefore not evidence.  Okay?

9    MR. VAN NEST:  All right.

10   MR. NATHAN:  There is only one other suggestion

11   I can make.  I'm not rearguing.  I understand that.

12   If they were focused on one part, would we -- we

13   could find out what the part is, and we can get the

14   language.

15   THE COURT:  Well, they're probably focused on 4

16   and 10.

17   MR. NATHAN:  4 and 9.

18   THE COURT:  4 and 9.

19   MR. NATHAN:  They just won't see that when they

20   look at the claim is the problem.

21   THE COURT:  Well, again, as Mr. Van Nest points

22   out, that is not actually claim language.

23   MR. NATHAN:  Oh, it is.

24   THE COURT:  Is that?

25   MR. NATHAN:  Oh, yes.

```
 1                    MR. VAN NEST:  Yes.

 2                    THE COURT:  I don't have my glasses on.  Yes, of

 3      course it is.

 4                    MR. NATHAN:  It's word for word.

 5                    THE COURT:  Yes.

 6                    I guess what they're telling us is that some

 7      formulation of this would help them focus on where the real

 8      field of dispute is.  And I think the idea should be to do

 9      whatever we can do to help the jury with its task, within

10      the confines of the rules.

11                    Mr. Nathan, Mr. Van Nest, is suggesting that the

12      parties might agree on the submission.  And maybe this might

13      necessitate another question to them from me back to the

14      jury.

15                    MR. VAN NEST:  The other option, Your Honor,

16      would be to direct them to Claim 1, which is basically the

17      same language, and see what happens.  I would prefer doing

18      that.

19                    THE COURT:  Let's try that first.

20                    MR. NATHAN:  Well, is that --

21                    MR. VAN NEST:  If they have further questions,

22      we can address it.

23                    MR. NATHAN:  As I say, Your Honor, there is so

24      much testimony about the parts that I'm sure is engrained in

25      their mind at this point.  Two experts -- three experts.
```

1    All three experts were asked about this part, that part.

2    And, frankly, if I were the juror, that is what I would be

3    thinking.  As I say, I can -- if what is bothering them is

4    the whole CoreValve device column with the checkmarks, I

5    can, if you give me five minutes, I'm sure I can figure out

6    some way to eliminate that.

7              THE COURT:  What is your reaction to that

8    suggestion, Mr. Van Nest?

9              MR. VAN NEST:  Again, it's the way their expert

10   parsed it up.

11             THE COURT:  And we don't have a contrary?

12             MR. VAN NEST:  We have our slides that show --

13   Your Honor saw that show the language we're disputing, you

14   know, that was shown in closing and with Dr. Rothman.  We

15   don't have a full board.  We have the slides that I

16   presented this morning.  And those were similar to what

17   Dr. Rothman presented.

18             MR. NATHAN:  All of these experts were cross

19   examined on both sides.

20             THE COURT:  Given the objection, I'm not

21   inclined.  If there was agreement, yes, we could get rid of

22   the checks and send it back, but there is not agreement so

23   they're not going.

24             MR. NATHAN:  The only other thing I can think

25   of, there is a lot of talent in the room here, maybe

```
 1    somebody can think of something, is to find out if there is

 2    a piece of the claim.  If they're thinking No. 9, we can

 3    tell them what No. 9 is.  If they're back there saying there

 4    was a lot of talk about No. 9, what was No. 9, we could

 5    identify that for them.

 6                  THE COURT:  Mr. Van Nest.

 7                  MR. VAN NEST:  But, again, No. 9 is the way they

 8    framed it.  I would prefer to just -- they have the claim

 9    construction.  I mean you could refer them to the claim and

10    the claim construction and say, you know, if you were going

11    to say, this is a demonstrative, it's not evidence, and then

12    let's see what happens.  They may, between looking at the

13    claim and claim construction, that breaks it up a little

14    bit, be able to move on.  And if they can't, we could deal

15    with it then.

16                  (Pause.)

17                  THE COURT:  You may sit down, gentlemen, while I

18    try to ...

19                  MR. NATHAN:  Thank you, Your Honor.

20                  THE COURT:  And the patent itself, the '552 is

21    in their binders?

22                  MR. NATHAN:  Yes, Your Honor.  It's Tab 1.

23                  THE COURT:  Okay.  And the Court's claim

24    construction order is also in the binder.

25                  MR. NATHAN:  Yes.  Tab 3, I think.
```

1        MR. VAN NEST:  That is also attached, Your

2   Honor, to your jury instructions, I believe.  The claim

3   construction.

4            (Pause.)

5        THE COURT:  Ms. Walker, why don't you share this

6   with counsel.

7            (Note passed for review to counsel.)

8        MR. VAN NEST:  Fine, Your Honor.

9        THE COURT:  Okay.  I'll read it into the record.

10       Do you agree, Mr. Nathan?

11       MR. NATHAN:  Yes, I do, Your Honor.

12       THE COURT:  So for the record, the Court, in

13  response to the question, has composed a note that reads as

14  follows:  Members of the jury --

15           I'll date it and time.  I'll date it at 1:37.

16           Members of the jury, the 12 point blue poster

17  is a demonstrative exhibit and has not been admitted into

18  evidence.  The 12 point blue poster replicates the language

19  of Claim 1, the '552 patent, as in your jury notebooks,

20  along with the Court's claim construction -- and there is a

21  parenthetic -- (which is also appended to your final jury

22  instructions).

23       MR. NATHAN:  I can confirm that the patent is in

24  Edwards notebook at Tab 1, if you want to direct them to

25  that, and the construction is at Tab 3.

```
 1                    THE COURT:  I think this is adequate.

 2                    MR. NATHAN:  All right.

 3                    MR. VAN NEST:  Are they going to come in here,

 4    Your Honor?

 5                    THE COURT:  No, unless you want them.

 6                    MR. VAN NEST:  No.  I was going to turn the

 7    board around.

 8                    THE COURT:  Yes, I was just trying not to uproot

 9    them at this point.  I think this is simple enough.

10                    MR. VAN NEST:  Agreed.

11                    THE COURT:  Ms. Walker, will you give this to

12    the jury officer, please.

13                    Counsel, let's recess.

14                    (Recess taken while the jury continues

15    deliberations.)

16

17

18    Reporters:  Kevin Maurer and Brian Gaffigan

19

20

21

22

23

24

25
```